IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOMERSET PHARMACEUTICALS, INC., | ) |
| Plaintiff, | ) C.A. NO.: |
| v. | ) |
| JON W. DUDAS, in his official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, | ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

Plaintiff brings this action to secure relief in the nature of mandamus compelling the Director of the United States Patent and Trademark Office ("PTO") to act upon the Plaintiff's application for a one year interim extension to the term of U.S. Reissue Patent No. 34,579 ("the '579 Patent") until August 18, 2008, or until a final non-appealable judicial decision on the eligibility of the patent for term extension is obtained, whichever is earlier, in accordance with 35 United States Code § 156(e)(2) (2006) and the decision of the PTO in *In Re Reckitt*, 230 U.S.P.Q. 369, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986). A true and correct copy of the '579 Patent is attached as Exhibit A to this Complaint.

For its Complaint in this matter, Plaintiff alleges as follows:

## Parties

1. Plaintiff Somerset Pharmaceuticals, Inc. ("Somerset") is a pharmaceutical company organized as a corporation under Delaware law. Somerset's principal place of business is located in Tampa, Florida 33607.

2. Defendant Jon W. Dudas (the "Director") is Under Secretary of the United States Department of Commerce and Director of the United States Patent and Trademark Office ("PTO"). The PTO is located at Madison Building East, Room 10B20, 600 Dulany St., Alexandria, Virginia 22314. The Director is sued in his official capacity. References to him herein are meant to refer both to him and to his official predecessors as the context requires.

## Jurisdiction and Venue

3. This Court has jurisdiction under both the federal mandamus statute, 28 U.S.C. § 1361, and the federal patent statute, 28 U.S.C. § 1338.

4. Venue is proper in this district under 28 U.S.C. § 1391(e)(3) as the Plaintiff resides in the District of Delaware for purposes of venue under this statute.

## Factual Allegations

### *The Product*

5. Plaintiff's product, EMSAM® (selegiline transdermal system), is a patch that is applied to the skin, which is designed to continuously administer the active ingredient of the product. The sole active ingredient in EMSAM® is selegiline. EMSAM® is applied by a patient once a day, and is prescribed as a treatment for major depressive disorder. The continuous administration of selegiline with the patch offers several significant therapeutic advantages to patients, including reducing the risk of potentially fatal hypertensive crises.

6. Plaintiff is the owner and assignee of the entire interest in the '579 Patent. The product EMSAM®, as well as a method of using EMSAM®, fall within the scope of certain claims of the '579 Patent.

7. Currently, the term of the '579 Patent is set to expire on August 18, 2007.

### *Somerset's Application for Patent Term Extension*

8. 35 U.S.C. § 156 provides that the term of a patent which claims a product or a method of using a product that is the subject of a New Drug Application ("NDA") shall be extended from the original expiration date of the patent to reimburse the NDA Applicant for patent life lost while going through the time-consuming regulatory approval process administered by the Food and Drug Administration ("FDA"). The patent and the product must meet the statutory requirements set forth in 35 U.S.C. § 156 in order to be eligible for extension of patent term. In particular, the statute requires that the product be the first permitted commercial marketing or use of the single active ingredient present in the drug product, in this case selegiline.

9. Plaintiff spent over 11 years of the patent life of the '579 Patent pursuing regulatory approval of EMSAM® by the FDA, leaving the '579 Patent with less than a year and a half of patent life upon approval of the NDA by the FDA on February 27, 2006.

10. On April 27, 2006, Plaintiff timely filed an Application for Extension of Patent Term under 35 U.S.C. § 156 ("PTE Application") for the '579 Patent, based on FDA approval of EMSAM® on February 27, 2006.

11. Based on the 11 years Plaintiff spent obtaining regulatory approval of EMSAM®, Plaintiff requested extension of the term of the '579 Patent for 5 years, until August 18, 2012, which is the maximum extension of patent term allowable under 35 U.S.C. § 156.

12. On December 22, 2006, the PTO wrote to the FDA indicating the PTO's preliminary view that the "subject patent would NOT be eligible for extension of the patent term under

3

35 U.S.C. § 156." (emphasis in original). Confirming the preliminary nature of its assessment, the PTO also emphasized that "this communication is NOT to be considered as notice which may be made in the future pursuant to 35 U.S.C. § 156(d)(2)(A)." (emphasis in original).

13. Notwithstanding the PTO's preliminary indication, Plaintiff maintains that the '579 Patent is entitled to term extension in accordance with the proper statutory construction of 35 U.S.C. § 156.

14. The PTO has not yet made a final decision on the eligibility of the '579 Patent for term extension, and has not provided Plaintiff with a timeframe in which it will make a final decision on the matter. Further, the PTO failed to comply with the statutory requirement of 35 U.S.C. § 156(d)(2)(A) to provide notice to the FDA, along with a copy of the PTE Application, within 60 days of submission of the application. That statutory deadline passed nearly a year ago, on June 26, 2006. Since then, despite repeated inquiries, the PTO has refused to give Plaintiff any information on the status of Plaintiff's PTE Application, other than to advise that the PTE Application is still pending and under consideration.

15. At this point, given the PTO's failure to act promptly on the PTE Application as required by statute, there is insufficient time for Somerset to protect its rights should the Director now decide to deny the PTE Application. Even if the PTE Application were denied today, it is unlikely that, within the less than three months of patent life remaining, Somerset could obtain complete administrative and/or judicial review of the decision in this Court and, if necessary, on appeal.

*Somerset's Application for Interim Extension*

16. 35 U.S.C. § 156(e)(2) provides that the Director of the PTO shall extend the term of a patent for periods of up to one year, if the term of a patent for which an application has been

4

submitted under 35 U.S.C. § 156 will expire before a certificate of extension is issued or denied. *See also* 37 C.F.R. § 1.760 (2006).

17. On February 21, 2007, Plaintiff filed an Application for Interim Patent Term Extension Under 35 U.S.C. § 156(e)(2) ("Application for Interim Extension") with the PTO. Plaintiff's Application for Interim Extension requested that the term of the '579 Patent be extended for a period of one year from the expiration date of the patent (from August 18, 2007, to August 18, 2008). Plaintiff further requested that the interim extension will continue even if the PTO issues a Final Determination that the '579 Patent is not eligible for extension under 35 U.S.C. § 156, until a final, non-appealable judicial decision on the eligibility of the '579 Patent for term extension is obtained, or until August 18, 2008, whichever is earlier.

18. Consistent with the PTO's rules and prior practice, a grant of the requested interim extension will avoid any possible hiatus in patent protection for Plaintiff, and will place the public on notice regarding the extension of the term of the patent. *See In re Reckitt*, 230 U.S.P.Q. 369, 372, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986).

19. In *Reckitt*, the PTO granted an interim extension to a patent despite a Final Determination by the PTO that the patent was not eligible for extension. *Id.* at 372. In that case, the applicant submitted an application for term extension of the patent at issue to the PTO under 35 U.S.C. § 156. The PTO simultaneously denied the application and granted an interim extension of the patent for one year, or until 14 days after a judicial determination of the patent's eligibility for term extension was rendered by the appropriate appellate court (i.e., the U.S. Court of Appeal for the Sixth Circuit), whichever was earlier. *Id.* The PTO noted that its decision to grant the interim extension avoided having to address "the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires." *Id.* at 371.

20. The PTO further noted in *Reckitt* that the FDA-approved product covered by the patent had been granted three years of non-patent marketing exclusivity by the FDA, meaning that no generic competitors could enter the U.S. market regardless of whether or not the patent was in force for that period of time. *Id.* at 372. Thus, while the interim extension protected the patentee from patent term expiration pending judicial review of the PTO's decision on the underlying application for patent term extension, the product's remaining period of non-patent marketing exclusivity meant that the interim extension would have no practical impact on the public interest.

21. Like the product at issue in *Reckitt*, EMSAM® has been granted three years of non-patent marketing exclusivity by the FDA, until February 27, 2009. Therefore, no generic competitors can enter the U.S. market until at least February 27, 2009, regardless of whether there is any patent protection available for EMSAM®. The sole purpose of Plaintiff's request to grant the interim extension is to keep the '579 Patent alive until the eligibility of the '579 Patent for term extension is finally resolved, thus avoiding the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires.

22. Plaintiff requested that the PTO decide whether to grant the interim extension within three months from the filing date of the Application for Interim Extension, or by May 21, 2007. 37 C.F.R. § 1.760 provides that an applicant should file an application for interim extension at least three months prior to the expiration of the patent, thus setting the regulatory time limit for the PTO to determine whether to grant the interim extension.

23. The PTO continues to follow the precedent established in *Reckitt*, and recently has shown that it can act quickly in granting an applicant's request for interim extension. For example, on September 27, 2006, another applicant – holder of Patent No. 4,600,706 – filed an

application for interim extension of a patent after the PTO had issued a Final Determination that the patent was not eligible for term extension under 35 U.S.C. § 156. Less than one month later, on October 20, 2006, the PTO responded by granting another one-year interim extension for the patent (which previously had been granted three one-year interim extensions). Somerset is aware of this prompt disposition because the PTO brought it up in discussions with Somerset as an example of the availability of interim relief.

24. Nonetheless, the PTO has refused to give Plaintiff any information on the status of Plaintiff's Application for Interim Extension, despite repeated inquiries by the Plaintiff, other than to advise that the Application for Interim Extension is still pending and under consideration.

## COUNT I: ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706

25. Plaintiff incorporates the allegations in Paragraphs 1 through 24 as if fully set forth herein.

26. Pursuant to 35 U.S.C. § 156(e)(2), as construed by the PTO in 37 C.F.R. § 1.760 and *Reckitt*, the Director has a clear legal duty to decide Plaintiff's timely Application for Interim Extension of the '579 Patent in sufficient time to protect Plaintiff from expiration of its patent prior to the issuance of a final, non-appealable decision on its underlying PTE Application, and in any event within 90 days.

27. The Director has a further clear legal duty to grant the requested interim extension. Plaintiff's request meets all of the requirements of the statute and 37 C.F.R. § 1.760, and is in accordance with PTO precedent as set forth in *Reckitt* and in the recent case of U.S. Patent No. 4,600,706. Given those clear precedents and their plain applicability to this situation, a decision to deny the interim extension could be set aside as arbitrary and capricious agency action under the Administrative Protective Act, 5 U.S.C. § 706.

28. Inasmuch as Plaintiff's request has not even been acted upon, the Director has not discharged his clear legal obligations. The Director's ongoing failure to discharge his duty to decide upon, and indeed to grant, an interim extension for the '579 Patent constitutes "action unlawfully withheld or unreasonably delayed" under the Administrative Procedure Act, 5 U.S.C. § 706(1).

29. As a result of the Director's inaction on both the Application for Interim Extension and the underlying PTE Application, there is a danger that the '579 will expire on August 18, 2007, either without an adjudication by the PTO of Somerset's statutory right to patent term extension or without adequate time to secure administrative and/or judicial review of a PTO decision denying that right. In particular, there is a significant risk that, if the patent were to expire, it could not be revived, even if the PTO or a court were later to conclude that Somerset was legally entitled to patent term extension. The less than three months of patent life remaining are not sufficient time for Somerset to obtain complete administrative and/or judicial review of a decision by the Director denying its PTE Application, even if such a decision were issued today.

30. Declaratory and injunctive relief in the nature of mandamus is the only adequate remedy available to Plaintiff to compel the Director to act promptly and appropriately on Plaintiff's Application for Interim Extension.

### Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

    a. Enter an order declaring that the Director's failure to decide Plaintiff's Application for Interim Extension of the term of the '579 Patent is unlawful;

    b. Enter an order declaring that the Director's failure to grant Plaintiff's Application for Interim Extension of the term of the '579 Patent is unlawful;

    c.    Enter an order compelling the Director to immediately decide upon Plaintiff's Application for Interim Extension;

    d.    Enter an order compelling the Director to immediately grant an interim extension of the term of the '579 Patent for a period of one year from the expiration date of the patent, until August 18, 2008, or until a final, non-appealable judicial decision of the eligibility PTE Application is obtained, whichever is earlier, and that the interim extension shall continue even if the PTO issues a Final Determination that the '579 Patent is not eligible for extension under 35 U.S.C. § 156;

    e.    Award costs, interest, and attorneys fees to Plaintiff; and

    f.    Order such other and further relief as the Court deems just and appropriate.

*/s/ David E. Wilks*
David E. Wilks
Del. Bar I.D. 2793
**Reed Smith LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel. 302.778.7560
Fax 302.778.7575

John M. Faust
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
Tel. 202.639.6500
Fax 202.639.6604

Counsel for Plaintiff
Somerset Pharmaceuticals, Inc.

May 22, 2007

# EXHIBIT A

US00RE34579E

## United States Patent [19]
### Buyske, deceased et al.

[11] E    Patent Number:    Re. 34,579
[45] Reissued    Date of Patent:    Apr. 5, 1994

[54] METHOD OF TREATING DEPRESSION

[75] Inventors: Donald A. Buyske, deceased, late of Lake Worth, Fla.; by Susan G. Buyske, administratrix, New York, N.Y.

[73] Assignee: Somerset Pharmaceuticals, Inc., Tampa, Fla.

[21] Appl. No.: 750,292

[22] Filed: Aug. 27, 1991

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: 4,868,218
Issued: Sep. 19, 1989
Appl. No.: 339,712
Filed: Apr. 18, 1989

U.S. Applications:
[62] Division of Ser. No. 86,795, Aug. 18, 1987, Pat. No. 4,861,800.

[51] Int. Cl.$^5$ ............................................. A61K 31/135
[52] U.S. Cl. ................................... 514/646; 514/946; 514/947; 514/969
[58] Field of Search ................ 514/646, 946, 947, 969

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,997,422 | 8/1961 | Tedeschi . |
| 4,230,105 | 10/1980 | Harwood . |
| 4,284,444 | 8/1981 | Bernstein et al. . |
| 4,409,243 | 10/1983 | Lieb . |
| 4,568,343 | 2/1986 | Leeper et al. . |
| 4,812,481 | 3/1989 | Reischig et al. . |
| 4,885,154 | 12/1989 | Cormier et al. . |
| 4,925,878 | 5/1990 | Bodo et al. . |
| 5,030,629 | 7/1991 | Rajadhyaksha .................... 514/946 |
| 5,045,317 | 9/1991 | Chess et al. ........................ 514/946 |
| 5,049,387 | 9/1991 | Amkraut . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0139127 | 8/1984 | European Pat. Off. . |
| 2.635M | 4/1963 | France . |
| 2163347A | 2/1986 | United Kingdom . |

#### OTHER PUBLICATIONS

Chem. Abst. 97-138,580q (1982).
Chem. Abst. 101—122860e (1984).
Martindale, The Extra Pharmacopoeia, Twenty-Eighth Edition, pp. 1752-753, Pharmaceutical Press, 1982.
Gardner, Targeting the Central Nervous System: New Drug Delivery Technologies for Psychotropic Agents, vol. 21, No. 3, 1985, pp. 657-662.
Koller et al., PHNO, A Novel Dopamine Agonist, in Animal Models of Parkinsonism, Movement Disorders, vol. 2, No. 3, pp. 193-199, 1987.

Primary Examiner—S. J. Friedman
Attorney, Agent, or Firm—Mathews, Woodbridge & Collins

[57] ABSTRACT

The monamine oxidase inhibitor drug L-deprenyl (phenÿlisopropyl methyl propynyl amine) is safely and conveniently used for the treatment of mental depression in a formulation applied to the skin of the patient. In this way the danger of side reaction due to the consumption of foods containing tyramine (the cheese effect) is minimized. Unlike other monamine oxidase drugs, such as Parnate, L-deprenyl does not cause skin irritation when used in this way.

12 Claims, No Drawings

# METHOD OF TREATING DEPRESSION

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## CROSS REFERENCE TO RELATED APPLICATION

[This application is a division of my copending application Ser. No. 07/086,795, filed 18 Aug. 1987.] *This application is a reissue of Ser. No. 339,712 filed Apr. 18, 1989, now U.S. Pat. No. 4,868,218, which is a division of Ser. No. 086,795, filed Aug. 18, 1987, now U.S. Pat. No. 4,861,800.*

## FIELD OF THE INVENTION

My present invention relates to the therapeutic administration of the drug L-deprenyl a method of treating human subjects suffering from depression and, more particularly, to (levo phenyl isopropyl methyl propynyl amine) for this purpose. For brevity, L-deprenyl will often be denoted as LDY.

## BACKGROUND OF THE INVENTION

Two general classes of organic pharmaceuticals useful in the treatment of the mental disease depression in humans have been recognized: (1) tricyclic antidepressants, as exemplified by amitriptyline and protriptylene, and (2) monoamine oxidase inhibitors (MAOI), as exemplified by the commercially available drugs Nardil, Parnate, and L-deprenyl.

Both types of drugs are generally regarded as effective, but both have undesirable side effects. For tricyclic drugs, recognized side effects include dry mouth, orthostatic hypotension, and impotence, and these effects are frequent. The most significant side effect of the MAOI drugs is a rare but serious one: sudden and dangerous life-threatening elevation of blood pressure when the patent taking such drugs also consumes foods high in the naturally occurring substance tyramine. Cheese is the most common food containing large amounts of tyramine, so that this side effect is often known colloquially in the medical profession as the "cheese effect".

Because the cheese effect can cause very serious medical problems, including death in severe cases, MAOI drugs are little used, even though they are generally free from the other more common side effects of the tricyclic drugs and are believed to have at least equal effectiveness in the treatment of most types of depression.

Tyramine is known to be capable of causing severe hypertension when presented in the blood, but it is normally converted in the gastrointestinal tract by the action of a monoamine oxidase enzyme naturally present there, to other substances incapable of causing dangerous hypertension. When a patient is taking an MAOI orally, however, deactivation of the tyramine by gastrointestinal enzymes is at least partially repressed, and serious clinical symptons may result.

Recent research has recognized a distinction among the MAOI drugs themselves, connected with recognition of the existence of two isozymes of monoamine oxidase itself, denoted simply as the A and B isozymes. Nardil and Parnate are recognized as primarily inhibitors of the action of monoamine oxidase A, while deprenyl first inhibits the action of monoamine oxidase B and significantly inhibits the action of monoamine oxidase A only at larger doses. The tyramine deactivating monoamine oxidase enzyme is primarily type A, so that it would appear that administration of L-deprenyl should not induce the cheese effect. The cheese effect, however, is potentially so serious that, the use of L-deprenyl in an oral dosage is nevertheless counterindicated simply because it does appear to have some MAO-A inhibiting activity. On the other hand, the monoamine oxidases in the brain are primarily of the B type, so that LDY is very effective in inhibiting their action.

There are three general modes of administration which have been used for the antidepressants under consideration, which must reach the blood stream in the course of exerting their therapeutic effects: oral, intravascular, and transdermal. Because of the danger of infection and the need for trained personnel for administration, intravascular administration is disfavored when one of the other two means is effective. Drugs for treating depression have traditionally been administered orally, but transdermal administration of some of the tricyclic antidepressant drugs, and by implication, any suitable drug, has also been taught by U.S. Pat. No. 4,230,105 of Oct. 28, 1980 to Harwood. Transdermal administration of drugs in general has been taught by earlier patents, including some cited in the Harwood reference.

One highly restrictive limitation on the transdermal administration of drugs is the possibility of skin irritation or allergic reactions induced by such administration. This is particularly important when considering treatment of depression since MAO inhibitors are required to be used at higher dose levels.

In Whatever dosage form it may be administered, an antidepressant drug must be constantly present in the body for up to six months if the patient is to derive maximum benefit and not revert to a depressed state.

If transdermal administration of an antidepressant is to be used, this means very prolonged and constant or near-constant contact between the patient's skin and the pharmaceutical including the drug. It is well known that long-term exposure of skin to a chemical substance even at low dosages often will result either in a local skin inflammation at the side of contact or a more general immunologically based allergic reaction that can have a serious adverse effect on the entire body. When either of these events occur, the affected patient should immediately discontinue contact with the offending agent. Since MAO inhibitors generally were found heretofore to be skin irritants, clearly their use for antidepression treatment by transdermal techniques was not indicated.

## SUMMARY OF THE INVENTION

I have found, most surprisingly, that LDY, applied to a suitable form and amount to human skin, is readily absorbed through the skin into the bloodstream to achieve and maintain a level in the blood, including the blood in the brain, which is effective in the treatment of depression.

Furthermore, while other MAO inhibitors are highly irritating to the skin, surprisingly, it has been found that LDY causes little or no skin irritation, by contrast with Parnate, for example, which is strongly irritating to the skin. Thus, transdermal administration of LDY provides a surprisingly nonirritating and effective method for treating depression.

Re. 34,579

3

## SPECIFIC DESCRIPTION

For a normal human adult, about 30 mg of deprenyl per day is normally an effective dose for a relief of depression. This may be adjusted to blood volume of a particular patient by calculations well-known in the medical arts. The drug is preferably used either as free base or as its hydrochloride. For convenience in dispensing, the drug usually is mixed with other pharmaceutically inert materials. These inert materials, also called excipients, can be formulated by methods known in the prior art so as to promote either rapid absorption of most of the drug content applied to the skin, or a slower absorption over a longer time.

In treating most patients for depression, it is preferable to use a formulation, which will result in an approximately constant level of the antidepressant drug in the blood supply to the brain. After a possibly different initial treatment, such a constant level of drug in the blood will normally result from a constant rate of absorption from the applied drug mixture through the patient's skin into the bloodstream.

A mixture of LDY with appropriate excipients may effectively be utilized in a skin patch structure, of any of several types known to the art which will maintain the drug mixture in effective contact with the skin, protect against deteriorations in the drug which might be caused by such common causes as air oxidation, moisture absorption or loss, etc., and stay in position under normal conditions of patient mobility and bathing. The prepared patch structure, including a mixture of LDY in contact with the skin, may be applied to the skin of a patient in any of the locations on the body conventionally used for application of transdermal medications.

In order to promote consistent therapy with poorly motivated, easily distracted, or otherwise less-than-ideally-attentive patients—types particularly likely to be countered in the treatment of depression—it is advantageous for the supply of LDY in a single therapeutic structure to last for at least one full day. Structures lasting several days, or even weeks, are still more preferable as they require less patient attention.

The scope and nature of the invention may be further appreciated from the following non-limiting examples. In all the examples, all specifications of parts and percentages in formulations refer to parts and percentages by weight, and the dosage specified may be adjusted to the exact needs of an individual patient and accurately dispensed by conventional techniques known in the medical arts.

### EXAMPLE 1

A suitable mixture for treatment according to this invention, consists of 3 parts of L-deprenyl mixed with 97 parts of an ointment base. The composition of the ointment base is as follows:

| | |
|---|---|
| Polyethylene glycol 6000 distearate | 5-15% |
| Polyethylene glycol 1540 | 15-25% |
| Butylated hydroxytoluene preservative | 0.1-.1-0-5% |
| Polyethylene glycol 300 | Balance |

An amount of 0.5 to 2.0 grams of this medicated ointment is applied to the forearm of a patient suffering from depression and rubbed into the skin to provide a therapeutically effective amount of L-deprenyl for at least one day.

4

### EXAMPLE 2

This is the same as Example 1, and is used in the same way, except that the base is a cream rather than an ointment. The composition of the cream base is:

| | |
|---|---|
| Glyceryl monostearate NF VII | 10-20% |
| Cetyl alcohol | 5-10% |
| Cetyl ester wax | 5-10% |
| Polysorbate 60 | 5-10% |
| Propylene glycol | 5-10% |
| Dimethicone 350 | 0.5-3% |
| Paraban preservative | 0.2% |
| Water | Balance |

### EXAMPLE 3

This is an example of a transdermal patch incorporating LDY. Five to fifty milligrams of this drug is dissolved in a mixture of mineral oil and poly (isobutylene) to provide a liquid-center reservoir of active drug. This reservoir is enclosed in a sealed, flat disc-shaped pouch, one to six centimeters in diameter. The top of the pouch consists of a thin aluminized polyester film that is impermeable to the pouch contents. The bottom of the pouch that will be in contact with the skin in use consists of thin polypropylene membrane that is slowly porous to LDY, allowing the drug to continuously come into contact with the skin, so long as the bottom of the pouch is in contact with the skin. This bottom of the pouch also includes a thin coat of a hypoallergenic silicone adhesive disposed on the bottom in such a way as to hold the patch firmly to the skin without unduly impeding the permeation of the drug through the membrane. As manufactured, a protective strip of siliconized polyester film covers the polypropylene membrane. This siliconized film is impermeable to the liquid mixture and thus protects the pouch's therapeutic contents during storage. The protective film is removed by the patent prior to the attachment of the patch to the skin.

### EXAMPLE 4

The general construction of the therapeutic device for this example is the same as for Example 3, except that (1) the LDY is mixed with 50 mg of lactose, 50 mg of finely divided silicon dioxide, and 0.1 to 0.4 milliliters of medical-grade silicon fluid to form the reservoir of active drug and (2) the bottom of the patch consists of a thin ethylene-vinyl acetate copolymer membrane. The product is used in the same manner as in Example 3.

### EXAMPLE 5

For this example, a solution or finely divided emulsion of L-deprenyl is prepared in a dispersion in water, or alternatively in a co-dispersion with a binder such as polyvinyl chloride. Geon 576, a product of B. F. Goodrich, is a suitable dispersion of binder into which LDY can be do-dispersed. The emulsion is dried onto a thin solid film of polyvinyl chloride or polypropylene plastic, which is slowly permeable to LDY to give a flat disc 1 to 6 centimeters in diameter. The top surface of the patch, the provision of a protective cover on the bottom for storage, and the optional use of a hypoallergenic adhesive on the outside of the bottom of the patch are the same as in the previous examples. The type of skin patch used for this example is described in more detail in U.S. Pat. No. 4,284,444.

Re. 34,579

It is well known in the medical arts that a patch maintained in tight contact with the skin will provide an occlusive cover. This will induce changes in the cellular architecture of the skin, including an increase in its water content. These changes allow LDY to migrate from the dried reservoir in the patch through the skin into the systemic blood circulation.

I claim:

1. A method of treating depression in a human patient which comprises maintaining in contact with the skin of said patient a quantity of L-deprenyl or a salt thereof in a form permitting migration of said L-deprenyl or salt thereof through the skin of said patient into the bloodstream of the patient to a sufficient extent to produce a therapeutically effective amount of L-deprenyl within the blood supply to the brain of said patient without causing skin irritation to the patient or inducing a cheese effect in the patient.

2. The method defined in claim 1 wherein said L-deprenyl or salt thereof is mixed with an excipient before being applied to the skin of said patient.

3. The method defined in claim 2 wherein said excipient causes the L-deprenyl content of the mixture to migrate into the bloodstream of the patient at a controlled rate, whereby at least said therapeutically effective amount of L-deprenyl is maintained in the blood supply to the brain of said patient continuously throughout a time interval.

4. The method defined in claim 3 wherein said mixture containing L-deprenyl is contained within a patch structure for convenient affixation to a part of the body of said patient in such a manner as to maintain contact between the skin of said patient and said mixture containing L-deprenyl during said time interval.

5. The method defined in claim 4 wherein said time interval is at least one day.

6. A method, according to claim 5, wherein said controlled rate is between 5 and 50 mg of L-deprenyl per day.

7. *A topical composition for the transdermal administration of L-deprenyl or a salt thereof, comprising a quantity of L-deprenyl or a salt thereof as a sole therapeutically active agent effective upon transdermal migration into the bloodstream to inhibit monoamine oxidase B, in combination with at least one pharmaceutical carrier operable to permit transdermal absorption of L-deprenyl or a salt thereof.*

8. *The topical composition according to claim 7 wherein the quantity of L-deprenyl or a salt thereof is sufficient to provide from about 5 to about 50 mg of L-deprenyl per day to a patient.*

9. *The topical composition according to claim 7 wherein the carrier is an ointment base.*

10. *The topical composition according to claim 7 wherein the carrier is a cream base.*

11. *The topical composition according to claim 7 wherein the composition is incorporated into a transdermal patch structure.*

12. *The topical composition according to claim 11 wherein the transdermal patch structure comprises a sealed pouch having a top layer impervious to the composition and a bottom membrane for dermal contact through which said L-deprenyl or a salt thereof is slowly porous.*

* * * * *

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF
SOMERSET PHARMACEUTICALS, INC.

### DEFENDANT
JON W. DUDAS, in his official capacity as Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Hillsborough County, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Arlington County, Virginia
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David E. Wilks
REED SMITH, LLP
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel: (302) 775-7560
Fax: (302) 778-7575

John M. Faust
VINSON & ELKINS, LLP
1455 Pennsylvania Ave., N.W., Ste. 600
Washington, D.C. 20004-1008
Tel: (202) 639-6500
Fax: (202) 639-6604

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

1 U.S. Government Plaintiff
2 U.S. Government Defendant
☒ 3 Federal Question (U.S. Government Not a Party)
4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only)
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 310 Airplane | 362 Personal Injury – Med. Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product | 365 Personal Injury – Product Liability | 625 Drug Related Seizure of Property 21 USC 881 |  | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault Libel & Slander | 368 Asbestos Personal Injury Product Liability | 630 Liquor Laws |  | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability |  | 640 R.R. & Truck | PROPERTY RIGHTS | 460 Deportation |
| 151 Medicare Act | 340 Marine | PERSONAL PROPERY | 650 Airline Regs. | 820 Copyrights | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability | 370 Other Fraud | 660 Occupational Safety/Health | 830 Patent | 810 Selective Service |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 371 Truth in Lending | 690 Other | 840 Trademark | 850 Securities/Commodities/Exchange |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage |  |  | 875 Customer Challenge 12 USC 3410 |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | LABOR | SOCIAL SECURITY | 891 Agricultural Acts |
| 195 Contract Product Liability |  |  | 710 Fair Labor Standards Act | 861 HIA (1 395ff) | 892 Economic Stabilization Act |
|  |  |  | 720 Labor/Mgmt. Relations | 862 Black Lung (923) | 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | 730 Labor/Mgmt. Reporting & Disclosure Act | 863 DIWC/DIWW (405(g)) | 894 Energy Allocation Act |
|  |  |  |  | 864 SSID Title XVI | 895 Freedom of Information Act |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence | 740 Railway Labor Act | 865 RSI (405(g)) | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 220 Foreclosure | 442 Employment | HABEAS CORPUS: | 790 Other Labor Litigation |  | 950 Constitutionality of State Statutes |
| 230 Rent Lease & Ejectment | 443 Housing Accommodations | 530 General | 791 Empl. Ret. Inc. Security Act | FEDERAL TAX SUITS | ☒ 890 Other Statutory Actions |
| 240 Torts to Land | 444 Welfare | 535 Death Penalty |  | 870 Taxes (U.S. Plaintiff or Defendant) |  |
| 245 Tort Product Liability | 440 Other Civil Rights | 540 Mandamus & Other |  | 871 IRS – Third Party 26 USC 7609 |  |
| 290 All Other Real Property |  | 550 Civil Rights |  |  |  |
|  |  | 555 Prison Condition |  |  |  |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
2 Removed from State Court
3 Remanded from Appellate Court
4 Reinstated or Reopened
5 Transferred from another district (specify)
6 Multidistrict Litigation
7 Appeal to District Judge From Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

35 U.S.C. § 156(e)(2); Application for one year interim extension or obtainment of final non-appealable judicial decision on eligibility of patent, whichever is earlier.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER FR.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: YES ☒ NO

## VII. RELATED CASE(S) IF ANY (See Instructions):
DOCKET

DATE: May 22, 2007

SIGNATURE OF ATTORNEY OF RECORD: David E Wilks

FOR OFFICE USE ONLY  RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. **07-279**

# ACKNOWLEDGMENT OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A UNITED STATES MAGISTRATE JUDGE TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF __2__ COPIES OF AO FORM 85.

MAY 2 2 2007
_____    _____
(Date forms issued)                (Signature of Party or their Representative)

            Stephen Lennon
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action