# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SOMERSET PHARMACEUTICALS, INC.,    )
    )
        Plaintiff,    )    C.A. No. 07-00279-UNA
    )
        v.    )
    )
JON W. DUDAS, in his official capacity    )
    as Under Secretary of Commerce for    )
    Intellectual Property and Director of the    )
    United States Patent and Trademark Office,    )
    )
        Defendant.    )
    )

## BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

David E. Wilks
Del. Bar I.D. 2793
**Reed Smith LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel.  302.778.7560
Fax 302.778.7575

John M. Faust
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
Tel. 202.639.6500
Fax  202.639.6604

Counsel for Plaintiff
Somerset Pharmaceuticals, Inc.

Dated:  May 22, 2006

# TABLE OF CONTENTS

**Page**

I.    Nature and Stage of the Proceedings ...................................................................1

II.   Summary of the Argument...............................................................................1

III.  Factual Background ...........................................................................................3

IV.   ARGUMENT ......................................................................................................8

    A.    Legal Standard ...........................................................................................9

    B.    Somerset Has A Strong Case On The Merits....................................................9

    C.    Somerset Will Be Irreparably Harmed By The Denial Of, Or A Failure To Decide, The Interim Extension. ..................................................................19

    D.    The PTO Would Suffer No Harm By Granting the Interim Extension. .................19

    E.    The Public Suffers No Harm By The Interim Extension Because Marketing Exclusivity Is In Place For The Interim Extension Period....................20

V.    CONCLUSION....................................................................................................21

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.K. Stamping Co. v. Instrument Specialties Co.,*
106 F.Supp.2d 627 (D.N.J. 2000) ................................................................. 23

*Cabell Huntington Hosp., Inc. v. Shalala,*
101 F.3d 984 (4th Cir. 1996) ...................................................................... 18

*Chisholm v. Def. Logistics Agency,*
656 F.2d 42 (3d Cir. 1981) ........................................................................ 21

*Cutler v. Hayes,*
818 F.2d 879 (D.C. Cir. 1987) .......................................................... 11, 12, 15, 17

*Donovan v. Adams Steel Erection, Inc.,*
766 F.2d 804 (3d Cir. 1985) ...................................................................... 20

*Environmental Defense Fund, Inc. v. Hardin,*
428 F.2d 1093 (D.C. Cir. 1970) .................................................................. 17

*Flowserve Corp. v. Burns Int'l. Servs. Corp.,*
423 F. Supp. 2d 433 (D.Del. 2006) ........................................................... 9, 10

*Gaffney v. City of Allentown,*
No. 97-4455, 1997 WL 597989 (E.D. Pa. Sept. 17, 1997) ................................. 10

*In Re Reckitt & Coleman Prods. Ltd.,*
30 U.S.P.Q. (BNA) 369, 1986 WL 83591 (Com'r Pat. & Trademarks) (Mar. 17, 1986) . passim

*Norton v. S. Utah Wilderness Alliance,*
542 U.S. 55 (2004) .......................................................................... 11, 16

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,*
290 F.3d 578 (3d Cir. 2002) ...................................................................... 22

*Oil, Chemical and Atomic Workers Union v. OSHA,*
145 F.3d 120 (3d Cir. 1998) .................................................................. 11, 12

*Pontarelli v. United States Dep't of the Treasury,*
285 F.3d 216 (3d Cir. 2002) ...................................................................... 16

*Smith Int'l, Inc. v. Hughes Tool Co.,*
718 F.2d 1573 (Fed. Cir. 1983) .................................................................. 23

*South Central Bell Tel. Co. v. Louisiana Public Serv. Comm'n,*
744 F.2d 1107 (5th Cir. 1984) .................................................................... 21

*Virgin Islands v. Douglas,*
812 F.2d 822 (3d Cir. 1987) ...................................................................... 16

## Rules and Statutes

21 U.S.C. § 355(j)(5)(F)(iii) ......................................................................... 5

35 U.S.C. § 156 ........................................................................................................ passim

35 U.S.C. § 156(a)(1) ....................................................................................................... 14

35 U.S.C. § 156(d)(2) ....................................................................................................... 12

35 U.S.C. § 156(d)(2)(A) .................................................................................................... 4

35 U.S.C. § 156(d)(5) ....................................................................................................... 14

35 U.S.C. § 156(e) ............................................................................................................ 12

35 U.S.C. § 156(e)(2) ................................................................................................. passim

37 C.F.R. § 1.760 ...................................................................................................... passim

476 U.S. 1166 (1986) ....................................................................................................... 21

5 U.S.C. § 706(1) (2006) .................................................................................... 1, 10, 11, 16

5 U.S.C. § 706(2)(A) (1976) .............................................................................................. 21

Fed. R. Civ. P. 56 ............................................................................................................. 10

Fed. R. Civ. P. 65(a)(2) ............................................................................................. passim

Fed. R. Civ. P. 12(c) ........................................................................................................ 10

## Other Authorities

Dr. Richard G. Frank & Erica Seiguer,
    *Generic Drug Competition in the U.S.*, Business Briefing: Pharmagenerics 2003, at 66 .......... 7

H.R. Rep. No. 98-857,
    Part I, at 43 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2676 ............................... 13, 17, 18

*Manual of Patent Examination Procedure* § 2755.02 ......................................................... 14, 18

## I.   Nature and Stage of the Proceedings

This Rule 65 motion for preliminary injunction and the underlying lawsuit are to "compel agency action unlawfully withheld or unreasonably delayed" pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1) (2006).    In particular, Plaintiff Somerset Pharmaceuticals, Inc. ("Somerset") seeks an order compelling Defendant Jon W. Dudas (the "Director"), Director of the United States Patent and Trademark Office ("PTO"), to act upon and grant Somerset's pending administrative request for interim relief relating to its patent, U.S. Reissue Patent No. 34,579 ("the '579 Patent").[1]   As they are designed to do, these interim measures would preserve the *status quo* here by extending the patent term on a preliminary and short term basis, preventing the looming irreparable harm of an expiration or lapse of Somerset's patent rights while the agency continues to evaluate Somerset's separate statutory application to extend the term of the '579 Patent by five years.   The '579 Patent is currently set to expire this summer, with insufficient time left even now to obtain complete administrative and/or judicial review should the PTO decide in the coming weeks to deny Somerset's longstanding statutory application.   The grant of an interim extension under these circumstances is consistent with, and indeed required by, the relevant statute, as well as the agency's rules and precedents, and such interim relief would harm no one.

## II.   Summary of the Argument

1.    Plaintiff Somerset spent over 11 years of the patent life of the '579 Patent pursuing regulatory approval of its product EMSAM® (selegiline transdermal system), leaving the '579 Patent with less than a year and a half of patent life upon approval of EMSAM® by the Food and Drug Administration ("FDA") on February 27, 2006.

---

[1]      Somerset also requests consolidation of the preliminary injunction proceedings with adjudication of the merits under Fed. R. Civ. P. 65(a)(2).

2.      Somerset timely filed with the PTO a statutory application to extend the life of the '579 patent under 35 U.S.C. § 156 by 5 years, based on the substantial amount of time Somerset spent obtaining regulatory approval of EMSAM®.

3.      Although the statutory application was filed over a year ago, the PTO still has not decided whether to grant or deny the application, with the '579 Patent set to expire in less than three months, on August 18, 2007.

4.      Given the impending expiration of the '579 Patent, Somerset filed an Application for Interim Extension to extend the life of the '579 patent under 35 U.S.C. § 156(e)(2) for a period of one year.   The one-year interim extension periods available under the statute are designed to extend the life of a patent so that it will not expire until the patentee has had a full and final determination (including agency and/or judicial review) of a statutory application for patent term extension.   Given the PTO's delay in deciding whether to grant the underlying statutory application, the life of the '579 Patent must be extended on an interim basis so that Somerset will not suffer the irreparable harm of having the '579 Patent expire prematurely.  It is an open legal question whether an expired patent can be reinstituted such that it is removed from the public domain, and the PTO historically has granted interim extensions to prevent having to confront this question.  Even if the patent can be revived, it is likewise an open legal question whether Somerset would have adequate recourse against losses in sales and market share caused by third party use of the patent during the period in which the '579 Patent was expired.

5.      With less than three months of patent life left, the PTO still has not granted Somerset's Application for Interim Extension of the '579 Patent.

6.      With this motion, Somerset therefore asks this Court for an order compelling the Director to decide and grant Somerset's pending Application for Interim Extension.

7.     In light of the language of 35 U.S.C. § 156(e)(2), 37 C.F.R. § 1.760, and PTO precedent, as set forth in *In Re Reckitt & Coleman Prods. Ltd.*, 230 U.S.P.Q. (BNA) 369, 372, 1986 WL 83591 (Com'r Pat. & Trademarks) (Mar. 17, 1986) as well as the PTO's grant of an interim extension for U.S. Patent No. 4,600,706, the PTO must promptly decide, and grant, Somerset's pending Application for Interim Extension.

8.     There is no harm to the PTO or the public if the PTO is required to meet its statutory obligations. Somerset has non-patent marketing exclusivity under FDA regulations that prevents any generic competitors from entering the market during the term of the interim extension and until February 27, 2009.

9.     Given the short timeframe and the fact that this motion and Somerset's complaint present pure questions of law, Somerset asks that proceedings on the requested preliminary injunction be consolidated with an action on the merits under Fed. R. Civ. P. 65(a)(2).

### III.   Factual Background

Somerset is a Delaware-incorporated, Florida-based pharmaceutical company. More than a year ago, on April 27, 2006, Somerset timely filed an application with the PTO seeking a statutory extension of the '579 Patent, which covers its drug product, EMSAM®, a transdermal patch that continuously administers an antidepressant drug called selegiline. *See* Ex. 9 Goodhead Decl. ¶ 6 & Ex. 2 ("Application for Patent Term Extension"). Under the applicable statute, 35 U.S.C. § 156[2] (the "Hatch-Waxman Act"), patents covering qualifying drugs receive patent term extensions of up to five years in recognition of the substantial patent life expended while the drug awaited FDA approval – *11 years of patent life* were lost in the case of EMSAM®, which the FDA approved on February 27, 2006.

---

[2]     Pertinent statutes and regulations are collected behind Exhibit 1 to this brief.

It is the PTO's responsibility to determine whether Somerset's Application for Patent Term Extension, or "PTE Application," demonstrates that EMSAM® and the '579 Patent satisfy the statute's various requirements such that the '579 Patent must be extended by the requested five year period, that is, until August 18, 2012. Somerset has been in regular and extensive contact with the PTO during the agency's consideration of the PTE Application. In those interactions, the PTO has indicated on several occasions that, while its preliminary assessment is that the '579 Patent does not qualify for patent term extension (a view with which Somerset strongly disagrees), the matter remains under consideration. In particular, the PTO is interested in the views of the FDA on Somerset's PTE Application. *See* Ex. 8 Sampson Decl. ¶ 7 & Ex. 3.

The PTO sought the FDA's position by letter in December 2006, some *six months* after the 60-day statutory period had expired for providing notice of Somerset's PTE Application to the FDA. *See* 35 U.S.C. § 156(d)(2)(A). This 60-day statutory period is the time prescribed for PTO review of an application before it must solicit the FDA's help in determining how long the subject patent should be extended. Somerset has repeatedly expressed to the PTO its position that, as a matter of law, the PTO alone is to make the required statutory determination in deciding Somerset's PTE Application. Since the FDA does not have a role in this statutory determination, Somerset has not contacted the FDA regarding the PTE Application. So far as we are aware, the agencies have not discussed the substance of Somerset's PTE Application, and there is no timetable for doing so, let alone for PTO's issuance of its final determination on the PTE Application.

Nonetheless, for present purposes, Somerset has no quarrel with the PTO consulting the FDA about Somerset's PTE Application, provided the PTO is diligently pursuing this input.[3] The only issue before this Court is the approaching expiration of the '579 Patent on August 18, 2007, less than three months from now. Were a decision denying the PTE Application to issue even today, the remaining patent life almost certainly would not be sufficient to review the decision at the administrative level upon motion for reconsideration, in this Court under the APA, and at the appellate level if necessary. Were the patent to expire on August 18, either before a PTO decision or during administrative or judicial review of that decision, there is an open legal question whether it could ever be reinstated, even if the agency or a court ultimately concludes, as it should, that Somerset in fact *is* entitled to patent term extension and that the '579 Patent therefore should *not* have been permitted to expire. *See Reckitt*, 230 U.S.P.Q. at 372.

Somerset is entitled to non-patent related marketing exclusivity under another statute until February 2009 (*see* 21 U.S.C. § 355(j)(5)(F)(iii)), so the impact of patent expiration in August would be focused on the three and one half year period from the expiration of the exclusivity period in February 2009 to the requested extension of the '579 Patent in August 2012.[4] The trigger for this harm, however, is imminent (the current expiration of the patent in August 2007) and the harm itself, beginning in 2009, is both inevitable and irreparable if either

---

[3]    Somerset reserves the right, however, to raise this point and all other appropriate legal and factual arguments should the PTO continue to unnecessarily delay its decision or deny patent term extension, a decision Somerset would challenge administratively and/or judicially, and a decision that Somerset maintains must be made independent of any comment from the FDA.

[4]    A review of the timeline may be helpful at this point. The '579 Patent is set to expire August 18, 2007. If extended as requested in the PTE Application, it would instead expire five years later, on August 18, 2012. The non-patent related marketing exclusivity period expires between those two endpoints, in February 2009 (three years after FDA approval of EMSAM®). *See* Ex. 8 Sampson Decl. ¶¶ 3, 4, 6 & Ex. 5.

(1) the patent cannot be reinstated or (2) even if it can be revived, third parties successfully claim rights to use the patent during the time period in which it was lapsed.

The harm is also sizeable enough to threaten Somerset's very existence. EMSAM® is Somerset's primary product and generates most of Somerset's revenue, *see* Ex. 9 Goodhead Decl. ¶ 7, so the loss of patent protection that Somerset is entitled to under the '579 Patent would be severely detrimental to the company. In 2006, EMSAM® generated net revenues of $24 million. *Id.* Somerset currently projects that EMSAM® will generate net revenues of approximately $20 million per year for 2007-2009. *Id.* at ¶ 8. Thus, even if the '579 Patent could be reinstated after expiration, a lapse in the '579 Patent could cause Somerset to lose most of its leading source of revenue. For example, after expiration of the non-patent marketing exclusivity for EMSAM®, net revenues for EMSAM® could be reduced by approximately $1.3 million per month,[5] potentially without any remedy if, again, the patent cannot be reinstated or if third parties gain intervening rights.

Foreseeing this situation, Somerset filed an Application for Interim Extension (the "Interim Application") with the PTO on February 21, 2007, some six months before the '579 Patent is set to expire. *See* Ex. 8 Sampson Decl. ¶ 8 & Ex. 5. In the Interim Application, Somerset requested that the term of the '579 Patent be extended for a period of one year from the expiration date of the patent (from August 18, 2007, to August 18, 2008). Ex. 5. Plaintiff further

---

[5]     This estimate is based on the entry of a generic product that may be substituted for EMSAM®, which could occur after the expiration of the FDA-granted non-patent marketing exclusivity in February 2009. After entry of one or more generic products, market erosion for the branded product occurs quickly, with generic products capturing at least up to 80% of the market, and often more. For example, a report issued by researchers from Harvard Medical School noted that Eli Lilly's branded product PROZAC® lost 80% of its market share within two months of generic entry in the market. Dr. Richard G. Frank & Erica Seiguer, *Generic Drug Competition in the U.S.*, Business Briefing: Pharmagenerics 2003, at 66, *available at* http://www.touchbriefings.com/pdf/890/PT04_frank.pdf (2003).

requested that the interim extension continue even if the PTO issues a final determination that the '579 Patent is not eligible for extension under 35 U.S.C. § 156, until a final, non-appealable judicial decision on the eligibility of the '579 Patent for term extension is obtained, or until August 18, 2008, whichever is earlier. *Id.* The length of the requested extension is in accordance with 35 U.S.C. § 156(e)(2) and 37 C.F.R. § 1.760, and Somerset's stated purpose in seeking the interim extension is to preserve the *status quo* while the PTO reaches a final determination of Somerset's PTE Application. *Id.*

Because Somerset is entitled to non-patent related marketing exclusivity throughout the requested one-year period of an interim extension, moreover, no competing generic drugs would be kept off the market as a result of the PTO granting the interim extension. *See* Ex. 8 Sampson Decl. ¶ 4 & Ex. 5. Indeed, the only impact of granting the Interim Application would be to preserve Somerset's chance at obtaining extended patent protection beyond the expiration of this marketing exclusivity period, and to avoid the legal uncertainty of whether the '579 Patent can be reinstated should it be permitted to expire in August, and if so, the related uncertainty regarding intervening rights asserted between expiration and reinstatement.

Noting that the applicable regulations, at 37 C.F.R. § 1.760, establish a deadline of three months prior to patent term expiration for filing a request for an *interim extension* – presumably because the agency views three months as sufficient time to adjudicate such requests – Somerset asked for a decision on its Interim Application within three months, or by May 21, 2007. *See* Ex. 5. The agency has acted even more promptly in other cases, *see* Part IV.B.1. below, and, in any event, the three additional months remaining between May 21 and patent expiration on August 18 is the minimum amount of time Somerset would need to take appropriate measures to protect its patent, *e.g.,* to sue for an interim extension, to compel a decision on the underlying

PTE Application, and/or to seek at least some administrative and/or judicial review of a negative decision on the PTE Application – even though it is unlikely that any review could be completed in that time.

Somerset and the PTO have discussed all of these considerations in several conversations since the filing of the Interim Application, with Somerset advising the PTO several times (including in the last business days before this lawsuit was filed) that it would be forced to litigate the matter if no interim extension was forthcoming by May 21.  *See* Ex. 8 Sampson Decl. ¶ 11 & Exs. 4a, 4b, & 6.  In response, PTO personnel were noncommittal, never raising any potential infirmity with the Interim Application, but otherwise giving no indication either as to their concerns (if any) or the timing or likely substance of a decision.  Ex. 8 Sampson Decl. ¶ 11.

The PTO's failure to act upon Somerset's Interim Application in a timely and appropriate manner brings Somerset to this Court for injunctive relief.

## IV.   **ARGUMENT**

The undisputed facts of this case warrant the Court's exercise of its authority to grant the injunctive relief requested.  In fact, this is a straightforward request that the PTO simply employ the measures available to it to preserve the *status quo* pending a decision on Somerset's underlying PTE Application, a classic application for preliminary relief under Rule 65.  Somerset will likely succeed on the merits because the relevant statute and agency precedent require the PTO to decide, and indeed, to grant the requested interim extension.  Somerset will be irreparably harmed if the interim extension is not granted because, without it, the '579 Patent may expire before a final decision on the PTE Application (or before a negative decision could be reviewed), with no certainty that it could be revived.  There is no harm to the PTO or the public from an interim extension because, under separate statutory rights not at issue here, no generic competitor can enter the market until February 27, 2009.

A.    **Legal Standard**

"In determining whether to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, courts must consider (1) whether the movant has shown a reasonable probability of success on the merits, (2) whether the movant will be irreparably injured by denial of the relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting the preliminary relief will be in the public interest." *Flowserve Corp. v. Burns Int'l. Servs. Corp.*, 423 F. Supp. 2d 433, 438 (D.Del. 2006) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153 (3d Cir. 1999). "The purpose of a preliminary injunction is to preserve the *status quo* until the merits of the case have been decided." *Id.*

In this particular case, the issues turn on judicial interpretation of the PTO's legal obligations under the applicable statutes, regulations, and prior agency practice as applied to undisputed factual circumstances. For that reason, it would be appropriate to advance proceedings on the merits and consolidate them with these preliminary injunction proceedings as contemplated under Rule 65(a)(2). Somerset accordingly seeks, in essence, expedited adjudication of a dispositive motion (a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment) and relief commensurate with the granting of such a motion. *See Gaffney v. City of Allentown*, No. 97-4455, 1997 WL 597989 at *2 (E.D. Pa. Sept. 17, 1997) (deciding preliminary injunction matter as motion for summary judgment given lack of contested facts).

B.    **Somerset Has A Strong Case On The Merits.**

Somerset seeks two forms of relief here. The first relates to the PTO's legal obligation to *decide* the Interim Application now. The second relates to the agency's obligation to *grant* the

Interim Application. Though it need only show a "reasonable probability of success," Somerset has a strong case on the merits for both forms of requested relief.

### 1.    The PTO Must Decide Somerset's Application for Interim Extension.

The Court's ability to hear claims of agency inaction is grounded in Section 706(1) of the APA.  5 U.S.C. § 706(1).  Section 706 provides that "[t]he reviewing court shall...compel agency action unlawfully withheld or unreasonably delayed."  *Id.*  The Court may act under the APA if an agency fails to take action that is "legally required."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64-65 (2004).  The fact that Somerset is entitled by statute and regulation to seek the interim extension (*see* 35 U.S.C. § 156, 37 C.F.R. § 1.760) can only mean that the agency must actually decide the matter.  The question is when and, in particular, at what point the agency's delay in deciding becomes unreasonable.

"The APA imposes a judicially-enforceable duty to proceed with reasonable dispatch." *Cutler v. Hayes*, 818 F.2d 879, 896 n.151 (D.C. Cir. 1987).  *See Oil, Chemical and Atomic Workers Union v. OSHA*, 145 F.3d 120, 123 (3d Cir. 1998) (in agency delay case, applying D.C. Circuit precedent, including *Cutler*).  To be sure, an agency has broad discretion to set its own agenda, but "since the consequences of dilatoriness may be great," the "agency's discretion is not unbounded," and "[t]here must be a 'rule of reason' to govern the time limit to administrative proceedings." *Cutler*, 818 F.2d at 896 (citations omitted).  "The deference traditionally accorded an agency to develop its own schedule is sharply reduced when injury likely will result from avoidable delay." *Id.* at 898.  Judicially recognized consequences of agency delay include diminished public confidence, "uncertainty for the parties, who must incorporate the potential effect of possible agency decision making into future plans," and – of special importance in this case – prejudice to the right of judicial review. *Id.* at 896-97 (citations omitted).

The factors courts consider in evaluating undue agency delay include the length of time that has elapsed since the agency's duty to act arose, the features of the agency's authorizing legislation, and "the extent to which delay may be undermining the statutory scheme, either by frustrating the statutory goal or by creating a situation in which the agency is 'losing the ability to effectively regulate at all.'" *Id.* at 897-98 (citations and internal quotes omitted). *See Oil, Chemical and Atomic Workers Union*, 145 F.3d at 123 (applying same standards). It is the agency's responsibility to "justify its delay to the court's satisfaction," and if the agency's "failure to proceed expeditiously will result in harm or substantial nullification of a right conferred by statute, 'the courts must act to make certain that what can be done is done.'" *Cutler*, 818 F.2d at 898 (citations and internal quotes omitted).

Judged by these standards, the PTO's duty to act now on Somerset's Interim Application is plain. The Hatch-Waxman Act itself marks out an expeditious review scheme: a strict 60-day deadline following FDA approval for the patentee to request patent term extension from the PTO, followed by another 60-day period in which the PTO must advise the FDA of the filing of the request so that the FDA may provide the PTO with information necessary for the PTO to determine how long to extend a particular patent. *See* 35 U.S.C. § 156(d)(1), (d)(2), (e). These deadlines evince legislative concern for avoiding a situation in which patent rights lapse or expire before the patentee's statutory right to a patent term extension can be fully and fairly determined. To avoid such a result, Congress included a provision for interim extensions if the term of the patent "would expire before a certificate of extension is issued or denied." 35 U.S.C. § 156(e)(2). The legislative history further confirms the statutory goal of avoiding patent expiration – especially where the PTO's apparent delay in acting on the underlying patent term extension request is because it awaits input from the FDA:

11

> It is possible that the original term of the patent for which extension is sought could expire before a final decision by the Commissioner to issue a certificate of extension. This might occur, for instance, because the determination of due diligence by … [FDA] has not been completed.

H.R. Rep. No. 98-857, Part I, at 43 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2676 (quoted in *Reckitt*, 230 U.S.P.Q. at 371).

Consistent with the statute and its legislative history, the PTO's precedents indicate the agency's proper view that interim extension applications must be decided in such a way as to preserve the patentee's rights in the event it appears that a truly final decision will not be made on a patent term extension application before the patent expires. In *Reckitt*, for example, the PTO granted an interim extension to a patentee – despite a Final Determination by the PTO that the patent was not eligible for a patent term extension – where the *Reckitt* patentee was still pursuing judicial resolution of a critical issue bearing on eligibility. *Id.* at 372. The PTO simultaneously denied the application and granted an interim extension of the patent for one year, or until 14 days after a judicial determination of the patentee's litigation by the appropriate appellate court, whichever was earlier. *Id.* Relying on the legislative history quoted above, the PTO noted that its decision to grant the interim extension avoided having to address "the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires." *Id.* at 371.

To be gleaned from *Reckitt* is the agency's recognition that interim extensions are to be addressed so as to avoid any possible lapse in patent protection while a statutory request for patent term extension is still an open question. *Id.* at 372. That concern is so significant that the PTO may grant interim extensions under 35 U.S.C. § 156(e)(2) even "without a request by the applicant," 37 C.F.R. § 1.760, and may issue multiple interim extensions if more than a year is

required to decide the underlying patent term extension request, *see Manual of Patent Examination Procedure* ("MPEP") § 2755.02.[6]

It would be unreasonable for the PTO, having properly recognized and articulated this concern, to delay adjudicating an interim extension application to a point where, as here, there is insufficient time left before the expiration of the patent for the applicant to (1) compel a decision by the agency on the underlying PTE Application and (2) obtain complete judicial review of that decision if it is negative. *See Cutler*, 818 F.2d at 897 ("In some cases, agency delay may collide with the right to judicial review."). Because the agency has waited more than a year (and counting) to address Somerset's underlying PTE Application *and* has not granted an interim extension, Somerset faces a grim prospect if the agency either ignores or denies the underlying PTE Application in the coming weeks. The best it can hope for in that event is a judicial determination that Somerset's PTE Application should have been granted, but even that "victory" would be delivered too late to preserve and extend the patent as the statute permits. *See id.* at 898 (Courts must act to prevent "nullification" of a statutory right by agency inaction).

The time for a decision on the interim extension is now. The agency's own deadline for submitting an interim extension request, three months before patent expiration, marks this time – now – as a critical point. Indeed, with less than three months of patent life left, and after more than a year since Somerset filed its application for the extension of the '579 Patent, the prospects

---

[6]    35 U.S.C. § 156(d)(5) shows further congressional concern for avoiding premature patent expiration by allowing the extension of a patent even before regulatory approval for a drug product is actually received by a patentee. 35 U.S.C. § 156(a)(1) requires that a patent must not have expired before an application to extend the term of the patent has been filed. Since such an application must be filed within 60 days *after* the drug product that is the basis for patent term extension has received regulatory approval by the FDA, 35 U.S.C. § 156(d)(5) provides for extending the term of a patent that will expire *before* the regulatory review period is complete, so that the requirement of 35 U.S.C. § 156(a)(1) can still be met.

for a decision on the PTE Application before August are unlikely and, with each passing day, the already uncertain prospects for obtaining complete judicial review in that interval grow ever dimmer.

There is no discernible basis for further delay, either. There is nothing particularly complex about Somerset's Interim Application or the reasons for it; indeed, as shown in Part B.2. below, the agency would err by failing to grant the interim extension under these circumstances, which are tailor-made for such relief. By choosing a three-month pre-expiration deadline for requesting interim extension, moreover, the PTO has marked that three-month period as sufficient time for it to adjudicate such a request. In practice, the agency has acted even faster.[7] It must be compelled to do so here, and end the uncertainty its delay has unfairly imposed on a company that is simply doing the best it can to protect its rights.

### 2. The PTO Must Grant Somerset's Application for Interim Extension.

Under APA § 706(1), the Court is empowered not only to remedy unreasonable agency delay, but also "compel agency action unlawfully withheld." Ordinarily, a court can order an agency to "perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *Norton*, 542 U.S. 55 at 64 (citation and internal quotation omitted). *See Virgin Islands v. Douglas*, 812 F.2d 822, 832 (3d Cir. 1987) (discussing requirement of a government officer's non-discretionary duty as grounds for relief in the nature of mandamus to compel agency action). Judicial review of the substance of an agency's decision

---

[7]  For example, as discussed *infra*, on September 27, 2006, another applicant filed an application for interim extension of a patent after the PTO had issued a Final Determination that the patent was not eligible for term extension under 35 U.S.C. § 156. *See* papers filed with the PTO for U.S. Patent No. 4,600,706. Ex. 7. On October 20, 2006, the PTO responded by granting another one-year interim extension for the patent (which previously had been granted three one-year interim extensions), less than one month after the request was made by the applicant. *Id.* We are aware of this case because PTO personnel brought it up in discussions with Somerset attorneys. See Ex. 8 Sampson Decl. ¶ 12 & Compl. ¶ 23.

typically must await that decision. Here, however, the PTO's failure at this late date to decide either Somerset's interim extension request or its underlying PTE Application amounts to a decision in itself – that the '579 Patent will be allowed to expire because insufficient time remains to challenge a possible denial of the PTE Application in the coming weeks.[8]  In these circumstances, moreover, the PTO's discretion to deny the interim extension is sharply curtailed. The governing statute, regulations, and agency precedent all require that the extension be granted.

The Hatch-Waxman Act provides, at § 156(e)(2), that:

> *If the term of a patent* for which an application has been submitted under subsection (d)(1) *would expire before a certificate of extension is issued or denied* under paragraph (1) respecting the application, the Director *shall extend*, until such determination is made, the term of the patent for periods of up to one year if he determines that the patent is eligible for extension.

35 U.S.C. § 156(e)(2) (emphasis added).   The legislative history indicates that, by "would expire," Congress intended to address situations in which a gap in patent coverage was "possible" as a result of delay in deciding an application for patent term extension, such as where the risk is occasioned by a delay in the PTO receiving input from the FDA.  H.R. Rep. No. 98-857, Part I, at 43, *reprinted in* 1984 U.S.C.C.A.N. at 2676 (addressing interim extensions provision and observing that "[i]t is possible that the original term of the patent for which extension is sought could expire before a final decision by the Commissioner to issue a certificate of extension").  In that situation, the statute provides that granting the interim

---

[8]      *See Pontarelli v. United States Dep't of the Treasury*, 285 F.3d 216, 237 n.6 (3d Cir. 2002) (McKee, J., concurring) (citing *Cutler* for proposition that "agency inaction can constitute a 'denial' triggering judicial review if the inaction has the same impact upon the 'rights' of the applicant as no action"); *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) ("In light of the urgent character of petitioners' claim, and the allegation that delay itself inflicts irreparable injury, the controversy is as ripe for judicial review as it can ever be.").

extension is *mandatory*. The PTO "shall extend" the term, 35 U.S.C. § 156(e)(2), and may exercise its discretion to adjust the length of the interim extension as necessary "to provide time for the completion of any outstanding requirements" necessary for a complete determination of the applicant's statutory right to a patent term extension. H.R. Rep. No. 98-857, Part I, at 43, *reprinted in* 1984 U.S.C.C.A.N. at 2676.

The PTO's mandatory obligation to grant an interim extension is made contingent on the PTO's determination that the patent is "eligible for extension," 35 U.S.C. § 156(e)(2). *See* MPEP § 2755.01 ("Where a determination is made that the patent is not eligible for patent term extension, an interim extension of the patent is not warranted under 35 U.S.C. [§] 156(e)(2)."). But, "eligible" in this context does not mean that the PTO must first have decided to grant patent term extension. After all, as the statute makes clear, the question of an interim extension only comes up when a decision on the requested patent term extension has not yet been made (the "certificate of extension" not yet "issued or denied"), 35 U.S.C. § 156(e)(2), so it would make no sense to construe the statute to *preclude* interim relief for the same reason – that no decision to grant the application for patent term extension was made.   Instead, "eligible" simply means that the patent at issue is of an appropriate type for consideration of interim relief and that there has been no full and final determination (including appropriate administrative and/or judicial review) that the patent is *not entitled* to term extension.[9]

For example, a patent would not be "eligible" for term extension under 35 U.S.C. § 156 if the patent does not cover the drug product approved by the FDA (and instead covers, say,

---

[9]    *Cf. Cabell Huntington Hosp., Inc. v. Shalala*, 101 F.3d 984, 988 (4th Cir. 1996) (explaining the distinction in the Medicare Act between "eligible" and "entitled": "[I]n a football game, wide receivers are *eligible* to receive the football from the quarterback, but none of them is *entitled* to receive it.").

computer software). An application to extend the term of such a patent would receive an immediate denial by the PTO because it is not eligible for term extension, let alone entitled to it. But the '579 Patent received no such immediate denial. As indicated by the PTO's significant delay in deciding Somerset's underlying PTE Application, eligibility of the '579 Patent is not in question; the PTO's ongoing review of the PTE Application instead is addressed to the question of entitlement.

In addition to being categorically ineligible, a patent might also be ineligible for interim extension because there has already been a full and final determination that it is not entitled to patent term extension. Importantly, however, the PTO's practice has been to grant interim extensions even after it has made a final determination to deny an application for patent term extension when it was clear that the decision would be subject to further agency or judicial review because of a question regarding the entitlement of the patent for term extension. In cases like that, there has been no truly final and unreviewable determination that the patent is not entitled to extension – in other words, pending review, the patent remains "eligible" for consideration of patent term extension, and the statutory command to grant an interim extension is triggered as a result.

In *Reckitt*, for example, the PTO granted an interim extension after it had finally denied the underlying PTE, on grounds that a potentially important basis for its decision was then before a federal court of appeals. *In Re Reckitt*, 230 U.S.P.Q. 369. The PTO granted the interim extension of the patent for one year, or until 14 days after a judicial determination of the patentee's litigation by the appropriate appellate court, whichever was earlier. *Id.* at 372. Somerset asks for similar relief here in order to accommodate the judicial review it would seek if the PTO were to deny or fail to timely decide Somerset's underlying PTE Application.

Late last year, the PTO similarly granted an interim extension to Arkion Life Sciences (owner of U.S. Patent No. 4,600,706), one month after issuing a Final Determination that the patent was "not eligible" for patent term extension. Ex. 7. Importantly, Arkion represented that it would file a timely and good faith request for reconsideration of the negative decision, leading the PTO to observe that, for purposes of an *interim* extension, "the subject patent _is_ eligible for an extension of the patent term under 35 U.S.C. § 156." *Id.* (emphasis added). The PTO also granted the requested interim extension "[b]ecause it is apparent that processing of the application for patent term extension will not be completed before the extended expiration date of the patent, interim extension of the patent is appropriate." *Id.*

Given the agency's practical application of the term "eligible" in the statutory interim extension provision, it is clear that the statute's instruction to grant an interim extension has been triggered here. That is because no decision on the PTE Application has been made and because no truly final decision *could* be made in the three months remaining – administrative reconsideration of a negative decision alone could take all that time, to say nothing of judicial review. Even if the granting of an interim extension were not mandatory, a denial on the facts of this case would be subject to reversal as an arbitrary and capricious departure from binding agency precedent.[10]  There is no basis for treating Somerset any differently than Reckitt or Arkion, each of which – 20 years apart (Reckitt in 1986 and Arkion in 2006) – benefited from a consistent practice by the agency to grant interim extensions as necessary to protect a patent

---

[10]    "It is settled that where an agency departs from established precedent without announcing a principled reason for such a reversal, its action is arbitrary, and an abuse of discretion, and should be reversed." *Donovan v. Adams Steel Erection, Inc.*, 766 F.2d 804, 807 (3d Cir. 1985) (internal citations omitted). Agencies are "subject to the requirement that they not act arbitrarily or capriciously, *see* 5 U.S.C. § 706(2)(A) (1976), and have an obligation to render consistent opinions and to either follow, distinguish or overrule their own precedent." *Chisholm v. Def. Logistics Agency*, 656 F.2d 42, 47 (3d Cir. 1981).

holder's ability to seek review of adverse agency action without losing its patent coverage in the time necessary to do so.

**C.    Somerset Will Be Irreparably Harmed By The Denial Of, Or A Failure To Decide, The Interim Extension.**

The unwarranted expiration of the '579 Patent before full and final review of Somerset's PTE Application would irreparably harm Somerset.  Although Somerset will argue strenuously to revive its patent if it comes to that, at present, it is currently an open legal question whether an expired patent can be revived.  Indeed, the PTO cited this uncertainty as a basis for granting the interim extension in *Reckitt*, 230 U.S.P.Q. at 371, effectively defining the risk of premature expiration as an irreparable harm to be prevented with an interim extension.[11]  Even assuming that the patent could be revived, Somerset would be forced to defend the patent against potential infringers, and could be harmed if an infringer gains intervening rights while the patent is expired.  Thus, the harm to Somerset if the patent were allowed to expire would be severe and irreparable.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,* 290 F.3d 578, 595-96  (3d Cir. 2002) (defining irreparable harm as "potential harm that cannot be redressed following trial," including loss of sales and market share to a competitor).

**D.    The PTO Would Suffer No Harm By Granting the Interim Extension.**

There is no conceivable harm to the PTO in granting the Application for Interim Extension.  As discussed above, granting an interim extension under the circumstances in this

---

[11]    Although Somerset has amply demonstrated irreparable harm, satisfaction of the statutory prerequisites for the interim administrative relief of a one-year term extension establishes Somerset's right to that relief even without any separate showing of irreparable harm. *See South Central Bell Tel. Co. v. Louisiana Public Serv. Comm'n,* 744 F.2d 1107, 1120 (5th Cir. 1984) ("It is well-established, however, that, when, as is the case here, an injunction is expressly authorized by statute and the statutory conditions are satisfied, the usual prerequisite of irreparable injury need not be established."), *vacated and remanded on other grounds,* 476 U.S. 1166 (1986).

case is in accordance with, and indeed required by, the relevant statute and the agency's prior practice. The balance of hardships weigh in favor of Somerset because of the substantial harm that it will suffer and the complete lack of harm to the PTO in granting the interim extension.

### E.    The Public Suffers No Harm By The Interim Extension Because Marketing Exclusivity Is In Place For The Interim Extension Period.

The FDA-granted marketing exclusivity is in place for EMSAM® until February 27, 2009. This ensures that there is no practical harm to the public from the continuation of the '579 Patent's term during a one-year interim extension because it prevents any generic competition from entering the market. In fact, the interim extension could be renewed again before the interim extension would overtake the marketing exclusivity period in 2009. Thus, no matter whether the '579 Patent is in place, the public and generic competitors are in the same condition. The only impact the interim extension will have is preserving the '579 Patent long enough for Somerset to obtain a full and final determination of its entitlement to patent term extension and, if that effort is successful, to enjoy patent protection until August 2012, three and a half years beyond the marketing exclusivity period. Thus, the public interest prong of the analysis weighs heavily in favor of Somerset.

Further, the public interest would be served even if there were no remaining marketing exclusivity period for EMSAM®, since the public interest strongly favors protecting the rights secured by a valid patent. *See, e.g., Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983). Here, the PTO's inaction threatens to cancel Somerset's '579 Patent before a full and fair adjudication of its right to patent term extension. Whatever "interest exists in having more suppliers...put their products on the market is strongly outweighed by the public policy in favor of enforcing patent rights and encouraging inventors to develop new products." *A.K. Stamping Co. v. Instrument Specialties Co.*, 106 F.Supp.2d 627, 656 (D.N.J. 2000).

## V.    CONCLUSION

The PTO has unlawfully withheld action on and effectively denied Somerset's Application for Interim Extension, raising the prospect of irreparable harm should the '579 Patent expire before a final determination by the PTO on Somerset's underlying application for patent term extension, or while Somerset is seeking review of such a decision. An interim extension will prevent that harm. Its imposition is required by law, will harm no one, and is in the public interest.

Somerset, therefore, requests that this Court grant its Motion for Preliminary Injunction and enter an order compelling the Director to immediately decide upon, and grant, Plaintiff's Application for Interim Extension, extending the term of the '579 Patent for a period of one year from the expiration date of the patent, until August 18, 2008, or until a final, non-appealable judicial decision of the eligibility of the '579 Patent for term extension is obtained, whichever is earlier, and that the interim extension shall continue even if the PTO issues a Final Determination that the '579 Patent is not eligible for extension under 35 U.S.C. § 156. Somerset also asks that this motion for preliminary injunction be consolidated with an adjudication of the merits under Fed. R. Civ. P. 65(a)(2).

Respectfully submitted,

David E. Wilks
Del. Bar I.D. 2793
**Reed Smith LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel.  302.778.7560
Fax 302.778.7575

John M. Faust
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
Tel. 202.639.6500
Fax  202.639.6604

Counsel for Plaintiff
Somerset Pharmaceuticals, Inc.

May 22, 2007

# Exhibit
# 1

# EXHIBIT A



35 U.S.C.A. § 156

**C**

### Effective: November 02, 2002

UNITED STATES CODE ANNOTATED
TITLE 35. PATENTS
**PART II--PATENTABILITY OF INVENTIONS AND GRANT OF PATENTS**
**CHAPTER 14--ISSUE OF PATENT**
→**§ 156. Extension of patent term**

**(a)** The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent, which shall include any patent term adjustment granted under section 154(b), if--

**(1)** the term of the patent has not expired before an application is submitted under subsection (d)(1) for its extension;

**(2)** the term of the patent has never been extended under subsection (e)(1) of this section;

**(3)** an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of paragraphs (1) through (4) of subsection (d);

**(4)** the product has been subject to a regulatory review period before its commercial marketing or use;

**(5)(A)** except as provided in subparagraph (B) or (C), the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred;

**(B)** in the case of a patent which claims a method of manufacturing the product which primarily uses recombinant DNA technology in the manufacture of the product, the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of a product manufactured under the process claimed in the patent; or

**(C)** for purposes of subparagraph (A), in the case of a patent which--

**(i)** claims a new animal drug or a veterinary biological product which (I) is not covered by the claims in any other patent which has been extended, and (II) has received permission for the commercial marketing or use in non-food-producing animals and in food-producing animals, and

**(ii)** was not extended on the basis of the regulatory review period for use in non-food-producing animals,

the permission for the commercial marketing or use of the drug or product after the regulatory review period for use in food-producing animals is the first permitted commercial marketing or use of the drug or product for administration to a food-producing animal.

The product referred to in paragraphs (4) and (5) is hereinafter in this section referred to as the "approved product".

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

**(b)** Except as provided in subsection (d)(5)(F), the rights derived from any patent the term of which is extended under this section shall during the period during which the term of the patent is extended--

**(1)** in the case of a patent which claims a product, be limited to any use approved for the product--

**(A)** before the expiration of the term of the patent--

**(i)** under the provision of law under which the applicable regulatory review occurred, or

**(ii)** under the provision of law under which any regulatory review described in paragraph (1), (4), or (5) of subsection (g) occurred, and

**(B)** on or after the expiration of the regulatory review period upon which the extension of the patent was based;

**(2)** in the case of a patent which claims a method of using a product, be limited to any use claimed by the patent and approved for the product--

**(A)** before the expiration of the term of the patent--

**(i)** under any provision of law under which an applicable regulatory review occurred, and

**(ii)** under the provision of law under which any regulatory review described in paragraph (1), (4), or (5) of subsection (g) occurred, and

**(B)** on or after the expiration of the regulatory review period upon which the extension of the patent was based; and

**(3)** in the case of a patent which claims a method of manufacturing a product, be limited to the method of manufacturing as used to make--

**(A)** the approved product, or

**(B)** the product if it has been subject to a regulatory review period described in paragraph (1), (4), or (5) of subsection (g).

As used in this subsection, the term "product" includes an approved product.

**(c)** The term of a patent eligible for extension under subsection (a) shall be extended by the time equal to the regulatory review period for the approved product which period occurs after the date the patent is issued, except that--

**(1)** each period of the regulatory review period shall be reduced by any period determined under subsection (d)(2)(B) during which the applicant for the patent extension did not act with due diligence during such period of the regulatory review period;

**(2)** after any reduction required by paragraph (1), the period of extension shall include only one-half of the time remaining in the periods described in paragraphs (1)(B)(i), (2)(B)(i), (3)(B)(i), (4)(B)(i), and (5)(B)(i) of subsection (g);

**(3)** if the period remaining in the term of a patent after the date of the approval of the approved product under the provision of law under which such regulatory review occurred when added to the regulatory review period as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

revised under paragraphs (1) and (2) exceeds fourteen years, the period of extension shall be reduced so that the total of both such periods does not exceed fourteen years; and

(4) in no event shall more than one patent be extended under subsection (e)(1) for the same regulatory review period for any product.

(d)(1) To obtain an extension of the term of a patent under this section, the owner of record of the patent or its agent shall submit an application to the Director. Except as provided in paragraph (5), such an application may only be submitted within the sixty-day period beginning on the date the product received permission under the provision of law under which the applicable regulatory review period occurred for commercial marketing or use. The application shall contain--

(A) the identity of the approved product and the Federal statute under which regulatory review occurred;

(B) the identity of the patent for which an extension is being sought and the identity of each claim of such patent which claims the approved product or a method of using or manufacturing the approved product;

(C) information to enable the Director to determine under subsections (a) and (b) the eligibility of a patent for extension and the rights that will be derived from the extension and information to enable the Director and the Secretary of Health and Human Services or the Secretary of Agriculture to determine the period of the extension under subsection (g);

(D) a brief description of the activities undertaken by the applicant during the applicable regulatory review period with respect to the approved product and the significant dates applicable to such activities; and

(E) such patent or other information as the Director may require.

(2)(A) Within 60 days of the submittal of an application for extension of the term of a patent under paragraph (1), the Director shall notify--

(i) the Secretary of Agriculture if the patent claims a drug product or a method of using or manufacturing a drug product and the drug product is subject to the Virus-Serum-Toxin Act, and

(ii) the Secretary of Health and Human Services if the patent claims any other drug product, a medical device, or a food additive or color additive or a method of using or manufacturing such a product, device, or additive and if the product, device, and additive are subject to the Federal Food, Drug, and Cosmetic Act,

of the extension application and shall submit to the Secretary who is so notified a copy of the application. Not later than 30 days after the receipt of an application from the Director, the Secretary receiving the application shall review the dates contained in the application pursuant to paragraph (1)(C) and determine the applicable regulatory review period, shall notify the Director of the determination, and shall publish in the Federal Register a notice of such determination.

(B)(i) If a petition is submitted to the Secretary making the determination under subparagraph (A), not later than 180 days after the publication of the determination under subparagraph (A), upon which it may reasonably be determined that the applicant did not act with due diligence during the applicable regulatory review period, the Secretary making the determination shall, in accordance with regulations promulgated by such Secretary, determine if the applicant acted with due diligence during the applicable regulatory review period. The Secretary making the determination shall make such determination not later than 90 days after the receipt of such a petition. For a drug product, device, or additive subject to the Federal Food, Drug, and Cosmetic Act or the Public Health Service Act, the Secretary may not delegate the authority to make the determination prescribed by this clause to an office below

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

the Office of the Director of Food and Drugs. For a product subject to the Virus-Serum-Toxin Act, the Secretary of Agriculture may not delegate the authority to make the determination prescribed by this clause to an office below the Office of the Assistant Secretary for Marketing and Inspection Services.

(ii) The Secretary making a determination under clause (i) shall notify the Director of the determination and shall publish in the Federal Register a notice of such determination together with the factual and legal basis for such determination. Any interested person may request, within the 60-day period beginning on the publication of a determination, the Secretary making the determination to hold an informal hearing on the determination. If such a request is made within such period, such Secretary shall hold such hearing not later than 30 days after the date of the request, or at the request of the person making the request, not later than 60 days after such date. The Secretary who is holding the hearing shall provide notice of the hearing to the owner of the patent involved and to any interested person and provide the owner and any interested person an opportunity to participate in the hearing. Within 30 days after the completion of the hearing, such Secretary shall affirm or revise the determination which was the subject of the hearing and shall notify the Director of any revision of the determination and shall publish any such revision in the Federal Register.

(3) For the purposes of paragraph (2)(B), the term "due diligence" means that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period.

(4) An application for the extension of the term of a patent is subject to the disclosure requirements prescribed by the Director.

(5)(A) If the owner of record of the patent or its agent reasonably expects that the applicable regulatory review period described in paragraph (1)(B)(ii), (2)(B)(ii), (3)(B)(ii), (4)(B)(ii), or (5)(B)(ii) of subsection (g) that began for a product that is the subject of such patent may extend beyond the expiration of the patent term in effect, the owner or its agent may submit an application to the Director for an interim extension during the period beginning 6 months, and ending 15 days, before such term is due to expire. The application shall contain--

(i) the identity of the product subject to regulatory review and the Federal statute under which such review is occurring;

(ii) the identity of the patent for which interim extension is being sought and the identity of each claim of such patent which claims the product under regulatory review or a method of using or manufacturing the product;

(iii) information to enable the Director to determine under subsection (a)(1), (2), and (3) the eligibility of a patent for extension;

(iv) a brief description of the activities undertaken by the applicant during the applicable regulatory review period to date with respect to the product under review and the significant dates applicable to such activities; and

(v) such patent or other information as the Director may require.

(B) If the Director determines that, except for permission to market or use the product commercially, the patent would be eligible for an extension of the patent term under this section, the Director shall publish in the Federal Register a notice of such determination, including the identity of the product under regulatory review, and shall issue to the applicant a certificate of interim extension for a period of not more than 1 year.

(C) The owner of record of a patent, or its agent, for which an interim extension has been granted under subparagraph (B), may apply for not more than 4 subsequent interim extensions under this paragraph, except that, in the case of a patent subject to subsection (g)(6)(C), the owner of record of the patent, or its agent, may apply for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

only 1 subsequent interim extension under this paragraph. Each such subsequent application shall be made during the period beginning 60 days before, and ending 30 days before, the expiration of the preceding interim extension.

**(D)** Each certificate of interim extension under this paragraph shall be recorded in the official file of the patent and shall be considered part of the original patent.

**(E)** Any interim extension granted under this paragraph shall terminate at the end of the 60-day period beginning on the date on which the product involved receives permission for commercial marketing or use, except that, if within that 60-day period the applicant notifies the Director of such permission and submits any additional information under paragraph (1) of this subsection not previously contained in the application for interim extension, the patent shall be further extended, in accordance with the provisions of this section--

    **(i)** for not to exceed 5 years from the date of expiration of the original patent term; or

    **(ii)** if the patent is subject to subsection (g)(6)(C), from the date on which the product involved receives approval for commercial marketing or use.

**(F)** The rights derived from any patent the term of which is extended under this paragraph shall, during the period of interim extension--

    **(i)** in the case of a patent which claims a product, be limited to any use then under regulatory review;

    **(ii)** in the case of a patent which claims a method of using a product, be limited to any use claimed by the patent then under regulatory review; and

    **(iii)** in the case of a patent which claims a method of manufacturing a product, be limited to the method of manufacturing as used to make the product then under regulatory review.

**(e)(1)** a determination that a patent is eligible for extension may be made by the Director solely on the basis of the representations contained in the application for the extension. If the Director determines that a patent is eligible for extension under subsection (a) and that the requirements of paragraphs (1) through (4) of subsection (d) have been complied with, the Director shall issue to the applicant for the extension of the term of the patent a certificate of extension, under seal, for the period prescribed by subsection (c). Such certificate shall be recorded in the official file of the patent and shall be considered as part of the original patent.

**(2)** If the term of a patent for which an application has been submitted under subsection (d)(1) would expire before a certificate of extension is issued or denied under paragraph (1) respecting the application, the Director shall extend, until such determination is made, the term of the patent for periods of up to one year if he determines that the patent is eligible for extension.

**(f)** For purposes of this section:

    **(1)** The term "product" means:

        **(A)** A drug product.

        **(B)** Any medical device, food additive, or color additive subject to regulation under the Federal Food, Drug, and Cosmetic Act.

    **(2)** The term "drug product" means the active ingredient of--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

(A) a new drug, antibiotic drug, or human biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act), or

(B) a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Virus-Serum-Toxin Act) which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques,

including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

(3) The term "major health or environmental effects test" means a test which is reasonably related to the evaluation of the health or environmental effects of a product, which requires at least six months to conduct, and the data from which is submitted to receive permission for commercial marketing or use. Periods of analysis or evaluation of test results are not to be included in determining if the conduct of a test required at least six months.

(4)(A) Any reference to section 351 is a reference to section 351 of the Public Health Service Act.

(B) Any reference to section 503, 505, 512, or 515 is a reference to section 503, 505, 512, or 515 of the Federal Food, Drug, and Cosmetic Act.

(C) Any reference to the Virus-Serum-Toxin Act is a reference to the Act of March 4, 1913 (21 U.S.C. 151-158).

(5) The term "informal hearing" has the meaning prescribed for such term by section 201(y) of the Federal Food, Drug, and Cosmetic Act.

(6) The term "patent" means a patent issued by the United States Patent and Trademark Office.

(7) The term "date of enactment" as used in this section means September 24, 1984, for a human drug product, a medical device, food additive, or color additive.

(8) The term "date of enactment" as used in this section means the date of enactment of the Generic Animal Drug and Patent Term Restoration Act for an animal drug or a veterinary biological product.

(g) For purposes of this section, the term "regulatory review period" has the following meanings:

(1)(A) In the case of a product which is a new drug, antibiotic drug, or human biological product, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.

(B) The regulatory review period for a new drug, antibiotic drug, or human biological product is the sum of--

(i) the period beginning on the date an exemption under subsection (i) of section 505 or subsection (d) of section 507 became effective for the approved product and ending on the date an application was initially submitted for such drug product under section 351, 505, or 507, and

(ii) the period beginning on the date the application was initially submitted for the approved product under section 351, subsection (b) of section 505, or section 507 and ending on the date such application was approved under such section.

(2)(A) In the case of a product which is a food additive or color additive, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

**(B)** The regulatory review period for a food or color additive is the sum of--

(i) the period beginning on the date a major health or environmental effects test on the additive was initiated and ending on the date a petition was initially submitted with respect to the product under the Federal Food, Drug, and Cosmetic Act requesting the issuance of a regulation for use of the product, and

(ii) the period beginning on the date a petition was initially submitted with respect to the product under the Federal Food, Drug, and Cosmetic Act requesting the issuance of a regulation for use of the product, and ending on the date such regulation became effective or, if objections were filed to such regulation, ending on the date such objections were resolved and commercial marketing was permitted or, if commercial marketing was permitted and later revoked pending further proceedings as a result of such objections, ending on the date such proceedings were finally resolved and commercial marketing was permitted.

**(3)(A)** In the case of a product which is a medical device, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.

**(B)** The regulatory review period for a medical device is the sum of--

(i) the period beginning on the date a clinical investigation on humans involving the device was begun and ending on the date an application was initially submitted with respect to the device under section 515, and

(ii) the period beginning on the date an application was initially submitted with respect to the device under section 515 and ending on the date such application was approved under such Act or the period beginning on the date a notice of completion of a product development protocol was initially submitted under section 515(f)(5) and ending on the date the protocol was declared completed under section 515(f)(6).

**(4)(A)** In the case of a product which is a new animal drug, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.

**(B)** The regulatory review period for a new animal drug product is the sum of--

(i) the period beginning on the earlier of the date a major health or environmental effects test on the drug was initiated or the date an exemption under subsection (j) of section 512 became effective for the approved new animal drug product and ending on the date an application was initially submitted for such animal drug product under section 512, and

(ii) the period beginning on the date the application was initially submitted for the approved animal drug product under subsection (b) of section 512 and ending on the date such application was approved under such section.

**(5)(A)** In the case of a product which is a veterinary biological product, the term means the period described in subparagraph (B) to which the limitation described in paragraph (6) applies.

**(B)** The regulatory period for a veterinary biological product is the sum of--

(i) the period beginning on the date the authority to prepare an experimental biological product under the Virus-Serum-Toxin Act became effective and ending on the date an application for a license was submitted under the Virus-Serum-Toxin Act, and

(ii) the period beginning on the date an application for a license was initially submitted for approval under the Virus-Serum-Toxin Act and ending on the date such license was issued.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

35 U.S.C.A. § 156

**(6)** A period determined under any of the preceding paragraphs is subject to the following limitations:

**(A)** If the patent involved was issued after the date of the enactment of this section, the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

**(B)** If the patent involved was issued before the date of the enactment of this section and--

**(i)** no request for an exemption described in paragraph (1)(B) or (4)(B) was submitted and no request for the authority described in paragraph (5)(B) was submitted,

**(ii)** no major health or environmental effects test described in paragraph (2)(B) or (4)(B) was initiated and no petition for a regulation or application for registration described in such paragraph was submitted, or

**(iii)** no clinical investigation described in paragraph (3) was begun or product development, protocol described in such paragraph was submitted,

before such date for the approved product the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

**(C)** If the patent involved was issued before the date of the enactment of this section and if an action described in subparagraph (B) was taken before the date of the enactment of this section with respect to the approved product and the commercial marketing or use of the product has not been approved before such date, the period of extension determined on the basis of the regulatory review period determined under such paragraph may not exceed two years or in the case of an approved product which is a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act or the Virus-Serum-Toxin Act), three years.

**(h)** The Director may establish such fees as the Director determines appropriate to cover the costs to the Office of receiving and acting upon applications under this section.

Current through P.L. 110-26 approved 05-11-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



37 C.F.R. § 1.760

**C**

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
  Title 37. Patents, Trademarks, and Copyrights
    Chapter I. United States Patent and Trademark Office, Department of Commerce (Refs & Annos)
      Subchapter A. General
      Patents
        Part 1. Rules of Practice in Patent Cases (Refs & Annos)
          Subpart F. Adjustment and Extension of Patent Term (Refs & Annos)
            Extension of Patent Term Due to Regulatory Review (Refs & Annos)

        →**§ 1.760 Interim extension of patent term under 35 U.S.C. 156(e)(2).**

An applicant who has filed a formal application for extension in compliance with § 1.740 may request one or more interim extensions for periods of up to one year each pending a final determination on the application pursuant to § 1.750. Any such request should be filed at least three months prior to the expiration date of the patent. The Director may issue interim extensions, without a request by the applicant, for periods of up to one year each until a final determination is made. The patent owner or agent will be notified when an interim extension is granted and notice of the extension will be published in the Official Gazette of the United States Patent and Trademark Office. The notice will be recorded in the official file of the patent and will be considered as part of the original patent. In no event will the interim extensions granted under this section be longer than the maximum period for extension to which the applicant would be eligible.

[60 FR 25618, May 12, 1995; 65 FR 54680, Sept. 8, 2000]

SOURCE: 52 FR 9394, March 24, 1987; 65 FR 56391, Sept. 18, 2000; 65 FR 56394, Sept. 18, 2000, unless otherwise noted.

AUTHORITY: 35 U.S.C. 2(b)(2), 154, and 156.

37 C. F. R. § 1.760, **37 CFR § 1.760**

Current through May 10, 2007; 72 FR 26566

Copr. © 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



230 U.S.P.Q. 369                                             Page 1

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

**(Cite as: 230 U.S.P.Q. 369)**

**H**

In re Reckitt & Colman Products Limited

Commissioner of Patents and Trademarks

Decided March 17, 1986

As amended March 20, 1986

United States Patents Quarterly Headnotes

**PATENTS**

**[1] Patent grant -- Extension (§ 50.10)**
Considering differences in PTO determination and
district court decision as to date patented drug was
approved for commercial marketing by FDA, said
difference being critical to determination of drug's
eligibility for patent term extension, patent is
granted interim extension under 35 USC 156(e)(2)
until 14 days after date of notice of appeal to circuit
court, and if timely filed, until 14 days after circuit
court decision.

**\*369** Request under 35 USC 156 for
reconsideration of decision holding patent No.
3,433,791 not eligible for patent term extension.
Request granted in part.

Richard E. Fichter, Arlington, Va., and Ronald
Wilson, Rockville, Md., for requestor.

Quigg, Commissioner of Patents and Trademarks.

*ORDER GRANTING INTERIM EXTENSION*
Reckitt & Colman Products Limited (Reckitt), the
owner of record in the Patent and Trademark Office
(PTO), of U.S. patent 3,433,791 (patent) [FN1]
requests reconsideration of a PTO decision entered
January 2, 1986, holding that the patent is not
eligible for patent term extension under 35 U.S.C. §
156. Reckitt further requests that the PTO (1) enter
a decision holding that the patent, which is due to

expire on March 18, 1986, is eligible for patent
term extension and (2) grant an interim extension
under 35 U.S.C. §156(e)(2) to (a) avoid any
possible hiatus in patent protection and (b) place the
public on notice concerning the extension of the
term of the patent. For reasons hereinafter given,
the request for reconsideration is *granted-in-part*
and *denied-in-part.*

*Facts*
On August 26, 1985, Reckitt filed an "application"
for extension of the term of the patent. In its
application, Reckitt states that buprenorphine
hydrochloride (BUPRENEX), a drug, falls within
the scope of claim 1 of the patent and that
BUPRENEX was subject to a regulatory review
under Section 505 of the Federal Food, Drug, and
Cosmetic Act (21 U.S.C. §301 *et seq).* The
application alleges that BUPRENEX was approved
by the Food and Drug Administration (FDA) for
commercial marketing pursuant to Section 505 on
June 28, 1985. Reckitt reasons, therefore, that
application for patent term extension was timely
filed on August 26, 1985 -- the last day of the
60-day period for filing the application under 35
U.S.C. §156(d).

On August 30, 1985, a copy of the application was
sent to FDA requesting confirmation that the
product identified in the application had been
subject to a regulatory review period within the
meaning of 35 U.S.C. §156(g) before its
commercial marketing or use. In a letter from the
FDA dated October 18, 1985, the PTO was
informed that BUPRENEX was subject to a
regulatory review period before its commercial
marketing or use and that the active ingredient in
the approved product had never before been
commercially marketed or used. The letter also
advised the PTO that Norwich Eaton
Pharmaceuticals Inc. (Norwich), a licensee under
the patent, had filed a citizen's petition concerning
BUPRENEX under 21 CFR §10.20. The citizen's

COPR. © 2007 The Bureau of National Affairs, Inc.

230 U.S.P.Q. 369                                                                                                          Page 2

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

**(Cite as: 230 U.S.P.Q. 369)**

petition specially addressed the issue of whether BUPRENEX is entitled to five years of non-patent exclusivity under Sections 505(j)(4)(D)(ii) and 505(c)(3)(D)(ii) of the Federal Food, Drug, and Cosmetic Act. According to the citizen's petition, the requested patent term extension, like the claim for non-patent exclusivity in the citizen's petition, is based in part on the assertion that June 28, 1985, is the date of the first approval of BUPRENEX.

Pending a decision on the citizen's petition by FDA and a final review of the application for patent term extension by the PTO, on October 24, 1985, a copy of the application was forwarded by PTO to FDA pursuant to 35 U.S.C. § 156(d)(2)(A) for a determination of the length of the regulatory review period. On November 8, 1985, FDA notified the PTO that it had received the PTO's request to determine the length of the regulatory review *370 period for BUPRENEX. However, since a decision on the citizen's petition was considered relevant to the issue of eligibility for patent term extension and a determination of the regulatory review period, FDA elected pursuant to 21 CFR § 10.30(e)(3) to suspend the regulatory review period determination pending a decision on the citizen's petition. On December 23, 1985, FDA notified the PTO that the citizen's petition requesting FDA to recognize either June 28, 1985 or January 8, 1982 as the "new drug application" (NDA) approval date for BUPRENEX had been denied. Instead, FDA decided that the NDA approval date for BUPRENEX was December 29, 1981.

In an initial decision entered January 2, 1986, denying Reckitt's application for patent term extension, the PTO found that BUPRENEX had been approved for commercial marketing or use by FDA under Section 505 of the Federal Food, Drug, and Cosmetic Act on December 29, 1981. Based on that finding, the PTO held that the patent was not eligible for extension, because Reckitt's "application" had not been timely filed in accordance with the 60-day provision of 35 U.S.C. § 156(d)(1). See also 35 U.S.C. §156(a)(3).

Prior to the PTO's initial decision, Norwich filed a civil action in the U.S. District Court for the

Southern District of Ohio seeking a declaratory judgment of its rights under Sections 505(j)(4)(D) and 505(c)(3)(D) of the Federal Food, Drug, and Cosmetic Act. *Norwich Eaton Pharmaceuticals, Inc. v. Bowen,* Civil Action No. C-1-85-1914 (S.D. Ohio Filed: Dec. 27, 1985). The Commissioner of Patents and Trademarks was not a party to the civil action. In the civil action, Norwich sought, *inter alia,* an injunction requiring FDA to recognize an appropriate non-patent exclusivity period for marketing BUPRENEX and preventing FDA from taking action inconsistent with any of Norwich's rights during any period of non-patent exclusivity. Norwich contended that FDA had made its approval on June 28, 1985; FDA -- consistent with its December 23, 1985, letter to the PTO -- maintained that it had approved BUPRENEX on December 29, 1981. On March 3, 1986, the district court entered an ORDER [FN2] in which it held, *inter alia:* (1) FDA's decision that December 29, 1981, was the effective date for approval of BUPRENEX is not substantiated in the administrative record [FN3] and is not in accordance with FDA regulations and (2) FDA's approval was not effective until June 28, 1985.

The PTO has been informed by FDA in a letter dated March 12, 1986, that the Government is considering an appeal to the U. S. Court of Appeals for the Sixth Circuit. A notice of appeal is due on or before May 2, 1986. See 28 U.S.C. § 2017, second paragraph, and Rules 4(a)(1) and 26(a) of the Federal Rules of Appellate Procedure.

*Discussion*

A human drug product, such as BUPRENEX, must undergo a regulatory review by FDA before the product is approved for commercial marketing or use. The regulatory review period for a human drug product is defined for the purposes of patent term extension in 35 U.S.C. §156(g)(1). As indicated in 35 U.S.C. § 156(g)(1)(B)(ii), the regulatory review period ends on the date a "new drug application" (NDA) [FN4] is approved by FDA under the section under which the regulatory review occurred.

The PTO generally takes the position that the date a drug receives permission for commercial

COPR. © 2007 The Bureau of National Affairs, Inc.

230 U.S.P.Q. 369                                                                                      Page 3

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

**(Cite as: 230 U.S.P.Q. 369)**

marketing or use under the provision of law under which the applicable regulatory review period occurred is the date on which FDA approves the NDA for that drug.

The legislative history supports this position. According to H.R. Rep. No. 857, Part I, 98th Cong., 2d Sess. 41 (1984), [FN5] *reprinted in* 1984 U. S. Code Cong. & Adm. News 2647, 2674, which accompanied H.R. 3605, 98th Cong. 2d Sess. (1984):

"To obtain an extension, the patent owner, or its agent would submit an application to the Commissioner of Patents and Trademarks within 60 days of *approval of the approved product.* The application must contain the information described in subparagraph (A)-(G) of section 156(d)(1)." [Emphasis supplied]

Also, according to H.R. Rep. No. 857, Part II, 98th Cong., 2d Sess. 23 (1984), [FN6] *reprinted in* 1984 U.S. Code Cong. & Adm. News 2686, *371 2707, also accompanying H.R. 3605, 98th Cong. 2d Sess. (1984):

"Proposed Section 156(d) sets forth procedures for applying for an extension. To obtain an extension, subsection (d)(1) requires the patent owner or its agent to submit an application to the Commissioner of Patents and Trademarks within 60 days of *approval of the approved product."* [Emphasis supplied]

A letter dated December 29, 1981, from FDA to Norwich concerning the NDA for BUPRENEX, states:

"We have completed the review of this application and have concluded that the drug is safe and effective for use as recommended in the labeling. As discussed in a telephone conversation between Dr. Alexander Neill and Dr. Marion J. Finkel on December 22, 1981, you have agreed to the conditional Phase IV bioavailability study and the labeling revisions outlined in our October 14, 1981 letter. Accordingly, the application is approved. As

you know, the Division is preparing documents to affect lesser controls for buprenorphine. This, however, in no way impairs your approval to market buprenorphine in its current controlled substances schedule."

This letter demonstrates that FDA considered the NDA for BUPRENEX to be approved as of December 29, 1981. Notwithstanding FDA's letter, Reckitt argues that the PTO has an independent obligation to determine the date on which BUPRENEX was first approved for commercial marketing. It also argues, citing 35 U.S.C. § 156(e)(1), that the PTO should rely solely on the information contained in the patent extension application and, if any further information is necessary to establish the eligibility of a patent for extension of the term, the information should be requested of the patent owner pursuant to 35 U.S.C. §156(d)(1)(E). While it is clear from the second sentence in 35 U.S.C. §156(e)(1) that the PTO has responsibility for determining eligibility, the PTO cannot agree that it is required to make an eligibility determination solely on the basis of a patent owner's representations. Note that 35 U.S.C. § 156(e)(1) states that "[a] determination . . . *may* be made by the Commissioner solely on the basis of the representations made in the application . . . ." [emphasis supplied]

Reckitt argues that the date an NDA is approved under Section 505(b) of the Federal Food, Drug, and Cosmetic Act may or may not coincide with "the date the product received permission under the provision of law under which the applicable regulatory period occurred for commercial marketing or use" as recited in 35 U.S.C. §156(d)(1) . Reckitt has offered no persuasive basis for its argument.

Based on an analysis of the evidence presently before the PTO, it would appear that FDA approved the NDA for BUPRENEX on December 29, 1981, and that Reckitt's request for reconsideration should be denied. However, what seems relatively straight forward and logical on its face has been somewhat complicated by the unusual circumstances of this case.

COPR. © 2007 The Bureau of National Affairs, Inc.

230 U.S.P.Q. 369    Page 4

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

(Cite as: 230 U.S.P.Q. 369)

Patent term extension "eligibility" under 35 U.S.C. §156 in this particular case would appear to be controlled by the date on which FDA *first* approved BUPRENEX for commercial marketing or use. FDA, the federal agency Congress has made responsible for approving drugs for commercial use, has determined that it gave its approval for commercial use under the Federal Food, Drug, and Cosmetic Act on December 29, 1981. A district court has concluded that FDA did not give approval on December 29, 1981; rather, the district court has held that approval was given on June 28, 1985. However, the decision of the district court is not final. Indeed, the PTO is aware that FDA is considering an appeal. Further complicating the matter is the imminent expiration of the patent on March 18, 1986 -- tomorrow.

There is some possibility that the PTO could hold Reckitt's request for reconsideration in abeyance pending a final decision on any appeal which might be taken. If the PTO were to do so, it would then have to resolve the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires. This is an issue which need not be addressed, however, if an interim extension is granted under 35 U.S.C. §156(e)(2).

Addressing interim extensions under 35 U.S.C. § 156(e)(2), H.R. Rep. No. 857, Part I, 98th Cong., 2d Sess. 43 (1984), *reprinted in* 1984 U. S. Code Cong. & Adm. News 2647, 2676 states:

> "It is possible that the original term of the patent for which extension is sought could expire before a final decision by the Commissioner to issue a certificate of extension. This might occur, for instance, because the determination of due diligence by . . . [FDA] has not been completed."

**\*372** After noting that the Commissioner is authorized to grant interim extensions, the Report goes on to say:

> "The length of . . . [any] interim extension is discretionary with the Commissioner, but is intended to provide time for the completion of any outstanding requirements."

After consideration of all factors involved, granting an interim extension would appear to be in the interest of justice. By granting an interim extension, there would be no hiatus in the term of the patent. Moreover, the length of any interim extension can be tailored to deal with relevant events which necessarily must take place at some future date, if at all.

An interim extension, therefore, will be granted until 14 calendar days after the date a notice of appeal is due in *Norwich v. Bowen, supra, and,* in the event a notice of appeal is timely filed, until 14 days after the U.S. Court of Appeals for the Sixth Circuit renders a decision on the appeal, *and,* in the further event the U.S. Court of Appeals for the Sixth Circuit does not render a decision prior to March 17, 1987, the interim extension shall expire on March 17, 1987.

By granting the interim extension, the PTO would be acting in harmony with a decision of a district court (albeit the decision is not final). Compare *In re Pearne,* 212 USPQ 466 (Comm'r. 1981). Reckitt, or its licensee, can attempt to enforce the patent during the interim extension. However, in doing so Reckitt must recognize that the final determination in the *Norwich* litigation could render the interim extension herein granted invalid should it ultimately turn out that FDA approved the NDA for BUPRENEX more than sixty days prior to the date Reckitt filed its patent term extension application. 35 U.S.C. § 282, fourth paragraph.

Granting an interim extension will not preclude others from making or using a drug covered by the patent solely for uses reasonably related to the development or submission of information under a federal law which regulates the manufacturer, use, or sale of the drug. 35 U.S.C. § 271(e)(1). See also H.R. Rep. No. 857, Part I, 98th Cong. 2d Sess. 45 (1984), *reprinted in* 1984 U.S. Code Cong. & Adm. News 2647, 2678.

It may be that others may not be free during the interim extension to submit to FDA an application

COPR. © 2007 The Bureau of National Affairs, Inc.

230 U.S.P.Q. 369    Page 5

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

**(Cite as: 230 U.S.P.Q. 369)**

under Sections 505(j) or 505(b)(2) of the Federal Food, Drug, and Cosmetic Act for a drug claimed in the patent if the purpose of such submission is to obtain approval under the Act to engage in commercial manufacture, use, or sale of the drug. Such submission might be considered infringement under 35 U.S.C. §271(e)(2). See also H.R. Rep. No. 857, Part I, 98th Cong., 2d Sess. 45-46 (1984), *reprinted in* 1984 U.S. Code Cong. & Adm. News 2647, 2678-79. However, under the district court's not yet final decision, Norwich presently enjoys non-patent exclusivity under Sections 505(j)(4)(D)(ii) and 505(c)(3)(D)(ii) of the Federal Food, Drug, and Cosmetic Act *and* FDA has been "enjoined from approving any ANDAs [FN7] or paper NDAs for generic equivalents of BUPRENEX until June 27, 1990." See conclusion of law G in the March 3, 1986, order entered in *Norwich v. Bowen, supra.*

While the relief provided herein may not solve all problems for Reckitt, Norwich, and potential commercial competitors, including generics, it is nevertheless believed that the relief strikes a reasonable balance between competing factors involved in this case. Compare *Mobil Oil Corp. v. Dann,* 448 F.Supp. 487, 489, 198 USPQ 347, 350 (D.D.C. 1978) (Commissioner could properly fashion relief which "fairly accommodates the competing interests" of all concerned).

*Decision*
[1] The request for reconsideration is *granted-in-part* to the extent that an *interim* extension under 35 U.S.C. §156(e)(2) of the term of U. S. patent 3,433,791 is granted until 14 calendar days after the date a notice of appeal to the U.S. Court of Appeals for the Sixth Circuit is due in *Norwich Eaton Pharmaceuticals, Inc. v. Bowen,* Civil Action No. C-1-85-1914 (S.D. Ohio Decided Mar. 3, 1986) *and,* in the event a notice of appeal is timely filed, until 14 calendar days after entry of a decision by the U. S. Court of Appeals for the Sixth Circuit on the appeal and, in the further event the U.S. Court of Appeals for the Sixth Circuit does not render a decision prior to March 17, 1987, the interim extension shall expire on March 17, 1987.

The length of the interim extension granted herein is believed to be factually supported in *373 view of the representations in the paragraph bridging pages 11 and 12 of the patent term extension application filed August 26, 1985, which reads in part as follows:

"As set forth in 35 U.S.C. Sec. 156(g)(1)(B), the regulatory review period equals the length of time between the effective date of the initial IND (X) (January 1, 1975) and the initial submission of the NDA (October 31, 1979), a period of 1399 days, plus the length of time between the initial submission of the NDA (October 31, 1979) and to NDA approval (June 28, 1985), (Y) a period of 2183 days. These two periods (Y and Y) added together equal 3582 days. These periods are each to be reduced by any lack of diligence in each period, Dx and Dy respectively. The period of patent term extension (PPTE) is (one-half (X-Dx) )+(Y-Dy) or 2882 days; Dx and Dy being zero.

The request for reconsideration is otherwise *denied* without prejudice to further requests for interim extensions as may be appropriate.

*Further Request For Interim Relief*
Reckitt is advised that it is responsible for applying for any further interim extension which may be needed pending a *final* decision in the *Norwich* litigation. In this respect, Reckitt is advised that the Commissioner will not act *sua sponte.* Any further request for interim relief must be timely filed in writing. [FN8]

Reckitt is also advised that should Norwich prevail in the *Norwich* litigation, FDA will have to determine the length of any regulatory review prior to the Commissioner issuing any "Certificate of Extension" under 35 U.S.C. §156(e)(2).

FN1 The patent was issued on March 18, 1969, based on application, Serial No. 726,591, filed May 3, 1968, naming Kenneth Walter Bentley as inventor.

COPR. © 2007 The Bureau of National Affairs, Inc.

230 U.S.P.Q. 369

1986 WL 83591 (Com'r Pat. & Trademarks), 230 U.S.P.Q. 369

**(Cite as: 230 U.S.P.Q. 369)**

FN2 A copy of the ORDER is attached to this opinion [omitted].

FN3 This specific holding is somewhat curious inasmuch as it appears the district court may have conducted a trial *de novo* -- an action which is difficult to reconcile in light of *Camp v. Pitts,* 411 U.S. 138 (1973).

FN4 NDA No. 18-401 was submitted to FDA to obtain necessary approvals for BUPRENEX.

FN5 Issued by the House Committee on Energy and Commerce.

FN6 Issued by the House Committee on the Judiciary.

FN7 An ANDA is an "abbreviated new drug application." "A manufacturer of a generic drug must conduct tests that show the generic drug is the same as the pioneer drug [BUPRENEX is a 'pioneer' drug] and that it will be properly manufactured and labeled. This information is submitted [to FDA] in an abbreviated new drug application (ANDA)." H.R. Rep. No. 857, 98th Cong., 2d Sess. 16 (1984), *reprinted in* 1984 U.S. Code Cong. & Adm. News 2647, 2649.

FN8 The Commissioner is authorized to grant successive interim extensions. See H.R. Rep. No. 857, Part I, 98th Cong., 2d Sess. 43 (1984), *reprinted in* 1984 U.S. Code Cong. & Adm. News 2647, 2676:

"If the Commissioner determined that subsequent interim extensions were necessary, and consistent with the objectives of section 156(e)(2), they could be granted as well."

Comm.Pat. & T.M.

230 U.S.P.Q. 369

END OF DOCUMENT

COPR. © 2007 The Bureau of National Affairs, Inc.

# EXHIBIT D

## 2754.03    Filing of a Request for an Extension Under 35 U.S.C. 156(e)(2)

A request for an interim extension under 35 U.S.C. 156(e)(2) (to extend the patent term during the processing of the patent term extension application) should be made at least three months before the patent is due to expire. See MPEP § 2755.01 for information pertaining to the interim extension of patent term under 35 U.S.C. 156(e)(2).

## 2755    Eligibility Determination [R-2]

**>

*37 CFR 1.750.  Determination of eligibility for extension of patent term*

A determination as to whether a patent is eligible for extension may be made by the Director solely on the basis of the representations contained in the application for extension filed in compliance with § 1.740 or § 1.790. This determination may be delegated to appropriate Patent and Trademark Office officials and may be made at any time before the certificate of extension is issued. The Director or other appropriate officials may require from applicant further information or make such independent inquiries as desired before a final determination is made on whether a patent is eligible for extension. In an application for extension filed in compliance with § 1.740, a notice will be mailed to applicant containing the determination as to the eligibility of the patent for extension and the period of time of the extension, if any. This notice shall constitute the final determination as to the eligibility and any period of extension of the patent. A single request for reconsideration of a final determination may be made if filed by the applicant within such time as may be set in the notice of final determination or, if no time is set, within one month from the date of the final determination. The time periods set forth herein are subject to the provisions of § 1.136.<

The determination as to whether a patent is eligible for an extension will normally be made solely from the representations contained in the application for patent term extension. However, further information may be required or inquiry made of applicant before a final determination is made on whether a patent is eligible for extension. In circumstances where further information is required by the Office, the applicant will be given a time period within which to respond. The failure to provide a response within the time period provided may result in a final determination adverse to the granting of an extension of patent term unless the response period is extended. An extension of time to respond may be requested under the provisions of 37 CFR 1.136. Under appropriate circumstances, e.g., if time is of the essence for a particular

reason, a request for information may contain a statement that the provisions of 37 CFR 1.136(a) are not available. The intentional failure to provide the information requested may result in an adverse final determination.

A final determination may be made at any time after an application is filed. A single request for reconsideration of a final determination may be filed within one month or within such other time period set in the final determination. A notice will be mailed to applicant containing the determination as to eligibility of the patent for extension and the period of time of the extension of the term, if any. This notice shall constitute the final determination as to eligibility and any period of extension of the patent term. If no request for reconsideration is filed within the time period set in the notice of final determination, the certificate of patent term extension will be issued in due course. See MPEP § 2758.

## 2755.01    Interim Extension of Patent Term During the Processing of the Application [R-2]

*35 U.S.C. 156.  Extension of patent term.*

*****

(e)(2) If the term of a patent for which an application has been submitted under subsection (d)(1) would expire before a certificate of extension is issued or denied under paragraph (1) respecting the application, the Director shall extend, until such determination is made, the term of the patent for periods of up to one year if he determines that the patent is eligible for extension.

*****

**>

*37 CFR 1.760.  Interim extension of patent term under 35 U.S.C. 156(e)(2).*

An applicant who has filed a formal application for extension in compliance with § 1.740 may request one or more interim extensions for periods of up to one year each pending a final determination on the application pursuant to § 1.750. Any such request should be filed at least three months prior to the expiration date of the patent. The Director may issue interim extensions, without a request by the applicant, for periods of up to one year each until a final determination is made. The patent owner or agent will be notified when an interim extension is granted and notice of the extension will be published in the *Official Gazette of the United States Patent and Trademark Office.* The notice will be recorded in the official file of the patent and will be considered as part of the original patent. In no event will the interim extensions

granted under this section be longer than the maximum period for extension to which the applicant would be eligible.<

If the original term of the patent for which extension is sought will expire before a final decision to issue a certificate of extension can be made, and a determination is made that the patent is eligible for extension, 35 U.S.C. 156 provides that the *>Director< may issue an interim extension of the patent term for up to one year pending a final decision on the application for extension. Should additional time be necessary, additional interim extensions of up to one year may be granted by the *>Director<. The length of any interim extension is discretionary with the *>Director< so long as it is for one year or less. Its length should be set to provide time for completion of any outstanding requirements. See *In re Reckitt & Colman Products Ltd.*, 230 USPQ 369, 372 (Comm'r Pat. & Tm. 1986). The *>Director< may issue an interim extension under 35 U.S.C. 156(e)(2) with or without a request from the applicant.

Where a determination is made that the patent is not eligible for patent term extension, an interim extension of the patent term is not warranted under 35 U.S.C. 156(e)(2). See *In re Alcon Laboratories Inc.*, 13 USPQ2d 1115, 1123 (Comm'r. Pat.& Tm. 1989).

Where an interim extension has been granted and it is subsequently determined that the patent is not eligible for patent term extension, the interim extension may be vacated *ab initio* as ineligible under 35 U.S.C. 156(e)(2). See *In re Reckitt,* 230 USPQ at 370.

While 37 CFR 1.760 provides that a request for an interim extension by the applicant "should" be filed three months prior to the expiration of the patent, this time frame is not mandatory. Any request filed within a shorter period of time will be considered, upon a proper showing, where it is not possible to make an earlier request. However, for an interim extension to be granted, the application for extension, in compliance with 37 CFR 1.741, must have been filed prior to the expiration date of the patent. In no event will an interim extension be granted for a period of patent term extension longer than the period of extension to which the patent would be eligible.

A notice of each interim extension granted will be issued to the applicant for patent term extension. The notice will be recorded in the official file of the patent and will be considered as part of the original patent. Notification of the issuance of the interim extension will be published in the Official Gazette of the Patent and Trademark Office.

## 2755.02   Interim Extension of Patent Term Before Product Approval

*35 U.S.C. 156. Extension of patent term.*

*****

(d)(5)(A) If the owner of record of the patent or its agent reasonably expects that the applicable regulatory review period described in paragraphs (1)(B)(ii), (2)(B)(ii), (3)(B)(ii), (4)(B)(ii), or (5)(B)(ii) of subsection (g) that began for a product that is the subject of such patent may extend beyond the expiration of the patent term in effect, the owner or its agent may submit an application to the Director for an interim extension during the period beginning 6 months, and ending 15 days before such term is due to expire. The application shall contain—

(i) the identity of the product subject to regulating review and the Federal statute under which such review is occurring;

(ii) the identity of the patent for which interim extension is being sought and the identity of each claim of such patent which claims the product under regulatory review or a method of using or manufacturing the product;

(iii) information to enable the Director to determine under subsection (a)(1), (2), and (3) the eligibility of a patent for extension;

(iv) a brief description of the activities undertaken by the applicant during the applicable regulatory review period to date with respect to the product under review and the significant dates applicable to such activities; and

(v) such patent or other information as the Director may require.

(5)(B)If the Director determines that, except for permission to market or use the product commercially, the patent would be eligible for an extension of the patent term under this section, the Director shall publish in the Federal Register a notice of such determination, including the identity of the product under regulatory review, and shall issue to the applicant a certificate of interim extension for a period of not more than 1 year.

(C) The owner of record of a patent, or its agent, for which an interim extension has been granted under subparagraph (B), may apply for not more than 4 subsequent interim extensions under this paragraph, except that, in the case of a patent subject to subsection (g)(6)(C), the owner of record of the patent, or its agent, may apply for only 1 subsequent interim extension under this paragraph. Each such subsequent application shall be made during the period beginning 60 days before, and ending 30 days before, the expiration of the preceding interim extension.

# EXHIBIT E



5 U.S.C.A. § 706

C

**Effective: [See Text Amendments]**

UNITED STATES CODE ANNOTATED
TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
**PART I--THE AGENCIES GENERALLY**
**CHAPTER 7--JUDICIAL REVIEW**
→**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

```
--------------------------------------------------------------------
     Derivation:             United States Code       Revised Statutes
                                                       and Statutes at
                                                          Large
--------------------------------------------------------------------
                             5 U.S.C. 1009(e)          June 11, 1946,
                                                        ch. 324, §
                                                        10(e), 60 Stat.
                                                        243.
--------------------------------------------------------------------
```

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

5 U.S.C.A. § 706

Current through P.L. 110-26 approved 05-11-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F



Federal Rules of Civil Procedure Rule 65

➤

**This document has been updated. Use KEYCITE.**

UNITED STATES CODE ANNOTATED
FEDERAL RULES OF CIVIL PROCEDURE . **FOR THE UNITED STATES DISTRICT COURTS**
VIII. PROVISIONAL AND FINAL REMEDIES
    ➡**Rule 65. Injunctions**

**(a) Preliminary Injunction.**

   **(1)** *Notice.* No preliminary injunction shall be issued without notice to the adverse party.

   **(2)** *Consolidation of Hearing With Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury.

**(b) Temporary Restraining Order; Notice; Hearing; Duration.** A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who obtained the temporary restraining order or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

**(c) Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

The provisions of Rule 65.1 apply to a surety upon a bond or undertaking under this rule.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Federal Rules of Civil Procedure Rule 65

**(d) Form and Scope of Injunction or Restraining Order.** Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

**(e) Employer and Employee; Interpleader; Constitutional Cases.** These rules do not modify any statute of the United States relating to temporary restraining orders and preliminary injunctions in actions affecting employer and employee; or the provisions of Title 28, U.S.C., § 2361, relating to preliminary injunctions in actions of interpleader or in the nature of interpleader; or Title 28, U.S.C., § 2284, relating to actions required by Act of Congress to be heard and determined by a district court of three judges.

**(f) Copyright Impoundment.** This rule applies to copyright impoundment proceedings.

Amendments received to 02-08-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



21 U.S.C.A. § 355

▷

**Effective: December 08, 2003**

UNITED STATES CODE ANNOTATED
TITLE 21. FOOD AND DRUGS
**CHAPTER 9--FEDERAL FOOD, DRUG, AND COSMETIC ACT**
SUBCHAPTER V--DRUGS AND DEVICES
PART A--DRUGS AND DEVICES
→**§ 355. New drugs**

(a) Necessity of effective approval of application

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.

(b) Filing application; contents

**(1)** Any person may file with the Secretary an application with respect to any drug subject to the provisions of subsection (a) of this section. Such person shall submit to the Secretary as a part of the application (A) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (B) a full list of the articles used as components of such drug; (C) a full statement of the composition of such drug; (D) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (E) such samples of such drug and of the articles used as components thereof as the Secretary may require; (F) specimens of the labeling proposed to be used for such drug. The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If an application is filed under this subsection for a drug and a patent which claims such drug or a method of using such drug is issued after the filing date but before approval of the application, the applicant shall amend the application to include the information required by the preceding sentence. Upon approval of the application, the Secretary shall publish information submitted under the two preceding sentences. The Secretary shall, in consultation with the Director of the National Institutes of Health and with representatives of the drug manufacturing industry, review and develop guidance, as appropriate, on the inclusion of women and minorities in clinical trials required by clause (A), and (G) any assessments required under section 355c of this title.

**(2)** An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted shall also include--

(A) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under paragraph (1) or subsection (c) of this section--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(i) that such patent information has not been filed,

(ii) that such patent has expired,

(iii) of the date on which such patent will expire, or

(iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

**(B)** if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

(3) Notice of opinion that patent is invalid or will not be infringed

(A) Agreement to give notice

An applicant that makes a certification described in paragraph (2)(A)(iv) shall include in the application a statement that the applicant will give notice as required by this paragraph.

(B) Timing of notice

An applicant that makes a certification described in paragraph (2)(A)(iv) shall give notice as required under this paragraph--

(i) if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(ii) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(C) Recipients of notice

An applicant required under this paragraph to give notice shall give notice to--

(i) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(ii) the holder of the approved application under this subsection for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(D) Contents of notice

A notice required under this paragraph shall--

(i) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

in the certification; and

(ii) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(4)(A) An applicant may not amend or supplement an application referred to in paragraph (2) to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary.

(B) With respect to the drug for which such an application is submitted, nothing in this subsection or subsection (c)(3) of this section prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

(5)(A) The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1) or under section 262 of Title 42, which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection or section 262 of Title 42 if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of clinical trials intended to form the primary basis of an effectiveness claim. The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of the clinical trials. Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant upon request.

(C) Any agreement regarding the parameters of the design and size of clinical trials of a new drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except--

(i) with the written agreement of the sponsor or applicant; or

(ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance division personnel unless such field or compliance division personnel demonstrate to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection or section 262 of Title 42 (including all scientific and medical matters, chemistry, manufacturing, and controls).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(c) Period for approval of application; period for, notice, and expedition of hearing; period for issuance of order

**(1)** Within one hundred and eighty days after the filing of an application under subsection (b) of this section, or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall either--

**(A)** Approve the application if he then finds that none of the grounds for denying approval specified in subsection (d) of this section applies, or

**(B)** Give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) of this section on the question whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

**(2)** If the patent information described in subsection (b) of this section could not be filed with the submission of an application under subsection (b) of this section because the application was filed before the patent information was required under subsection (b) of this section or a patent was issued after the application was approved under such subsection, the holder of an approved application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If the holder of an approved application could not file patent information under subsection (b) of this section because it was not required at the time the application was approved, the holder shall file such information under this subsection not later than thirty days after September 24, 1984, and if the holder of an approved application could not file patent information under subsection (b) of this section because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued. Upon the submission of patent information under this subsection, the Secretary shall publish it.

**(3)** The approval of an application filed under subsection (b) of this section which contains a certification required by paragraph (2) of such subsection shall be made effective on the last applicable date determined by applying the following to each certification made under subsection (b)(2)(A) of this section:

**(A)** If the applicant only made a certification described in clause (i) or (ii) of subsection (b)(2)(A) of this section or in both such clauses, the approval may be made effective immediately.

**(B)** If the applicant made a certification described in clause (iii) of subsection (b)(2)(A) of this section, the approval may be made effective on the date certified under clause (iii).

**(C)** If the applicant made a certification described in clause (iv) of subsection (b)(2)(A) of this section, the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in subsection (b)(3) of this section is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under paragraph (2) or subsection (b)(1) of this section before the date on which the application (excluding an amendment or supplement to the application) was submitted. If such an action is brought before the expiration of such days, the approval may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under subsection (b)(3) of this section or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

**(i)** if before the expiration of such period the district court decides that the patent is invalid or not infringed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

(I) the date on which the court enters judgment reflecting the decision; or

(II) the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

(ii) if before the expiration of such period the district court decides that the patent has been infringed--

(I) if the judgment of the district court is appealed, the approval shall be made effective on--

(aa) the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

(bb) the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

(II) if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35;

(iii) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in clause (i); or

(iv) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in clause (ii).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(D) Civil action to obtain patent certainty

(i) Declaratory judgment absent infringement action

(I) In general

No action may be brought under section 2201 of Title 28, by an applicant referred to in subsection (b)(2) of this section for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (C) unless--

(aa) the 45-day period referred to in such subparagraph has expired;

(bb) neither the owner of such patent nor the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

(cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(II) Filing of civil action

If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with section 2201 of Title 28, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought such a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable. A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(III) Offer of confidential access to application

For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant referred to in subsection (b)(2) of this section for the purpose of determining whether an action referred to in subparagraph (C) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under subsection (b)(2)(A)(iv) of this section and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) Counterclaim to infringement action

(I) In general

If an owner of the patent or the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) of this section or this subsection on the ground that the patent does not claim either--

**(aa)** the drug for which the application was approved; or

**(bb)** an approved method of using the drug.

(II) No independent cause of action

Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) No damages

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

**(E)(i)** If an application (other than an abbreviated new drug application) submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of another application for a drug for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted effective before the expiration of ten years from the date of the approval of the application previously approved under subsection (b) of this section.

**(ii)** If an application submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, is approved after September 24, 1984, no application which refers to the drug for which the subsection (b) application was submitted and for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted may be submitted under subsection (b) of this section before the expiration of five years from the date of the approval of the application under subsection (b) of this section, except that such an application may be submitted under subsection (b) of this section after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv) of subsection (b)(2)(A) of this section. The approval of such an application shall be made effective in accordance with this paragraph except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

**(iii)** If an application submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b) of this section, is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) of this section for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) of this section if the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

**(iv)** If a supplement to an application approved under subsection (b) of this section is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailabilty [FN1] studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under subsection (b) of this section for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) of this section if the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(v) If an application (or supplement to an application) submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection and for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted and which refers to the drug for which the subsection (b) application was submitted effective before the expiration of two years from September 24, 1984.

(4) A drug manufactured in a pilot or other small facility may be used to demonstrate the safety and effectiveness of the drug and to obtain approval for the drug prior to manufacture of the drug in a larger facility, unless the Secretary makes a determination that a full scale production facility is necessary to ensure the safety or effectiveness of the drug.

(d) Grounds for refusing application; approval of application; "substantial evidence" defined

If the Secretary finds, after due notice to the applicant in accordance with subsection (c) of this section and giving him an opportunity for a hearing, in accordance with said subsection, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b) of this section; or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application. If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application. As used in this subsection and subsection (e) of this section, the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary determines, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for purposes of the preceding sentence.

(e) Withdrawal of approval; grounds; immediate suspension upon finding imminent hazard to public health

The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved; (2) that new evidence of clinical experience, not contained in such application or not available to the Secretary until after such application was approved, or tests by new methods, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available to the Secretary when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved; or (3) on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof; or (4) the patent information prescribed by subsection (c) of this section was not filed within thirty days after the receipt of written notice from the Secretary specifying the failure to file such information; or (5) that the application contains any untrue statement of a material fact: *Provided,* That if the Secretary (or in his absence the officer acting as Secretary) finds that there is an imminent hazard to the public health, he may suspend the approval of such application immediately, and give the applicant prompt notice of his action and afford the applicant the opportunity for an expedited hearing under this subsection; but the authority conferred by this proviso to suspend the approval of an application shall not be delegated. The Secretary may also, after due notice and opportunity for hearing to the applicant, withdraw the approval of an application submitted under subsection (b) or (j) of this section with respect to any drug under this section if the Secretary finds (1) that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports, in accordance with a regulation or order under subsection (k) of this section or to comply with the notice requirements of section 360(k)(2) of this title, or the applicant has refused to permit access to, or copying or verification of, such records as required by paragraph (2) of such subsection; or (2) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity and were not made adequate within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of; or (3) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the labeling of such drug, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of. Any order under this subsection shall state the findings upon which it is based.

(f) Revocation of order refusing, withdrawing or suspending approval of application

Whenever the Secretary finds that the facts so require, he shall revoke any previous order under subsection (d) or (e) of this section refusing, withdrawing, or suspending approval of an application and shall approve such application or reinstate such approval, as may be appropriate.

(g) Service of orders

Orders of the Secretary issued under this section shall be served (1) in person by any officer or employee of the Department designated by the Secretary or (2) by mailing the order by registered mail or by certified mail addressed to the applicant or respondent at his last-known address in the records of the Secretary.

(h) Appeal from order

An appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of an application under this section. Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein such applicant resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a written petition praying that the order of the Secretary be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Secretary, or any officer designated by him for that purpose, and thereupon the Secretary shall certify and file in the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have exclusive jurisdiction to affirm or set aside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

such order, except that until the filing of the record the Secretary may modify or set aside his order. No objection to the order of the Secretary shall be considered by the court unless such objection shall have been urged before the Secretary or unless there were reasonable grounds for failure so to do. The finding of the Secretary as to the facts, if supported by substantial evidence, shall be conclusive. If any person shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Secretary, the court may order such additional evidence to be taken before the Secretary and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Secretary may modify his findings as to the facts by reason of the additional evidence so taken, and he shall file with the court such modified findings which, if supported by substantial evidence, shall be conclusive, and his recommendation, if any, for the setting aside of the original order. The judgment of the court affirming or setting aside any such order of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28. The commencement of proceedings under this subsection shall not, unless specifically ordered by the court to the contrary, operate as a stay of the Secretary's order.

(i) Exemptions of drugs for research; discretionary and mandatory conditions; direct reports to Secretary

(1) The Secretary shall promulgate regulations for exempting from the operation of the foregoing subsections of this section drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs. Such regulations may, within the discretion of the Secretary, among other conditions relating to the protection of the public health, provide for conditioning such exemption upon--

(A) the submission to the Secretary, before any clinical testing of a new drug is undertaken, of reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing;

(B) the manufacturer or the sponsor of the investigation of a new drug proposed to be distributed to investigators for clinical testing obtaining a signed agreement from each of such investigators that patients to whom the drug is administered will be under his personal supervision, or under the supervision of investigators responsible to him, and that he will not supply such drug to any other investigator, or to clinics, for administration to human beings;

(C) the establishment and maintenance of such records, and the making of such reports to the Secretary, by the manufacturer or the sponsor of the investigation of such drug, of data (including but not limited to analytical reports by investigators) obtained as the result of such investigational use of such drug, as the Secretary finds will enable him to evaluate the safety and effectiveness of such drug in the event of the filing of an application pursuant to subsection (b) of this section; and

(D) the submission to the Secretary by the manufacturer or the sponsor of the investigation of a new drug of a statement of intent regarding whether the manufacturer or sponsor has plans for assessing pediatric safety and efficacy.

(2) Subject to paragraph (3), a clinical investigation of a new drug may begin 30 days after the Secretary has received from the manufacturer or sponsor of the investigation a submission containing such information about the drug and the clinical investigation, including--

(A) information on design of the investigation and adequate reports of basic information, certified by the applicant to be accurate reports, necessary to assess the safety of the drug for use in clinical investigation; and

(B) adequate information on the chemistry and manufacturing of the drug, controls available for the drug,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

and primary data tabulations from animal or human studies.

**(3)(A)** At any time, the Secretary may prohibit the sponsor of an investigation from conducting the investigation (referred to in this paragraph as a "clinical hold") if the Secretary makes a determination described in subparagraph (B). The Secretary shall specify the basis for the clinical hold, including the specific information available to the Secretary which served as the basis for such clinical hold, and confirm such determination in writing.

**(B)** For purposes of subparagraph (A), a determination described in this subparagraph with respect to a clinical hold is that--

**(i)** the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation, taking into account the qualifications of the clinical investigators, information about the drug, the design of the clinical investigation, the condition for which the drug is to be investigated, and the health status of the subjects involved; or

**(ii)** the clinical hold should be issued for such other reasons as the Secretary may by regulation establish (including reasons established by regulation before November 21, 1997).

**(C)** Any written request to the Secretary from the sponsor of an investigation that a clinical hold be removed shall receive a decision, in writing and specifying the reasons therefor, within 30 days after receipt of such request. Any such request shall include sufficient information to support the removal of such clinical hold.

**(4)** Regulations under paragraph (1) shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation, requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible or it is contrary to the best interests of such human beings. Nothing in this subsection shall be construed to require any clinical investigator to submit directly to the Secretary reports on the investigational use of drugs.

(j) Abbreviated new drug applications

**(1)** Any person may file with the Secretary an abbreviated application for the approval of a new drug.

**(2)(A)** An abbreviated application for a new drug shall contain--

**(i)** information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

**(ii)(I)** if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

**(II)** if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

**(III)** if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (B) through (F) of subsection (b)(1) of this section;

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section--

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

(B) Notice of opinion that patent is invalid or will not be infringed

(i) Agreement to give notice

An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

statement that the applicant will give notice as required by this subparagraph.

(ii) Timing of notice

An applicant that makes a certification described in subparagraph (A)(vii)(IV) shall give notice as required under this subparagraph--

(I) if the certification is in the application, not later than 20 days after the date of the postmark on the notice with which the Secretary informs the applicant that the application has been filed; or

(II) if the certification is in an amendment or supplement to the application, at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application.

(iii) Recipients of notice

An applicant required under this subparagraph to give notice shall give notice to--

(I) each owner of the patent that is the subject of the certification (or a representative of the owner designated to receive such a notice); and

(II) the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent (or a representative of the holder designated to receive such a notice).

(iv) Contents of notice

A notice required under this subparagraph shall--

(I) state that an application that contains data from bioavailability or bioequivalence studies has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification; and

(II) include a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed.

(C) If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds--

(i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

(ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

**(D)(i)** An applicant may not amend or supplement an application to seek approval of a drug referring to a different listed drug from the listed drug identified in the application as submitted to the Secretary.

**(ii)** With respect to the drug for which an application is submitted, nothing in this subsection prohibits an applicant from amending or supplementing the application to seek approval of a different strength.

**(iii)** Within 60 days after December 8, 2003, the Secretary shall issue guidance defining the term "listed drug" for purposes of this subparagraph.

**(3)(A)** The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

**(B)** The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and bioequivalence studies needed for approval of such application. The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies. Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

**(C)** Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary. Such agreement shall not be changed after the testing begins, except--

**(i)** with the written agreement of the sponsor or applicant; or

**(ii)** pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

**(D)** A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

**(E)** The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance office personnel unless such field or compliance office personnel demonstrate to the reviewing division why such decision should be modified.

**(F)** No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

**(G)** For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

**(4)** Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds--

**(A)** the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

drug are inadequate to assure and preserve its identity, strength, quality, and purity;

**(B)** information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

**(C)(i)** if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

**(ii)** if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

**(iii)** if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show--

**(I)** that the other active ingredients are the same as the active ingredients of the listed drug, or

**(II)** that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 321(p) of this title,

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

**(D)(i)** if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

**(ii)** if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

**(E)** if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

**(F)** information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

**(G)** information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

**(H)** information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

included;

**(I)** the approval under subsection (c) of this section of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section, the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) of this section for grounds described in the first sentence of subsection (e) of this section, the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

**(J)** the application does not meet any other requirement of paragraph (2)(A); or

**(K)** the application contains an untrue statement of material fact.

**(5)(A)** Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

**(B)** The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined by applying the following to each certification made under paragraph (2)(A)(vii):

**(i)** If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

**(ii)** If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

**(iii)** If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in paragraph (2)(B) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under subsection (b)(1) or (c)(2) of this section before the date on which the application (excluding an amendment or supplement to the application), which the Secretary later determines to be substantially complete, was submitted. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

**(I)** if before the expiration of such period the district court decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity), the approval shall be made effective on--

**(aa)** the date on which the court enters judgment reflecting the decision; or

**(bb)** the date of a settlement order or consent decree signed and entered by the court stating that the patent that is the subject of the certification is invalid or not infringed;

**(II)** if before the expiration of such period the district court decides that the patent has been infringed--

**(aa)** if the judgment of the district court is appealed, the approval shall be made effective on--

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

**(AA)** the date on which the court of appeals decides that the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity); or

**(BB)** the date of a settlement order or consent decree signed and entered by the court of appeals stating that the patent that is the subject of the certification is invalid or not infringed; or

**(bb)** if the judgment of the district court is not appealed or is affirmed, the approval shall be made effective on the date specified by the district court in a court order under section 271(e)(4)(A) of Title 35;

**(III)** if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective as provided in subclause (I); or

**(IV)** if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent has been infringed, the approval shall be made effective as provided in subclause (II).

In such an action, each of the parties shall reasonably cooperate in expediting the action.

(iv) 180-day exclusivity period

(I) Effectiveness of application

Subject to subparagraph (D), if the application contains a certification described in paragraph (2)(A)(vii)(IV) and is for a drug for which a first applicant has submitted an application containing such a certification, the application shall be made effective on the date that is 180 days after the date of the first commercial marketing of the drug (including the commercial marketing of the listed drug) by any first applicant.

(II) Definitions

In this paragraph:

(aa) 180-day exclusivity period

The term "180-day exclusivity period" means the 180-day period ending on the day before the date on which an application submitted by an applicant other than a first applicant could become effective under this clause.

(bb) First applicant

As used in this subsection, the term "first applicant" means an applicant that, on the first day on which a substantially complete application containing a certification described in paragraph (2)(A)(vii)(IV) is submitted for approval of a drug, submits a substantially complete application that contains and lawfully maintains a certification described in paragraph (2)(A)(vii)(IV) for the drug.

(cc) Substantially complete application

As used in this subsection, the term "substantially complete application" means an application under this subsection that on its face is sufficiently complete to permit a substantive review and contains all the information required by paragraph (2)(A).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(dd) Tentative approval

(AA) In general

The term "tentative approval" means notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval because the application does not meet the requirements of this subparagraph, there is a period of exclusivity for the listed drug under subparagraph (F) or section 355a of this title, or there is a 7-year period of exclusivity for the listed drug under section 360cc of this title.

(BB) Limitation

A drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval until the Secretary issues an approval after any necessary additional review of the application.

(C) Civil action to obtain patent certainty

(i) Declaratory judgment absent infringement action

(I) In general

No action may be brought under section 2201 of Title 28, by an applicant under paragraph (2) for a declaratory judgment with respect to a patent which is the subject of the certification referred to in subparagraph (B)(iii) unless--

(aa) the 45-day period referred to in such subparagraph has expired;

(bb) neither the owner of such patent nor the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brought a civil action against the applicant for infringement of the patent before the expiration of such period; and

(cc) in any case in which the notice provided under paragraph (2)(B) relates to noninfringement, the notice was accompanied by a document described in subclause (III).

(II) Filing of civil action

If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the applicant referred to in such subclause may, in accordance with section 2201 of Title 28, bring a civil action under such section against the owner or holder referred to in such subclause (but not against any owner or holder that has brought such a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval, except that such civil action may be brought for a declaratory judgment that the patent will not be infringed only in a case in which the condition described in subclause (I)(cc) is applicable. A civil action referred to in this subclause shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(III) Offer of confidential access to application

For purposes of subclause (I)(cc), the document described in this subclause is a document providing an offer of confidential access to the application that is in the custody of the applicant under paragraph (2) for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

purpose of determining whether an action referred to in subparagraph (B)(iii) should be brought. The document providing the offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information. A request for access to an application under an offer of confidential access shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract. Any person provided an offer of confidential access shall review the application for the sole and limited purpose of evaluating possible infringement of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV) and for no other purpose, and may not disclose information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access. Further, the application may be redacted by the applicant to remove any information of no relevance to any issue of patent infringement.

(ii) Counterclaim to infringement action

(I) In general

If an owner of the patent or the holder of the approved application under subsection (b) of this section for the drug that is claimed by the patent or a use of which is claimed by the patent brings a patent infringement action against the applicant, the applicant may assert a counterclaim seeking an order requiring the holder to correct or delete the patent information submitted by the holder under subsection (b) or (c) of this section on the ground that the patent does not claim either--

(aa) the drug for which the application was approved; or

(bb) an approved method of using the drug.

(II) No independent cause of action

Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).

(iii) No damages

An applicant shall not be entitled to damages in a civil action under clause (i) or a counterclaim under clause (ii).

(D) Forfeiture of 180-day exclusivity period

(i) Definition of forfeiture event

In this subparagraph, the term "forfeiture event", with respect to an application under this subsection, means the occurrence of any of the following:

(I) Failure to market

The first applicant fails to market the drug by the later of--

(aa) the earlier of the date that is--

(AA) 75 days after the date on which the approval of the application of the first applicant is made

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

effective under subparagraph (B)(iii); or

**(BB)** 30 months after the date of submission of the application of the first applicant; or

**(bb)** with respect to the first applicant or any other applicant (which other applicant has received tentative approval), the date that is 75 days after the date as of which, as to each of the patents with respect to which the first applicant submitted and lawfully maintained a certification qualifying the first applicant for the 180-day exclusivity period under subparagraph (B)(iv), at least 1 of the following has occurred:

**(AA)** In an infringement action brought against that applicant with respect to the patent or in a declaratory judgment action brought by that applicant with respect to the patent, a court enters a final decision from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the patent is invalid or not infringed.

**(BB)** In an infringement action or a declaratory judgment action described in subitem (AA), a court signs a settlement order or consent decree that enters a final judgment that includes a finding that the patent is invalid or not infringed.

**(CC)** The patent information submitted under subsection (b) or (c) of this section is withdrawn by the holder of the application approved under subsection (b) of this section.

(II) Withdrawal of application

The first applicant withdraws the application or the Secretary considers the application to have been withdrawn as a result of a determination by the Secretary that the application does not meet the requirements for approval under paragraph (4).

(III) Amendment of certification

The first applicant amends or withdraws the certification for all of the patents with respect to which that applicant submitted a certification qualifying the applicant for the 180-day exclusivity period.

(IV) Failure to obtain tentative approval

The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

(V) Agreement with another applicant, the listed drug application holder, or a patent owner

The first applicant enters into an agreement with another applicant under this subsection for the drug, the holder of the application for the listed drug, or an owner of the patent that is the subject of the certification under paragraph (2)(A)(vii)(IV), the Federal Trade Commission or the Attorney General files a complaint, and there is a final decision of the Federal Trade Commission or the court with regard to the complaint from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken that the agreement has violated the antitrust laws (as defined in section 12 of Title 15, except that the term includes section 45 of Title 15 to the extent that that section applies to unfair methods of competition).

(VI) Expiration of all patents

All of the patents as to which the applicant submitted a certification qualifying it for the 180-day exclusivity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

period have expired.

(ii) Forfeiture

The 180-day exclusivity period described in subparagraph (B)(iv) shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant.

(iii) Subsequent applicant

If all first applicants forfeit the 180-day exclusivity period under clause (ii)--

(I) approval of any application containing a certification described in paragraph (2)(A)(vii)(IV) shall be made effective in accordance with subparagraph (B)(iii); and

(II) no applicant shall be eligible for a 180-day exclusivity period.

(E) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(F)(i) If an application (other than an abbreviated new drug application) submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b) of this section.

(ii) If an application submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, is approved after September 24, 1984, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b) of this section, except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii). The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)(iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b) of this section, is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) of this section for such drug.

**(iv)** If a supplement to an application approved under subsection (b) of this section is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) of this section.

**(v)** If an application (or supplement to an application) submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from September 24, 1984.

**(6)** If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended--

**(A)** for the same period as the withdrawal or suspension under subsection (e) of this section or this paragraph, or

**(B)** if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

**(7)(A)(i)** Within sixty days of September 24, 1984, the Secretary shall publish and make available to the public--

**(I)** a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) of this section before September 24, 1984;

**(II)** the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

**(III)** whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

**(ii)** Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) of this section or approved under this subsection during the thirty-day period.

**(iii)** When patent information submitted under subsection (b) or (c) of this section respecting a drug included on the list is to be published by the Secretary, the Secretary shall, in revisions made under clause (ii), include such information for such drug.

**(B)** A drug approved for safety and effectiveness under subsection (c) of this section or approved under this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or September 24, 1984, whichever is later.

(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section or was withdrawn or suspended under paragraph (6) or if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list--

(i) for the same period as the withdrawal or suspension under subsection (e) of this section or paragraph (6), or

(ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

(8) For purposes of this subsection:

(A)(i) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

(ii) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may assess bioavailability by scientifically valid measurements intended to reflect the rate and extent to which the active ingredient or therapeutic ingredient becomes available at the site of drug action.

(B) A drug shall be considered to be bioequivalent to a listed drug if--

(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

(C) For a drug that is not intended to be absorbed into the bloodstream, the Secretary may establish alternative, scientifically valid methods to show bioequivalence if the alternative methods are expected to detect a significant difference between the drug and the listed drug in safety and therapeutic effect.

(9) The Secretary shall, with respect to each application submitted under this subsection, maintain a record of--

(A) the name of the applicant,

(B) the name of the drug covered by the application,

(C) the name of each person to whom the review of the chemistry of the application was assigned and the date of such assignment, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

(D) the name of each person to whom the bioequivalence review for such application was assigned and the date of such assignment.

The information the Secretary is required to maintain under this paragraph with respect to an application submitted under this subsection shall be made available to the public after the approval of such application.

(k) Records and reports; required information; regulations and orders; access to records

(1) In the case of any drug for which an approval of an application filed under subsection (b) or (j) of this section is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, of data relating to clinical experience and other data or information, received or otherwise obtained by such applicant with respect to such drug, as the Secretary may by general regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination, whether there is or may be ground for invoking subsection (e) of this section. Regulations and orders issued under this subsection and under subsection (i) of this section shall have due regard for the professional ethics of the medical profession and the interests of patients and shall provide, where the Secretary deems it to be appropriate, for the examination, upon request, by the persons to whom such regulations or orders are applicable, of similar information received or otherwise obtained by the Secretary.

(2) Every person required under this section to maintain records, and every person in charge or custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

(l) Public disclosure of safety and effectiveness data

Safety and effectiveness data and information which has been submitted in an application under subsection (b) of this section for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown--

(1) if no work is being or will be undertaken to have the application approved,

(2) if the Secretary has determined that the application is not approvable and all legal appeals have been exhausted,

(3) if approval of the application under subsection (c) of this section is withdrawn and all legal appeals have been exhausted,

(4) if the Secretary has determined that such drug is not a new drug, or

(5) upon the effective date of the approval of the first application under subsection (j) of this section which refers to such drug or upon the date upon which the approval of an application under subsection (j) of this section which refers to such drug could be made effective if such an application had been submitted.

(m) "Patent" defined

For purposes of this section, the term "patent" means a patent issued by the United States Patent and Trademark Office.

(n) Scientific advisory panels

(1) For the purpose of providing expert scientific advice and recommendations to the Secretary regarding a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

clinical investigation of a drug or the approval for marketing of a drug under this section or section 262 of Title 42, the Secretary shall establish panels of experts or use panels of experts established before November 21, 1997, or both.

**(2)** The Secretary may delegate the appointment and oversight authority granted under section 394 of this title to a director of a center or successor entity within the Food and Drug Administration.

**(3)** The Secretary shall make appointments to each panel established under paragraph (1) so that each panel shall consist of--

**(A)** members who are qualified by training and experience to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and experience in the development, manufacture, or utilization of such drugs;

**(B)** members with diverse expertise in such fields as clinical and administrative medicine, pharmacy, pharmacology, pharmacoeconomics, biological and physical sciences, and other related professions;

**(C)** a representative of consumer interests, and a representative of interests of the drug manufacturing industry not directly affected by the matter to be brought before the panel; and

**(D)** two or more members who are specialists or have other expertise in the particular disease or condition for which the drug under review is proposed to be indicated.

Scientific, trade, and consumer organizations shall be afforded an opportunity to nominate individuals for appointment to the panels. No individual who is in the regular full-time employ of the United States and engaged in the administration of this chapter may be a voting member of any panel. The Secretary shall designate one of the members of each panel to serve as chairman thereof.

**(4)** Each member of a panel shall publicly disclose all conflicts of interest that member may have with the work to be undertaken by the panel. No member of a panel may vote on any matter where the member or the immediate family of such member could gain financially from the advice given to the Secretary. The Secretary may grant a waiver of any conflict of interest requirement upon public disclosure of such conflict of interest if such waiver is necessary to afford the panel essential expertise, except that the Secretary may not grant a waiver for a member of a panel when the member's own scientific work is involved.

**(5)** The Secretary shall, as appropriate, provide education and training to each new panel member before such member participates in a panel's activities, including education regarding requirements under this chapter and related regulations of the Secretary, and the administrative processes and procedures related to panel meetings.

**(6)** Panel members (other than officers or employees of the United States), while attending meetings or conferences of a panel or otherwise engaged in its business, shall be entitled to receive compensation for each day so engaged, including traveltime, at rates to be fixed by the Secretary, but not to exceed the daily equivalent of the rate in effect for positions classified above grade GS-15 of the General Schedule. While serving away from their homes or regular places of business, panel members may be allowed travel expenses (including per diem in lieu of subsistence) as authorized by section 5703 of Title 5, for persons in the Government service employed intermittently.

**(7)** The Secretary shall ensure that scientific advisory panels meet regularly and at appropriate intervals so that any matter to be reviewed by such a panel can be presented to the panel not more than 60 days after the matter is ready for such review. Meetings of the panel may be held using electronic communication to convene the meetings.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 U.S.C.A. § 355

**(8)** Within 90 days after a scientific advisory panel makes recommendations on any matter under its review, the Food and Drug Administration official responsible for the matter shall review the conclusions and recommendations of the panel, and notify the affected persons of the final decision on the matter, or of the reasons that no such decision has been reached. Each such final decision shall be documented including the rationale for the decision.

[FN1] So in original. Probably should be "bioavailability".

Current through P.L. 110-26 approved 05-11-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



PL 98-417, 1984 S 1538                                                                                         Page 1

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

**UNITED STATES PUBLIC LAWS**
**98th Congress - Second Session**
**Convening January 23, 1984**

Copr. © West Group 1998. No Claim to Orig. U.S. Govt. Works

**DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)**
Additions and Deletions are not identified in this document.

PL 98-417 (S 1538)
September 24, 1984

An Act to amend the Federal Food, Drug, and Cosmetic Act to revise the procedures for new drug applications, to amend title 35, United States Code, to authorize the extension of the patents for certain regulated products, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled, That this Act may be cited as the "Drug Price
Competition and Patent Term Restoration Act of 1984".

TITLE I -- "21 USC 301 note" ABBREVIATED NEW DRUG APPLICATIONS

SEC. 101. Section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355) is amended by redesignating subsection (j) as subsection (k) and inserting after subsection (i) the following:

"(j)(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

"(2)(A) An abbreviated application for a new drug shall contain --

"(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (6) (hereinafter in this subsection referred to as a 'listed drug');

"(ii)(I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

"(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

"(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

listed drug or of a drug which does not meet the requirements of section 201(p), "21 USC 321" and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

"(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

"(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

"(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

"(vi) the items specified in clauses (B) through (F) of subsection (b)(1);

"(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) --

   "(I) that such patent information has not been filed,

   "(II) that such patent has expired,

   "(III) of the date on which such patent will expire, or

   "(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

"(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

"(B)(i) An applicant who makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give the notice required by clause (ii) to --

   "(I) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(II) the holder of the approved application under subsection (b) for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

"(ii) The notice referred to in clause (i) shall state that an application, which contains data from bioavailability or bioequivalence studies, has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of such drug before the expiration of the patent referred to in the certification. Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

"(iii) If an application is amended to include a certification described in subparagraph (A)(vii)(IV), the notice required by clause (ii) shall be given when the amended application is submitted.

"(C) If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds --

"(i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug, or

"(ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

"(3) Subject to paragraph (4), the Secretary shall approve an application for a drug unless the Secretary finds --

"(A) the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

"(B) information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

"(C)(i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

"(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

"(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show --

"(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

"(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 201(p), "21 USC 321"

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

"(D)(i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538

Page 4

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

"(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

"(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

"(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

"(G) information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

"(H) information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

"(I) the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (5), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

"(J) the application does not meet any other requirement of paragraph (2)(A); or

"(K) the application contains an untrue statement of material fact.

"(4)(A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

"(B) The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined under the following:

"(i) If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538                                                                 Page 5

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(ii) If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

"(iii) if the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that --

"(I) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision,

"(II) if before the expiration of such period the court decides that such patent has been infringed, the approval shall be made effective on such date as the court orders under section 271(e)(4)(A) of title 35, United States Code, or

"(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision.

In such an action, each of the parties shall reasonably cooperate in expediting the action. Until the expiration of forty-five days from the date the notice made under paragraph (2)(B)(i) is received, no action may be brought under section 2201 of title 28, United States Code, for a declaratory judgment with respect to the patent. Any action brought under section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

"(iv) If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for drug for which a previous application has been submitted under this subsection continuing such a certification, the application shall be made effective not earlier than one hundred and eighty days after --

"(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

"(II) the date of a decision of a court in an action, described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

"(C) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(D)(i) If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b).

"(ii) If an application submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after the date of the enactment of this subsection, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii). The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)( iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

"(iii) If an application submitted under subsection (b) for a drug which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b), is approved after the date of enactment of this subsection and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) for such drug.

"(iv) If a supplement to an application approved under subsection (b) is approved after the date of enactment of this subsection and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b).

"(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from the date of enactment of this subsection.

"(5) If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended --

"(A) for the same period as the withdrawal or suspension under subsection (e) or this paragraph, or

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(B) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

"(6)(A)(i) Within sixty days of the date of the enactment of this subsection, the Secretary shall publish and make available to the public --

"(I) a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) before the date of the enactment of this subsection;

"(II) the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

"(III) whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

"(ii) Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) or approved under this subsection during the thirty-day period.

"(iii) When patent information submitted under subsection (b) or (c) respecting a drug included on the list is to be published by the Secretary the Secretary shall, in revisions made under clause (ii), include such information for such drug.

"(B) A drug approved for safety and effectiveness under subsection (c) or approved under this subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or the date of enactment, whichever is later.

"(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) or was withdrawn or suspended under paragraph (5) or if the Secretary determines that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list --

"(i) for the same period as the withdrawal or suspension under subsection (e) or paragraph (5), or

"(ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

"(7) For purposes of this subsection:

"(A) The term 'bioavailability' means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

"(B) A drug shall be considered to be bioequivalent to a listed drug if --

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

"(ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.".

SEC. 102. (a)(1) Section 505(b) of such Act "21 USC 355" if amended by adding at the end the following: "The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If an application is filed under this subsection for a drug and a patent which claims such drug or a method of using such drug is issued after the filing date but before approval of the application, the applicant shall amend the application to include the information required by the preceding sentence. Upon approval of the application, the Secretary shall publish information submitted under the two preceding sentences.".

(2) Section 505(c) of such Act is amended by inserting "(1)" after "(c)", by redesignating paragraphs (1) and (2) as subparagraphs (A) and (B), respectively, and by adding at the end the following:

"(2) If the patent information described in subsection (b) could not be filed with the submission of an application under subsection (b) because the application was filed before the patent information was required under subsection (b) or a patent was issued after the application was approved under such subsection, the holder of an approved application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If the holder of an approved application could not file patent information under subsection (b) because it was not required at the time the application was approved, the holder shall file such information under this subsection not later than thirty days after the date of the enactment of this sentence, and if the holder of an approved application could not file patent information under subsection (b) because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued. Upon the submission of patent information under this subsection, the Secretary shall publish it.".

(3)(A) The first sentence of section 505(d) of such Act "21 USC 355" is amended by redesignating clause (6) as clause (7) and inserting after clause (5) the following: "(6) the application failed to contain the patent information prescribed by subsection (b); or".

(B) The first sentence of section 505(e) of such Act is amended by redesignating clause (4) as clause (5) and inserting after clause (3) the following: "(4) the patent information prescribed by subsection (c) was not filed within thirty days after the receipt of written notice from the Secretary specifying the failure to file such information; or".

(b)(1) Section 505(a) of such Act is amended by inserting "or (j)" after "subsection (b)".

(2) Section 505(c) of such Act is amended by striking out "this subsection" and inserting in lieu thereof "subsection (b)".

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

(3) The second sentence of section 505(e) of such Act is amended by inserting "submitted under subsection (b) or (j)" after "an application".

(4) The second sentence of section 505(e) is amended by striking out "(j)" each place it occurs in clause (1) and inserting in lieu thereof "(k)".

(5) Section 505(k)(1) of such Act (as so redesignated) is amended by striking out "pursuant to this section" and inserting in lieu thereof "under subsection (b) or (j)".

(6) Subsections (a) and (b) of section 527 of such Act "21 USC 360cc" are each amended by striking out "505(b)" each place it occurs and inserting in lieu thereof "505".

SEC. 103. (a) Section 505(b) of such Act is amended by inserting "(1)" after "(b)", by redesignating clauses (1) through (6) as clauses (A) through (F), respectively, and by adding at the end the following:

"(2) An application submitted under paragraph (1) for a drug for which the investigations described in clause (A) of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted shall also include --

"(A) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under paragraph (1) or subsection (c) --

"(i) that such patent information has not been filed,

"(ii) that such patent has expired,

"(iii) of the date on which such patent will expire, or

"(iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

"(B) if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

"(3)(A) An applicant who makes a certification described in paragraph (2)(A)(iv) shall include in the application a statement that the applicant will give the notice required by subparagraph (B) to --

"(i) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

"(ii) the holder of the approved application under subsection (b) for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

"(B) The notice referred to in subparagraph (A) shall state that an application has been submitted under this

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538                                                    Page 10

PL 98-417, September 24, 1984, 98 Stat 1585
(Publication page references are not available for this document.)

subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification. Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

"(C) If an application is amended to include a certification described in paragraph (2)(A)(iv), the notice required by subparagraph (B) shall be given when the amended application is submitted.".

(b) Section 505(c) of such Act (as amended by section 102(a)(2)) is amended by adding at the end the following:

"(3) The approval of an application filed under subsection (b) which contains a certification required by paragraph (2) of such subsection shall be made effective on the last applicable date determined under the following:

"(A) If the applicant only made a certification described in clause (i) or (ii) of subsection (b)(2)(A) or in both such clauses, the approval may be made effective immediately.

"(B) If the applicant made a certification described in clause (iii) of subsection (b)(2)(A), the approval may be make effective on the date certified under clause (iii).

(C) If the applicant made a certification described in clause (iv) of subsection (b)(2)(A), the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (3)(B) is received. If such an action is brought before the expiration of such days, the approval may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (3)(B) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that --

"(i) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval may be made effective on the date of the court decision,

"(ii) if before the expiration of such period the court decides that such patent has been infringed, the approval may be made effective on such date as the court orders under section 271(e)(4)(A) of title 35, United States Code, or

"(iii) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision.

In such an action, each of the parties shall reasonably cooperate in expediting the action. Until the expiration of forty-five days from the date the notice made under paragraph (3)(B) is received, no action may be brought under section 2201 of title 28, United States Code, for a declaratory judgment with respect to the patent. Any action brought under such section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

"(D)(i) If an application (other than an abbreviated new drug application) submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this subsection, the Secretary may not make the approval of another application for a

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538                                                   Page 11

PL 98-417, September 24, 1984, 98 Stat 1585
(Publication page references are not available for this document.)

drug for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted effective before the expiration of ten years from the date of the approval of the application previously approved under subsection (b).

"(ii) If an application submitted under subsection (b) for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b), is approved after the date of the enactment of this clause, no application which refers to the drug for which the subsection (b) application was submitted and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted may be submitted under subsection (b) before the expiration of five years from the date of the approval of the application under subsection (b), except that such an application may be submitted under subsection (b) after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv of subsection (b)(2)( A). The approval of such an application shall be made effective in accordance with this paragraph except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

"(iii) If an application submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b), is approved after the date of the enactment of this clause and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) if the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

"(iv) If a supplement to an application approved under subsection (b) is approved after the date of enactment of this clause and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under subsection (b) for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) if the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

"(v) If an application (or supplement to an application) submitted under subsection (b) for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b), was approved during the period beginning January 1, 1982, and ending on the date of the enactment of this clause, the Secretary may not make the approval of an application submitted under this subsection and for which the investigations described in clause (A) of subsection (b)(1) and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted and which refers to the drug for which the subsection (b) application was submitted effective before the expiration of

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

two years from the date of enactment of this clause.".

SEC. 104. Section 505 of such Act is amended by adding at the end the following:

"(1) Safety and effectiveness data and information which has been submitted in an application under subsection (b) for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown --

"(1) if no work is being or will be undertaken to have the application approved,

"(2) if the Secretary has determined that the application is not approvable and all legal appeals have been exhausted,

"(3) if approval of the application under subsection (c) is withdrawn and all legal appeals have been exhausted,

"(4) if the Secretary has determined that such drug is not a new drug, or

"(5) upon the effective date of the approval of the first application under subsection (j) which refers to such drug or upon the date upon which the approval of an application under subsection (j) which refers to such drug could be made effective if such an application had been submitted.

"(m) For purposes of this section, the term 'patent means a patent issued by the Patent and Trademark Office of the Department of Commerce.".

SEC. 105. "21 USC 355 note" (a) The Secretary of Health and Human Services shall promulgate, in accordance with the notice and comment requirements of section 553 of title 5, United States Code, such regulations as may be necessary for the administration of section 505 of the Federal Food, Drug, and Cosmetic Act, as amended by sections 101, 102, and 103 of this Act, within one year of the date of enactment of this Act.

(b) During the period beginning sixty days after the date of the enactment of this Act and ending on the date regulations promulgated under subsection (a) take effect, abbreviated new drug applications may be submitted in accordance with the provisions of section 314.2 of title 21 of the Code of Federal Regulations and shall be considered as suitable for any drug which has been approved for safety and effectiveness under section 505(c) of the Federal Food, Drug, and Cosmetic Act before the date of the enactment of this Act. If any such provision is inconsistent with the requirements of section 505(j) of the Federal Food, Drug, and Cosmetic Act, the Secretary shall consider the application under the applicable requirements of such section. The Secretary of Health and Human Services may not approve such an abbreviated new drug application which is filed for a drug which is described in sections 505(c)(3)(D) and 505(j)(4)(D) of the Federal Food, Drug, and Cosmetic Act except in accordance with such section.

SEC. 106. Section 2201 of title 28, United States Code, is amended by inserting "(a)" before "In a case" and by adding at the end the following:

"(b) For limitations on actions brought with respect to drug patents see section 505 of the Federal Food, Drug, and Cosmetic Act.".

SEC. 201. (a) Title 35 of the United States Code is amended by adding the following new section immediately after section 155A:

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538                                                                 Page 13

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"Section 156. "35 USC 156" Extension of patent term

"(a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent if --

"(1) the term of the patent has not expired before an application is submitted under subsection (d) for its extension;

"(2) the term of the patent has never been extended;

"(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of subsection (d);

"(4) the product has been subject to a regulatory review period before its commercial marketing or use;

"(5)(A) except as provided in subparagraph (B), the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred; or

"(B) in the case of a patent which claims a method of manufacturing the product which primarily uses recombinant DNA technology in the manufacture of the product, the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of a product manufactured under the process claimed in the patent.

The product referred to in paragraphs (4) and (5) is hereinafter in this section referred to as the 'approved product'.

"(b) The rights derived from any patent the term of which is extended under this section shall during the period during which the patent is extended --

"(1) in the case of a patent which claims a product, be limited to any use approved for the approved product before the expiration of the term of the patent under the provision of law under which the applicable regulatory review occurred;

"(2) in the case of a patent which claims a method of using a product, be limited to any use claimed by the patent and approved for the approved product before the expiration of the term of the patent under the provision of law under which the applicable regulatory review occurred; and

"(3) in the case of a patent which claims a method of manufacturing a product, be limited to the method of manufacturing as used to make the approved product.

"(c) The term of a patent eligible for extension under subsection (a) shall be extended by the time equal to the regulatory review period for the approved product which period occurs after the date the patent is issued, except that --

"(1) each period of the regulatory review period shall be reduced by any period determined under subsection (d)(2)(B) during which the applicant for the patent extension did not act with due diligence during such period of the regulatory review period;

"(2) after any reduction required by paragraph (1), the period of extension shall include only one-half of the time remaining in the periods described in paragraphs (1)(B)(i), (2)(B)(i), and (3)(B)(i) of subsection (g);

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(3) if the period remaining in the term of a patent after the date of the approval of the approved product under the provision of law under which such regulatory review occurred when added to the regulatory review period as revised under paragraphs (1) and (2) exceeds fourteen years, the period of extension shall be reduced so that the total of both such periods does not exceed fourteen years; and

"(4) in no event shall more than one patent be extended for the same regulatory review period for any product.

"(d)(1) To obtain an extension of the term of a patent under this section, the owner of record of the patent or its agent shall submit an application to the Commissioner. Such an application may only be submitted within the sixty-day period beginning on the date the product received permission under the provision of law under which the applicable regulatory review period occurred for commercial marketing or use. The application shall contain --

"(A) the identity of the approved product and the Federal statute under which regulatory review occurred;

"(B) the identity of the patent for which an extension is being sought and the identity of such claim of such patent which claims the approved product or a method of using or manufacturing the approved product;

"(C) information to enable the Commissioner to determine under subsections (a) and (b) the eligibility of a patent for extension and the rights that will be derived from the extension and information to enable the Commissioner and the Secretary of Health and Human Services to determine the period of the extension under subsection (g);

"(D) a brief description of the activities undertaken by the applicant during the applicable regulatory review period with respect to the approved product and the significant dates applicable to such activities; and

"(E) such patent or other information as the Commissioner may require.

"(2)(A) Within sixty days of the submittal of an application for extension of the term of a patent under paragraph (1), the Commissioner shall notify the Secretary of Health and Human Services if the patent claims any human drug product, a medical device, or a food additive or color additive or a method of using or manufacturing such product, device, or additive and if the product, device, and additive are subject to the Federal Food, Drug, and Cosmetic Act "21 USC 301", of the extension application and shall submit to the Secretary a copy of the application. Not later than thirty days after the receipt of an application from the Commissioner, the Secretary shall review the dates contained in the application pursuant to paragraph (1)(C) and determine the applicable regulatory review period, shall notify the Commissioner of the determination, and shall publish in the Federal Register a notice of such determination.

"(B)(i) If a petition is submitted to the Secretary under subparagraph (A), not later than one hundred and eighty days after the publication of the determination under subparagraph (A), upon which it may reasonably be determined that the applicant did not act with due diligence during the applicable regulatory review period, the Secretary shall, in accordance with regulations promulgated by the Secretary determine if the applicant acted with due diligence during the applicable regulatory review period. The Secretary shall make such determination not later than ninety days after the receipt of such a petition. The Secretary may not delegate the authority to make the determination prescribed by this subparagraph to an office below the Office of the Commissioner of Food and Drugs.

"(ii) The Secretary shall notify the Commissioner of the determination and shall publish in the Federal Register a notice of such determination together with the factual and legal basis for such determination. Any interested person may request, within the sixty-day period beginning on the publication of a determination, the Secretary to hold an informal hearing on the determination. If such a request is made within such period, the Secretary shall hold such

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
(Publication page references are not available for this document.)

hearing not later than thirty days after the date of the request, or at the request of the person making the request, not later than sixty days after such date. The Secretary shall provide notice of the hearing to the owner of the patent involved and to any interested person and provide the owner and any interested person an opportunity to participate in the hearing. Within thirty days after the completion of the hearing, the Secretary shall affirm or revise the determination which was the subject of the hearing and notify the Commissioner of any revision of the determination and shall publish any such revision in the Federal Register.

"(3) For the purposes of paragraph (2)(B), the term 'due diligence' means that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period.

"(4) An application for the extension of the term of a patent is subject to the disclosure requirements prescribed by the Commissioner.

"(e)(1) A determination that a patent is eligible for extension may be made by the Commissioner solely on the basis of the representations contained in the application for the extension. If the Commissioner determines that a patent is eligible for extension under subsection (a) and that the requirements of subsection (d) have been complied with, the Commissioner shall issue to the applicant for the extension of the term of the patent a certificate of extension, under seal, for the period prescribed by subsection (c). Such certificate shall be recorded in the official file of the patent and shall be considered as part of the original patent.

"(2) If the term of a patent for which an application has been submitted under subsection (d) would expire before a certificate of extension is issued or denied under paragraph (1) respecting the application, the Commissioner shall extend, until such determination is made, the term of the patent for periods of up to one year if he determines that the patent is eligible for extension.

"(f) For purposes of this section:

"(1) The term 'product' means:

  "(A) A human drug product.

  "(B) Any medical device, food additive, or color additive subject to regulation under the Federal Food, Drug, and Cosmetic Act. "21 USC 301".

"(2) The term 'human drug product' means the active ingredient of a new drug, antibiotic drug, or human biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act) "21 USC 301; 42 USC 201 note" including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

"(3) The term 'major health or environmental effects test' means a test which is reasonably related to the evaluation of the health or environmental effects of a product, which requires at least six months to conduct, and the data from which is submitted to receive permission for commercial marketing or use. Periods of analysis or evaluation of test results are not to be included in determining if the conduct of a test required at least six months.

"(4)(A) Any reference to section 351 is a reference to section 351 of the Public Health Service Act. "42 USC 262".

"(B) Any reference to section 503, 505, 507, or 515 is a reference to section 503, 505, 507, or 515 of the Federal

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

Food, Drug, and Cosmetic Act. "21 USC 353, 355, 357, 360e".

"(5) The term 'informal hearing' has the meaning prescribed for such term by section 201(y) of the Federal Food, Drug, and Cosmetic Act. "21 USC 321".

"(6) The term 'patent' means a patent issued by the United States Patent and Trademark Office.

"(g) For purposes of this section, the term 'regulatory review period' has the following meanings:

"(1)(A) In the case of a product which is a human drug product, the term means the period described in subparagraph (B) to which the limitation described in paragraph (4) applies.

"(B) The regulatory review period for a human drug product is the sum of --

"(i) the period beginning on the date an exemption under subsection (i) of section 505 or subsection (d) of section 507 became effective for the approved human drug product and ending on the date an application was initially submitted for such drug product under section 351, 505, or 507, and

"(ii) the period beginning on the date the application was initially submitted for the approved human drug product under section 351, subsection (b) of section 505, or section 507 and ending on the date such application was approved under such section.

"(2)(A) In the case of a product which is a food additive or color additive, the term means the period described in subparagraph (B) to which the limitation described in paragraph (4) applies.

"(B) The regulatory review period for a food or color additive is the sum of --

"(i) the period beginning on the date a major health or environmental effects test on the additive was initiated and ending on the date a petition was initially submitted with respect to the product under the Federal Food, Drug, and Cosmetic Act requesting the issuance of a regulation for use of the product, and

"(ii) the period beginning on the date a petition was initially submitted with respect to the product under the Federal Food, Drug, and Cosmetic Act requesting the issuance of a regulation for use of the product, and ending on the date such regulation became effective or, if objections were filed to such regulation, ending on the date such objections were resolved and commercial marketing was permitted or, if commercial marketing was permitted and later revoked pending further proceedings as a result of such objections, ending on the date such proceedings were finally resolved and commercial marketing was permitted.

"(3)(A) In the case of a product which is a medical device, the term means the period described in subparagraph (B) to which the limitation described in paragraph (4) applies.

"(B) The regulatory review period for a medical device is the sum of --

"(i) the period beginning on the date a clinical investigation on humans involving the device was begun and ending on the date an application was initially submitted with respect to the device under section 515, "21 USC 360e" and

"(ii) the period beginning on the date an application was initially submitted with respect to the device under section 515 and ending on the date such application was approved under such Act or the period beginning on the

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

date a notice of completion of a product development protocol was initially submitted under section 515(f)(5) and ending on the date the protocol was declared completed under section 515(f)(6).

"(4) A period determined under any of the preceding paragraphs is subject to the following limitations:

"(A) If the patent involved was issued after the date of the enactment of this section, the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

"(B) If the patent involved was issued before the date of the enactment of this section and --

"(i) no request for an exemption described in paragraph (1)(B) was submitted,

"(ii) no major health or environmental effects test described in paragraph (2) was initiated and no petition for a regulation or application for registration described in such paragraph was submitted, or

"(iii) no clinical investigation described in paragraph (3) was begun or product development protocol described in such paragraph was submitted, before such date for the approved product the period of extension determined on the basis of the regulatory review period determined under any such paragraph may not exceed five years.

"(C) If the patent involved was issued before the date of the enactment of this section and if an action described in subparagraph (B) was taken before the date of the enactment of this section with respect to the approved product and the commercial marketing or use of the product has not been approved before such date, the period of extension determined on the basis of the regulatory review period determined under such paragraph may not exceed two years.

"(h) The Commissioner may establish such fees as the Commissioner determines appropriate to cover the costs to the Office of receiving and acting upon applications under this section.".

(b) The analysis for chapter 14 of title 35 of the United States Code is amended by adding at the end thereof the following:

"156. Extension of patent term.".

SEC. 202. Section 271 of title 35, United States Code, is amended by adding at the end the following:

"(e)(1) It shall not be an act of infringement to make, use, or sell a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913)) "21 USC 301, 151 note" solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs.

"(2) It shall be an act of infringement to submit an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

"(3) In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, or selling of a patented invention under paragraph (1).

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

"(4) For an act of infringement described in paragraph (2) --

"(A) the court shall order the effective date of any approval of the drug involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

"(B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, or sale of an approved drug, and

"(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, or sale of an approved drug.

The remedies prescribed by subparagraphs (A), (B), and (C) are the only remedies which may be granted by a court for an act of infringement described in paragraph (2), except that a court may award attorney fees under section 285.". "35 USC 285".

SEC. 203. Section 282 of title 35, United States Code, is amended by adding at the end the following: "Invalidity of the extension of a patent term or any portion thereof under section 156 of this title because of the material failure --

"(1) by the applicant for the extension, or

"(2) by the Commissioner,

to comply with the requirements of such section shall be a defense in any action involving the infringement of a patent during the period of the extension of its term and shall be pleaded. A due diligence determination under section 156(d)(2) is not subject to review in such an action.".

### TITLE III -- AMENDMENTS TO THE TEXTILE FIBER PRODUCTS IDENTIFICATION ACT AND THE WOOL PRODUCTS LABELING ACT OF 1939

SEC. 301. Subsection (b) of section 4 of the Textile Fiber Products Identification Act (15 U.S.C. 70b) is amended by adding at the end thereof the following new paragraph:

"(5) If it is a textile fiber product processed or manufactured in the United States, it be so identified.".

SEC. 302. Subsection (e) of section 4 of the Textile Fiber Products Identification Act (15 U.S.C. 70b) is amended to read as follows:

"(e) For purposes of this Act, in addition to the textile fiber products contained therein, a package of textile fiber products intended for sale to the ultimate consumer shall be misbranded unless such package has affixed to it a stamp, tag, label, or other means of identification bearing the information required by subsection (b), with respect to such contained textile fiber products, or is transparent to the extent it allows for the clear reading of the stamp, tag, label, or other means of identification on the textile fiber product, or in the case of hosiery items, this section shall not be construed as requiring the affixing of a stamp, tag, label, or other means of identification to each hosiery product contained in a package if (1) such hosiery products are intended for sale to the ultimate consumer in such package, (2) such package has affixed to it a stamp, tag, label, or other means of identification bearing, with respect to the hosiery products contained therein, the information required by subsection (b), and (3) the information on the stamp, tag, label, or other means of identification affixed to such package is equally applicable with respect to each textile fiber product contained therein.".

Copr. © West 2007 No Claim to Orig. Govt. Works

PL 98-417, 1984 S 1538                                                           Page 19

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

SEC. 303. Section 4 of the Textile Fiber Products Identification Act (15 U.S.C. 70b) is amended by adding at the end thereof the following new subsections:

"(i) For the purposes of this Act, a textile fiber product shall be considered to be falsely or deceptively advertised in any mail order catalog or mail order promotional material which is used in direct sale or direct offering for sale of such textile fiber product, unless such textile fiber product description states in a clear and conspicuous manner that such textile fiber product is processed or manufactured in the United States of America, or imported, or both.

"(j) For purposes of this Act, any textile fiber product shall be misbranded if a stamp, tag, label, or other identification conforming to the requirements of this section is not on or affixed to the inside center of the neck midway between the shoulder seams or, if such product does not contain a neck, in the most conspicuous place on the inner side of such product, unless it is on or affixed on the outer side of such product, or in the case of hosiery items on the outer side of such product or package.".

SEC. 304. Paragraph (2) of section 4(a) of the Wool Products Labeling Act of 1939 (15 U.S.C. 68b(a)(2)) is amended by adding at the end thereof the following new subparagraph:

"(D) the name of the country where processed or manufactured.".

SEC. 305. Section 4 of the Wool Products Labeling Act of 1939 (15 U.S.C. 68b) is amended by adding at the end thereof the following new subsections:

"(e) For the purposes of this Act, a wool product shall be considered to be falsely or deceptively advertised in any mail order promotional material which is used in the direct sale or direct offering for sale of such wool product, unless such wool product description states in a clear and conspicuous manner that such wool product is processed or manufactured in the United States of America, or imported, or both.

"(f) For purposes of this Act, any wool product shall be misbranded if a stamp, tag, label, or other identification conforming to the requirements of this section is not on or affixed to the inside center of the neck midway between the shoulder seams or, if such product does not contain a neck, in the most conspicuous place on the inner side of such product, unless it is on or affixed on the outer side of such product or in the case of hosiery items, on the outer side of such product or package.".

SEC. 306. Section 5 of the Wool Products Labeling Act of 1939 (15 U.S.C. 68c) is amended --

(1) by striking out "Any person" in the first paragraph and inserting in lieu thereof "(a) Any person",

(2) by striking out "Any person" in the second paragraph and inserting in lieu thereof "(b) Any person", and

(3) by inserting after subsection (b) (as designated by this section) the following new subsection:

"(c) For the purposes of subsections (a) and (b) of this section, any package of wool products intended for sale to the ultimate consumer shall also be considered a wool product and shall have affixed to it a stamp, tag, label, or other means of identification bearing the information required by section 4, with respect to the wool products contained therein, unless such package of wool products is transparent to the extent that it allows for the clear reading of the stamp, tag, label, or other means of identification affixed to the wool product, or in the case of hosiery items this section shall not be construed as requiring the affixing of a stamp, tag, label, or other means of identification to each hosiery product contained in a package if (1) such hosiery products are intended for sale to

Copr. © West 2007 No Claim to Orig. Govt. Works

Page 21 of 21

PL 98-417, 1984 S 1538

Page 20

PL 98-417, September 24, 1984, 98 Stat 1585
**(Publication page references are not available for this document.)**

the ultimate consumer in such package, (2) such package has affixed to it a stamp, tag, label, or other means of identification bearing, with respect to the hosiery products contained therein, the information required by subsection (4), and (3) the information on the stamp, tag, label, or other means of identification affixed to such package is equally applicable with respect to each hosiery product contained therein.".

SEC. 307. The amendments made by this title shall be effective ninety days after the date of enactment of this Act. "15 USC 68b note".

Approved September 24, 1984.

LEGISLATIVE HISTORY -- S. 1538 (H.R. 3605):
HOUSE REPORT No. 98-857 accompanying H.R. 3605, Pt. 1 (Comm. on Energy and Commerce) and Pt. 2 (Comm. on the Judiciary).

SENATE REPORT No. 98-547 (Comm. on the Judiciary).

CONGRESSIONAL RECORD, Vol. 130 (1984): June 29, considered and passed Senate. Sept. 6, considered and passed House, amended, in lieu of H.R. 3605. Sept. 12, Senate concurred in House amendments.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, vol. 20, No. 39 (1984): Sept. 24, Presidential statement.

PL 98-417, 1984 S 1538

END OF DOCUMENT

Copr. © West 2007 No Claim to Orig. Govt. Works

# Exhibit
# 2



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

U.S. Reissue No. 34,579

In re:

Issued:                              April 5, 1994

Inventor:                            Buyske, Donald A. (deceased), late of Lake Worth, Florida
                                     Buyske, Susan G., Administratrix, New York, New York

Assignee:                            Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                                 Method of Treating Depression

---

**CERTIFICATE OF EXPRESS MAILING**
LABEL NO:  EV 258 030 987 US
DATE OF DEPOSIT:   April 27, 2006

I hereby certify that this papers is being deposited with the United States Postal Service "express Mail Post
Orffice to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:
Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Carol Porter
Name of Person mailing the paper and fee

Signature of Person mailing the paper and fee

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

**RECEIVED**

MAY 0 2 2006

**OFFICE OF PETITIONS**

Dear Sir:

Enclosed for filing in connection with the above-referenced patent are the following:

1. Application for Extension of Patent Term Under 35 U.S. C. §156 (Original and four copies);
2. Exhibits A-M;
3. Credit Card Payment form;

If the referenced Credit Card Payment Form is insufficient or otherwise deficient, or should an overpayment be included herein, the Commissioner is authorized to appropriately deduct or credit the requisite amount from Vinson & Elkins L.L.P. Deposit Account No. 22-0365/SOM700/4-01RE US/13001.

Respectfully submitted,

Margaret J. Sampson

MJS/cp

| 05/01/2006 | 00000100 | 1 | 1457 | $1,120.00 | 04/27/2006 | CC |



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                        U.S. Reissue No. 34,579

Issued:                       April 5, 1994

Inventor:                     Buyske, Donald A. (deceased), late of Lake Worth, Florida
                              Buyske, Susan G., Administratrix, New York, New York

Assignee:                     Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                          Method of Treating Depression

**CERTIFICATE OF EXPRESS MAILING**
LABEL NO:         EV 258 030 987US
DATE OF DEPOSIT:         April 27, 2006

I hereby certify that this papers is being deposited with the United
States Postal Service "express Mail Post Orffice to Addressee"
service under 37 CFR 1.10 on the date indicated above and is
address to:

Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Carol Porter
Name of Person mailing the paper and fee

Signature of Person mailing the paper and fee

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

RECEIVED

MAY 0 2 2006

OFFICE OF PETITIONS

# APPLICATION FOR EXTENSION OF
# PATENT TERM UNDER 35 U.S.C. §156

### **EXHIBITS**

|  | **Exhibit No.** |
|---|:---:|
| Assignment for U.S. Patent No. 4,868,218 …………………………..….. | A |
| FDA Approval Letter for EMSAM®…………………………………….. | B |
| Copy of U.S. Patent No. RE 34,579……………………………..…..….. | C |
| First Maintenance Fee Statement (U.S. Pat. No. 4,868,218)………………..….. | D |
| Second Maintenance Fee Statement (U.S. Pat. No. RE 34,579)……………..…. | E |
| Third Maintenance Fee Statement (U.S. Pat. No. RE 34,579)………………….. | F |
| Copy of Applicant's Transmittal Letter for IND Appl. No. 46,944………………….. | G |
| Copy of Applicant's Transmittal Letter for NDA No. 21-336………….…..…….. | H |
| Applicant's Submission to FDA Regarding IND Appl. No. 46,944………………. | I |
| Applicant's Communication with FDA Regarding NDA No. 21-336……………… | J |
| Table of Contents for Part 13 of Application………………….………………….. | K |
| Approvals of Type 1 vs. Type 2 NDAs……………………………………..….. | L |
| Graph Depicting Average Approval Time (Standard Review) for Type 1 vs. Type 2 NDAs………………………………………………………………….. | M |

APPLICATION FOR EXTENSION OF PATENT TERM
UNDER 35 U.S.C. § 156

Sir:

Pursuant to 35 U.S.C. § 156 and 37 C.F.R. §§ 1.710-1.791, Somerset Pharmaceuticals, Inc. ("Applicant") hereby requests an extension of the patent term of Reissue No. 34,579 ("the '579 patent"). Applicant is the owner and assignee of the entire interest in and to the '579 patent by virtue of the assignment to Applicant by Donald A. Buyske (executed on November 2, 1989) of his interests in U.S. Serial No. 07/086,795, filed August 18, 1987, which later issued as U.S. Patent No. 4,861,800 on August 29, 1989. U.S. Serial No. 07/339,712, filed April 18, 1989, is a divisional of U.S. Serial No. 07/086,795, and issued as U.S. Patent No. 4,868,218 on September 19, 1989. The assignment for U.S. Patent No. 4,868,218 was recorded in the United States Patent and Trademark Office ("USPTO") on April 24, 1990, at Reel 5285, Frame 0768 (copy attached hereto as Exhibit A). U.S. Patent No. 4,868,218 was reissued as the '579 patent on April 5, 1994.

This application for extension is based on the regulatory approval of EMSAM® (selegiline transdermal system) patches, available in 6mg/24 hours, 9mg/24 hours, and 12mg/24 hours strengths, in the acute and longer-term treatment of major depressive disorder in adult patients. Applicant is the holder of marketing approval for EMSAM®. The single active ingredient in EMSAM® is selegiline.

The current expiration date of the '579 patent is August 18, 2007. The '579 patent claims a topical composition for the transdermal administration of selegiline, as well as a method for treating depression by maintaining selegiline in contact with the skin of a patient. The EMSAM® patches fall within the scope of these claims. The extension of patent term requested for the '579 patent is until August 18, 2012, which is the maximum permitted extension provided under 35 U.S.C. § 156, since the regulatory review period for EMSAM® (reduced by one-half of the IND period) was greater than five years.

The date of the NDA approval for the EMSAM® patches is February 27, 2006. Applicant believes this is the first permitted commercial marketing or use of this single active ingredient as a human drug product. This application is being made within the sixty day statutory period provided in 35 U.S.C. § 156(d).

Applicant, through its duly authorized attorney, hereby submits this application for extension of patent term under 35 U.S.C. § 156 by providing the following information required by the statute and in accordance with the provisions of 37 C.F.R. § 1.740. For the convenience of the USPTO, the information in this application is presented in the order set forth in 37 C.F.R. § 1.740.

1.  **A COMPLETE IDENTIFICATION OF THE APPROVED PRODUCT AS BY APPROPRIATE CHEMICAL AND GENERIC NAME, PHYSICAL STRUCTURE OR CHARACTERISTICS (37 C.F.R. § 1.740(a)(1))**

The approved product, EMSAM® (selegiline transdermal system) patches, contains the single active ingredient selegiline. Selegiline, also known as L-deprenyl, is a selective irreversible inhibitor of B-type monoamine oxidase ("MAO-B"). As shown in the approved labeling for EMSAM® in Exhibit B, the active ingredient in the approved product has the following characteristics:

Selegiline base is a colorless to yellow liquid, chemically described as (-)-(N)-Methyl-N-[(1R)-1-methyl-2-phenylethyl]prop-2-yn-1-amine. Selegiline has an empirical formula of $C_{13}H_{17}N$, and a molecular weight of 187.30. The structural formula is:



2.  **A COMPLETE IDENTIFICATION OF THE FEDERAL STATUTE INCLUDING THE APPLICABLE PROVISION OF LAW UNDER WHICH THE REGULATORY REVIEW OCCURRED (37 C.F.R. § 1.740(a)(2))**

The regulatory review for EMSAM® (selegiline transdermal system) patches occurred under Section 505(b) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(b).

2

3. **AN IDENTIFICATION OF THE DATE ON WHICH THE PRODUCT RECEIVED PERMISSION FOR COMMERCIAL MARKETING OR USE UNDER THE PROVISION OF LAW UNDER WHICH THE APPLICABLE REGULATORY REVIEW PERIOD OCCURRED (37 C.F.R. § 1.740(a)(3))**

The Food and Drug Administration ("FDA") approved EMSAM® (selegiline transdermal system) patches for commercial marketing or use on February 27, 2006. *See* Exhibit B.

4. **AN IDENTIFICATION OF EACH ACTIVE INGREDIENT IN THE PRODUCT AND A STATEMENT THAT EACH SUCH ACTIVE INGREDIENT HAS NOT BEEN PREVIOUSLY APPROVED FOR COMMERCIAL MARKETING OR USE UNDER THE FEDERAL FOOD DRUG AND COSMETIC ACT, THE PUBLIC HEALTH SERVICE ACT, OR THE VIRUS-SERUM-TOXIN ACT, OR A STATEMENT OF WHEN THE ACTIVE INGREDIENT WAS APPROVED FOR COMMERCIAL MARKETING OR USE (EITHER ALONE OR IN COMBINATION WITH OTHER ACTIVE INGREDIENTS) THE USE FOR WHICH IT WAS APPROVED, AND THE PROVISION OF LAW UNDER WHICH IT WAS APPROVED (37 C.F.R. § 1.740(a)(4))**

The single active ingredient in EMSAM® (selegiline transdermal system) patches is selegiline. Selegiline has not been previously approved for commercial marketing or use under the FDCA, the Public Health Service Act, or the Virus-Serum-Toxin Act. Please note that selegiline is a different active ingredient from selegiline hydrochloride, which is marketed as ELDEPRYL® (NDA 20-647). *See* discussion *infra*, Part 13.

5. **A STATEMENT THAT THE APPLICATION IS BEING SUBMITTED WITHIN THE SIXTY-DAY PERIOD PERMITTED FOR SUBMISSION PURSUANT TO § 1.720(F) AND AN IDENTIFICATION OF THE DATE OF THE LAST DAY ON WHICH THE APPLICATION COULD BE SUBMITTED (37 C.F.R. § 1.740(a)(5))**

This application is being submitted on or before April 28, 2006, the last day of the sixty-day period following February 27, 2006, the NDA approval date, that is not a Saturday, Sunday or holiday, as provided in Title 35, U.S.C. Therefore, this application is being submitted within the sixty day statutory period provided in 35 U.S.C. § 156(d).

6. **A COMPLETE IDENTIFICATION OF THE PATENT FOR WHICH AN EXTENSION IS BEING SOUGHT BY THE NAME OF THE INVENTOR, THE PATENT NUMBER, THE DATE OF ISSUE, AND THE DATE OF EXPIRATION (37 C.F.R. § 1.740(a)(6))**

Inventor:       Donald A. Buyske
Patent No.:     Reissue No. 34,579
Issued:         April 5, 1994
Expiration:     August 18, 2007

3

7. **A COPY OF THE PATENT FOR WHICH AN EXTENSION IS BEING SOUGHT, INCLUDING THE ENTIRE SPECIFICATION (INCLUDING CLAIMS) AND DRAWINGS (37 C.F.R. § 1.740(a)(7))**

A copy of the '579 patent for which an extension is being sought, including the entire specification (including claims), is found as Exhibit C.

8. **A COPY OF ANY DISCLAIMER, CERTIFICATE OF CORRECTION, RECEIPT OF MAINTENANCE FEE PAYMENT, OR REEXAMINATION CERTIFICATE ISSUED IN THE PATENT (37 C.F.R. § 1.740(a)(8))**

The '579 patent reissued from U.S. Patent No. 4,868,218 ("the '218 patent") on April 5, 1994. The '218 patent issued on September 19, 1989, from U.S. Serial No. 07/339,712 ("the '712 application"), filed April 18, 1989. The '712 application is a divisional of U.S. Serial No. 07/086,795, filed August 18, 1987, which issued as U.S. Patent No. 4,861,800 on August 29, 1989. Copies of any or all of these related documents will be provided to the USPTO upon request.

No disclaimers or certificates of correction have been filed for the '579 patent. The '579 patent has not been re-examined, so no re-examination certificate has been issued.

Since the first maintenance fee for U.S. Patent No. 4,868,218 was due before it was reissued as the '579 patent, the first maintenance fee was paid for U.S. Patent No. 4,868,218 as a large entity as shown by the relevant USPTO Maintenance Fee Statement. *See* Exhibit D.

The second maintenance fee for the '579 patent was paid as a large entity as shown by the relevant USPTO Maintenance Fee Statement. *See* Exhibit E.

The third and final maintenance fee for the '579 patent was paid as a large entity as shown by the relevant USPTO Maintenance Fee Statement. *See* Exhibit F.

9. **A STATEMENT THAT THE PATENT CLAIMS THE APPROVED PRODUCT, OR A METHOD OF USING OR MANUFACTURING THE APPROVED PRODUCT, AND A SHOWING WHICH LISTS EACH APPLICABLE PATENT CLAIM AND DEMONSTRATES THE MANNER IN WHICH EACH APPLICABLE PATENT CLAIM READS ON THE APPROVED PRODUCT AND A METHOD OF USING OR MANUFACTURING THE APPROVED PRODUCT (37 C.F.R. § 1.740(a)(9))**

The approved product, EMSAM® (selegiline transdermal system) patches, as well as a method of using the approved product, fall within the scope of certain claims of the '579 patent.

4

The following chart sets forth how each of the two independent claims of the '579 patent read on the approved product EMSAM®, as well as a method of using the approved product. 37 C.F.R. § 1.740(a)(9).[1] This explanation is based in part on information provided in the approved labeling for EMSAM®, which is found in Exhibit B as an attachment to the Approval Letter from the FDA dated February 27, 2006:

**Applicable Claims of The '579 Patent**

1. A method of treating depression in a human patient which comprises maintaining in contact with the skin of said patient a quantity of L-deprenyl or a salt thereof in a form permitting migration of said L-deprenyl or salt thereof through the skin of said patient into the bloodstream of the patient to a sufficient extent to produce a therapeutically effective amount of L-deprenyl within the blood supply to the brain of said patient without causing skin irritation to the patient or inducing a cheese effect in the patient.

**Manner in Which Each Independent Claim of The '579 Patent Reads on EMSAM® or Method of Using EMSAM®**

EMSAM® (selegiline transdermal system) is a transdermal patch approved for the acute and longer-term treatment of major depressive disorder in adult patients. The selegiline transdermal patch treats adult patients for major depressive disorder by the transdermal administration of selegiline, which is also known as L-deprenyl. Selegiline is the single active ingredient of EMSAM®. Transdermal administration involves maintaining selegiline in contact with the skin of the patient in a form permitting migration of the selegiline through the skin and into the bloodstream of the patient to a sufficient extent to produce a therapeutically effective amount of selegiline within the blood supply to the brain of the patient. EMSAM® generally does not cause skin irritation in patients. The FDA allows EMSAM® in the 6mg/24 hour strength to be marketed without any dietary restrictions, because this strength does not induce hypertensive crisis caused by the ingestion of foods containing high amounts of tyramine (the "cheese effect") in patients. Therefore, EMSAM® is within the scope of claim 1.

[1] *See also* MPEP § 2753 (8th ed.) (Incorporating Revision No. 4) ("Pursuant to 37 CFR 1.740(a)(9), the application for patent term extension need only explain how one product claim of the patent claims the approved product, if there is a claim to the product. In addition, the application need only explain how one method of use claim of the patent claims the method of use of the approved product.")

5

7. A topical composition for the transdermal administration of L-deprenyl or a salt thereof, comprising a quantity of L-deprenyl or a salt thereof as a sole therapeutically active agent effective upon transdermal migration into the bloodstream to inhibit monoamine oxidase B, in combination with at least one pharmaceutical carrier operable to permit transdermal absorption of L-deprenyl or a salt thereof.

EMSAM® (selegiline transdermal system) is a transdermal patch, which is a topical composition, for the transdermal administration of selegiline, which is also known as L-deprenyl. Selegiline is the sole therapeutically active agent of EMSAM®. When EMSAM® is applied transdermally, it is designed to continuously deliver selegiline by transdermal migration into the bloodstream of a patient. Selegiline is a selective inhibitor of monoamine oxidase B. The selegiline in EMSAM® is administered to the patient by attaching an Adhesive/Drug Layer to the patient's skin. This Layer contains selegiline in combination with an acrylic adhesive, which is a pharmaceutical carrier, operable to permit transdermal absorption of selegiline. Therefore, EMSAM® is within the scope of claim 7.

In addition, at least claims 1-8 and 11-12 of the '579 patent read on the approved product EMSAM® or a method of use of the approved product:[2]

1.    A method of treating depression in a human patient which comprises maintaining in contact with the skin of said patient a quantity of L-deprenyl or a salt thereof in a form permitting migration of said L-deprenyl or salt thereof through the skin of said patient into the bloodstream of the patient to a sufficient extent to produce a therapeutically effective amount of L-deprenyl within the blood supply to the brain of said patient without causing skin irritation to the patient or inducing a cheese effect in the patient.

2.    The method defined in claim 1 wherein said L-deprenyl or salt thereof is mixed with an excipient before being applied to the skin of said patient.

3.    The method defined in claim 2 wherein said excipient causes the L-deprenyl content of the mixture to migrate into the bloodstream of the patient at a controlled rate, whereby

---

[2] See 35 U.S.C. § 156(d)(1)(B). See also MPEP § 2753 (8th ed.) (Incorporating Revision No. 4) ("[E]ach claim that claims the approved product, the method of use of the approved product, or the method of manufacturing the approved product must be listed.")

at least said therapeutically effective amount of L-deprenyl is maintained in the blood supply to the brain of said patient continuously throughout a time interval.

4.      The method defined in claim 3 wherein said mixture containing L-deprenyl is contained within a patch structure for convenient affixation to a part of the body of said patient in such a manner as to maintain contact between the skin of said patient and said mixture containing L-deprenyl during said time interval.

5.      The method defined in claim 4 wherein said time interval is at least one day.

6.      A method, according to claim 5, wherein said controlled rate is between 5 and 50 mg of L-deprenyl per day.

7.      A topical composition for the transdermal administration of L-deprenyl or a salt thereof, comprising a quantity of L-deprenyl or a salt thereof as a sole therapeutically active agent effective upon transdermal migration into the bloodstream to inhibit monoamine oxidase B, in combination with at least one pharmaceutical carrier operable to permit transdermal absorption of L-deprenyl or a salt thereof.

8.      The topical composition according to claim 7 wherein the quantity of L-deprenyl or a salt thereof is sufficient to provide from about 5 to about 50 mg of L-deprenyl per day to a patient.

11.     The topical composition according to claim 7 wherein the composition is incorporated into a transdermal patch structure.

12.     The topical composition according to claim 11 wherein the transdermal patch structure comprises a sealed pouch having a top layer impervious to the composition and a bottom membrane for dermal contact through which said L-deprenyl or a salt thereof is slowly porous.

If the USPTO would like additional information about the above listed claims and how any one of the claims reads on the approved product EMSAM® or a method of use of the approved product, Applicant will provide such information upon request.

7

10. **A STATEMENT BEGINNING ON A NEW PAGE OF THE RELEVANT DATES AND INFORMATION PURSUANT TO 35 U.S.C. 156(G) IN ORDER TO ENABLE THE SECRETARY OF HEALTH AND HUMAN SERVICES OR THE SECRETARY OF AGRICULTURE, AS APPROPRIATE, TO DETERMINE THE APPLICABLE REGULATORY REVIEW PERIOD, PARTICULARLY, FOR A PATENT CLAIMING A HUMAN DRUG, ANTIBIOTIC, OR HUMAN BIOLOGICAL PRODUCT, THE EFFECTIVE DATE OF THE INVESTIGATIONAL NEW DRUG (IND) APPLICATION AND THE IND NUMBER; THE DATE ON WHICH A NEW DRUG APPLICATION (NDA) OR A PRODUCT LICENSE APPLICATION (PLA) WAS INITIALLY SUBMITTED AND THE NDA OR PLA NUMBER; AND THE DATE ON WHICH THE NDA WAS APPROVED OR THE PRODUCT LICENSE ISSUED (37 C.F.R. § 1.740(a)(10))**

NDA 21-336 was submitted and approved for EMSAM® (selegiline transdermal system) patches. The relevant dates are as follows:

| | |
|---|---|
| Effective date of the IND Application No. 46,944 | January 19, 1995 |
| Date on which NDA 21-336 was submitted | May 24, 2001 |
| Date on which the Non-Approvable Letter issued for NDA 21-336 | March 25, 2002 |
| Date of Resubmission of NDA 21-336 | July 31, 2003 |
| Date Approvable Letter issued for NDA 21-336 | January 31, 2004 |
| Date on which Formal Response to Approvable Letter for NDA 21-336 was submitted | May 26, 2005 |
| Date on which NDA 21-336 was approved | February 27, 2006 |

On December 20, 1994, Applicant submitted to the FDA an Investigational New Drug ("IND") Application No. 46,944 for selegiline transdermal patches under Section 505 of the FDCA for the purpose of conducting clinical studies to support the approval of a subsequent New Drug Application ("NDA") for the use of EMSAM® (selegiline transdermal system) patches. A copy of the letter from Applicant transmitting the application for IND Application No. 46,944 is attached as Exhibit G. This establishes the beginning of the "regulatory review period" under 35 U.S.C. § 156(g)(1)(B)(i) as January 19, 1995, the effective date of an investigational exemption, i.e., 30 days after the date the FDA received the IND application.

On May 24, 2001, Applicant submitted to the FDA an original NDA for selegiline transdermal patches for the treatment of major depressive disorder in humans under Section 505 of the FDCA. A copy of the letter from Applicant transmitting NDA 21-336 is attached as Exhibit H. This establishes May 24, 2001, as the end of the "testing phase" under IND

Application No. 46,944 of the "regulatory review period" and the beginning of the "approval phase" under NDA 21-336 of the "regulatory review period" under 35 U.S.C. § 156(g)(1)(B)(ii).

On February 27, 2006, the FDA approved NDA 21-336 for use of EMSAM® (selegiline transdermal system) patches in the acute and longer-term treatment of major depressive disorder in adult patients. *See* Exhibit B. This establishes the end of the "regulatory review period" under 35 U.S.C. § 156(g)(1)(B)(ii) as February 27, 2006.

11. **A BRIEF DESCRIPTION BEGINNING ON A NEW PAGE OF THE SIGNIFICANT ACTIVITIES UNDERTAKEN BY THE MARKETING APPLICANT DURING THE APPLICABLE REGULATORY REVIEW PERIOD WITH RESPECT TO THE APPROVED PRODUCT AND THE SIGNIFICANT DATES APPLICABLE TO SUCH ACTIVITIES (37 C.F.R. § 1.740(a)(11))**

During the regulatory review period, Applicant was actively involved in obtaining FDA approval for the use of EMSAM® (selegiline transdermal system) patches in the acute and longer-term treatment of major depressive disorder in adult patients.

As previously noted, Applicant submitted IND Application No. 46,944 on December 20, 1994, for selegiline transdermal system patches. The regulatory review period began 30-days later on January 19, 1995, when the IND Application became effective. During the period from January 19, 1995, through May 24, 2001, Applicant, in close consultation with the FDA, conducted clinical trials under IND Application No. 46,944. Applicant acted with due diligence under IND Application No. 46,944 during the "testing phase" of the regulatory review period under 35 U.S.C. § 156(g)(1)(B)(i). Exhibit I identifies submissions by Applicant to FDA officials concerning IND Application No. 46,944, briefly describes significant and other activities by Applicant during the "testing phase," and confirms that Applicant acted with due diligence during this phase.

On May 24, 2001, Applicant submitted NDA 21-336 for use of EMSAM® (selegiline transdermal system) patches. From the time NDA 21-336 was received by the FDA to February 27, 2006, when Applicant received regulatory approval for NDA 21-336, Applicant continued to interact with various FDA officials and answered numerous questions, generated requested data, and supplied requested information regarding all clinical studies and data on the use of EMSAM® (selegiline transdermal system) patches. Applicant acted with due diligence under NDA 21-336 during the "approval phase" of the regulatory review period under 35 U.S.C. § 156(g)(1)(B)(ii), which ended when NDA 21-336 was approved by the FDA. Exhibit J identifies submissions and communications between Applicant and FDA officials concerning NDA 21-336, briefly describes significant and other activities by Applicant during the "approval phase," and confirms that Applicant acted with due diligence during this phase.

Applicant does not believe that copies of any of the submissions or communications identified in Exhibits I and J are required to be submitted pursuant to 37 C.F.R. § 1.765. Copies

of any or all of the submissions and communications identified in those Exhibits will be provided to the USPTO upon request.

Applicant reserves the right to present additional information in support of the conclusion that it acted with due diligence during the regulatory review period. See, e.g., 21 C.F.R. § 60.32.

12.   A STATEMENT BEGINNING ON A NEW PAGE THAT IN THE OPINION OF THE APPLICANT THE PATENT IS ELIGIBLE FOR THE EXTENSION AND A STATEMENT AS TO THE LENGTH OF EXTENSION CLAIMED, INCLUDING HOW THE LENGTH OF EXTENSION WAS DETERMINED (37 C.F.R. § 1.740(a)(12))

a.   Statement of Eligibility

Applicant believes that it is entitled to an extension for the '579 patent under 35 U.S.C. § 156 because it satisfies all of the requirements for such extension as follows:

1.   35 U.S.C. § 156(a), 37 C.F.R. § 1.720

The claims of the '579 patent encompass EMSAM® (selegiline transdermal system), as well as a method of using that product.

2.   35 U.S.C. § 156(a)(1)

Pursuant to 35 U.S.C. § 154(c)(1), as amended (effective June 8, 1995) by the Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 4809 (1994), and 35 U.S.C. § 156, the term of the '579 patent currently expires on August 18, 2007. Therefore, the term of the '579 patent will not have expired before submission of this application.

3.   35 U.S.C. § 156(a)(2)

The term of the '579 patent has never been extended under 35 U.S.C. § 156(e)(1).

4.   35 U.S.C. § 156(a)(3)

This application for extension is submitted by an attorney for the owner of record in accordance with the requirements of 35 U.S.C. § 156(d)(1)-(4) and the rules of the USPTO.

5.   35 U.S.C. § 156(a)(4)

As shown by the February 27, 2006 letter from the FDA to Applicant (see Exhibit B), the product was subject to a regulatory review period under Section 505(b) of the FDCA before its commercial marketing or use.

12

6.    35 U.S.C. § 156(a)(5)(A)

The commercial marketing or use of the product EMSAM® (selegiline transdermal system) is the first permitted commercial marketing or use of the product under Section 505(b) of the FDCA for humans of the active ingredient, selegiline. *See* discussion *infra*, Part 13.

7.    35 U.S.C. § 156(c)(4)

No other patent has been extended under 35 U.S.C. § 156(e)(1) for the same regulatory review period for the product EMSAM® (selegiline transdermal system).

b.    **Statement of Length of Extension and Determination of Such Extension**

Applicant believes that the period of extension applicable to the '579 patent is the maximum allowed, i.e., five years, based on the following chronology.

| Patent Extension Calculation | Calculations |
|---|---|
| Date IND 46,944 Became Effective | January 19, 1995 |
| Date NDA 21-336 Submitted to the FDA | May 24, 2001 |
| Date NDA 21-336 Approved by the FDA | February 27, 2006 |
| | |
| Reissue No. 34,579 Issue Date | April 5, 1994 |
| Effective Patent Filing Date | August 18, 1987 |
| U.S. Pat. No. 4,868,218 (reissued as Reissue No. 34,579) Issue Date | September 19, 1989 |
| | |
| 17 Years from Issue Date | September 19, 2006 |
| 20 Years from Effective Patent Filing Date | August 18, 2007 |
| Greater of 17 Years from Issue or 20 Years from Filing | August 18, 2007 |
| | |
| Start Date of Regulatory Review Period | December 20, 1994 |
| IND Review Period (days) | 2317 |
| ½ IND Review Period (days) | 1158 |
| NDA Review Period (days) | 1741 |
| Regulatory Review Period (days) | 4058 |
| NDA Period + ½ IND Period (days) | 2899 |
| | |
| Expiration Date of 5 Year Limitation Period | August 18, 2012 |
| Five Year Limitation Period in Days | 1,827 |
| Statutory Extension Period In Days | 1,827 |

The current term of the '579 patent, which expires on August 18, 2007, should be extended by 1,827 days, or to August 18, 2012. This period of extension was determined on the following basis. As set forth in 35 U.S.C. § 156(g)(1), the regulatory review period for

EMSAM® (selegiline transdermal system) equals the sum of the following two time periods: (1) the period of time beginning on the effective date of IND Application No. 46,944 of January 19, 1995, and ending with the submission of NDA 21-336 on May 24, 2001, a period of 2,317 days, and (2) the period of time beginning with the submission of NDA 21-336 on May 24, 2001 and ending with the approval of NDA 21-336 on February 27, 2006, a period of 1,741 days. The two periods added together equal 4,058 days.

Section 156(c)(2) requires the period calculated under 35 U.S.C. § 156(g)(1)(B)(i) (i.e., the period beginning on the effective date of IND Application No. 46,944 and ending with the submission of NDA 21-336) to be reduced by one-half of the 2,317 day period, resulting in a period of 1,158 days.

From the foregoing calculation, an extension of 2,899 days results, i.e., the period under 35 U.S.C. § 156(g)(1)(B)(i) (1,158 days) plus the period under 35 U.S.C. § 156(g)(1)(B)(ii) (1,741 days). This extension is subject to two potential further limitations under 35 U.S.C. § 156.

First, under 35 U.S.C. § 156(g)(6)(A), a maximum extension of five years is permitted. Since the calculated extension of 2,898 days is more than five years (1,827 days), the maximum extension available is five years, or until August 18, 2012.

Second, under 35 U.S.C. § 156(c)(3), if the period remaining in the term of the patent after the date of FDA approval (i.e., February 27, 2006), when added to the extension period calculated above would exceed 14 years, the period of extension is to be limited so that the total does not exceed 14 years. Here, a combination of the remaining term of the patent until August 18, 2007 and five years of extension is much less than the 14 year limit. As a result, the patent term extension of five years is not reduced under 35 U.S.C. § 156(c)(3).

Accordingly, the '579 patent is eligible for an extension of five years, from August 18, 2007 to August 18, 2012.

14

13. **A STATEMENT THAT APPLICANT ACKNOWLEDGES A DUTY TO DISCLOSE TO THE DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE AND THE SECRETARY OF HEALTH AND HUMAN SERVICES OR THE SECRETARY OF AGRICULTURE ANY INFORMATION WHICH IS MATERIAL TO THE DETERMINATION OF ENTITLEMENT TO THE EXTENSION SOUGHT (SEE 37 C.F.R. § 1.765) (37 C.F.R. § 1.740(a)(13))**

Applicant acknowledges a duty to disclose to the Commissioner of Patents and Trademarks and the Secretary of Health and Human Services or the Secretary of Agriculture any information which is material to the determination of entitlement to the extension sought. In furtherance of that duty, Applicant hereby explains that the '579 patent is eligible for patent term extension under 35 U.S.C. § 156. For the convenience of the reader, a Table of Contents of Part 13 is found in Exhibit K.

SUMMARY OF ARGUMENT

The '579 patent must be extended under the plain language of 35 U.S.C. § 156, as properly construed, because the product EMSAM® is the first permitted commercial marketing or use of the single active ingredient present in the drug product: selegiline. This result comports with the plain statutory language of 35 U.S.C. § 156, as well as the clear legislative intent of Congress to reimburse NDA applicants for the time, expense, and patent life lost during the regulatory approval process for drug products with new active ingredients. Applicant spent over eleven years of the patent life of the '579 patent pursuing regulatory approval of EMSAM® by the FDA, and now is left with a mere year and a half of patent protection. Congress enacted 35 U.S.C. § 156 (Title II) of The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Act") with the express purpose of benefiting innovators, such as Applicant, who have lost a large amount of patent life by "restor[ing]... some of the time lost on patent life while the product is awaiting pre-market approval."[3] Congress implemented this intent through the unambiguous statutory language of 35 U.S.C. § 156, and the legislative history of this significant legislation further reflects this intent. The explicit mandate and intent of Congress must be followed when evaluating whether to grant patent term extension.

---

[3] Mylan Pharmaceuticals v. Thompson, 268 F.3d 1323, 1326 (Fed. Cir. 2001) (citing H.R. REP. No. 98-857, pt. 1 at 15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2648).

15

The eligibility of the '579 patent for patent term extension is, to Applicant's knowledge, a matter of first impression; Applicant was unable to identify a previous instance of or application for term extension involving the factual situation presented by the approval of EMSAM®. Thus, this application provides the USPTO with the opportunity to adopt and apply the statutory construction intended by Congress by focusing on the plain statutory language, binding precedent, and the intent of Congress when enacting this legislation.

A patent is eligible for patent term extension only if the commercial marketing or use of the product that was subject to regulatory review is the first permitted commercial marketing or use of the *product*.[4]  The term "product" is defined as the *drug product*, which is defined further in 35 U.S.C. § 156(f)(2) as follows:

> (2) The term "drug product" means the active ingredient of—
>
>     (A) a new drug...
>
> including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.[5]

Based on this plain statutory language, for products with a single active ingredient, drug product means the active ingredient of a new drug, "including any salt or ester of the active ingredient, *as a single entity*..."[6]  The statutory language "single entity" makes it clear that Congress intended the term "active ingredient of a new drug" to mean the single, specific active ingredient actually present in the drug product, whether it is in a basic form *per se*,[7] in the form of a salt *per se*, or in the form of an ester *per se*.  This language also clearly indicates that the *single* "active ingredient" cannot be defined to include a class of compounds related to the active ingredient.

The courts have analyzed the meaning of "active ingredient" as found in 35 U.S.C. § 156(f)(2) before.  The prior case law regarding this statutory language makes clear that the term "active ingredient" itself means the exact form of the active ingredient in the approved drug product.  What remains to be clarified by the USPTO is that, in the context of the statute as a whole, active ingredient means the single, specific active ingredient actually present in the drug product, whether it is in a basic form, in the form of a salt, or in the form of an ester.

---

[4] 35 U.S.C. § 156(a)(5)(A) (2005) (emphasis added).
[5] *Id.* at § 156(f)(2).
[6] *Id.* (emphasis added).
[7] For example, an acid or base.

**"Active Ingredient" does not mean "Active Moiety."** In *Glaxo Operations UK Ltd. v. Quigg* (*Glaxo II*),[8] the Federal Circuit evaluated whether the term "active ingredient" means "active moiety," as advocated by the Commissioner of Patents and Trademarks ("Commissioner"). The Federal Circuit explicitly rejected the Commissioner's proposed statutory construction, holding that under the plain statutory language, "active ingredient" cannot mean "active moiety."[9] Since this holding has not been overruled *en banc* by the Federal Circuit, this holding is binding precedent on the proper construction of the term "active ingredient."[10]

Therefore, binding Federal Circuit precedent explicitly rejects the proposal that "active ingredient" means "active moiety." This holding, however, does not resolve the precise issue now presented by Applicant's application for patent term extension: namely, whether the Act's unambiguous language means what it says, that "active ingredient" must be the single, specific active ingredient actually present in the drug product.

**"Active Ingredient" does not include a group or class of compounds related to the active ingredient.** The effect of the statutory phrase "as a single entity" has not been addressed by the courts. Thus, while *Glaxo II* discussed above does not focus on this aspect of the definition of "product," the Federal Circuit's holding that the term "active ingredient" cannot mean "active moiety" is important in correctly construing the plain meaning of "active ingredient of a new drug." Although this holding, as affirmed by the Federal Circuit, provided the plaintiff in that case with all requested relief, the district court in *Glaxo Operations UK Ltd. v. Quigg* (*Glaxo I*) nevertheless decided to suggest another statutory construction for the term "active ingredient" as *dictum* in a footnote.[11] Under this construction, "active ingredient" would be a class of compounds that consists of the active ingredient, all salts of the active ingredient, *and* all esters of the active ingredient.

In the words of the district court, this construction creates an "unattractive asymmetry," which arbitrarily grants patent term extension based on the sequence in which related compounds are approved.[12] For example, under this construction, if an acid is approved before a salt of the acid, the salt is eligible for patent term extension, but if the situation is reversed and the salt of

---

[8] 894 F.2d 392 (Fed. Cir. 1990).
[9] *Id.* at 395.
[10] *See* discussion *infra*, Part 13.B.
[11] 10 U.S.P.Q.2d 1100, 1105 n.12 (E.D. Va. 1989).
[12] *Id.*

17

the acid was approved first, the acid is not eligible for patent term extension. Such a temporal distinction based on the serendipitous order of product approval is not consistent with any legislative goal of Congress.[13] This farfetched construction advances neither the interests of the research-oriented pharmaceutical industry nor the generic drug industry, and Congress surely would not have intended to produce such an irrational result.[14] In fact, when an appellate court, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), evaluated a similar statutory construction, it characterized the district court's suggested construction as "speculation," and rejected such statutory construction as failing to serve any conceivable statutory purpose.[15] Indeed, the legislative history is devoid of any statements indicating that Congress intended the farfetched and serendipitous construction proposed by the district court.

The USPTO expressed a similar view of the district court's suggested construction in its briefing on appeal of the district court's decision in *Glaxo I* to the Federal Circuit: "[I]n this case the district court's formalistic reading of the statute would produce absurdly anomalous results. Availability of a patent term extension for a particular drug would depend upon which form of the drug's therapeutically active substance… was the first to receive FDA approval."[16]

The fact that the construction suggested in *dicta* by the district court in *Glaxo I* would be incorrect is further supported in that it also renders the statutory term "single entity" meaningless, since the term "active ingredient" would then be construed to encompass a class of compounds related to the active ingredient, not a *single entity*. By ignoring that the statutory language "single entity" modifies "active ingredient," this statutory construction violates the rules of statutory construction that require courts to construe statutes in a manner that attributes meaning to each term if possible[17] and does not render any part of the statutory language superfluous or inoperative.[18]

---

[13] *See* Abbott Laboratories v. Young, 920 F.2d 984, 988-89 (D.C. Cir. 1990).

[14] *See id.*

[15] *See id.*

[16] Brief for the Appellant at 11, Glaxo Operations UK Ltd. v. Quigg, No. 89-1407 (Fed. Cir. July 19, 1989). Note, the briefing by the USPTO argued for the position that "active ingredient" means "active moiety," which avoided the asymmetric and illogical result of the district court's suggested construction. The USPTO's argument that "active ingredient" means "active moiety" was expressly rejected by the Federal Circuit in *Glaxo II*. 894 F.2d at 395.

[17] Monclair v. Ramsdell, 107 U.S. 147, 152 (1882).

[18] Duncan v. Walker, 533 U.S. 167, 174 (2001).

18

In fact, the district court's statutory construction suggested in *dictum* is so confusing that the USPTO incorrectly summarized this construction in the MPEP. MPEP § 2751 summarizes the district court's *dictum* as follows:

> Both the ester and the salt active ingredient may each support an extension of patent term of different patents provided the acid itself has not been previously approved. See *Glaxo Operations UK Ltd. v. Quigg*, 706 F.Supp. 1224, 1232-33, 10 USPQ2d 1100, 1107 (E.D. Va. 1989); *aff'd.*, 894 F.2d 392, 13 USPQ2d 1628 (Fed. Cir. 1990).[19]

But a careful analysis of the district court's suggested construction shows that it would, in fact, have the exact opposite result;[20] if the acid has been previously approved, both the salt and ester will be eligible for patent term extension, but if the salt or ester has been previously approved, the acid will not be eligible for patent term extension. It is not surprising that such a confusing, farfetched and asymmetrical construction is difficult to summarize.

In contrast, MPEP § 2751 correctly summarizes the straight-forward and logical holding of the Federal Circuit in *Glaxo II*, that "active ingredient" does not mean "active moiety":

> A "drug product" means the active ingredient found in the final dosage form prior to administration of the product to the patient, not the resultant form the drug may take after administration. In this regard, a drug in the ester form which is used for oral administration is a different drug product from the same active moiety in a salt form which is administered by injection, even though both the salt and the ester are used to treat the same disease condition. The ester form is a different active ingredient from the salt form.[21]

**"Active Ingredient of a New Drug" is a "Single Entity."** In contrast to the previously proposed construction, Applicant proposes a very simple statutory construction for the term "active ingredient of a new drug" for a drug product with a single active ingredient,[22] based on and consistent with the plain statutory language and the intent of Congress when it enacted this legislation:

> "Active Ingredient of a New Drug" = Single Active Ingredient of the Drug Product

---

[19] MPEP § 2751 (8th ed.) (Incorporating Revision No. 4).
[20] *See Glaxo I*, 10 U.S.P.Q.2d at 1105 n.12.
[21] MPEP § 2751 (8th ed.) (Incorporating Revision No. 4).
[22] If the drug product at issue contained two active ingredients, i.e., it was a combination product, Applicant's proposal would result in the consistently logical construction that "active ingredient" means a single, specific active ingredient in combination with a different, specific active ingredient, as set forth in the plain statutory language.

19

This construction gives meaning to the statutory language of the active ingredient "as a single entity," which is effectively read out of district court's suggested construction in *Glaxo I*, and is consistent with the statute as a whole, as well as the legislative history. In light of this language, the only logical statutory construction of "drug product" is the single, specific active ingredient actually present in the drug product.

Under this correct construction, the proper inquiry under 35 U.S.C. § 156(a)(5)(A) for the '579 patent is whether the single, specific active ingredient of EMSAM®, which is selegiline, is the first permitted commercial marketing or use of that specific active ingredient. It is. The only product that has been previously approved related to selegiline is Eldepryl®,[23] in which the active ingredient is selegiline hydrochloride (a salt), but not selegiline. Since selegiline has never been approved as the active ingredient of an approved drug product before, the '579 patent, based on the approval of EMSAM®, is eligible for patent term extension.

The statutory construction and case law analysis supporting the above construction of 35 U.S.C. § 156 are set forth in greater detail below.

A.    **Proper Construction of "Active Ingredient of a New Drug" is the Single Active Ingredient of the Drug Product**

When construing the proper meaning of statutory language, courts favor the plain and ordinary meaning of the text of a statute. Statutory construction begins with the language of the statute itself,[24] with words being given their ordinary, contemporaneous and common meanings.[25] Under the plain language of 35 U.S.C. § 156(f)(2), the term "drug product" means the active ingredient of a new drug, "including any salt or ester of the active ingredient, *as a single entity* or in combination with another active ingredient."[26] This plain language clearly indicates that a drug product with a single active ingredient means the single, specific active ingredient of a new drug actually present in the drug product, whether that active ingredient is in a basic form, in the form of a salt, or in the form of an ester. In the context of the statutory language, the term "single entity" clearly modifies the term "active ingredient." This position is reinforced by the phrase following "as a single entity," which makes clear that a drug product

---

[23] Eldepryl® is also marketed by Somerset Pharmaceuticals, Inc., the Applicant herein.
[24] Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330 (1978).
[25] Perrin v. U.S., 444 U.S. 37, 42 (1979).
[26] (emphasis added).

20

may contain an active ingredient as a single entity, or a combination of one single, specific active ingredient with another, different, active ingredient.

Under this correct statutory construction, the proper inquiry is whether the particular active ingredient of the drug product is the first permitted commercial marketing or use of that specific active ingredient. It would not matter whether another form related to the specific active ingredient, such as an acid, salt, or ester, had been previously approved, since the inquiry is limited to whether the single, specific active ingredient itself, which is actually present in the approved drug product, had been previously approved in another drug product.

Under the plain language of 35 U.S.C. § 156(f)(2), the best way to determine the ordinary and common meaning of "single entity" is to look at the definition of each word in this term. The ordinary meaning of "single" in the context of this statutory language is "consisting of only one in number."[27] When the word "single" is used to modify a noun, it means that there is only one of that noun. The ordinary meaning of "entity" in the context of this statutory language is "independent, separate, or self-contained existence [ ]: the existence of a thing as contrasted with its attributes."[28] Thus, although the word "entity" already connotes a separate existence that is independent of any particular attributes, Congress chose to combine "single" with "entity" to make it abundantly clear that "drug product" means the particular active ingredient of a new drug actually present in the drug product, unless it is combined with another, different, active ingredient. The "single entity" language is unambiguous, and indicates that Congress clearly intended "drug product" to mean the *single*, specific active ingredient actually present in the drug product, not a class of compounds that consists of the active ingredient, all salts of the active ingredient, *and* all esters of the active ingredient. The latter construction, which includes a class of compounds within the meaning of "active ingredient," would render the language "single entity" superfluous and inoperative, which is not permitted under the rules of statutory construction.

Because any statutory construction that defines the phrase "active ingredient of a new drug... , including any salt or ester of the active ingredient, as a single entity," as including a class of compounds renders the language "single entity" meaningless, it must be rejected. When

---

[27] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1095 (10th ed. 1999).
[28] *Id.* at 387.

read in context, the proper and logical interpretation of the statutory language "including any salt or ester of the active ingredient, as a single entity" is that it is intended to clarify that the active ingredient of a new drug refers to the particular active ingredient actually present in the drug product, whether that active ingredient is in a basic form, in the form of a salt, or in the form of an ester.  Congress also may have used the phrase "including any salt or ester of the active ingredient" in the statute to indicate that "active ingredient" should not be interpreted to mean "active moiety," because the phrase would become superfluous and inoperative under such a construction.[29]  Indeed, the D.C. Circuit in *Abbott Laboratories v. Young (Abbott)*[30] specifically found that the phrase "including any ester or salt of the active ingredient," as used in a different Title of the same Act, cannot mean "active moiety."[31]  The D.C. Circuit explained that for a statutory phrase to mean "active moiety" it would need to "cover all possible permutations of active ingredient," yet the parenthetical phrase only covers esters and salts.[32]  The court found that it was "*linguistically* infeasible" to read "including any ester or salt of the active ingredient" as merely illustrative, such that it would cover "*any* form that eventually produces the same active moiety."[33]

The statutory construction of the phrase "active ingredient of a new drug" proposed herein not only is reasonable and consistent with the statutory language of 35 U.S.C. § 156, it is also consistent with the statute as a whole, and the intent of Congress as shown by the legislative history.  Further, Applicant's construction is consistent with binding precedent related to the meaning of "active ingredient" under 35 U.S.C. § 156(f)(2).  Applicant's construction also avoids the confusing and illogical asymmetry of the statutory construction of "active ingredient" as proposed by the district court in *dicta* in *Glaxo I*.[34]

---

[29] The FDA defines "active moiety" as follows: "Active moiety means the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt (including a salt with hydrogen or coordination bonds), or other noncovalent derivative (such as a complex, chelate, or clathrate) of the molecule, responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 314.108 (2005). Since the active moiety is independent of those portions of the molecule that cause the drug to be a salt or an ester, the language "including any salt or ester of the" active moiety is redundant with the meaning of the term "active moiety." Since the phrase does not give any further meaning to the statute, this construction is necessarily incorrect because it renders the statutory language superfluous and inoperative. *See Duncan*, 533 U.S. at 174.

[30] 920 F.2d 984, 985-89 (D.C. Cir. 1990).

[31] *Abbott*, 920 F.2d at 987-88.

[32] *Id.* at 988 (emphasis in original).

[33] *Id.* (emphasis in original).

[34] 10 U.S.P.Q.2d 1100, 1105 n.12 (E.D. Va. 1989).

22

Thus, the proper inquiry into term extension for the '579 patent begins by identifying the single, specific active ingredient in the drug product EMSAM®, which is selegiline. The '579 patent is eligible for patent term extension under 35 U.S.C. § 156(a)(5)(A) if the permission for the commercial marketing or use of selegiline in EMSAM® is the first permitted commercial marketing or use of selegiline. Since the single active ingredient of the previously approved product ELDEPRYL® is selegiline hydrochloride, the approval of the drug product EMSAM® is the first permitted commercial marketing or use of the specific active ingredient selegiline. Therefore, under the proper statutory construction of 35 U.S.C. § 156, the '579 patent is entitled to five years of patent term extension, less than half of the over eleven years of patent life spent obtaining regulatory approval of EMSAM® from the FDA.

**B.    Binding Precedent Dictates That "Active Ingredient" Does Not Mean "Active Moiety"**

The proper statutory construction of 35 U.S.C. § 156(a)(5)(A) has been addressed by the Federal Circuit in two cases. In the first case, *Fisons PLC v. Quigg (Fisons)*,[35] the proper construction of the term "active ingredient" was not at issue, because Fisons argued that under 35 U.S.C. § 156(a)(5)(A), the term "product" should not be interpreted to mean an "active ingredient."[36] Nevertheless, the Federal Circuit's holding in *Fisons* that subsection 156(a)(5)(A) limited "extensions to the term of the patent on the first permitted marketing or use of a particular *active ingredient*" is consistent with the statutory construction proposed by Applicant herein.[37] In the second case, *Glaxo II*, the Federal Circuit carefully analyzed whether the term "active ingredient" is equivalent to "active moiety." The Federal Circuit held that under the plain statutory language of 35 U.S.C. § 156(a), "active ingredient" cannot mean "active moiety" within the context of eligibility for patent term extension.[38]

---

[35] 876 F.2d 99 (Fed. Cir. 1989).
[36] *Id.* at 100.
[37] *Id.* at 100 (emphasis in original). Fisons argued that "product" means the specific product approved by the FDA, regardless of whether the active ingredient of that specific product had been previously approved in another product. *Id.* at 101. The court rejected this argument, and held that Fisons' patents were not eligible for patent term extension because the specific active ingredient in Fisons' products had already been approved by the FDA in an earlier marketed drug product. Therefore, Fisons' products clearly were not the first permitted marketing or use of that particular active ingredient. *Id.* Thus, the Federal Circuit's analysis of the scope of the term "active ingredient" ended when it determined that the single, specific active ingredient present in the drug products had already been approved by the FDA in another drug product. This is the exact same analysis that would be performed under the correct statutory construction proposed by Applicant herein.
[38] 894 F.2d at 395.

In *Glaxo II*, the Commissioner had argued that "active ingredient" means "active moiety," such that the term "would encompass all acid, salt, or ester forms of a single therapeutically active substance even if the drug before being administered contained only other substances."[39] The Federal Circuit rejected the Commissioner's proposed construction because it ignored the plain meaning of the term "active ingredient," which had a well-defined, ordinary, common meaning when Congress enacted the Act, and would have required the court to find that "Congress intended a meaning contrary to the plain meaning" of the statutory language.[40] The Federal Circuit noted that if Congress had wanted to define "product" as a new active moiety it could have done so directly, since that term also had a well-defined, ordinary plain meaning at the time the statute was enacted.[41]

After the Federal Circuit construed the plain statutory language of the statute, it carefully evaluated whether the legislative history was inconsistent with its finding that "active ingredient" does not mean "active moiety."[42] The court was unable to find a clearly expressed intent of Congress contrary to the plain meaning of the statutory language.[43] Instead, the Federal Circuit found that "Congress clearly had articulated policy reasons for making *more types* of patents eligible for extension, including to encourage research."[44] The Federal Circuit noted that the legislative history did not provide the Commissioner with any basis for ignoring the plain and unambiguous meaning of "active ingredient," and rejected the Commissioner's attempt to base an argument on the legislative history's discussions of "new chemical entities."[45] The Federal Circuit refused to stray from the plain meaning of "active ingredient" as used in the statute to substitute the Commissioner's "active moiety" definition:

> we simply cannot find any clear statement that extensions are required based on
> first approval of "new chemical entities." In fact, if that were Congress' intent,
> one would expect it to use the same term—"new chemical entity"—in the bill as

---

[39] *Id.*

[40] *Id.*

[41] *Id.* at 397 ("Further, we are hesitant to stray from the plain meaning of the statute because both the terms Congress used and the terms the Commissioner would have us substitute were all well-known and well-defined at the time the Act was passed. FN8 *See, e.g,* 45 Fed. Reg. 72,582; 72,591 (1980); 44 Fed. Reg. 2932; 2937-38 (1979); *The Condensed Chemical Dictionary* 418, 907 (G. Hawley rev. 10th ed. 1981); FDA, Bureau of Drugs, Staff Manual Guide BD 4820.3 at 1-2 (Feb. 19, 1982).").

[42] *Id.* at 395-96.

[43] *Id.* at 396-400.

[44] *Id.* at 396 (emphasis added) ("Lesser profits might result in less research on new drugs.").

[45] *Id.* at 397-98.

is used in the House Report. Instead, the bill employed other terms with an equally clear but quite different meaning.[46]

The holding by the Federal Circuit that "active ingredient" does not mean "active moiety" under 35 U.S.C. § 156(f)(2) is binding precedent

*Glaxo I* is also instructive on this issue, since the lower court's opinion spends more time explaining the Federal Circuit's holding that the plain language of "active ingredient" cannot be construed to mean "active moiety." In *Glaxo I*, Glaxo appealed a decision by the Commissioner denying patent term extension based on the newly approved drug product CEFTIN® tablets.[47] The patent at issue claimed cefuroxime axetil, the active ingredient of the CEFTIN® tablets.[48] Cefuroxime axetil is an ester of cefuroxime, which is an organic acid.[49] The acid cefuroxime had never been approved for marketing or use by the FDA.[50] The FDA had previously approved two salts of cefuroxime as ZINACEP® and KEFUROX®, both of which were marketed by Glaxo.[51] Thus, the central question was whether the previously approved salts would preclude patent term extension eligibility based on a newly approved ester with the same active moiety, i.e., cefuroxime.[52]

The Commissioner denied Glaxo's application for patent term extension, stating that "for the purpose of eligibility for patent term extension, an active ingredient in the acid, salt or ester form is treated as the same drug product."[53] The Commissioner concluded that since the active moiety for the previously approved salts and the newly approved ester were the same, the permission for commercial marketing or use of the ester was not the first permitted commercial marketing or use of the active moiety.[54] The Commissioner's argument was rejected based on "undisputed material facts and unambiguous statutory language."[55]

The lower court found that there was no doubt that cefuroxime axetil—the ester—is the "active ingredient" of the product, and had never been the subject of commercial marketing or

---

[46] *Id.* at 398.
[47] *Id.* at 1100.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* at 1101.
[53] *Id.*
[54] 10 U.S.P.Q.2d 1100, 1101, 1103 (E.D. Va. 1989) (citing *In re Glaxo Operations UK Limited,* Request for Patent Term Extension Under 35 U.S.C. 156 For U.S. Patent No. 4,267,320 at 3-4 (Sept. 9, 1988)).
[55] *Id.* at 1102.

use as a product.[56]  Under the plain and unambiguous language of the statute, cefuroxime, the active moiety, is not present in the product; therefore, it is not an "ingredient" of the product.[57] An ingredient "must be something found in the mixture or compound, not just something that can be derived from it or from which the mixture or compound can be derived."[58]  Analogously, the court reasoned that a caterpillar cannot be said to be an ingredient of a butterfly, even though "a butterfly comes from, or derives from, a caterpillar in metamorphosis as does the ester from the acid in esterification.  But there is no caterpillar that is part of a butterfly, just as the acid itself is not a part of or found in the ester."[59]  Thus, even though cefuroxime axetil is metabolized into the "active moiety" cefuroxime, just as the previously approved sodium salts are metabolized into cefuroxime, cefuroxime is not the "active ingredient" of the product, which, according to the plain reading of the statute, must be present in the drug product when administered.[60]  "This is an insurmountable obstacle for the Commissioner's proposed rationale" given that the Commissioner conceded that cefuroxime is *not* an ingredient of the product.[61] Since it was undisputed that no prior FDA approval existed for cefuroxime axetil, the Commissioner's decision to deny patent term extension for Glaxo's patent was found to be arbitrary and capricious.[62]

As set forth above, the Federal Circuit in *Glaxo II* rejected the argument that the term "active ingredient" means "active moiety" as used in 35 U.S.C. § 156(f)(2).  Recently, in *Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.*, the Federal Circuit found that "active ingredient" is equivalent to "active moiety" under 35 U.S.C. § 156(b), in the context of infringement of claims of a patent (the term of which had been extended under 35 U.S.C. § 156(a)), and not in the context of determining whether a patent is eligible for term extension.[63]  The *Pfizer* opinion mischaracterizes the finding of the D.C. Circuit in *Abbott* by citing the court's opinion as supporting the statement: "35 U.S.C. § 156(f) defines the drug product as including 'any salt or

---

[56] *Id.* at 1103.
[57] *Id.* (stating that the plain meaning of "ingredient" refers to a "constituent element of a mixture or compounds." (citing WEBSTER'S SECOND UNIVERSITY DICTIONARY (1984))).
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* at 1107.
[63] 359 F.3d 1361, 1366 (Fed. Cir. 2004).  In *Pfizer*, there was no question that the patent extended covered a product that was the first commercial marketing or use of that product.

26

ester of the active ingredient.'"[64]   In fact, *Abbott* never even mentions 35 U.S.C. § 156 in its opinion.[65]   In addition, *Pfizer* does not cite or in any way discuss the Federal Circuit's earlier decision in *Glaxo II*, which also addresses the issue, and is binding precedent.

Accordingly, any reliance on *Pfizer* by the USPTO to once again argue that that the term "active ingredient" means "active moiety" in determining whether a patent is eligible for term extension under 35 U.S.C. § 156(a) would be misplaced.  Since the Federal Circuit will have jurisdiction over any questions regarding patent term extension, the Commissioner is bound by the Federal Circuit's finding in *Glaxo II* that "active ingredient" is not equivalent to "active moiety" for several reasons.  Most importantly, the Federal Circuit "has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc."[66]   An *en banc* hearing for *Pfizer* was denied by the Federal Circuit. The Federal Circuit has further held that "[w]here there is a direct conflict [between holdings], the precedential decision is the first."[67]   Since *Glaxo II* is the first panel decision, and *Pfizer* is not an *en banc* decision (indeed, *Pfizer* is not even a unanimous decision), the panel decision in *Pfizer* cannot overrule *Glaxo II*.  Thus, the statutory construction by the Federal Circuit in *Glaxo II* that the term "active ingredient" does not mean "active moiety" is binding precedent.

In addition, *Glaxo II* is the more relevant decision to determining whether a product "is the first permitted commercial marketing or use of the product" under 35 U.S.C. § 156(a)(5)(A), since the court directly addressed eligibility, not enforcement, in its decision.  In contrast, in *Pfizer* there was no dispute regarding the eligibility of the patent for extension, i.e., whether the product was the first permitted commercial marketing or use of the product.  Instead, the *Pfizer* court addressed the enforcement issue of whether a salt that was different than a salt which had received regulatory approval, and upon which patent term extension had been granted, infringed the patent.

---

[64] *Id.* at 1366 (citing Abbott Laboratories v. Young, 920 F.2d 984, 985-89 (D.C. Cir. 1990)).
[65] The issue before the court was whether a drug product with a salt as the active ingredient could qualify for ten years of marketing exclusivity under 21 U.S.C. § 355(f)(4)(D)(i) and (v), when the acid had already received marketing approval. *Abbott*, 920 F.2d at 985.  For a more detailed discussion of the court's analysis in *Abbott*, see discussion *infra*, Part 13.C.
[66] Newell Companies, Inc. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988) (citations omitted); *see also* George E. Warren Corp. v. United States, 341 F.3d 1348, 1351 (Fed. Cir. 2003) ("We cannot simply overrule the *Texport* decision, even if we were persuaded... that it is appropriate; to overrule a precedent, the court must rule en banc.").  The Federal Circuit has explicitly found that this rule applies when construing statutory language. *See* McCormick v. Department of Air Force, 307 F.3d 1339, 1341-42 (Fed. Cir. 2002).
[67] *Newell*, 864 F.2d at 765.

The USPTO recently relied on *Pfizer* to issue a Notice of Final Determination denying patent term extension for U.S. Patent No. 6,143,771 ("the '771 patent") based on the approval of NEXIUM® I.V.  A Request for Reconsideration of Final Determination ("Request") was filed by the owner of the '771 patent on January 27, 2006, properly arguing that "active ingredient" cannot mean "active moiety" under *Glaxo II*, which is the binding precedent, not *Pfizer*.  The Request recites many of the same arguments presented above regarding the inappropriate reliance by the USPTO on *Pfizer* to deny extension of patent term for the '771 patent.  In addition, the Request argues that since the focus of *Glaxo II* is on the eligibility provisions of 35 U.S.C. § 156(a), while the focus of *Pfizer* is on the enforcement provisions of 35 U.S.C. § 156(b), these opinions are in fact consistent and compatible with each other.[68]

### C.    Court *Dicta* Suggesting "Active Ingredient" Encompasses All Salts and Esters of the Active Ingredient is Incorrect

In *Glaxo I* and *II*, the parties agreed that the dispositive question at issue was whether "active ingredient" is equivalent to "active moiety."  Both courts determined that "active ingredient" does not mean "active moiety."  Thus, the legal analysis to resolve the dispute stopped with the question of whether cefuroxime axetil, the active ingredient in the form of an ester, was the first permitted commercial marketing and use of the active ingredient, when two other salts of the acid cefuroxime had been previously approved.[69]  Since the parties did not dispute that the product at issue was the first permitted commercial marketing or use of the specific ester cefuroxime axetil, the holding was based on this simple analysis.  Nevertheless, in *Glaxo I* the district court decided to suggest in *dicta* that the term "active ingredient" actually refers to a potentially enormous class of compounds, namely the active ingredient, all salts of the active ingredient, and all esters of the active ingredient, even though the district court had no motivation or reason to perform such an analysis of the term "active ingredient."

The district court never performed any in depth analysis of the actual scope of the term "active ingredient," because under the facts of the case, it did not have to.  If a salt or an ester of cefuroxime axetil, or the acid cefuroxime, had been the subject of previous regulatory approval,

---

[68] For a detailed discussion of this argument, see Request for Reconsideration of Final Determination for U.S. Patent No. 6,143,771, filed January 27, 2006, at 4, under the subsection entitled "Glaxo and Pfizer Are Consistent and Distinguishable from Each Other."
[69] As noted by the Federal Circuit, the parties did not dispute that the two previously approved salts were not salts or esters of the ester cefuroxime axetil. *Glaxo II*, 894 F.2d at 394.

the parties would have briefed and the courts would have carefully analyzed and determined whether such previous approval would prevent eligibility for patent term extension based on the statutory language and meaning of "active ingredient." Instead, it was "undisputed that no prior FDA approval exists for cefuroxime axetil, or any ester or acid of it."[70]  Since the district court was not required to make this analysis, any passing comments on the meaning of "active ingredient" as it relates to salts and esters of the active ingredient are no more than *dicta*.

Judge Posner aptly defined *dictum* as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it."[71] It is apparent from the opinions of both the district court and the Federal Circuit in *Glaxo I* and *II* that the analysis of the term "active ingredient" with respect to whether that term encompasses an entire class of compounds did not receive the full and careful consideration of either court, because this question simply was not an issue in the case.  For example, even though the term "single entity" clearly modifies the phrase "active ingredient of a new drug" in 35 U.S.C. § 156(f)(2) and is necessarily critical to the proper construction of this statutory language, neither court even mentions the impact of this term on the meaning of "active ingredient."  The Federal Circuit in *Glaxo II*, for example, states that the "Act explicitly defines 'product' as 'the active ingredient of a new drug, ... including any salt or ester of the active ingredient,'" and concludes that these terms all have a plain meaning.[72]  The Federal Circuit's failure to include the "single entity" statutory language in its definition of "product" demonstrates a lack of focus in the opinion on the true statutory meaning of "active ingredient" beyond the court's holding that "active ingredient" does not mean "active moiety."

Another problem with the district court's suggested construction arises if the "active ingredient" at issue is in the basic form responsible for the physiological or pharmacological

---

[70] *Glaxo I*, 10 U.S.P.Q. 2d at 1107.  The district court's lack of focus on this issue is further illustrated by its acknowledgment that "it is doubtful that any salt or ester of the ester cefuroxime axetil exists since cefuroxime acetyl has no free acid group." *Id.* at 1102 n.6.  Thus, even under the erroneous construction suggested by the district court in *dicta*, the only compound that would fall within the definition of "active ingredient" was the single active ingredient of the drug product, cefuroxime axetil.  This meant that after the district court held that "active ingredient" does not mean "active moiety," the inquiry for the court necessarily stopped after it determined that the specific active ingredient cefuroxime axetil itself was the first permitted commercial marketing and use of cefuroxime axetil, and the patent could be properly extended.  This is the exact same analysis that would be performed under the correct statutory construction proposed herein by Applicant.
[71] Sarnoff v. American Home Prods. Corp., 798 F.2d 1075, 1084 (7th Cir. 1986).
[72] *Glaxo II*, 894 F.2d at 394-95.

action of the drug, such as an acid. Under the district court's construction, the term "active ingredient" would mean the acid, all salts of the acid, and all esters of the acid. Thus, this construction would effectively achieve the result advocated by the Commissioner in *Glaxo II*, i.e., that the term "active ingredient" means "active moiety," such that the term "would encompass all acid, salt, or ester forms of a single therapeutically active substance even if the drug before being administered contained only other substances."[73] Such a result would clearly violate the Federal Circuit's holding in *Glaxo II* (and ironically the district court's own holding in the same case), and reflects the problems that can be created by *dicta*.

The district court's suggestion in *Glaxo I* that the phrase "active ingredient" means the active ingredient, all salts of the active ingredient, and all esters of the active ingredient, is set forth in footnote 12 of its opinion.[74] The district court's failure to fully and carefully consider the construction it suggests for "active ingredient" is well illustrated in footnote 12, where the district court recognized that its proposed construction creates an "unattractive asymmetry," which arises as follows:

> Giving "active ingredient" its plain, ordinary meaning results in granting patent term extensions where the new active ingredient is an ester, even though a salt or acid related to the ester were previously approved by FDA. Yet no extension is available where the active ingredient is an acid and a salt or ester of that acid has previously received FDA approval.[75]

While the district court noted this illogical result, since this issue was not dispositive of the case, the district court chose not to revisit its proposed construction, and instead simply stated that "neither the Commissioner nor this Court sit to rewrite Congressional acts to ensure their symmetry."[76] The district court also contemplated its construction could be valid by stating that

---

[73] *Id.* at 395.

[74] *Glaxo I*, 10 U.S.P.Q. 2d at 1105 n.12. The district court also suggests this construction at two other points in its opinion. The first suggestion is found in footnote 6, after the district court states that if the active ingredient is the ester cefuroxime axetil, the plaintiff is entitled to an extension of its patent term: "This would follow under (a)(5)(A) because FDA has not previously approved cefuroxime axetil or any salt or ester of it." *Id.* at 1102 n.6. No analysis is offered by the court to support its suggestion that the inquiry also includes determining whether a salt or ester of the active ingredient had been previously approved. Indeed, as already noted, the court was doubtful as to whether such a salt or ester could even exist for cefuroxime axetil. The second suggestion is found in the court's discussion of Count II, which is pure *dictum* since the court's holding for Count I provided the "plaintiff with all requested relief." *Id.* at 1102. In its discussion of Count II, the district court suggested that the "product definition" includes "alternative forms of the active ingredient (*i.e.*, the salt or ester)," but again did not provide any reasoning to support this suggested construction. *Id.* at 1107-08.

[75] *Id.* at 1105 n.12.

[76] *Id.*

the asymmetry may be illusory because there may be a sound basis to allow patent term extension in one case, but not the other.[77] But the district court offered no support for its conclusory reasoning. In contrast, the D.C. Circuit in *Abbott* specifically rejected an analogous construction for the term "active ingredient (including any ester or salt of the active ingredient)" in Title I of the Act as failing "to serve any conceivable statutory purpose."[78]

In *Abbott*, the D.C. Circuit examined the meaning of the phrase "active ingredient (including any ester or salt of the active ingredient)" as used in 21 U.S.C. § 355(f)(4)(D)(i) and (v), which is in Title I of the Act directed to marketing exclusivities.[79] The issue before the court was whether a drug product with a salt as the active ingredient could qualify for ten years of marketing exclusivity under Title I, when the acid had already received marketing approval.[80] Although the statutory language in Title I is clearly different than the statutory language of 35 U.S.C. § 156(f)(2) in Title II of the Act, the D.C. Circuit's analysis of the district court's construction of this language in *Glaxo I* is at least relevant and potentially instructive.

After the D.C. Circuit rejected the FDA's proposed construction for the phrase "active ingredient (including any ester or salt of the active ingredient),"[81] the court turned to the construction proposed by Abbott, the NDA holder, for this phrase.[82] Abbott's construction mirrored the construction proposed by the district court in *Glaxo I*, which the D.C. Circuit noted led to the same asymmetrical result:

> Abbott's interpretation... would mean that if an original drug application has an active ingredient in the form of a salt, a drug company cannot obtain extended protection by merely filing a new application for a drug with an active ingredient in its non-salt form, but if it does the reverse, as in this case, it can.[83]

---

[77] *Id.*

[78] *See Abbott,* 920 F.2d at 988-90.

[79] *Id.* at 985. The Act consists of two Titles. Title I of the Act was intended to "make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962," while Title II of the Act was intended to restore "some of the time lost on patent life while the product is awaiting pre-market approval." *Mylan*, 268 F.3d at 1326 (citing H.R. REP. No. 98-857, pt. 1, at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647-48).

[80] *Abbott,* 920 F.2d at 986-87.

[81] In brief, the FDA argued that the phrase "including any ester or salt of the active ingredient" as used in 21 U.S.C. § 355 should be construed as a "virtual synonym for active moiety." *Id.* at 987. The D.C. Circuit rejected the FDA's proposed statutory construction as "*linguistically* infeasible," and therefore unreasonable. *Id.* at 988 (emphasis in original).

[82] *Id.* at 988.

[83] *Id.* at 989.

The D.C. Circuit recognized that its construction of the term "active ingredient" would be critical to its holding, since Abbott's proposed statutory construction would be beneficial to Abbott because the acid was approved before the salt, but if the situation was reversed, namely the salt was approved before the acid, no such benefit would be available. Based on this careful analysis of its potential holding, the D.C. Circuit concluded that Abbott's proposed construction was "farfetched because it is not consistent with any legislative goals," giving "serendipitous results":

> Abbott can advance no hypothetical reason why Congress (or indeed any of the interest groups) would have wanted the degree of protection a drug received to turn on this variable sequence. Abbott's reading promotes neither the interests of the research-oriented pharmaceutical industry nor the generic drug industry in a rational way, producing instead a windfall depending on an accident of chemical nomenclature... We have not been offered *any* scientific, technical, economic or other explanation why Congress would intend the grant of a ten year market exclusivity to depend on the temporal sequence in which subsection (b) applications were approved and the counsel could not suggest any when pressed on this point. It appears, then, entirely serendipitous that in this case Abbott sought an application for the salt of valproic acid after *first* applying for valproic acid.[84]

The D.C. Circuit stated that the district court in *Glaxo I* offered no support for its notion of the statutory construction it suggested, and characterized this suggested construction as "speculation."[85] The D.C. Circuit also found that Abbott could not advance any hypothetical reason why Congress would have chosen statutory language with such a serendipitous result dependent on the sequence of drug approval.[86] The D.C. Circuit remanded this case to the FDA for further analysis, concluding that 21 U.S.C. § 355(f)(4)(D) is ambiguous, and that neither the FDA nor Abbott had proposed a reasonable construction for this ambiguous portion of the statute.[87] To Applicant's knowledge, no subsequent opinions or rulings occurred after *Abbott*, indicating that the meaning of the term "active ingredient" as used in 21 U.S.C. § 355 has not yet been construed by the courts.

The conclusory suggestions by the district court and Federal Circuit in *Glaxo I* and *II* that "active ingredient" means the active ingredient and all salts and esters of the active ingredient are

---

[84] *Id.*
[85] *Id* at n.7.
[86] *Id.* at 989.
[87] *Id.* at 989-90.

clearly *dicta*. Accordingly, these suggestions should be regarded with skepticism not only because the courts' analysis of this issue "was peripheral," and clearly did not receive "the full and careful consideration of the court,"[88] but also because of the illogical and asymmetric result of the construction, which, in a related context, has been explicitly rejected by at least one appellate court as "farfetched," with "serendipitous" results that are not consistent with any conceivable Congressional intent. Therefore, *Glaxo I* and *II* must not be read as a precedential opinion beyond the legal holding that an "active ingredient" is not equivalent to an "active moiety."

**D.     Applicant's Proposed Construction of "Active Ingredient of a New Drug" is Consistent with the Statute as a Whole**

The Supreme Court has noted: "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."[89]  The present statute consists of two Titles with different intents; Title I is intended to facilitate approval of generic drugs, while Title II is intended to restore patent life lost while a product awaits regulatory approval.[90]  Under the guidance of the Supreme Court, identical terms such as "active ingredient" may be interpreted differently when used in different Titles of the same Act when they are used in different contexts, or if they are used in such a way as to suggest that they are used with different intents.[91]

Under the plain language of 35 U.S.C. § 156(f)(2), the proper statutory construction for "drug product" is the single, specific active ingredient of a new drug actually present in the drug product.  When the D.C. Circuit in *Abbott* analyzed the statutory phrase "active ingredient (including any ester or salt of the active ingredient)" in 21 U.S.C. § 355(f)(4)(D), which is in Title I of the Act, it found the meaning of this phrase ambiguous.  The language of 35 U.S.C. § 156(f)(2) in Title II of the Act, unlike the phrase of Title I, includes the term "single entity" to clarify the plain meaning of the statutory language, thereby removing any ambiguity about the meaning intended by Congress for this statutory language.  In this context, the only logical statutory construction of "drug product" is the single, specific active ingredient of a new drug

---

[88] *Sarnoff*, 798 F.2d at 1084.
[89] Sullivan v. Stroop, 496 U.S. 478, 482 (1990) (quoting Kmart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92 (1988)).
[90] *Mylan*, 286 F.3d at 1326 (citing H.R. REP. No. 98-857, pt. 1, at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647-48).
[91] General Dynamics Land Systems, Inc. v. Cline, 540 U.S. 581, 582 (2004).

actually present in the drug product. Any other statutory construction would read the language "single entity" out of the statute, which is not allowed under the canons of statutory construction. Clearly, the term "active ingredient" is used in an entirely different context and with a different intent in Title II than its ambiguous use, as found by the D.C. Circuit, in Title I. Therefore, the statutory construction of the language "active ingredient of a new drug" is not inconsistent with the statute as a whole.

. In addition to determining whether the statutory construction proposed by Applicant herein is consistent with the statute as a whole, 35 U.S.C. § 156 should also be evaluated to verify that the proposed statutory construction is consistent with Title II as a whole.[92] Without performing this analysis, there is a risk that a meaning could be assigned to a phrase that it "cannot bear" when "used elsewhere" in 35 U.S.C. § 156.[93] This analysis has verified that Applicant's proposed statutory construction is consistent with the use of the term "product" throughout 35 U.S.C. § 156. In contrast, the language of 35 U.S.C. § 156 precludes an interpretation of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient, as suggested in *dicta* by the district court in *Glaxo I*, because it would render the meaning of the term "product" nonsensical in the context of 35 U.S.C. § 156. .

For example, 35 U.S.C. § 156(a)(4) sets forth as a requirement for eligibility for patent term extension that "the *product* has been subject to a regulatory review period before its commercial marketing or use."[94] The term "product" is defined in the statute as "drug product," which is further defined as "the active ingredient of a new drug... , as a single entity."[95] Thus, by substituting this definition into the plain language of the statute, the "active ingredient of a new drug... , as a single entity" must "ha[ve] been subject to a regulatory review period before its commercial marketing or use" to be eligible for a patent term extension. A construction of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient does not make sense under a plain reading of subsection 156(a)(4), since only the single active ingredient actually present in the product was subject to regulatory review, not a

---

[92] *Sullivan*, 496 U.S. at 482.
[93] *See* Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 478 (1992).
[94] 35 U.S.C. § 156(a)(5)(A) (emphasis added).
[95] *Id.* at § 156(f)(2).

class of compounds related to the active ingredient.[96]   Such a nonsensical result is a strong indication that an interpretation is incorrect.[97]

In contrast, the statutory construction proposed by Applicant herein that "drug product" is the single, specific active ingredient of a new drug actually present in the drug product is absolutely consistent with subsection 156(a)(4), since this drug product is the exact "product" that was "subject to a regulatory review period before its commercial marketing or use." Thus, as shown by this illustrative example, Applicant's proposed statutory construction is consistent with the language of 35 U.S.C. § 156, while the district court's suggested construction in *Glaxo I* is not.[98]

E.    **Applicant's Proposed Construction of "Active Ingredient of a New Drug" is Consistent with Legislative History**

As proposed herein, the proper statutory construction for "drug product" is the single, specific active ingredient of a new drug actually present in the drug product.  Not only is this proposed statutory construction reasonable and consistent with the plain statutory language of 35 U.S.C. § 156, it also avoids the asymmetrical and illogical result of the statutory construction of "active ingredient" suggested by the district court as *dicta* in *Glaxo I*.  After a reasonable statutory construction based on the plain language of the statute is proposed, "the legislative history should usually be examined at least 'to determine whether there is a clearly expressed legislative intention contrary to the statutory language.'"[99]  As noted by the court in *Glaxo I*, the extensive legislative history of the Act "contains no specific discussion of the definitions of the statutory term 'active ingredient,' the non-statutory term 'active moiety' or any of the specific

---

[96] This analysis presumes the product at issue contains a single active ingredient, and is not a combination of two different active ingredients.

[97] *See, e.g.*, Estate of Cowart, 505 U.S. at 478-79.  Nor can "product" be interpreted as having a different meaning under subsection 156(a)(5)(A) than it does under subsection 156(a)(4).  Clearly, identical terms within 35 U.S.C. § 156 should be construed to have the same meaning, particularly when the identical term appears within the same sentence, and when one instance of the term explicitly refers back to another instance of the identical term.  Brown v. Gardner, 513 U.S. 115, 118 (1994); IBP, Inc. v. Alvarez, 126 S.Ct. 514, 523-24 (2005).

[98] Another example is illustrated by the language of 35 U.S.C. § 156(a), which states: "The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section... ."  A construction of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient does not make sense under a plain reading of subsection 156(a), since this construction could broaden the scope of "product" to include compounds not claimed in the patent for which term extension is sought.  Substitution for "product" in "patent which claims a product" of a class of compounds including compounds *not* claimed in the patent creates a nonsensical result.

[99] *Glaxo II*, 894 F.2d at 395 (citing Madison Galleries, Ltd. v. United States, 870 F.2d 627, 629 (Fed. Cir. 1989) (emphasis added); *see* LSI Computer Sys. v. United States Int'l Trade Comm'n, 832 F.2d 588, 590 (Fed. Cir. 1987

35

issues raised here."[100]    Thus, a more general examination of Congressional intent in the enactment of this legislation is appropriate for determining whether the proposed construction is consistent with the legislative history.

Before any new drug product may be marketed in the U.S., it must undergo rigorous and often time-consuming regulatory approval by the FDA. This regulatory approval can take years to complete, thereby reducing the amount of patent protection available for the approved new drug. In recognition of this, Congress enacted the Act, which consists of two Titles. These Titles are meant "to balance two conflicting policy objectives: to induce name brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to market."[101]  Title I of the Act was intended to "make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962."[102]  Title II, on the other hand, was intended to benefit pioneer drug manufacturers by "restor[ing]... some of the time lost on patent life while the product is awaiting pre-market approval."[103]

Not only did Congress intend Title II to benefit pioneering drug manufacturers by restoring lost patent life, such as Applicant who lost over eleven years of patent life pursuing FDA approval, "Congress clearly had articulated policy reasons for making *more types* of patents eligible for extension, including to encourage research."[104]  As noted by the Federal Circuit in *Fisons*, "*some* legislators explicitly criticized section 156(a)(5) for not covering new uses and dosages."[105]  This legislative history is completely consistent with the statutory construction

---

[100] *Glaxo I*, 10 U.S.P.Q. 2d at 1104.

[101] *Abbott*, 920 F.2d at 991.

[102] *Mylan*, 286 F.3d at 1326 (citing H.R. REP. No. 98-857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647).

[103] *Mylan*, 286 F.3d at 1326 (citing H.R. REP. No. 98-857, pt. 1 at 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2648).

[104] *Glaxo II*, 894 F.2d at 396 (emphasis added) ("Lesser profits might result in less research on new drugs.").

[105] *Fisons*, 876 F.2d at 101 (emphasis in original). The Federal Circuit made this comment in light of the district court's analysis of the extensive legislative history in *Fisons PLC v. Quigg* (*Fisons I*), 8 U.S.P.Q.2d 1491 (D.D.C. 1988). Although the district court concludes from its examination of the legislative history that Congress intended only new chemical entities, i.e., active moieties, to be eligible for patent term extension, *Fisons I*, 8 U.S.P.Q.2d at 1497, this discussion was clearly non-binding, since it was not relevant to the holding of the case. In addition, the Federal Circuit in *Fisons II*, while endorsing the district court's opinion, did not expressly adopt the district court's discussion that patent term extension is only available for new chemical entities. Instead, the Federal Circuit expressly limited its holding to the dispositive issue of the case, namely that extensions are limited "to the term of the patent on the first permitted marketing or use of a particular *active ingredient*." *Fisons*, 876 F.2d at 100

proposed herein by Applicant, since Applicant's construction would not allow patent term extension for new indications or new dosage forms or strengths, which contain the same specific active ingredient that has been previously approved by the FDA. This result is fair, since applications directed to new indications, dosage forms or strengths can be filed as a supplemental NDA to an earlier approved NDA, which is likely to result in significantly faster approval by the FDA as compared to an NDA for a new drug that has not been previously approved.[106] Thus, the statutory construction proposed herein achieves a balance between the competing interests of pharmaceutical and generic companies, and yet also achieves the intended benefit to pioneer manufacturers who pursue regulatory approval for new drugs, i.e., new active ingredients. This is the exact result intended by Congress.

For example, John R. Strafford, President of American Home Products, argued that "it is common for additional research on a patented drug to lead to the development of new delivery systems, therapeutic indications, or dosage forms of the original product. These later innovations contribute significantly to the safety and effectiveness of drug therapy, and the later-discovered products deserve restoration to the same extent as initial products of a patent."[107] The eligibility provisions were also criticized by then PTO Commissioner Gerald J. Mossinghoff, who "pointed out that the bills as written did not reward investors who developed new uses for their already patented products."[108] In addition, in a letter to Representative Peter W. Rodino, Jr., Chair of the House Judiciary Committee, three Representatives charged that the legislation "would discriminate against companies which innovate in areas such a [sic] new dosage forms, new

---

(emphasis in original). In addition, the Federal Circuit in *Glaxo II*, when looking at the same language of the legislative history as the district court in *Fisons I*, expressly held that "active ingredient" cannot be equated with "active moiety." *Glaxo II*, 894 F.2d at 395. Therefore, the district court's discussion of this matter is of no precedential value.

[106] The FDA provides the following definition for a Supplemental Type NDA: "Companies are allowed to make changes to drugs or their labels after they have been approved. To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA). The supplement type refers to the kind of change that was approved by FDA. This includes changes in manufacturing, patient population, and formulation." U.S. Food & Drug Administration, *Drugs@FDA, Glossary of Terms*, http://www.fda.gov/cder/drugsatfda/glossary.htm (last updated Sept. 10, 2004). *See generally*, 21 C.F.R. § 314.70 (2005) (discussing supplements and changes to approved NDAs). 21 C.F.R. § 314.54 sets forth the requirements for obtaining approval to market a previously approved active ingredient for a new indication. This section states that a 505(b)(2) application may be submitted where approval is sought for a new indication. The application "need contain only that information needed to support the modification." 21 C.F.R. § 314.54(a) (2005).

[107] *Innovation and Patent Law Reform, Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary* ("*House Subcomm. Hearings*"), 98th Cong., 2d Sess. 441 (1984).

[108] *Drug Price Competition and Patent Term Restoration Act of 1984: Hearing Before the Senate Committee on Labor and Human Resources*, 98th Cong., 2d Sess. 158 (1984).

delivery systems, and creative formulations."[109]    Thus, although several parties pleaded for loosened patent term extension eligibility requirements under 35 U.S.C. § 156, these pleas were implicitly rejected by Congress.[110]

While it appears that Congress did not intend eligibility for patent term extension to apply to new indications, dosage forms or strengths containing the same active ingredient, the same cannot be said for new drug products that contain new active ingredients that have not received previous regulatory approval, even if the new active ingredient is related to a previously approved but different active ingredient.  Such NDA applications, which are directed to, for example, a new ester, new salt, or other noncovalent derivative of a previously approved drug, will be subject to the same rigorous and time-consuming regulatory approval by the FDA as an NDA directed to a new chemical entity.  This is exactly the issue Congress intended to address when it enacted Title II of the Act.  Therefore, it is consistent with the intent of Congress that all new active ingredients be eligible for patent term extension, given the long delays in approval of drug products with new active ingredients that have not been previously approved by the FDA, as vividly demonstrated by the Applicant's experience in making EMSAM® available to patients.

For example, the FDA categorizes NDAs into seven different "types."[111]  Type 1 NDAs are NDAs directed to a "new molecular entity."  Type 2 NDAs are NDAs directed to a "new ester, new salt, or other noncovalent derivative" of a previously approved drug.  In other words, Type 2 NDAs are directed to drug products that contain new active ingredients that are related to a previously approved but different active ingredient.  One would expect that if Type 2 drugs are approved in a substantially shorter period of time than Type 1 drugs, Congress would have intended to exclude new active ingredients that are related to previously approved but different active ingredients from being eligible for patent term extension.  While under the district court's suggested construction in *Glaxo I*, certain Type 2 drugs would be eligible for patent term extension, others would not be entitled to that benefit.  Distinguishing whether new drugs are eligible for patent term extension, which all fall within the classification of Type 2, based on the

[109] *House Subcomm. Hearings*, at 764-765.
[110] *See Fisons I*, 8 U.S.P.Q.2d at 1498.
[111] *See* U.S. Food & Drug Administration, *CDER NDAs Approved in Calendar Years 1999-2004 by Therapeutic Potential and Chemical Type*, http://www.fda.gov/cder/rdmt/pstable.htm (last visited April 26, 2006); *see also* U.S. Food & Drug Administration, *New Drug Application*, http:/www.fda.gov/cder/handbook/ndabox.htm (last visited April 26, 2006) (describing the seven different categories of new drug applications utilized by the Center for Drug Evaluation and Research within the FDA).

order of approval of related active ingredients is inappropriate, and could not have been the intent of Congress.

Based on Applicant's analysis as set forth in Exhibit L, in a direct comparison, Type 2 drugs take a slightly longer time to approve by the FDA than Type 1 drugs. For example, the average approval time from 1999-2005 of Type 1 (new molecular entity) NDAs undergoing standard review is 20.3 months. The average approval time for the same time period of Type 2 (new ester, new salt, or other noncovalent derivative) NDAs undergoing standard review is slightly longer at 22 months. *See* Exhibit M. Therefore, new active ingredients that have not been previously approved, even if related to a previously approved but different active ingredient, do not receive expedited approval by the FDA.

The calculations performed by Applicant using actual data reported by the FDA from the period of 1999 through 2005 clearly rebuts any argument that an NDA directed to a new active ingredient that is related to a previously approved active ingredient generally requires less FDA approval time than an NDA for a new molecular entity. Consequently, Applicant's proposed construction, which would allow patent term extension for all patents based on eligible drug products with new active ingredients, such as Type 2 NDAs, is entirely consistent with the legislative intent of Congress and the purpose of the Act. After all, Congress' intent was to compensate all applicants who pursue regulatory approval of new drug products with *new* active ingredients for the significant delay and expense in obtaining marketing approval.

### F.    Conclusion

Applicant proposes that under a proper statutory construction, the term "product" as found in 35 U.S.C. § 156(a)(5)(A) means the single, specific active ingredient actually present in the drug product, whether it is in a basic form, in the form of a salt, or in the form of an ester. This statutory construction is consistent with the intent of Congress, which was to benefit NDA applicants in exchange for the time-consuming and expensive task of obtaining regulatory approval of a new drug. Applicant spent over 11 years getting EMSAM® approved by the FDA. Meanwhile, the life of the '579 patent was ticking away. Now, Applicant is left with a mere year and a half of patent protection. This is precisely the situation to which Congress was reacting when it enacted 35 U.S.C. § 156 to allow an NDA holder to recoup some of its patent life after the incredibly expensive and time-consuming regulatory approval process for a new drug. The

legislative history indicates that Congress did not intend to give this protection if the NDA is for a new indication, dosage form or strength of an already approved active ingredient, but Congress could not have intended this result for drug products containing a new active ingredient that has not been previously approved. An NDA application to a new active ingredient, even if related to a different, previously approved active ingredient with the same moiety, will experience the same long delays and significant expense in the approval process, as vividly demonstrated by EMSAM®. Therefore, not only is the statutory construction proposed herein consistent with a plain reading of the statute, it also clearly comports with reasoning of the binding precedent and the legislative intent of Congress in enacting 35 U.S.C. § 156.

Under the correct statutory construction proposed herein by Applicant, the proper inquiry is whether the marketing or use of the single, specific active ingredient of EMSAM®, selegiline, is the first permitted commercial marketing or use of that particular active ingredient. The answer to this question is yes, since only a salt of selegiline, selegiline hydrochloride, has been previously approved for commercial marketing. Therefore, the '579 patent, which claims the selegiline transdermal patch EMSAM®, is entitled to patent term extension. This construction is absolutely consistent with the plain statutory language of 35 U.S.C. § 156, as well as the intent of Congress. Under the statutory construction proposed herein, the '579 patent is entitled to get back a portion (less than half) of the patent life lost while seeking regulatory approval of EMSAM®.

14. **THE PRESCRIBED FEE FOR RECEIVING AND ACTING UPON THE APPLICATION FOR EXTENSION (*SEE* 37 C.F.R. § 1.20(J)) (37 C.F.R. § 1.740(a)(14))**

Applicant hereby encloses a check in the amount of the prescribed fee under 37 C.F.R. § 1.20(j), $1,120.00. If for any reason this payment is insufficient, Applicant hereby authorizes that any deficiency may be charged to Deposit Account 22-0365/SOM700/4-1/13001.

15. **THE NAME, ADDRESS, AND TELEPHONE NUMBER OF THE PERSON TO WHOM INQUIRIES AND CORRESPONDENCE RELATING TO THE APPLICATION FOR PATENT TERM EXTENSION ARE TO BE DIRECTED (37 C.F.R. § 1.740(a)(15))**

Please direct all correspondence in connection with this application to:

> Margaret J. Sampson
> Registration No: 47,052
> Vinson & Elkins, L.L.P.
> 2300 First City Tower
> 1001 Fannin
> Houston, Texas 77002-6760
> Telephone:    (512)542-8569
> Facsimile:    (512)236-3264.

16. **TWO ADDITIONAL COPIES OF THE APPLICATION PAPERS, CERTIFIED AS SUCH (37 C.F.R. § 1.740(b))**

Applicant hereby certifies that this application for extension is being filed in triplicate. Applicant is also providing an additional two copies of the application, as requested in MPEP § 2753, for a total of five copies. The undersigned patent attorney certifies under penalty of perjury that the enclosed duplicates of the application papers are true and correct copies of such papers.

41

If this application for extension of patent term is held to be informal, Applicant may seek to have that holding reviewed by filing a petition with the required fee, as necessary, pursuant to 37 C.F.R. §§ 1.181, 1.182 or 1.183, as appropriate, within such time as may be set in any notice that the application has been held to be informal.

Respectfully submitted,

Somerset Pharmaceuticals, Inc.

By:    *Margaret Sampson*

Margaret J. Sampson, Registration Number 47,052
Vinson & Elkins, L.L.P.
2300 First City Tower
1001 Fannin
Houston, Texas  77002-6760
Telephone:(512)542-8569
Facsimile: (512)236-3264
Email: msampson@velaw.com.

42

USPTO Assignments on the Web



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Assignments on the Web > Patent Query

## Patent Assignment Abstract of Title

_NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff._

**Total Assignments: 1**
**Patent #:** 4868218    **Issue Dt:** 09/19/1989    **Application #:** 07339712    **Filing Dt:** 04/18/1989
**Inventor:** DONALD A. BUYSKE
   **Title:** METHOD OF TREATING DEPRESSION

**Assignment: 1**
**Reel/Frame:** 005285/0768    **Recorded:** 04/24/1990    **Pages:** 1
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
   **Assignor:** BUYSKE, DONALD A.    **Exec Dt:** 11/02/1989
   **Assignee:** SOMERSET PHARMACEUTICALS, INC., 400 MORRIS AVE., DENVILLE, NJ A CORP. OF DE
**Correspondent:** KARL F. ROSS AND ASSO.
   5676 RIVERDALE AVE.
   NEW YORK, N.Y. 10471

If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 571-272-3350

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

Search Results as of: 04/26/2006 05:28 PM

EXHIBIT A

EX MAIL NO. EV 258 030 987 US

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&frame=&pat=4868218&pub=&asnr=&asnri=&asne=&asne...    4/26/2006

Page 1 of 1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

**EXHIBIT B**

EX MAIL NO. EV 258 030 987 US

NDA 21-336
NDA 21-708

Melissa L. Goodhead, B.S., RAC
Group Director, Regulatory Affairs/Quality Assurance
Somerset Pharmaceuticals, Inc.
2202 N. West Shore Blvd., Suite 450
Tampa, FL 33607

Dear Ms. Goodhead:

Please refer to your new drug application (NDA) 21-336, dated May 24, 2001, received May 25, 2001, and to your New Drug Application (NDA) 21-708, dated October 15, 2003, received October 16, 2003, both submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for EMSAM (selegiline transdermal system) patches, 6mg/24 hours, 9mg/24 hours, and 12mg/24 hours.

We acknowledge receipt of your additional submissions dated December 21, 2004, January 20, 2005, May 26, 2005, June 9, 2005, June 17, 2005, June 21, 2005, July 18, 2005, July 21, 2005, August 2, 2005, August 16, 2005, August 31, 2005, October 4, 2005, October 10, 2005, November 3, 2005, November 15, 2005, November 16, 2005, January 9, 2006, February 6, 2006, and February 7, 2006.

Your May 26, 2005 submission, received May 27, 2005, constituted a complete, Class 2 response to our January 30, 2004 action letter for both referenced NDAs. Additionally, your November 16, 2005, submission constituted an extension on the regulatory due date.

These new drug applications provide for the use of EMSAM (selegiline transdermal system) patches, 6mg/24 hours, 9mg/24 hours, and 12mg/24 hours in the acute (21-336) and longer-term (21-708) treatment of major depressive disorder in adult patients.

We have completed our review of these applications, as amended. They are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

The final printed labeling (FPL) must be identical to the enclosed labeling and Medication Guide. Marketing the product(s) with FPL that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug.

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA*. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed. Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate these submissions "**FPL for approved NDAs 21-336 & NDA 21-708.**" Approval of these submissions by FDA is not required before the labeling is used.

NDA 21-336
NDA 21-708
Page 2

All 15-day alert reports, periodic (including quarterly) adverse drug experience reports, field alerts, annual reports, supplements, and other submissions should be addressed to the original NDA, 21-336, for this drug product, not to NDA 21-708. In the future, do not make submissions to NDA 21-708 except for the final printed labeling requested above.

## Pediatric Research Equity Act (PREA) Requirements-Studies Deferred

All applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred. We are waiving studies for ages 0 to 7 years (neonates and young children). We are deferring submission of your pediatric studies for ages 7 to 17 years (children and adolescents) until July 30, 2009.

## Pediatric Exclusivity

Pediatric studies conducted under the terms of section 505A of the Federal Food, Drug, and Cosmetic Act may result in additional marketing exclusivity for certain products (pediatric exclusivity). You should refer to the Guidance for Industry on Qualifying for Pediatric Exclusivity (available on our web site at www.fda.gov/cder/pediatric) for details. If you wish to qualify for pediatric exclusivity, you should submit a "Proposed Pediatric Study Request" *in addition to* your plans for pediatric drug development described above. Please note that satisfaction of the requirements in Section 2 of PREA alone may not qualify you for pediatric exclusivity.

## Dissolution Methods and Specifications

We note your agreement to accept the dissolution method and specifications requested for the dosage form. The agreed upon method and specification are presented here for reference:

| Formulation(s) | 6mg/24 hours (20 mg / 20 cm²) and 9mg/24 hours (30 mg / 30 cm²) | 12mg/24 hours (40 mg / 40 cm²) |
|---|---|---|
| Media | 0.1 M Potassium Phosphate Buffer Monobasic pH 5 | 0.1 M Potassium Phosphate Buffer Monobasic pH 5 |
| Volume | 500 ml | 1000 ml |
| Temp (°C) | 32 ± 0.5 | 32 ± 0.5 |
| Apparatus | USP 5 Paddle over disk | USP 6 Rotating Cylinder |
| RPM | 50 | 50 |
| Sampling Times And Specifications (% LC) | 1 hr   25% - 35%<br>4 hr   45% - 65%<br>8 hr   60% - 80%<br>24 hr  NLT 80% | 1 hr   25% - 35%<br>4 hr   45% - 65%<br>8 hr   60% - 80%<br>24 hr  NLT 80% |
| Acceptance Criteria | Per acceptance table 4 in TRANSDERMAL DELIVERY SYSTEMS—GENERAL DRUG RELEASE STANDARDS USP 26-NF 21 2nd Suppl., section<724> DRUG RELEASE | |

NDA 21-336
NDA 21-708
Page 3

**Phase 4 Commitments**
We remind you of your postmarketing commitments agreed upon in communications dated May 26, 2005 and January 18, 2006. These commitments are listed below.

1. **Deferred pediatric studies under PREA**

   Your deferred pediatric study required under Section 2 of the Pediatric Research Equity Act (PREA) is considered a required postmarketing study commitment. The status of such postmarketing commitments shall be reported annually according to 21 CFR 314.81. The associated commitment is listed below.

   You are required to assess the safety and effectiveness of EMSAM as a treatment for Major Depressive Disorder in pediatric patients ages 7 to 17 (children and adolescents). Both children (ages 7 to 11) and adolescents (ages 12 to 17) should be equally represented in the samples, and there should be a reasonable distribution of both sexes in these age strata.

   Final Report Submission: July 30, 2009

   Please submit final study reports to this NDA. For administrative purposes, all submissions related to this pediatric postmarketing study commitment, whether submitted to the IND or the NDA, must be clearly designated "**Required Pediatric Study Commitments**".

2. **Nonclinical Pharmacology and Toxicology: 2-year mouse carcinogenicity study (dermal route of application)**

   You are required to conduct a full 2-year carcinogenicity study of EMSAM in the mouse using the dermal route of application. Please refer to our action letter of January 30, 2004 for additional details regarding the need for this study. Please note that, as per the FDA Guidance "Special Protocol Assessment", the protocol for this study is eligible for special protocol review. Only one protocol at a time should be included in any submission for special protocol review, and each such protocol submitted should be submitted at least 90 days prior to the planned start of the study.

   Final Report Submission: July 30, 2009.

3. **Nonclinical Pharmacology and Toxicology: *in vivo* mouse micronucleus assay**

   You are required to conduct an *in vivo* mouse micronucleus assay either (a) via the oral route using a higher dose of selegiline in order to attain plasma exposures that cover the expected human plasma exposure or (b) via the dermal route. Please refer to our action letter of January 30, 2004 for additional details regarding the need for this study. Please note that, as per the FDA Guidance "Special Protocol Assessment", the protocol for this study is eligible for special protocol review. Only one protocol at a time should be included in any submission for special protocol review, each such protocol submitted should be submitted at least 90 days prior to the planned start of the study.

   Final Report Submission: July 30, 2007.

NDA 21-336
NDA 21-708
Page 4

4. **Clinical Pharmacology and Biopharmaceutics:** *Adhesion*

   Please provide information regarding the adhesion properties of the selegiline transdermal system over the range of approved patch sizes, (i.e. 20 cm$^2$ to 40 cm$^2$), over a 3 week period under conditions approximating actual use. The following factors are to be examined in this study:
   - Subject age [i.e., young healthy adults, the elderly (65 – 84 years old), and the extreme elderly (> 85)].
   - Application to the different labeled application sites including the upper torso and upper arm.
   - For each study arm 100 completers are anticipated.
   - The data generated should be examined by gender, race, physical activity, bathing and showering practices. Therefore variations in each of these secondary factors should be well represented in each study arm.

   Within 3 months of approval Somerset will submit the protocols for these studies and will submit the final study reports within 9 months following the agreement on the protocols.

5. **Clinical Pharmacology and Biopharmaceutics:** *Dermal Tolerability*

   Please provide information regarding the dermal tolerability of the selegiline transdermal system over the range of approved patch sizes, (i.e. 20 cm$^2$ to 40 cm$^2$), over a 3 week period under conditions approximating actual use. The following factors are to be examined in this study:
   - Subject age [i.e. young healthy adults, the elderly (65 – 84 years old), and the extreme elderly (> 85)].
   - Application to the different labeled application sites including the upper torso and upper arm.
   - For each study arm 100 completers are anticipated.
   - The data generated should be examined by gender, race, physical activity, bathing and showering practices. Therefore variations in each of these secondary factors should be well represented in each study arm.

   Within 3 months of approval Somerset will submit the protocols for these studies and will submit the final study reports within 9 months following the agreement on the protocols.

6. **Clinical Pharmacology and Biopharmaceutics:** *Performance of Selegiline Transdermal Systems in the Elderly*

   Only 3 subjects studied were > 65 years of age. All three were women and the eldest was 70 years old. Consequently, please provide information regarding the pharmacokinetic, pharmacodynamic and biopharmaceutic properties of the selegiline transdermal system over the range of approved patch sizes, (i.e. 20 cm$^2$ to 40 cm$^2$), in young healthy adults, the elderly (i.e. 65 – 84 years old), and the extreme elderly (i.e.> 85).
   - The effects of gender and ethnicity/race should be examined for each age range.
   - Information provided for each age group should include the following:
     - complete pharmacokinetic profiles of selegiline and the 3 metabolites previously examined
     - the tyramine response
     - MAO selectivity
     - drug delivery
     - safety information by age
   - With regard to safety we are specifically interested in CNS effects, as well as differences in blood pressure changes, especially as the elderly typically have higher baseline systolic blood pressure and are at risk for orthostatic hypotension.

NDA 21-336
NDA 21-708
Page 5

 Within 3 months of approval Somerset will submit the protocols for these studies and will submit the final study reports within 9 months following the agreement on the protocols.

Submit clinical protocols to your IND for this product. Submit nonclinical and chemistry, manufacturing, and controls protocols and all study final reports to this NDA. In addition, under 21 CFR 314.81(b)(2)(vii) and 314.81(b)(2)(viii), you should include a status summary of each commitment in your annual report to this NDA. The status summary should include expected summary completion and final report submission dates, any changes in plans since the last annual report, and, for clinical studies, number of patients entered into each study. All submissions, including supplements, relating to these postmarketing study commitments must be prominently labeled

**Comments and Recommendations on Risk Management Plan for EMSAM**

Patient Education/Communication Tools (including the patient directed information to be placed on the unit-of-use packaging)

- The Medication Guide will be the main risk communication material for patients. All supplemental patient education pieces should reference the Medication Guide and/or contain identical language.
- A Wallet Card could be a useful tool; however, it may not be useful in its current form. There is a lot of information and the font size is quite small, and may not be readable for many patients. The font size of patient materials should be at least 10-point. The content should be limited to the concise key messages it is intended to convey, preferably in bulleted format.
- Since the prescriber will be responsible for the majority of the patient education, please ensure that prescribers are supplied with adequate teaching materials for their offices, including at minimum, the Wallet Card (with revisions as suggested above) and the Medication Guide.

Enhanced Pharmacovigilance Activities

- Section 3.2.1 'Spontaneous / Literature / Serious Clinical Trial Cases' (page # 12), mentions "creation of an algorithm to identify AEs of special interest related to hypertensive crisis and its complications". The algorithm was not included with this submission. Please submit the algorithm to the agency for possible comments.
- Section 3.2.2 'Targeted Adverse Event Follow-up' the RMP mentions that 'structured questionnaires will be designed to systematically collect targeted clinical and dietary intake information from spontaneous reports' of AEs of interest. Please submit to FDA the structured questionnaire that you plan to use for possible comments.
- Section 3.2.3 'Rapid Response to Events of Special Interest', mentions the creation of a Rapid Response Team (comprised of 2 professionals with pharmacovigilance and medical expertise) which will be dispatched to the reporting hospital within 24 hours of receipt of a report of hypertensive crisis. You propose that this Rapid Response Team will review hospital records and interview medical personnel regarding each case. This is commendable but there is a question of how this will be accomplished considering patient privacy laws. Please provide details including results of your experience in conducting similar surveillance exercises for any of your other products.
- Reporting of Postmarketing Adverse Events

NDA 21-336
NDA 21-708
Page 6

- We ask that you submit hypertensive crisis reports of any dosage strength as expedited reports pending further evaluation.
- The RMP mentions that routine signal detection activities will occur on a monthly basis (as detailed in the November 21, 2005 submission). Please include a summary of this information as a section in the quarterly report.
- Please send a desk copy of the quarterly report, via the usual method of sending desk copies, marked for "ODS".

Specialized Unit-of-Use Packaging

- We agree that specialized unit-of-use packaging would be useful in helping to deliver the dietary modification message and is also the best way to ensure that the patient receives the MG.
- The "Dietary Modifications Required" term, which appears in red lettering in a red box on the packaging, may not be understandable for some patients. We suggest revising this language to make it clearer, e.g., "**Important: Do not eat certain foods while using Emsam (see enclosed Medication Guide)**.

Education and Outreach Monitoring

You plan to conduct both physician and patient tracking surveys to assess the education and outreach efforts and indicate and the results of such tracking will be reported to ODS at 9 and 15 month intervals following marketing. If physician and patient awareness of the primary risk communication message are below the pre-established goals for education and outreach, you indicate that you plan to create and implement a remediation plan to address deficiencies.

One of the patient tracking studies is described as a 2-wave quantitative survey among approximately 30 patients who received a prescription for Emsam, conducted at 6 and 12 months into the multi-layered education and outreach effort. The objective of the study will be to measure the percentage of patients receiving written information about Emsam risk management, the usefulness of patient materials received and the awareness of the key risk management messages. Please submit your complete protocol, when available, for further review and comment.

**Comments and Recommendations on Container, Carton, and Patch Labeling**

GENERAL COMMENTS
- The total drug amount per patch size (XX mg/XX cm²) may immediately follow the expression of strength per 24 hours or be located on the side panel for further clarification. If the total drug content per patch size will immediately follow the expression of strength per 24 hours, the total drug content per patch size should be given less prominence in order to avoid confusion.

- You have placed the statement "Dietary Modification Required" on the 9 mg/24 hours and 12 mg/24 hours container labels and carton labeling.

  - This statement should refer to the MedGuide where it is further defined.

NDA 21-336
NDA 21-708
Page 7

- We are concerned that patients may double up with the 6 mg/24 hours patch for a 12 mg/24 hours dose yet not follow or be aware of the dietary restrictions since this strength is not labeled as such. To remedy this situation, we suggest that all packaging materials for the 6 mg/24 hours patch remind patients not to wear more than 1 patch at a time.

## CONTAINER LABEL (Pouch)

- See GENERAL COMMENTS above

- The established name is difficult to read due to elongated font style and inadequate spacing between the letters. Please revise to increase the readability of the established name.

- The unit designation (i.e. mg, $cm^2$, and h) immediately follows the numbers without a space. Insert a space between the number and unit designation to improve readability.

- Relocate the expression of strength to follow the established name where it appears on each principal display panel.

- The pictorials on the back of the container label show a man wearing multiple patches. While DMETS realizes the intent of this pictorial is to show different proper sites for patch adhesion, it could be misinterpreted as a direction to place multiple patches on. DMETS prefers that arrows be used and that a tile accompany the pictorial.

- The white writing on grey background for the 12 mg/24 hours strength is difficult to read. Please increase the background contrast by darkening the grey background.

- Include lot number and expiration date on the pouch label.

## PATCH LABEL

- We acknowledge comments that your patch will have a "clear backer". Reports in the literature describe cases of multiple patches being applied to hospitalized patients because of overlooked clear or translucent patches[1]. To prevent adhesion of multiple patches, DMETS encourages use of visual cues, i.e., name and strength, such that old patches can be easily found for removal and are not overlooked. Additionally, consideration should be given to revising the patch so it has color. We acknowledge your comments that the patch label will be printed with white ink on a clear backer and that the black background represented by draft labeling is for viewing purposed only. Please ensure that there is sufficient contrast to afford adequate readability for the actual product once placed on the patient's body.

---

[1] Institute for Safe Medication Practices Press Release: ISMP calls for more action to safeguard pain patches. August 13, 2005.

NDA 21-336
NDA 21-708
Page 8

- We encourage the use of colors, boxing or some other means to differentiate the different strengths of the patches.

- Allow the established name to follow the proprietary name on the patch. We refer you to 21 CFR 201.10(g)(1) for guidance.

CARTON LABELING
- See GENERAL COMMENTS

PACKAGE INSERT LABELING
- See GENERAL COMMENTS

- HOW SUPPLIED

   Include the established name of the drug product in association with the proprietary name where it appears in this section.

In addition, submit three copies of the introductory promotional materials that you propose to use for this/these product(s). Submit all proposed materials in draft or mock-up form, not final print. Send one copy to this division/ the Division of Psychiatry Products and two copies of both the promotional materials and the package insert(s) directly to:

   Food and Drug Administration
   Center for Drug Evaluation and Research
   Division of Drug Marketing, Advertising, and Communications
   Food and Drug Administration
   5901-B Ammendale Road
   Beltsville, MD 20705-1266

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Renmeet Gujral, Pharm.D., Regulatory Project Manager, at (301) 796-1080.

                              Sincerely,

                              {See appended electronic signature page}

                              Thomas Laughren, M.D.
                              Director
                              Division of Psychiatry Products
                              Office of Drug Evaluation I
                              Center for Drug Evaluation and Research

Enclosure: Labeling and Medguide

### EMSAM®
### (SELEGILINE TRANSDERMAL SYSTEM)
CONTINUOUS DELIVERY FOR ONCE-DAILY APPLICATION

Rx only

---

**Suicidality in Children and Adolescents**

**Antidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with major depressive disorder (MDD) and other psychiatric disorders. Anyone considering the use of EMSAM or any other antidepressant in a child or adolescent must balance this risk with the clinical need. Patients who are started on therapy should be observed closely for clinical worsening, suicidality, or unusual changes in behavior. Families and caregivers should be advised for the need for close observation and communication with the prescriber. EMSAM is not approved for use in pediatric patients. (See WARNINGS and PRECAUTIONS, Pediatric Use)**

**Pooled analyses of short-term (4 to 16 weeks) placebo-controlled trials of nine antidepressant drugs (SSRI's and others) in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders (a total of 24 trials involving over 4400 patients) have revealed a greater risk of adverse events representing suicidal thinking or behavior (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. No suicides occurred in these trials.**

---

## DESCRIPTION

EMSAM® (selegiline transdermal system) is a transdermally administered antidepressant. When applied to intact skin, EMSAM is designed to continuously deliver selegiline over a 24-hour period.

Selegiline base is a colorless to yellow liquid, chemically described as (-)-(*N*)-Methyl-*N*-[(1*R*)-1-methyl-2-phenylethyl]prop-2-yn-1-amine. It has an empirical formula of $C_{13}H_{17}N$ and a molecular weight of 187.30. The structural formula is:



Selegiline Base

2

EMSAM systems are transdermal patches that contain 1 mg of selegiline per $cm^2$ and deliver approximately 0.3 mg of selegiline per $cm^2$ over 24 hours. EMSAM systems are available in three sizes: $20mg/20cm^2$, $30mg/30cm^2$, and $40mg/40cm^2$ that deliver, on average, doses of 6mg, 9mg or 12mg, respectively, of selegiline over 24 hours.

EMSAM is a matrix-type transdermal system composed of three layers as illustrated in Figure 1 below. Layer 1 is the Backing Film that provides the matrix system with occlusivity and physical integrity and protects the adhesive/drug layer. Layer 2 is the Adhesive/Drug Layer. Layer 3 consists of side-by-side release liners that are peeled off and discarded by the patient prior to applying EMSAM. The inactive ingredients are acrylic adhesive, ethylene vinyl acetate/polyethylene, polyester, polyurethane, and silicon coated polyester.

Figure 1: Side view of EMSAM system. (Not to scale).



CLINICAL PHARMACOLOGY

Pharmacodynamics

Selegiline (the drug substance of EMSAM) is an irreversible inhibitor of monoamine oxidase (MAO), an intracellular enzyme associated with the outer membrane of mitochondria. MAO exists as two isoenzymes, referred to as MAO-A and MAO-B. Selegiline has a greater affinity for MAO-B, compared to MAO-A. However, at antidepressant doses, selegiline inhibits both isoenzymes (see below).

The mechanism of action of EMSAM as an antidepressant is not fully understood, but is presumed to be linked to potentiation of monoamine neurotransmitter activity in the central nervous system (CNS) resulting from its inhibition of MAO activity. In an *in vivo* animal model used to test for antidepressant activity (Forced Swim Test), selegiline administered by transdermal patch exhibited antidepressant properties only at doses that inhibited both MAO-A and MAO-B activity in brain. In the CNS, MAO-A and MAO-B play important roles in the catabolism of neurotransmitter amines such as norepinephrine, dopamine, and serotonin, as well as neuromodulators such as phenylethylamine. Other molecular sites of action have also been explored and in this regard, a direct pharmacological interaction may also occur between selegiline and brain neuronal $\alpha_{2B}$ receptors. In *in vitro* receptor binding assays, selegiline has demonstrated affinity for the human recombinant adrenergic $\alpha_{2B}$ receptor ($K_i = 284$ nM). No affinity [$K_i > 10$ $\mu$M] was noted at dopamine receptors, adrenergic $\beta_3$, glutamate, muscarinic $M_1$-$M_5$, nicotinic, or rolipram receptor/sites.

Pharmacokinetics

Absorption

3

Following dermal application of **EMSAM** to humans, 25% - 30% of the selegiline content on average is delivered systemically over 24 hours, (range ~ 10% - 40%). Consequently, the degree of drug absorption may be 1/3 higher than the average amounts of 6 to 12mg per 24 hours. Transdermal dosing results in substantially higher exposure to selegiline and lower exposure to metabolites compared to oral dosing, where extensive first-pass metabolism occurs (Figure 2). In a 10-day study with **EMSAM** administered to normal volunteers, steady-state selegiline plasma concentrations were achieved within five days of daily dosing. Absorption of selegiline is similar when EMSAM is applied to the upper torso or upper thigh. Mean (95% CI) steady-state plasma concentrations in healthy men and women following application of EMSAM to the upper torso or upper thigh are shown in Figure 3.

**Figure 2:** Average $AUC_{inf}$ (ng·hr/mL) of selegiline and the three major metabolites estimated for a single, 24-hour application of an EMSAM 6mg/24hours Patch and a single, 10mg oral immediate release dose of selegiline HCl in 12 healthy male and female volunteers



Figure 3. Average plasma (±95% CI) selegiline concentrations in healthy male and female volunteers at steady-state after application of EMSAM 6mg/24 hours to the upper torso.



## Distribution

Following dermal application of radiolabeled selegiline to laboratory animals, selegiline is rapidly distributed to all body tissues.  Selegiline rapidly penetrates the blood-brain barrier.

In humans, selegiline is approximately 90% bound to plasma protein over a 2-500 ng/mL concentration range.  Selegiline does not accumulate in the skin.

### In vivo Metabolism

Transdermally absorbed selegiline (via EMSAM) is not metabolized in human skin and does not undergo extensive first-pass metabolism.  Selegiline is extensively metabolized by several $CYP_{450}$-dependent enzyme systems (see *In vitro* Metabolism).  Selegiline is metabolized initially via N-dealkylation or N-depropargylation to form N-desmethylselegiline or R-(-) methamphetamine, respectively.  Both of these metabolites can be further metabolized to R-(-)amphetamine.  These metabolites are all levorotatory (l-) enantiomers and no racemic biotransformation to the dextrorotatory form (i.e., S(+)-amphetamine or S(+)-methamphetamine) occurs.  R-(-)-methamphetamine and R-(-)-amphetamine are mainly excreted unchanged in urine.

### In vitro Metabolism

*In vitro* studies utilizing human liver microsomes demonstrated that several $CYP_{450}$-dependent enzymes are involved in the metabolism of selegiline and its metabolites.  CYP2B6, CYP2C9, and CYP3A4/5 appeared to be the major contributing enzymes in the formation of R-(-)-methamphetamine from selegiline, with CYP2A6 having a minor role. CYP2A6, CYP2B6, and CYP3A4/5 appeared to contribute to the formation of R-(-)-amphetamine from N-desmethylselegiline.

The potential for selegiline or N-desmethylselegiline to inhibit individual $CYP_{450}$-dependent enzyme pathways was also examined *in vitro* with human liver microsomes.  Each substrate was examined over

5

a concentration range of 2.5 to 250 µM. Consistent with competitive inhibition, both selegiline and N-desmethylselegiline caused a concentration dependent inhibition of CYP2D6 at 10 – 250 µM and CYP3A4/5 at 25 - 250 µM. CYP2C19 and CYP2B6 were also inhibited at concentrations ≥ 100 µM. All inhibitory effects of selegiline and N-desmethylselegiline occurred at concentrations that are several orders of magnitude higher than concentrations seen clinically (highest predose concentration observed at a dose of 12mg/24hours at steady-state was 0.046 µM) (see **PRECAUTIONS, Drug Interactions**).

Excretion

Approximately 10% and 2% of a radiolabeled dose applied dermally, as a DMSO solution, was recovered in urine and feces respectively, with at least 63% of the dose remaining unabsorbed. The remaining 25% of the dose was unaccounted for. Urinary excretion of unchanged selegiline accounted for 0.1% of the applied dose with the remainder of the dose recovered in urine being metabolites.

The systemic clearance of selegiline after intravenous administration was 1.4 L/min, and the mean half-lives of selegiline and its three metabolites, R(-)-N-desmethylselegiline, R(-)- amphetamine, and R(-)-methamphetamine, ranged from 18 - 25 hours.

Population Subgroups

Age—The effect of age on the pharmacokinetics or metabolism of selegiline during administration of **EMSAM** has not been systematically evaluated. The recommended dose for elderly patients is **EMSAM** 6mg/24hours. (See **DOSAGE AND ADMINISTRATION**.)

Gender--No gender differences have been observed in the pharmacokinetics or metabolism of selegiline during administration of **EMSAM**. No adjustment of **EMSAM** dosage based on gender is needed.

Reduced Hepatic Function

After a single administration of EMSAM 6mg/24hours in 8 patients with mild or moderate liver impairment (Child-Pugh classifications of A or B), no differences in either the metabolism or pharmacokinetic behavior of selegiline or its metabolites were observed as compared with data of normal subjects. No adjustment of EMSAM dosage is required in patients with moderate liver impairment.

Reduced Renal Function

Data from a single dose study examining the pharmacokinetics of EMSAM 6mg/24hours in 12 patients with renal impairment suggest that mild, moderate, or severe renal impairment does not affect the pharmacokinetics of selegiline after transdermal application. Therefore, no adjustment of EMSAM dosage is required in patients with renal impairment.

Dermal Adhesion

Dermal adhesion of EMSAM was examined after application of 6mg/24hours selegiline patches for 10 days to the upper-torso. Approximately 88% - 89% of 6mg/24hours selegiline patches applied to the upper torso exhibited <10% lift with approximately 6 – 7 % of patches becoming detached.

External Heat

The effect of direct heat applied to the EMSAM patch on the bioavailability of selegiline has not been studied. However, in theory, heat may result in an increase in the amount of selegiline absorbed from the EMSAM patch and produce elevated serum levels of selegiline. Patients should be advised to avoid exposing the EMSAM application site to external sources of direct heat, such as heating pads or electric blankets, heat lamps, saunas, hot tubs, heated water beds, and prolonged direct sunlight.

**Clinical Efficacy Trials**

The efficacy of **EMSAM** as a treatment for major depressive disorder was established in two placebo-controlled studies of six and eight weeks duration in adult outpatients (ages 18 to 70 years) meeting DSM-IV criteria for major depressive disorder. In both studies, patients were randomized to double-blind treatment with **EMSAM** or placebo. The 6-week trial (N=176) showed that **EMSAM** 6mg/24hours was significantly more effective than placebo on the 17-item Hamilton Depression Rating Scale (HAM-D). In an 8-week dose titration trial, depressed patients (N=265), who received **EMSAM** or placebo at a starting dose of 6mg/24hours, with possible increases to 9mg/24hours or 12mg/24hours based on clinical response, showed significant improvement compared with placebo on the primary outcome measure, the 28-item HAM-D total score.

In another trial, 322 patients meeting DSM-IV criteria for major depressive disorder who had responded during an initial 10-week open-label treatment phase for about 25 days, on average, to **EMSAM** 6mg/24hours, were randomized either to continuation of **EMSAM** at the same dose (N=159) or to placebo (N=163) under double-blind conditions for observation of relapse. About 52% of the **EMSAM**-treated patients, as well as about 52% of the placebo-treated patients, had discontinued treatment by week 12 of the double-blind phase. Response during the open-label phase was defined as 17-item HAM-D score <10 at either week 8 or 9 and at week 10 of the open-label phase. Relapse during the double-blind phase was defined as follows : (1) a 17-item HAM-D score ≥ 14, (2) a CGI-S score of ≥ 3 (with at least a 2-point increase from double-blind baseline), and (3) meeting DSM-IV criteria for major depressive disorder on two consecutive visits ≥ 11 days apart.  In the double-blind phase, patients receiving continued **EMSAM** experienced a significantly longer time to relapse.

An examination of population subgroups did not reveal any clear evidence of differential responsiveness on the basis of age, gender, or race.

**INDICATIONS AND USAGE**

**EMSAM** is indicated for the treatment of major depressive disorder.

The efficacy of **EMSAM** in the treatment of major depressive disorder was established in 6- and 8-week placebo-controlled trials of outpatients with diagnoses of DSM-IV category of major depressive disorder (see **Clinical Efficacy Trials**).

A major depressive episode (DSM-IV) implies a prominent and relatively persistent (nearly every day for at least 2 weeks) depressed or dysphoric mood that usually interferes with daily functioning, and includes at least five of the following nine symptoms: depressed mood, loss of interest in usual activities, significant change in weight and/or appetite, insomnia or hypersomnia, psychomotor agitation or retardation, increased fatigue, feelings of guilt or worthlessness, slowed thinking or impaired concentration, and suicide attempt or suicidal ideation.

The benefit of maintaining patients with major depressive disorder on therapy with **EMSAM** after achieving a responder status for an average duration of about 25 days was demonstrated in a controlled

7

trial (see **Clinical Efficacy Trials** under **CLINICAL PHARMACOLOGY**). The physician who elects to use **EMSAM** for extended periods should periodically re-evaluate the long-term usefulness of the drug for the individual patient (see **DOSAGE AND ADMINISTRATION**).

The antidepressant action of **EMSAM** in hospitalized depressed patients has not been studied.

## CONTRAINDICATIONS

**EMSAM** is contraindicated in patients with known hypersensivity to selegiline or to any component of the transdermal system.

**EMSAM** is contraindicated with selective serotonin re-uptake inhibitors (SSRI's, e.g., fluoxetine, sertraline, and paroxetine), dual serotonin and norepinephrine re-uptake inhibitors (SNRI's, e.g., venlafaxine and duloxetine), tricyclic antidepressants (TCA's, e.g., imipramine and amitripyline), bupropion hydrochloride; meperidine and analgesic agents such as tramadol, methadone and propoxyphene; the antitussive agent dextromethorphan; St. John's wort; mirtazapine; and cyclobenzaprine. **EMSAM** should not be used with oral selegiline or other MAO inhibitors (MAOI's e.g., isocarboxazid, phenelzine, and tranylcypromine) (see **WARNINGS**).

Carbamazepine and oxcarbazepine are contraindicated in patients taking selegiline. (see **PRECAUTIONS, Drug Interactions**).

As with other MAOI's, **EMSAM** is contraindicated for use with sympathomimetic amines, including amphetamines as well as cold products and weight-reducing preparations that contain vasoconstrictors (e.g., pseudoephedrine, phenylephrine, phenylpropanolamine, and ephedrine).

As with other MAOI's, patients taking **EMSAM** should not undergo elective surgery requiring general anesthesia. Also, they should not be given cocaine or local anesthesia containing sympathomimetic vasoconstrictors. **EMSAM** should be discontinued at least 10 days prior to elective surgery. If surgery is necessary sooner, benzodiazepines, mivacurium, rapacuronium, fentanyl, morphine, and codeine may be used cautiously.

As with other MAOI's, **EMSAM** is contraindicated for use in patients with pheochromocytoma.

**EMSAM** is an irreversible MAO inhibitor. As a class, these compounds have been associated with hypertensive crises caused by the ingestion of foods containing high amounts of tyramine. In its entirety, the data for **EMSAM** 6mg/24hours support the recommendation that a modified diet is not required at this dose. Due to the more limited data available for **EMSAM** 9mg/24hours and 12mg/24hours, patients receiving these doses should follow **Dietary Modifications Required for Patients Taking EMSAM 9mg/24hours and 12mg/24hours.** (See WARNINGS and PRECAUTIONS, Drug Interactions, Tyramine.)

## WARNINGS

### Clinical Worsening and Suicide Risk

Patients with major depressive disorder (MDD), both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal ideation and behavior (suicidality) or unusual changes

8

in behavior, whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. There has been a long-standing concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients. Antidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disoders.

Pooled analyses of short-term placebo-controlled trials of nine antidepressant drugs (SSRI's and others) in children and adolescents with MDD, OCD, or other psychiatric disorders (a total of 24 trials involving over 4400 patients) have revealed a greater risk of adverse events representing suicidal behavior or thinking (suicidality) during the first few months of treatment in those receiving antidepressants. The average risk of such events in patients receiving antidepressants was 4%, twice the placebo risk of 2%. There was considerable variation in risk among drugs, but a tendency toward an increase for almost all drugs studied. The risk of suicidality was most consistently observed in the MDD trials, but there were signals of risk arising from trials in other psychiatric indications (obsessive compulsive disorder and social anxiety disorder) as well. No suicides occurred in these trials. It is unknown whether the suicidality risk in pediatric patients extends to longer-term use, i.e., beyond several months. It is also unknown whether the suicidality risk extends to adults.

All pediatric patients being treated with antidepressants for any indication should be observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases. Such observation would generally include at least weekly face-to-face contact with patients or their family members or caregivers during the first 4 weeks of treatment, then every other week visits for the next 4 weeks, then at 12 weeks, and as clinically indicated beyond 12 weeks. Additional contact by telephone may be appropriate between face-to-face visits.

Adults with MDD or co-morbid depression in the setting of other psychiatric illness being treated with antidepressants should be observed similarly for clinical worsening and suicidality, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases.

The following symptoms, anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, and mania, have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as for other indications, both psychiatric and non-psychiatric. Although a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, there is concern that such symptoms may represent precursors to emerging suicidality.

Consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients whose depression is persistently worse, or who are experiencing emergent suicidality or symptoms that might be precursors to worsening depression or suicidality, especially if these symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

If the decision has been made to discontinue treatment, medication should be tapered, as rapidly as is feasible, but with recognition that abrupt discontinuation can be associated with certain symptoms.

Families and caregivers of pediatric patients being treated with antidepressants for major depressive disorder or other indications, both psychiatric and nonpsychiatric, should be alerted

about the need to monitor patients for the emergence of agitation, irritability, unusual changes in behavior, and the other symptoms described above, as well as the emergence of suicidality, and to report such symptoms immediately to health care providers. Such monitoring should include daily observation by families and care givers. Prescriptions for EMSAM should be written for the smallest quantity consistent with good patient management, in order to reduce the risk of overdose. Families and caregivers of adults being treated for depression should be similarly advised.

**Screening Patients for Bipolar Disorder:** A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an antidepressant alone may increase the likelihood of precipitation of a mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients with depressive symptoms should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression. It should be noted that EMSAM is not approved for use in treating bipolar depression.

**Hypertensive Crisis**

EMSAM is an irreversible MAO inhibitor. MAO is important in the catabolism of dietary amines (e.g., tyramine). In this regard, significant inhibition of intestinal MAO-A activity can impose a cardiovascular safety risk following the ingestion of tyramine-rich foods. As a class, MAOI's have been associated with hypertensive crises caused by the ingestion of foods with a high concentration of tyramine. Hypertensive crises, which in some cases may be fatal, are characterized by some or all of the following symptoms: occipital headache which may radiate frontally, palpitation, neck stiffness or soreness, nausea, vomiting, sweating (sometimes with fever and sometimes with cold, clammy skin), dilated pupils, and photophobia. Either tachycardia or bradycardia may be present and can be associated with constricting chest pain. Intracranial bleeding has been reported in association with the increase in blood pressure. Patients should be instructed as to the signs and symptoms of severe hypertension and advised to seek immediate medical attention if these signs or symptoms are present.

In 6 of the 7 clinical studies conducted with EMSAM at doses of 6mg/24hours-12mg/24hours, patients were not limited to a modified diet typically associated with this class of compounds. Although no hypertensive crises were reported as part of the safety assessment, the likelihood of developing this reaction cannot be fully determined since the amount of tyramine typically consumed during the course of treatment is not known and blood pressure was not continuously monitored.

To further define the likelihood of hypertensive crises with use of EMSAM, several Phase I tyramine challenge studies were conducted both with and without food (see PRECAUTIONS, Drug Interactions, Tyramine). In its entirety, the data for EMSAM 6mg/24hours support the recommendation that a modified diet is not required at this dose. Due to the more limited data available for EMSAM 9mg/24hours, and the results from the Phase I tyramine challenge study in fed volunteers administered EMSAM 12mg/24hours (See **PRECAUTIONS, Drug Interactions**, Tyramine), patients receiving these doses should follow **Dietary Modifications Required for Patients Taking EMSAM 9mg/24hours and 12mg/24hours.**

If a hypertensive crisis occurs, EMSAM should be discontinued immediately and therapy to lower blood pressure should be instituted immediately. Phentolamine 5mg or labetalol 20mg administered slowly intravenously is recommended therapy to control hypertension. Alternately, nitroprusside

delivered by continuous intravenous infusion may be used. Fever should be managed by means of external cooling. Patients must be closely monitored until symptoms have stabilized.

## Dietary Modifications Required for Patients Taking EMSAM 9mg/24hours and 12mg/24hours

The following foods and beverages should be avoided beginning on the first day of **EMSAM 9mg/24hours** or **12mg/24hours** treatment and should continue to be avoided for two weeks after a dose reduction to EMSAM 6mg/24hours or following the discontinuation of EMSAM 9mg/24hours or 12mg/24hours.

Food and beverages to avoid and those which are acceptable[1]:

| Class of Food and Beverage | Tyramine-Rich Foods and Beverages to Avoid | Acceptable Foods, Containing No or Little Tyramine |
|---|---|---|
| Meat, Poultry and Fish | Air dried, aged and fermented meats, sausages and salamis (including cacciatore, hard salami and mortadella); pickled herring; and any spoiled or improperly stored meat, poultry and fish (e.g., foods that have undergone changes in coloration, odor, or become moldy); spoiled or improperly stored animal livers | Fresh meat, poultry and fish, including fresh processed meats (e.g., lunch meats, hot dogs, breakfast sausage, and cooked sliced ham) |
| Vegetables | Broad bean pods (fava bean pods) | All other vegetables |
| Dairy | Aged cheeses | Processed cheeses, mozzarella, ricotta cheese, cottage cheese and yogurt |
| Beverages | All varieties of tap beer, and beers that have not been pasteurized so as to allow for ongoing fermentation | As with other antidepressants, concomitant use of alcohol with **EMSAM** is not recommended. (Bottled and canned beers and wines contain little or no tyramine) |
| Miscellaneous | Concentrated yeast extract (e.g., Marmite), sauerkraut, most soybean products (including soy sauce and tofu); OTC supplements containing tyramine | Brewer's yeast, baker's yeast, soy milk, commercial chain-restaurant pizzas prepared with cheeses low in tyramine |

[1] Adapted from K. I. Shulman, S. E. Walker, Psychiatric Annals 2001; 31:378-384

## Use With Other Drugs Affecting Monoamine Activity

Serious, sometimes fatal, central nervous system (CNS) toxicity referred to as the "serotonin syndrome" has been reported with the combination of non-selective MAOI's with certain other drugs, including

tricyclic or selective serotonin reuptake inhibitor antidepressants, amphetamines, meperidine, or pentazocine. Serotonin syndrome is characterized by signs and symptoms that may include hyperthermia, rigidity, myoclonus, autonomic instability with rapid fluctuations of the vital signs, and mental status changes that include extreme agitation progressing to delirium and coma. Similar less severe syndromes have been reported in a few patients receiving a combination of oral selegiline with one of these agents.

Therefore, **EMSAM** should not be used in combination with selective serotonin reuptake inhibitors (SSRI's, e.g., fluoxetine, sertraline, paroxetine); dual serotonin and norepinephrine reuptake inhibitors (SNRI's, e.g., venlafaxine and duloxetine); tricyclic antidepressants (TCA's, e.g., imipramine and amitripyline); oral selegiline or other MAOI's (e.g., isocarboxazid, phenelzine, and tranylcypromine), mirtazapine; bupropion hydrochloride; meperidine and analgesic agents such as tramadol, methadone, and propoxyphene; the antitussive agent dextromethorphan, or St. John's wort because of the risk of life-threatening adverse reactions. Also, **EMSAM** should not be used with sympathomimetic amines, including amphetamines as well as cold products and weight-reducing preparations that contain vasoconstrictors (e.g., pseudoephedrine, phenylephrine, phenylpropanolamine, and ephedrine). (see **CONTRAINDICATIONS**).

Concomitant use of **EMSAM** with buspirone hydrochloride is not advised since several cases of elevated blood pressure have been reported in patients taking MAO inhibitors who were then given buspirone HCl.

After stopping treatment with SSRI's, SNRI's, TCA's, MAOI's, meperidine and analgesics such as tramadol, methadone, and propoxyphene; dextromethorphan, St. John's wort, mirtazapine, bupropion HCl, or buspirone HCl, a time period equal to 4-5 half lives (approximately 1 week) of the drug or any active metabolite should elapse before starting therapy with **EMSAM**. Because of the long half-life of fluoxetine and its active metabolite, at least five weeks should elapse between discontinuation of fluoxetine and initiation of treatment with **EMSAM**. At least two weeks should elapse after stopping **EMSAM** before starting therapy with buspirone HCl or a drug that is contraindicated with **EMSAM**.

## PRECAUTIONS

### General

Hypotension

As with other MAOI's, postural hypotension, sometimes with orthostatic symptoms, can occur with **EMSAM** therapy. In short-term, placebo-controlled depression studies, the incidence of orthostatic hypotension (i.e., a decrease of 10mmHg or greater in mean blood pressure when changing position from supine or sitting to standing) was 9.8% in EMSAM-treated patients and 6.7% in placebo-treated patients. It is recommended that elderly patients treated with **EMSAM** be closely observed for postural changes in blood pressure throughout treatment. Dose increases should be made cautiously in patients with pre-existing orthostasis. Postural hypotension may be relieved by having the patient recline until the symptoms have abated. Patients should be cautioned to change positions gradually. Patients displaying orthostatic symptoms should have appropriate dosage adjustments as warranted.

Activation of Mania/Hypomania

During Phase III trials, a manic reaction occurred in 8/2036 (0.4%) patients treated with **EMSAM**. Activation of mania/hypomania can occur in a small proportion of patients with major affective disorder treated with other marketed antidepressants. As with all antidepressants, **EMSAM** should be used cautiously in patients with a history of mania.

Use in Patients With Concomitant Illness
Clinical experience with **EMSAM** in patients with certain concomitant systemic illnesses is limited. Caution is advised when using **EMSAM** in patients with disorders or conditions that can produce altered metabolism or hemodynamic responses.

**EMSAM** has not been systematically evaluated in patients with a history of recent myocardial infarction or unstable heart disease. Such patients were generally excluded from clinical studies during the product's premarketing testing.

No ECG abnormalities attributable to **EMSAM** were observed in clinical trials.

Although studies of phenylpropanolamine and pseudoephedrine did not reveal pharmacokinetic drug interactions with **EMSAM**, it is prudent to avoid the concomitant use of sympathomimetic agents, such as some decongestants.

**Information for Patients**

Prescribers or other health professionals should inform patients, their families, and their caregivers about the benefits and risks associated with treatment with **EMSAM** and should counsel them in its appropriate use. A patient Medication Guide about Using Antidepressants in Children and Teenagers is available for **EMSAM**. The prescriber or health professional should instruct patients, their families, and their caregivers to read the Medication Guide and should assist them in understanding its contents. Patients should be given the opportunity to discuss the contents of the Medication Guide and to obtain answers to any questions they may have. The complete text of the Medication Guide is reprinted at the end of this document.

Patients should be advised of the following issues and asked to alert their prescriber if these occur while taking **EMSAM**.

**Clinical Worsening and Suicide Risk:**
Patients, their families and their caregivers should be encouraged to be alert to the emergence of anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia, (psychomotor restlessness), hypomania, mania, other unusual changes in behavior, worsening of depression, and suicidal ideation, especially early during antidepressant treatment or when the dose is adjusted up or down. Families and caregivers of patients should be advised to observe for the emergence of such symptoms on a day-to-day basis, since changes may be abrupt. Such symptoms should be reported to the patient's prescriber or health professional, especially if they are severe, abrupt in onset, or were not part of the patient's presenting symptoms. Symptoms such as these may be associated with an increased risk for suicidal thinking and behavior and indicate a need for very close monitoring and possibly change in the medication.

**General**

Patients should be advised not to use oral selegiline while on **EMSAM** therapy.

13

Patients should be advised not to use carbamazepine or oxcarbazepine while on **EMSAM** therapy.

Patients should be advised not to use meperidine and analgesic agents such as tramadol, methadone, and propoxyphene.

Patients should be advised not to use sympathomimetic agents while on **EMSAM** therapy.

Patients should be advised not to use selective serotonin reuptake inhibitors (SSRI's, e.g., fluoxetine, sertraline, paroxetine, and St. John's wort), dual serotonin and norepinephrine reuptake inhibitors (SNRI's, e.g., venlafaxine and duloxetine), tricyclic antidepressants (TCA's, e.g., imipramine and amitripyline), mirtazapine, oral selegiline or other MAOI's (e.g., isocarboxazid, phenelzine, and tranylcypromine), bupropion hydrochloride or buspirone hydrochloride while on **EMSAM** therapy.

**EMSAM** has not been shown to impair psychomotor performance; however, any psychoactive drug may potentially impair judgment, thinking, or motor skills. Patients should be cautioned about operating hazardous machinery, including automobiles, until they are reasonably certain that **EMSAM** therapy does not impair their ability to engage in such activities.

Patients should be told that, although **EMSAM** has not been shown to increase the impairment of mental and motor skills caused by alcohol, the concomitant use of **EMSAM** and alcohol in depressed patients is not recommended.

Patients should be advised to notify their physician if they are taking, or plan to take, any prescription or over-the-counter drugs, including herbals, because of the potential for drug interactions. Patients should also be advised to avoid tyramine-containing nutritional supplements and any cough medicine containing dextromethorphan.

Patients should be advised to use **EMSAM** exactly as prescribed. The need for dietary modifications at higher doses should be explained, and a brief description of hypertensive crisis provided. Rare hypertensive reactions with oral selegiline at doses recommended for Parkinson's disease and associated with dietary influences have been reported. The clinical relevance to **EMSAM** is unknown.

Patients should be advised that certain tyramine rich foods and beverages should be avoided while on **EMSAM** 9mg/24hours or **EMSAM** 12mg/24hours, and for two weeks following discontinuation of **EMSAM** at these doses (See **CONTRAINDICATIONS** and **WARNINGS**).

Patients should be instructed to immediately report the occurrence of the following acute symptoms: severe headache, neck stiffness, heart racing or palpitations, or other sudden or unusual symptoms.

Patients should be advised to avoid exposing the EMSAM application site to external sources of direct heat, such as heating pads or electric blankets, heat lamps, saunas, hot tubs, heated water beds, and prolonged direct sunlight since heat may result in an increase in the amount of selegiline absorbed from the EMSAM patch and produce elevated serum levels of selegiline.

Patients should be advised to change position gradually if lightheaded, faint, or dizzy while on **EMSAM** therapy.

Patients should be advised to notify their physician if they become pregnant or intend to become pregnant during therapy.

Patients should be advised to notify their physician if they are breast-feeding an infant.

While patients may notice improvement with **EMSAM** therapy in one to several weeks, they should be advised of the importance of continuing drug treatment as directed.

Patients should be advised not to cut the **EMSAM** system into smaller portions.

For instructions on how to use **EMSAM**, see **DOSAGE AND ADMINISTRATION, How to Use EMSAM**.

### Drug Interactions

The potential for drug interactions between **EMSAM** and a variety of drugs was examined in several human studies. Drug interaction studies described below were conducted with **EMSAM** 6mg/24hours. Although no differences are expected, drug interaction studies have not been conducted at higher doses (see *In vitro* **Metabolism**). In all of the studies described below, no drug-related adverse events were noted that required discontinuation of any subjects. Further, the incidence and nature of the adverse events were consistent with those known for selegiline or the test agent.

Alcohol

The pharmacokinetics and pharmacodynamics of alcohol (0.75 mg/kg) alone or in combination with **EMSAM** 6mg/24hours for 7 days of treatment was examined in 16 healthy volunteers. No clinically significant differences were observed in the pharmacokinetics or pharmacodynamics of alcohol or the pharmacokinetics of selegiline during co- administration. Although **EMSAM** has not been shown to increase the impairment of mental and motor skills caused by alcohol (0.75 mg/kg) and failed to alter the pharmacokinetic properties of alcohol, patients should be advised that the use of alcohol is not recommended while taking **EMSAM**.

Alprazolam

In subjects who had received **EMSAM** 6mg/24hours for 7 days, co-administration with alprazolam (15 mg/day), a CYP3A4/5 substrate, did not affect the pharmacokinetics of either selegiline or alprazolam.

Carbamazepine

Carbamazepine is an enzyme inducer and typically causes decreases in drug exposure, however, slightly increased levels of selegiline and its metabolites were seen after single application of **EMSAM** 6mg/24hours in subjects who had received carbamazepine (400mg/day) for 14 days. Changes in plasma selegiline concentrations were nearly two-fold, and variable across the subject population. The clinical relevance of these observations is unknown. Carbamazepine is contraindicated with MAOI's , including selegiline. (see **CONTRAINDICATIONS**)

Ibuprofen

In subjects who had received **EMSAM** 6mg/24hours for 11 days, combined administration with the CYP2C9 substrate ibuprofen (800 mg single dose) did not affect the pharmacokinetics of either selegiline or ibuprofen.

Ketoconazole

Seven-day treatment with ketoconazole (200mg/day), a potent inhibitor of CYP3A4, did not affect the steady-state pharmacokinetics of selegiline in subjects who received **EMSAM** 6mg/24hours for seven days and no differences in the pharmacokinetics of ketoconazole were observed.

## Levothyroxine

In healthy subjects who had received **EMSAM** 6mg/24hours for 10 days, single dose administration with levothyroxine (150 µg) did not alter the pharmacokinetics of either selegiline or levothyroxine (as judged by $T_3$ and $T_4$ plasma levels).

## Olanzapine

In subjects who had received **EMSAM** 6mg/24hours for 10 days, co-administration with olanzapine, a substrate for CYP1A2, CYP2D6, and possibly CYP2A6, did not affect the pharmacokinetics of either selegiline or olanzapine.

## Phenylpropanolamine (PPA)

In subjects who had received EMSAM 6mg/24hours for 9 days, co-administration with PPA (25mg every 4 hours for 24 hours) did not affect the pharmacokinetics of PPA. There was a higher incidence of significant blood pressure elevations with the co-administration of EMSAM and PPA than with PPA alone, suggesting a possible pharmacodynamic interaction. It is prudent to avoid the concomitant use of sympathomimetic agents with EMSAM.

## Pseudoephedrine

**EMSAM** 6mg/24hours for 10 days, co-administered with pseudoephedrine (60mg three times a day) did not affect the pharmacokinetics of pseudoephedrine. The effect of pseudoephedrine on EMSAM was not examined. There were no clinically significant changes in blood pressure during pseudoephedrine administration alone, or in combination with **EMSAM**. Nonetheless, it is prudent to avoid the concomitant use of sympathomimetic agents with **EMSAM**.

## Risperidone

In subjects who had received **EMSAM** 6mg/24hours for 10 days, co-administration with risperidone (2 mg per day for 7 days), a substrate for CYP2D6, did not affect the pharmacokinetics of either selegiline or risperidone.

## Tyramine

Selegiline (the drug substance of **EMSAM**) is an irreversible inhibitor of monoamine oxidase (MAO), a ubiquitous intracellular enzyme. MAO exists as two isoenzymes, referred to as MAO-A and MAO-B. Selegiline shows greater affinity for MAO-B; however, as selegiline concentration increases, this selectivity is lost with resulting dose-related inhibition of MAO-A. Intestinal MAO is predominantly type A, while in the brain both isoenzymes exist.

MAO plays a vital physiological role in terminating the biological activity of both endogenous and exogenous amines. In addition to their role in the catabolism of monoamines in the CNS, MAOs are also important in the catabolism of exogenous amines found in a variety of foods and drugs. MAO in

16

the gastrointestinal tract (primarily type A) provides protection from exogenous amines with vasopressor actions, such as tyramine, which if absorbed intact can cause a hypertensive crisis, the so-called "cheese reaction." If a large amount of tyramine is absorbed systemically, it is taken up by adrenergic neurons and causes norepinephrine release from neuronal storage sites with resultant elevation of blood pressure. While most foods contain negligible amounts or no tyramine, a few food products (See WARNINGS) may contain large amounts of tyramine that represent a potential risk for patients with significant inhibition of intestinal MAO-A resulting from administration of MAO inhibitors. Tyramine-containing nutritional supplements should be avoided by patients taking EMSAM.

Animal studies have indicated the transdermal administration of selegiline via EMSAM 6mg/24hours allows for critical levels of MAO inhibition to be achieved in the brain while avoiding levels of gastrointestinal inhibition. To further define the risk of hypertensive crises with use of EMSAM, several Phase I tyramine challenge studies were conducted both with and without food.

Fourteen tyramine challenge studies including 214 healthy subjects (age range 18-65; 31 subjects >50 years of age) were conducted to determine the pressor effects of oral tyramine with concurrent EMSAM treatment (6mg/24hours -12mg/24hours), measured as the dose of tyramine required to raise systolic blood pressure by 30mmHg (TYR30). Studies were conducted with and without concomitant administration of food. Studies conducted with food are most relevant to clinical practice since tyramine typically will be consumed in food. A high-tyramine meal is considered to contain up to 40mg of tyramine.

One study using a crossover design in 13 subjects investigated tryamine pressor doses (TYR30) after administration of EMSAM 6mg/24hours and oral selegiline (5mg twice daily) for 9 days. Mean pressor doses (TYR30) of tyramine capsules administered without food were 338mg and 385 in subjects treated with EMSAM and oral selegiline, respectively.

Another study using a crossover design in 10 subjects investigated tyramine pressor doses after administration of EMSAM 6mg/24hours or tranylcypromine 30mg/day for 10 days. Mean pressor doses (TYR30) of tyramine capsules administered without food were 270 mg in subjects treated with EMSAM 6mg/24hours and 10mg in subjects treated with tranylcypromine.

In a third crossover study, tyramine without food was administered to 12 subjects. The mean tyramine pressor doses (TYR30) after administration of EMSAM 6mg/24hours for 9 and 33 days were 292mg and 204mg, respectively. The lowest pressor dose was 50mg in one subject in the 33-day group.

Tyramine pressor doses were also studied in 11 subjects after extended treatment with EMSAM 12mg/24hours. At 30, 60, and 90 days, the mean pressor doses (TYR30) of tyramine administered without food were 95mg, 72mg, and 88mg, respectively. The lowest pressor dose without food was 25mg in 3 subjects at day 30 while on EMSAM 12mg/24hours. Eight subjects from this study, with a mean tyramine pressor dose of 64mg at 90 days, were subsequently administered tyramine with food, resulting in a mean pressor dose of 172mg (2.7 times the mean pressor dose observed without food, p < 0.003).

With the exception of one study (N = 153), the phase III clinical development program was conducted without requiring a modified diet (N= 2553, 1606 at 6mg/24hours, and 947 at 9mg/24hours or 12mg/24hours). No hypertensive crises were reported in any patient receiving EMSAM.

In its entirety, the data for EMSAM 6mg/24hours support the recommendation that a modified diet is not required at this dose. Due to the more limited data available for EMSAM 9mg/24hours and

12mg/24hours, patients receiving these doses should follow <u>Dietary Modifications Required for Patients Taking EMSAM 9mg/24hours and 12mg/24hours</u>. (See **WARNINGS**.)

17

Warfarin

Warfarin is a substrate for CYP2C9 and CYP3A4 metabolism pathways. In healthy volunteers titrated with Coumadin® (warfarin sodium) to clinical levels of anticoagulation (INR of 1.5 to 2), co-administration with EMSAM 6mg/24hours for 7 days did not affect the pharmacokinetics of the individual warfarin enantiomers. EMSAM did not alter the clinical pharmacodynamic effects of warfarin as measured by INR, Factor VII or Factor X levels.

## CARCINOGENESIS, MUTAGENESIS, IMPAIRMENT OF FERTILITY

### Carcinogenesis

In an oral carcinogenicity study in rats, selegiline given in the diet for 104 weeks was not carcinogenic up to the highest evaluable dose tested (3.5 mg/kg/day, which is 3 times the oral maximum recommended human dose on a $mg/m^2$ basis).

Carcinogenicity studies have not been conducted with transdermal administration of selegiline.

### Mutagenesis

Selegiline induced mutations and chromosomal damage when tested in the *in vitro* mouse lymphoma assay with and without metabolic activation. Selegiline was negative in the Ames assay, the *in vitro* mammalian chromosome aberration assay in human lymphocytes, and the *in vivo* oral mouse micronucleus assay.

### Impairment of Fertility

A mating and fertility study was conducted in male and female rats at transdermal doses of 10, 30, and 75 mg/kg/day of selegiline (8, 24 and 60 times the maximum recommended human dose of EMSAM [12mg/24hours on a $mg/m^2$ basis). Slight decreases in sperm concentration and total sperm count were observed at the high dose; however, no significant adverse effects on fertility or reproductive performance were observed.

### Teratogenic Effects - Pregnancy Category C

In an embryofetal development study in rats, dams were treated with transdermal selegiline during the period of organogenesis at doses of 10, 30, and 75 mg/kg/day (8, 24, and 60 times the maximum recommended human dose [MRHD] of EMSAM [12 mg/24hours] on a $mg/m^2$ basis). At the highest dose there was a decrease in fetal weight and slight increases in malformations, delayed ossification (also seen at the mid dose), and embryofetal post-implantation lethality. Concentrations of selegiline and its metabolites in fetal plasma were generally similar to those in maternal plasma. In an *oral* embryofetal development study in rats, a decrease in fetal weight occurred at the highest dose tested (36 mg/kg; no-effect dose 12 mg/kg); no increase in malformations was seen.

In an embryofetal development study in rabbits, dams were treated with transdermal selegiline during the period of organogenesis at doses of 2.5, 10, and 40 mg/kg/day (4, 16, and 64 times the MRHD on a $mg/m^2$ basis). A slight increase in visceral malformations was seen at the high dose. In an *oral*

embryofetal development study in rabbits, increases in total resorptions and post-implantation loss, and a decrease in the number of live fetuses per dam, occurred at the highest dose tested (50 mg/kg; no-effect dose 25 mg/kg).

In a prenatal and postnatal development study in rats, dams were treated with transdermal selegiline at doses of 10, 30, and 75 mg/kg/day (8, 24, and 60 times the MRHD on a mg/m$^2$ basis) on days 6-21 of gestation and days 1-21 of the lactation period. An increase in post-implantation loss was seen at the mid and high doses, and an increase in stillborn pups was seen at the high dose. Decreases in pup weight (throughout lactation and post-weaning periods) and survival (throughout lactation period), retarded pup physical development, and pup epididymal and testicular hypoplasia, were seen at the mid and high doses. Retarded neurobehavioral and sexual development was seen at all doses. Adverse effects on pup reproductive performance, as evidenced by decreases in implantations and litter size, were seen at the high dose. These findings suggest persistent effects on the offspring of treated dams. A no-effect dose was not established for developmental toxicity. In this study concentrations of selegiline and its metabolites in milk were ~ 15 and 5 times, respectively, the concentrations in plasma, indicating that the pups were directly dosed during the lactation period.

There are no adequate and well-controlled studies in pregnant women. EMSAM should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

**Labor and Delivery**

The effect of EMSAM on labor and delivery in humans is unknown.

**Nursing Mothers**

In a prenatal and postnatal study of transdermal selegiline in rats, selegiline and metabolites were excreted into the milk of lactating rats. The levels of selegiline and metabolites in milk were approximately 15 and 5 times, respectively, steady state levels of selegiline and metabolites in maternal plasma. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk, caution should be exercised administering EMSAM to a nursing mother.

**Pediatric Use**

Safety and effectiveness in the pediatric population have not been established (See BOX **WARNING** and **WARNINGS**- Clinical Worsening and Suicide Risk).

Anyone considering the use of **EMSAM** in a child or adolescent must balance the potential risks with the clinical need.

**Geriatric Use**

One hundred ninety-eight (198) elderly ($\geq$ 65 years of age) patients participated in clinical studies with **EMSAM** 6mg/24hours to 12mg/24hours. There were no overall differences in effectiveness between elderly and younger patients. In short-term, placebo-controlled depression trials, patients age 50 and older appeared to be at higher risk for rash (4.4% EMSAM versus 0% placebo) than younger patients (3.4% **EMSAM** versus 2.4% placebo).

**ADVERSE EVENTS**

The premarketing development program for **EMSAM** included selegiline exposures in patients and/or normal subjects from two different groups of studies: 702 healthy subjects in clinical pharmacology/pharmacokinetics studies and 2,036 exposures from patients in controlled and uncontrolled major depressive disorder clinical trials. The conditions and duration of treatment with **EMSAM** varied and included double-blind, open-label, fixed-dose, and dose titration studies of short-term and longer-term exposures. Safety was assessed by monitoring adverse events, physical examinations, vital signs, body weights, laboratory analyses, and ECGs.

Adverse events during exposure were obtained primarily by general inquiry and recorded by clinical investigators. In the tables and tabulations that follow, standard COSTART terminology has been used to classify reported adverse events. The stated frequencies of adverse events represent the proportion of individuals who experienced, at least once, a treatment-emergent adverse event of the type listed. An event was considered treatment emergent if it occurred for the first time or worsened while receiving therapy following baseline evaluation.

## Adverse Findings Observed in Short-Term Placebo-Controlled Trials

### Adverse Events Associated with Discontinuation of Treatment

Among 817 depressed patients who received **EMSAM** at doses of either 3mg/24hours (151 patients), 6mg/24hours (550 patients) or 6mg/24hours, 9mg/24hours, and 12mg/24hours (116 patients) in placebo-controlled trials of up to 8 weeks in duration, 7.1% discontinued treatment due to an adverse event as compared with 3.6% of 668 patients receiving placebo. The only adverse event associated with discontinuation, in at least 1% of EMSAM -treated patients at a rate at least twice that of placebo, was application site reaction (2% EMSAM vs. 0% placebo).

### Adverse Events Occurring at an Incidence of 2% or More Among EMSAM-Treated Patients

Table 1 enumerates adverse events that occurred at an incidence of 2% or more (rounded to the nearest percent) among 817 depressed patients who received **EMSAM** in doses ranging from 3 to 12mg/24hours in placebo-controlled trials of up to 8 weeks in duration. Events included are those occurring in 2% or more of patients treated with **EMSAM** and for which the incidence in patients treated with **EMSAM** was greater than the incidence in placebo-treated patients.

Only one adverse event was associated with a reporting of at least 5% in the EMSAM group, and a rate at least twice that in the placebo group, in the pool of short-term, placebo-controlled studies: application site reactions (see Application Site Reactions, below). In one such study which utilized higher mean doses of EMSAM than that in the entire study pool, the following events met these criteria: application site reactions, insomnia, diarrhea, and pharyngitis.

These figures cannot be used to predict the incidence of adverse events in the course of usual medical practice where patient characteristics and other factors differ from those that prevailed in the clinical trials. Similarly, the cited frequencies cannot be compared with figures obtained from other clinical investigations involving different treatments, uses, and investigators. The cited figures, however, do provide the prescribing physicians with some basis for estimating the relative contribution of drug and non-drug factors to the adverse event incidence rate in the population studied.

## TABLE 1
### Treatment-Emergent Adverse Events:
### Incidence in Placebo-Controlled Clinical Trials for
### Major Depressive Disorder With EMSAM[1]

| Body System/Preferred Term | EMSAM (N=817) | Placebo (N=668) |
|---|---|---|
| | (% of Patients Reporting Event) | |
| **Body as a Whole** | | |
| Headache | 18 | 17 |
| | | |
| **Digestive** | | |
| Diarrhea | 9 | 7 |
| Dyspepsia | 4 | 3 |
| | | |
| **Nervous** | | |
| Insomnia | 12 | 7 |
| Dry Mouth | 8 | 6 |
| | | |
| **Respiratory** | | |
| Pharyngitis | 3 | 2 |
| Sinusitis | 3 | 1 |
| | | |
| **Skin** | | |
| Application Site Reaction | 24 | 12 |
| Rash | 4 | 2 |

[1] Events reported by at least 2% of patients treated with EMSAM are included, except the following events which had an incidence on placebo treatment ≥ to EMSAM: infection, nausea, dizziness, pain, abdominal pain, nervousness, back pain, asthenia, anxiety, flu syndrome, accidental injury, somnolence, rhinitis, and palpitations.

Application Site Reactions

In the pool of short-term, placebo-controlled major depressive disorder studies, application site reactions (ASR's) were reported in 24% of EMSAM-treated patients and 12% of placebo-treated patients. Most ASR's were mild or moderate in severity. None were considered serious. ASR's led to dropout in 2% of EMSAM-treated patients and no placebo-treated patients.

In one such study which utilized higher mean doses of EMSAM, ASR's were reported in 40% of EMSAM-treated patients and 20% of placebo-treated patients. Most of the ASR's in this study were described as erythema and most resolved spontaneously, requiring no treatment. When treatment was administered, it most commonly consisted of dermatological preparations of corticosteroids.

Male and Female Sexual Dysfunction with MAO Inhibitors

Although changes in sexual desire, sexual performance and sexual satisfaction often occur as manifestations of a psychiatric disorder, they may also be a consequence of pharmacologic treatment.

Reliable estimates of the incidence and severity of untoward experiences involving sexual desire, performance, and satisfaction are difficult to obtain, in part because patients and physicians may be reluctant to discuss them. Accordingly, estimates of the incidence of untoward sexual experience and performance cited in product labeling are likely to underestimate their actual incidence. Table 2 shows

that the incidence rates of sexual side effects in patients with major depressive disorder are comparable to the placebo rates in placebo-controlled trials.

**TABLE 2. Incidence of Sexual Side Effects in Placebo-Controlled Clinical Trials With EMSAM**

| Adverse Event | EMSAM | Placebo |
|---|---|---|
| | IN MALES ONLY | |
| | (N=304) | (N=256) |
| Abnormal Ejaculation | 1.0% | 0.0% |
| Decreased Libido | 0.7% | 0.0% |
| Impotence | 0.7% | 0.4% |
| Anorgasmia | 0.2% | 0.0% |
| | IN FEMALES ONLY | |
| | (N=513) | (N=412) |
| Decreased Libido | 0.0% | 0.2% |

There are no adequately designed studies examining sexual dysfunction with EMSAM treatment.

<u>Vital Sign Changes</u>

**EMSAM** and placebo groups were compared with respect to (1) mean change from baseline in vital signs (pulse, systolic blood pressure, and diastolic blood pressure) and (2) the incidence of patients meeting criteria for potentially clinically significant changes from baseline in these variables. In the pool of short-term, placebo-controlled major depressive disorder studies, 3.0% of **EMSAM**-treated patients and 1.5% of placebo-treated patients experienced a low systolic blood pressure, defined as a reading less than or equal to 90mmHg with a change from baseline of at least 20mmHg. In one study which utilized higher mean doses of **EMSAM**, 6.2% of **EMSAM**-treated patients and no placebo-treated patients experienced a low standing systolic blood pressure by these criteria.

In the pool of short-term major depressive disorder trials, 9.8% of **EMSAM**-treated patients and 6.7% of placebo-treated patients experienced a notable orthostatic change in blood pressure, defined as a decrease of at least 10mmHg in mean blood pressure with postural change.

<u>Weight Changes</u>

In placebo-controlled studies (6-8 weeks), the incidence of patients who experienced $\geq$5% weight gain or weight loss is shown in Table 3.

**TABLE 3. Incidence of Weight Gain and Weight Loss in Placebo-Controlled Trials With EMSAM**

| Weight Change | EMSAM | Placebo |
|---|---|---|
| | (N=757) | (N=614) |
| Gained $\geq$ 5% | 2.1% | 2.4% |
| Lost $\geq$ 5% | 5.0% | 2.8% |

In these trials, the mean change in body weight among **EMSAM**-treated patients was -1.2 lbs compared to +0.3 lbs in placebo-treated patients.

22

<u>Laboratory Changes</u>

**EMSAM** and placebo groups were compared with respect to (1) mean change from baseline in various serum chemistry, hematology, and urinalysis variables and (2) the incidence of patients meeting criteria for potentially clinically significant changes from baseline in these variables. These analyses revealed no clinically important changes in laboratory test parameters associated with **EMSAM**.

<u>ECG Changes</u>

Electrocardiograms (ECGs) from **EMSAM** (N=817) and placebo (N=668) groups in controlled studies were compared with respect to (1) mean change from baseline in various ECG parameters and (2) the incidence of patients meeting criteria for clinically significant changes from baseline in these variables.

No clinically meaningful changes in ECG parameters from baseline to final visit were observed for patients in controlled studies.

**Other Events Observed During the Premarketing Evaluation of EMSAM**

During the premarketing assessment in major depressive disorder, **EMSAM** was administered to 2036 patients in phase III studies. The conditions and duration of exposure to **EMSAM** varied and included double-blind and open-label studies.

In the tabulations that follow, reported adverse events were classified using a standard COSTART–based dictionary terminology. All reported adverse events are included except those already listed in Table 1 or elsewhere in labeling, and those events occurring in only one patient. It is important to emphasize that although the events occurred during treatment with **EMSAM**, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring on one or more occasions in at least 1/100 patients; infrequent adverse events are those occurring in less than 1/100 patients but at least 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

**Body as a Whole:** *Frequent:* Chest pain, neck pain. *Infrequent:* Bacterial infection, fever, cyst, fungal infection, chills, viral infection, suicide attempt, neck rigidity, pelvic pain, photosensitivity reaction, face edema, flank pain, hernia, intentional injury, neoplasm, generalized edema, overdose. *Rare:* Body odor, halitosis, heat stroke, parasitic infection, malaise, moniliasis.

**Cardiovascular System:** *Frequent:* Hypertension. *Infrequent:* Vasodilatation, tachycardia, migraine, syncope, atrial fibrillation, peripheral vascular disorder. *Rare:* Myocardial infarct.

**Digestive System:** *Frequent:* Constipation, flatulence, anorexia, gastroenteritis, vomiting. *Infrequent:* Increased appetite, thirst, periodontal abscess, eructation, gastritis, colitis, dysphagia, tongue edema, glossitis, increased salivation, abnormal liver function tests, melena, tongue disorder, tooth caries. *Rare:* GI neoplasia, rectal hemorrhage.

**Hemic and Lymphatic System** *Frequent:* Ecchymosis. *Infrequent:* Anemia, lymphadenopathy. *Rare:* Leukocytosis, leukopenia, petechia.

**Metabolic and Nutritional:** *Frequent*: Peripheral edema. *Infrequent*: Hyperglycemia, increased SGPT, edema, hypercholesteremia, increased SGOT, dehydration, alcohol intolerance, hyponatremia, increased lactic dehydrogenase. *Rare*: Increased alkaline phosphatase, bilirubinemia, hypoglycemic reaction.

**Musculoskeletal System:** *Frequent*: Myalgia, pathological fracture. *Infrequent*: Arthralgia, generalized spasm, arthritis, myasthenia, arthrosis, tenosynovitis. *Rare*: Osteoporosis.

**Nervous System:** *Frequent*: Agitation, paresthesia, thinking abnormal, amnesia. *Infrequent*: Leg cramps, tremor, vertigo, hypertonia, twitching, emotional lability, confusion, manic reaction, depersonalization, hyperkinesias, hostility, myoclonus, circumoral paresthesia, hyperesthesia, increased libido, euphoria, neurosis, paranoid reaction; *Rare*: Ataxia.

**Respiratory System:** *Frequent*: Cough increased, bronchitis. *Infrequent*: Dyspnea, asthma, pneumonia, laryngismus; *Rare*: Epistaxis, laryngitis, yawn.

**Skin and Appendages:** *Frequent*: Pruritus, sweating, acne. *Infrequent*: Dry skin, maculopapular rash, contact dermatitis, urticaria, herpes simplex, alopecia, vesiculobullous rash, herpes zoster, skin hypertrophy, fungal dermatitis, skin benign neoplasm; *Rare*: Eczema.

**Special Senses:** *Frequent*: Taste perversion, tinnitus. *Infrequent*: Dry eyes, conjunctivitis, ear pain, eye pain, otitis media, parosmia; *Rare*: Mydriasis, otitis external, visual field defect.

**Urogenital System:** *Frequent*: Urinary tract infection, urinary frequency, dysmenorrhea, metrorrhagia. *Infrequent*: Urinary tract infection (male), vaginitis, cystitis (female), hematuria (female), unintended pregnancy, dysuria (female), urinary urgency (male and female), vaginal moniliasis, menorrhagia, urination impaired (male), breast neoplasm (female), kidney calculus (female), vaginal hemorrhage, amenorrhea, breast pain, polyuria (female).

## DRUG ABUSE AND DEPENDENCE

### Controlled Substance Class

EMSAM is not a controlled substance.

### Physical and Psychological Dependence

Several animal studies have assessed potential for abuse and/or dependence with chronic selegiline administration. None of these studies demonstrated a potential for selegiline abuse or dependence.

EMSAM has not been systematically studied in humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug-seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a CNS-active drug will be misused, diverted, and/or abused once marketed. Consequently, patients should be evaluated carefully for a history of drug abuse, and such patients should be observed closely for signs of EMSAM misuse or abuse (e.g., development of tolerance, increases in dose, or drug-seeking behavior).

24

## OVERDOSAGE

There are no specific antidotes for EMSAM. If symptoms of overdosage occur, immediately remove the EMSAM system and institute appropriate supportive therapy. For contemporary consultation on the management of poisoning or overdosage, contact the National Poison Control Center at 1-800-222-1222.

EMSAM is considered to be an irreversible, MAOI at therapeutic doses and, in overdosage, is likely to cause excessive MAO-A inhibition, and may result in the signs and symptoms resembling overdosage with other non-selective, oral MAOI antidepressants (e.g., tranylcypromine (Parnate®), phenelzine (Nardil®), or isocarboxazide (Marplan®).

Overdosage with Non-Selective MAO Inhibition:

NOTE: The following is provided for reference only; it does not describe events that have actually been observed with selegiline in overdosage. No information regarding overdose by ingestion of EMSAM is available.

Typical signs and symptoms associated with overdosage of non-selective MAOI antidepressants may not appear immediately. Delays of up to 12 hours between ingestion of drug and the appearance of signs may occur, and peak effects may not be observed for 24-48 hours. Since death has been reported following overdosage with MAOI agents, hospitalization with close monitoring during this period is essential.

Overdosage with MAOI agents is typically associated with CNS and cardiovascular toxicity. Signs and symptoms of overdosage may include, alone or in combination, any of the following: drowsiness, dizziness, faintness, irritability, hyperactivity, agitation, severe headache, hallucinations, trismus, opisthotonos, convulsions, coma, rapid and irregular pulse, hypertension, hypotension and vascular collapse, precordial pain, respiratory depression and failure, hyperpyrexia, diaphoresis, and cool, clammy skin. Type and intensity of symptoms may be related to extent of the overdosage.

Treatment should include supportive measures, with pharmacological intervention as appropriate. Symptoms may persist after drug washout because of the irreversible inhibitory effects of these agents on systemic MAO activity. With overdosage, in order to avoid the occurrence of hypertensive crisis ("cheese reaction"), dietary tyramine should be restricted for several weeks beyond recovery to permit regeneration of the peripheral MAO-A isoenzyme.

## DOSAGE AND ADMINISTRATION

### Initial Treatment

EMSAM should be applied to dry, intact skin on the upper torso (below the neck and above the waist), upper thigh or the outer surface of the upper arm once every 24 hours. The recommended starting dose and target dose for EMSAM is 6mg/24hours. EMSAM has been systematically evaluated and shown to be effective in a dose range of 6mg/24hours to 12mg/24hours. However the trials were not designed to assess if higher doses are more effective than the lowest effective dose of 6mg/24hours. Based on

25

clinical judgment, if dose increases are indicated for individual patients, they should occur in dose increments of 3mg/24hours (up to a maximum dose of 12mg/24hours) at intervals of no less than two weeks. As with all antidepressant drugs, full antidepressant effect may be delayed.

Patients should be informed that tyramine-rich foods and beverages should be avoided beginning on the first day of EMSAM 9mg/24hours or 12mg/24hours treatment and should continue to be avoided for two weeks after a dose reduction to EMSAM 6mg/24hours or following the discontinuation of EMSAM 9mg/24hours or 12mg/24hours (See **WARNINGS**).

**Special Populations**

No dosage adjustment is required for patients with mild to moderate renal or hepatic impairment. The recommended dose for elderly patients ($\geq$ 65 years) is EMSAM 6mg/24hours daily. Dose increases, in the elderly, should be made with caution and patients should be closely observed for postural changes in blood pressure throughout treatment.

**How to Use EMSAM**

**1.** EMSAM should be applied to dry, intact skin on the upper torso (below the neck and above the waist), upper thigh or the outer surface of the upper arm. A new application site should be selected with each new patch to <u>avoid re-application to the same site on consecutive days</u>. Patches should be applied at approximately the same time each day.

2. Apply the patch to an area of skin that is not hairy, oily, irritated, broken, scarred or calloused. Do not place the patch where your clothing is tight which could cause the patch to rub off.

3. After you have selected the site for your patch, wash the area gently and thoroughly with soap and warm water. Rinse until all soap is removed. Dry the area with a clean dry towel.

4. Just before you apply the patch, remove it from the pouch. Remove half of the protective backing and throw it away. Try not to touch the exposed side (sticky side) of the patch, because the medicine could come off on your fingers.

5. Press the sticky side of the patch firmly against the skin site that was just washed and dried. Remove the second half of the protective liner and press the remaining sticky side firmly against your skin. Make sure that the patch is flat against the skin (there should be no bumps or folds in the patch) and is sticking securely. Be sure the edges are stuck to the skin surface.

6. After you have applied the patch, <u>wash your hands</u> thoroughly with soap and water to remove any medicine that may have gotten on them. Do not touch your eyes until after you have washed your hands.

7. After 24 hours, remove the patch. Do not touch the sticky side. As soon as you have removed the patch, fold it so that the sticky side sticks to itself.

8. Throw away the folded patch so that children and/or pets cannot reach it.

9. <u>Wash your hands</u> with soap and water.

10. If your patch falls off, apply a new patch to a new site and resume your previous schedule.

26

11. Only one EMSAM patch should be worn at a time.

12. Avoid exposing the EMSAM application site to external sources of direct heat, such as heating pads or electric blankets, heat lamps, saunas, hot tubs, heated water beds, and prolonged direct sunlight.

**Maintenance Treatment**

It is generally agreed that episodes of depression require several months or longer of sustained pharmacologic therapy. The benefit of maintaining depressed patients on therapy with **EMSAM** at a dose of 6mg/24hours after achieving a responder status for an average duration of about 25 days was demonstrated in a controlled trial (see **CLINICAL EFFICACY TRIALS** and **INDICATIONS AND USAGE**). The physician who elects to use **EMSAM** for extended periods should periodically re-evaluate the long-term usefulness of the drug for the individual patient.

**HOW SUPPLIED**

EMSAM is supplied as 6mg/24 hours (20mg/20cm$^2$), 9mg/24 hours (30mg/30cm$^2$)and 12mg/24 hours (40mg/40cm$^2$) transdermal systems.

They are available as:
NDC 39506-033-30 6mg/24hours (20mg/20cm$^2$) box of 30 transdermal systems.
NDC 39506-044-30 9mg/24 hours (30mg/30cm$^2$)box of 30 transdermal systems.
NDC 39506-055-30 12mg/24 hours (40mg/40cm$^2$) box of 30 transdermal systems.

**STORAGE AND DISPOSAL**

Store at 20° to 25° C (68° to 77° F) [see USP Controlled Room Temperature]. Do not store outside of the sealed pouch. Apply immediately upon removal from the protective pouch. Discard used **EMSAM** in household trash in a manner that prevents accidental application or ingestion by children, pets or others.

DISTRIBUTED BY:
Bristol-Myers Squibb Company
Princeton, New Jersey 08543 USA

MANUFACTURED FOR:
Somerset Pharmaceuticals, Inc.
Tampa, FL 33607 USA

**Rx Only**
Tampa, FL  33607
Literature issued XXXXXX XXXX
**EMSAM:R0.2**
Revised Proposed Labeling- 2/24/06

## MEDICATION GUIDE

### *EMSAM® [EM sam]*
### Generic Name: selegiline transdermal system

**Rx only**

Read this Medication Guide carefully before you start using EMSAM and each time you get a refill. There may be new information. This information does not take the place of talking with your doctor about your medical condition or your treatment. If you have any questions about EMSAM, ask your doctor or pharmacist.

**IMPORTANT: Be sure to read the section of this Medication Guide beginning with "What is the most important information I should know about EMSAM?" It contains important information about certain changes in diet that might be needed, other medications to avoid, and other important information about this medication. It immediately follows the next section called "About Using Antidepressants in Children and Teenagers."**

### ABOUT USING ANTIDEPRESSANTS IN CHILDREN AND TEENAGERS

**What is the most important information I should know if my child is being prescribed an antidepressant?**

Parents or guardians need to think about 4 important things when their child is prescribed an antidepressant:
1. There is a risk of suicidal thoughts or actions
2. How to try to prevent suicidal thoughts or actions in your child
3. You should watch for certain signs if your child is taking an antidepressant
4. There are benefits and risks when using antidepressants

**1. There is a Risk of Suicidal Thoughts or Actions**

Children and teenagers sometimes think about suicide, and many report trying to kill themselves.

Antidepressants increase suicidal thoughts and actions in some children and teenagers. But suicidal thoughts and actions can also be caused by depression, a serious medical condition that is commonly treated with antidepressants. Thinking about killing yourself or trying to kill yourself is called *suicidality* or *being suicidal*.

A large study combined the results of 24 different studies of children and teenagers with depression or other illnesses. In these studies, patients took either a placebo (sugar pill) or an antidepressant for 1 to 4 months. *No one committed suicide in these studies*, but some patients became suicidal. On sugar pills, 2 out of every 100 became suicidal. On the antidepressants, 4 out of every 100 patients became suicidal.

**For some children and teenagers, the risks of suicidal actions may be especially high.** These include patients with
• Bipolar illness (sometimes called manic-depressive illness)
• A family history of bipolar illness
• A personal or family history of attempting suicide

28

If any of these are present, make sure you tell your healthcare provider before your child takes an antidepressant.

## 2. How to Try to Prevent Suicidal Thoughts and Actions

To try to prevent suicidal thoughts and actions in your child, pay close attention to changes in her or his moods or actions, especially if the changes occur suddenly. Other important people in your child's life can help by paying attention as well (e.g., your child, brothers and sisters, teachers, and other important people). The changes to look out for are listed in Section 3, on what to watch for.

Whenever an antidepressant is started or its dose is changed, pay close attention to your child.

After starting an antidepressant, your child should generally see his or her healthcare provider:
• Once a week for the first 4 weeks
• Every 2 weeks for the next 4 weeks
• After taking the antidepressant for 12 weeks
• After 12 weeks, follow your healthcare provider's advice about how often to come back
• More often if problems or questions arise (see Section 3)

You should call your child's healthcare provider between visits if needed.

## 3. You Should Watch for Certain Signs If Your Child is Taking an Antidepressant

Contact your child's healthcare provider *right away* if your child exhibits any of the following signs for the first time, or if they seem worse, or worry you, your child, or your child's teacher:
• Thoughts about suicide or dying
• Attempts to commit suicide
• New or worse depression
• New or worse anxiety
• Feeling very agitated or restless
• Panic attacks
• Difficulty sleeping (insomnia)
• New or worse irritability
• Acting aggressive, being angry, or violent
• Acting on dangerous impulses
• An extreme increase in activity and talking
• Other unusual changes in behavior or mood

Never let your child stop taking an antidepressant without first talking to his or her healthcare provider. Stopping an antidepressant suddenly can cause other symptoms.

## 4. There are Benefits and Risks When Using Antidepressants

Antidepressants are used to treat depression and other illnesses. Depression and other illnesses can lead to suicide. In some children and teenagers, treatment with an antidepressant increases suicidal thinking or actions. It is important to discuss all the risks of treating depression and also the risks of not treating it. You and your child should discuss all treatment choices with your healthcare provider, not just the use of antidepressants.

Other side effects can occur with antidepressants (see section below).

Of all the antidepressants, only fluoxetine (Prozac®) has been FDA approved to treat pediatric depression.

For obsessive compulsive disorder in children and teenagers, the FDA has approved only fluoxetine (Prozac®), sertraline (Zoloft®), fluvoxamine (Luvox®), and clomipramine (Anafranil®).

Your healthcare provider may suggest other antidepressants based on the past experience of your child or other family members.

**Is this all I need to know if my child is being prescribed an antidepressant?**
No. This is a warning about the risk for suicidality. Other side effects can occur with antidepressants.

Be sure to ask your healthcare provider to explain all the side effects of the particular drug he or she is prescribing. Also ask about drugs to avoid when taking an antidepressant. Ask your healthcare provider or pharmacist where to find more information.

## What is the most important information I should know about EMSAM?

1. **EMSAM contains a medicine called a monoamine oxidase inhibitor, also called a MAOI. MAOI medicines, including EMSAM can cause a sudden, large increase in blood pressure (hypertensive crisis) if you eat foods and drinks that contain high amounts of tyramine. A hypertensive crisis can be a life-threatening condition.** See "What are the possible side effects of EMSAM?" for signs and symptoms of a hypertensive crisis.

- **EMSAM comes in three different doses and patch sizes:**
  - a 6mg/24hours patch
  - a 9mg/24hours patch
  - a 12mg/24hours patch

- **You must avoid (not eat or drink) certain foods and drinks while using EMSAM 9mg/24hours and EMSAM 12mg/24hours patches and for 2 weeks after stopping EMSAM 9mg/24hours and EMSAM 12mg/24hours patches. (The table below lists these foods and drinks). The table also lists foods and drinks that are okay to eat and drink while using EMSAM 9mg/24hours and EMSAM 12mg/24hours patches.**

- **You do not have to make any diet changes with the EMSAM 6mg/24hours patch.**

| Type of Food and Drink | Tyramine-Rich Foods and Drinks to Avoid | Acceptable Foods and Drinks, Containing No or Little Tyramine |
|---|---|---|
| **Meat, Poultry and Fish** | • Air dried, aged and fermented meats, sausages and salamis<br>• pickled herring<br>• and any spoiled or improperly stored meat, poultry and fish. These are foods that have a change in color, odor, or become moldy. | • Fresh meat, poultry and fish, including fresh processed meats (such as lunch meats, hot dogs, breakfast sausage, and cooked sliced ham) |

| | • spoiled or improperly stored animal livers. | |
|---|---|---|
| **Vegetables** | • Broad bean pods (fava bean pods) | • All other vegetables |
| **Dairy (milk products)** | • Aged cheeses | • Processed cheeses, mozzarella, ricotta cheese, cottage cheese, and yogurt |
| **Drinks** | • All tap beers, and other beers that have not been pasteurized | • As with other antidepressants, concomitant use of alcohol with EMSAM is not recommended. (Bottled and canned beers and wines contain little or no tyramine) |
| **Other** | • Concentrated yeast extract (such as Marmite)<br>• Sauerkraut<br>• Most soybean products (including soy sauce and tofu)<br>• over-the-counter supplements containing tyramine | • Brewer's yeast, bakers yeast<br>• Soy milk<br>• Pizzas from commercial chain-restaurants prepared with cheeses low in tyramine. |

¹ Adapted from K. I. Shulman, S. E. Walker, Psychiatric Annals 2001; 31:378-384

- All foods you eat must be fresh or properly frozen.
- Avoid foods when you do not know their storage conditions.

2. **EMSAM can cause serious and potentially life-threatening reactions if used with certain other medicines. Do not take the following medicines while using EMSAM, and for 2 weeks after stopping EMSAM:**
- other medicines to treat depression (antidepressants) including other MAOI medicines
- medicine which contains selegiline (such as Eldepryl®).
- St. John's Wort (a herbal supplement)
- Demerol® (meperidine), or medicines that contain meperidine (a narcotic pain medicine) or the pain medicines tramadol, methadone, or propxyphene
- Tegretol (carbamazepine), or other medicines that contain carbamazepine (a seizure medicine)
- Trileptal (oxcarbazepine), or other medicines that contain oxcarbazepine (a seizure medicine)
- Cold or cough preparations that contain dextromethorphan.
- Flexeril or other medicines that contain cyclobenzaprine (a medicine used to treat muscle spasms)
- decongestant medicines, found in many products to treat cold symptoms
- over-the-counter diet pills or herbal weight-loss products
- any herbal or dietary supplement that contains tyramine
- medicines called amphetamines, also called stimulants or "uppers"
- BuSpar® (buspirone HCL), an anxiety medicine

**Some of these medicines will have to be stopped for at least a week before you can start using EMSAM.**

**What is EMSAM?**
EMSAM is a skin patch (transdermal system) used to treat major depression. The skin patch delivers the medicine through your skin and into your bloodstream.

EMSAM has not been studied for the treatment of depression in children under 18 years of age.

## Who should not use EMSAM?
**Do not use EMSAM if you are:**
- **taking certain other medicines.** See "What is the most important information I should know about EMSAM?"
- **allergic to anything in EMSAM.** See the end of this Medication Guide for a complete list of ingredients in EMSAM.

## What should I tell my doctor before starting EMSAM?
**Tell your doctor about all your medical conditions, including if you:**
- **have any heart problems**
- **have or had manic episodes** (a mental condition that causes "high" moods).
- **have or had seizures** (convulsions or "fits").
- **tend to get dizzy or faint**
- **are pregnant or planning to become pregnant.** It is not known if EMSAM can harm your unborn baby.
- **are breastfeeding.** It is not known if EMSAM passes into your milk or if it can harm your baby.

**Tell your doctor about all the medicines you take** including prescription and non-prescription medicines, vitamins and herbal supplements. **EMSAM can cause a serious and life-threatening reaction if used with certain other medicines.** See "What is the most important information I should know about EMSAM?"

**Know the medicines you take. Keep a list of them with you to show your doctor and pharmacist. Do not take any new medicine while using EMSAM, and for 2 weeks after you stop using it, before talking with your doctor.**

## How should I use EMSAM?
See the end of this Medication Guide for "How to Use and Apply an EMSAM Patch".

- Use **EMSAM** exactly as prescribed by your doctor. **Use only one patch at a time.** Change the patch once a day (every 24 hours). Choose a time of day that works best for you.

- Your doctor will prescribe a dose of **EMSAM** based on your condition. Your doctor may change your dose if needed.

- Talk to your doctor often about your condition. You may notice an improvement in your condition with **EMSAM** therapy after several weeks. **Do not stop or change your treatment with EMSAM without talking to your doctor.**

- **Make sure you do not eat foods or drink beverages that contain high amounts of tyramine while using EMSAM 9mg/24hours or EMSAM 12mg/24hours patches, and for 2 weeks after you stop using them.**

- If you use more than one **EMSAM patch at a time**, remove **EMSAM** patches right away and call your doctor or local Poison Control Center.

- Avoid exposing the EMSAM application site to external sources of direct heat, such as heating pads or electric blankets, heat lamps, saunas, hot tubs, heated water beds, and prolonged direct sunlight.

- Tell your doctor if you plan to have surgery. Also, tell your surgeon that you take EMSAM. EMSAM should be stopped 10 days before you have elective surgery.

## What should I avoid while using EMSAM?

- **You must not eat foods or drink beverages foods and drinks that contain high amounts of tyramine while using EMSAM 9mg/24hours and 12mg/24hours patches.** You do not have to make any diet changes with the EMSAM 6 mg/24hours patch.. See "What is the most important information I should know about EMSAM?"

- **Do not take other medicines while using EMSAM or for 2 weeks after you stop using it unless your doctor has told you it is okay.** See "What is the most important information I should know about EMSAM?"

- **Do not drive or operate dangerous machinery until you know how EMSAM affects you. EMSAM may reduce your judgment, ability to think, or coordination.**

- **Drinking alcoholic beverages is not recommended while using EMSAM.**

## What are the possible side effects of EMSAM?
**EMSAM:**

- **can cause a sudden, large increase in blood pressure, ("hypertensive crisis") if you eat certain foods and drinks during treatment.** See "What is the most important Information I should know about EMSAM?" **A hypertensive crisis can lead to stroke and death.** Symptoms of a hypertensive crisis include the sudden onset of severe headache, nausea, stiff neck, a fast heartbeat or a change in the way your heart beats (palpitations), a lot of sweating, and confusion. **If you suddenly have these symptoms, get medical care right away.**

- **can cause serious and potentially life-threatening reactions if used with certain other medicines.** See "What is the most important Information I should know about EMSAM?"

- **may worsen your depression, give you suicidal thoughts, or cause unusual changes in behavior.** Call your doctor right away if you feel worse with EMSAM.

- **may cause a mental condition called mania or hypomania** (mental condition which causes high moods) in people who have a history of mania.

- **can cause low blood pressure.** Lie down if you feel dizzy, faint, or lightheaded. Change your position slowly if low blood pressure is a problem for you. Tell your doctor if you have these symptoms. You may need a lower dose of EMSAM.

The most common side effect of EMSAM is a skin reaction where the patch is placed. You may see mild redness at the site when a patch is removed. This redness should go away within several hours after removing the patch. If irritation or itching continues, tell your doctor.

These are not all the side effects of EMSAM. For more information, ask your doctor or pharmacist.

33

## How do I store EMSAM?
- Store **EMSAM** at 68° to 77°F (20° to 25°C).
- Store **EMSAM** in its sealed pouch until use.
- **Keep EMSAM and all medicines out of the reach of children and away from pets.**

## General information about EMSAM
Medicines are sometimes prescribed for conditions that are not mentioned in Medication Guides. Do not give **EMSAM** to other people, even if they have the same symptoms you have. It may harm them.

This Medication Guide summarizes the most important information about **EMSAM**. If you would like more information, talk with your doctor. You can ask your pharmacist or doctor for information about **EMSAM** that is written for health professionals.

**For more information, call 1-800-321-1335 or visit www.EMSAM.com**

### What are the ingredients in EMSAM?
**Active Ingredient:** Selegiline
**Inactive Ingredients:** acrylic adhesive, ethylene vinyl acetate, low density polyethylene, polyester, polyurethane, and silicon coated polyethylene terephthalate

## How to Use and Apply an EMSAM Patch

**Read these instructions carefully before you apply EMSAM. Ask your doctor or pharmacist about anything you do not understand.**

- Apply a new **EMSAM** patch every day (24hours).

- **Wear only one EMSAM patch at a time.** Wear one EMSAM patch all the time until it is time to apply a new one.

- Remove a used patch before applying a new one.

- Change the patch at the same time each day.

- Apply an EMSAM patch to dry, smooth skin on your upper chest or back (below the neck and above the waist), upper thigh or to the outer surface of the upper arm. Choose a new site each time you change your patch. Do not use the same site two days in a row. (See picture 1 for skin sites that may be used.)



**Picture 1. Skin sites for EMSAM patch (Do not use more than one patch at a time)**

- Apply an EMSAM patch to an area of skin that is not hairy, oily, irritated, broken, scarred or calloused. Do not place the patch where your clothing is tight, which could cause the patch to rub

34

off.

- After you have selected the site for your patch, wash the area gently and well with soap and warm water. Rinse until all soap is removed. Dry the area with a clean dry towel.

- Just before you apply the patch, remove it from its sealed pouch. **Do not keep or store the patch outside of the sealed pouch. Never cut an EMSAM patch into smaller pieces to use.**

- Remove half of the protective backing and throw it away. (See picture 2) Try not to touch the exposed side (sticky side) of the patch, because the medicine could come off on your fingers. With your fingertips, press the sticky side of the patch firmly against the skin site that was just washed and dried. Remove the second half of the protective liner and press the remaining sticky side firmly against your skin. Make sure that the patch is flat against the skin (there should be no bumps or folds in the patch) and is sticking securely. Be sure the edges are stuck to the skin surface. (See picture 3.)



**Picture 2. Removing the protective backing from an EMSAM patch.**



**Picture 3. Applying an EMSAM patch**

After you have applied the patch, <u>wash your hands</u> well with soap and water to remove any medicine that may have gotten on them. **Do not touch your eyes until after you have washed your hands.**

- After 24 hours, remove the patch slowly and carefully to avoid damaging the skin. Do not touch the sticky side. As soon as you have removed the patch, fold it so that the sticky side sticks to itself.

- Throw away the folded patch so that children and pets cannot reach it. This patch still contains some medicine and could harm a child or pet.

- Gently wash the old application site with warm water and a mild soap to remove any sticky material (adhesive) that stays on your skin after removing the patch. A small amount of baby oil may also be used to remove any adhesive. You may need to use a medical adhesive removal pad that you can get from your pharmacist. Alcohol or other dissolving liquids such as nail polish remover may cause skin irritation and should not be used.

35

- Wash your hands with soap and water.

- If the patch becomes loose, press it back in place.  If your EMSAM patch falls off, apply a new EMSAM patch to a new site and resume your normal schedule for changing patches.

- If you forget to change your patch after 24 hours, remove the old patch, put on a new patch in a different area and continue to follow your original schedule.

**This Medication Guide has been approved by the US Food and Drug Administration.**

DISTRIBUTED BY:                                          MANUFACTURED FOR:





*Prozac® is a registered trademark of Eli Lilly and Company
*Zoloft® is a registered trademark of Pfizer Pharmaceuticals
*Anafranil® is a registered trademark of Mallinckrodt Inc.
*Demerol® is a registered trademark of Sanofi
*Eldepryl® is a registered trademark of Somerset Pharmaceuticals
*Tegretol® is a registered trademark of Novartis Pharmaceuticals Corporation
*Flexeril® is a registered trademark of ALZA Corporation
*BuSpar® is a registered trademark of Bristol-Myers Squibb Company

February 2006

EMSAM:PILR2

---------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
---------------------------------------------------------------------------------

```
 /s/
---------------------
Thomas Laughren
2/27/2006 04:02:39 PM
```



US00RE34579E

# United States Patent [19]

Buyske, deceased et al.

[11] E    Patent Number:    Re. 34,579

[45] Reissued    Date of Patent:    Apr. 5, 1994

[54] **METHOD OF TREATING DEPRESSION**

[75] Inventors: Donald A. Buyske, deceased, late of Lake Worth, Fla.; by Susan G. Buyske, administratrix, New York, N.Y.

[73] Assignee: Somerset Pharmaceuticals, Inc., Tampa, Fla.

[21] Appl. No.: 750,292

[22] Filed: Aug. 27, 1991

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: 4,868,218
    Issued: Sep. 19, 1989
    Appl. No.: 339,712
    Filed: Apr. 18, 1989

U.S. Applications:
[62] Division of Ser. No. 86,795, Aug. 18, 1987, Pat. No. 4,861,800.

[51] Int. Cl.⁵ ............................................... A61K 31/135
[52] U.S. Cl. ........................................ 514/646; 514/946; 514/947; 514/969
[58] Field of Search ................ 514/646, 946, 947, 969

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,997,422 | 8/1961 | Tedeschi . |
| 4,230,105 | 10/1980 | Harwood . |
| 4,284,444 | 8/1981 | Bernstein et al. . |
| 4,409,243 | 10/1983 | Lieb . |
| 4,568,343 | 2/1986 | Leeper et al. . |
| 4,812,481 | 3/1989 | Reischig et al. . |
| 4,885,154 | 12/1989 | Cormier et al. . |
| 4,925,878 | 5/1990 | Bodo et al. . |

| | | | |
|---|---|---|---|
| 5,030,629 | 7/1991 | Rajadhyaksha | .................... 514/946 |
| 5,045,317 | 9/1991 | Chess et al. | .................... 514/946 |
| 5,049,387 | 9/1991 | Amkraut . | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0139127 | 8/1984 | European Pat. Off. . |
| 2.635M | 4/1963 | France . |
| 2163347A | 2/1986 | United Kingdom . |

### OTHER PUBLICATIONS

Chem. Abst. 97–138,580q (1982).
Chem. Abst. 101—122860e (1984).
Martindale, The Extra Pharmacopoeia, Twenty–Eighth Edition, pp. 1752–753, Pharmaceutical Press, 1982.
Gardner, Targeting the Central Nervous System: New Drug Delivery Technologies for Psychotropic Agents, vol. 21, No. 3, 1985, pp. 657–662.
Koller et al., PHNO, A Novel Dopamine Agonist, in Animal Models of Parkinsonism, Movement Disorders, vol. 2, No. 3, pp. 193–199, 1987.

*Primary Examiner*—S. J. Friedman
*Attorney, Agent, or Firm*—Mathews, Woodbridge & Collins

[57] **ABSTRACT**

The monamine oxidase inhibitor drug L-deprenyl (phenýlisopropyl methyl propynyl amine) is safely and conveniently used for the treatment of mental depression in a formulation applied to the skin of the patient. In this way the danger of side reaction due to the consumption of foods containing tyramine (the cheese effect) is minimized. Unlike other monamine oxidase drugs, such as Parnate, L-deprenyl does not cause skin irritation when used in this way.

**12 Claims, No Drawings**

**EXHIBIT C**

**EX MAIL NO. EV 258 030 987 US**

Re. 34,579

**1**

# METHOD OF TREATING DEPRESSION

Matter enclosed in heavy brackets 〖 〗 appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## CROSS REFERENCE TO RELATED APPLICATION

〖This application is a division of my copending application Ser. No. 07/086,795, filed 18 Aug. 1987.〗 *This application is a reissue of Ser. No. 339,712 filed Apr. 18, 1989, now U.S. Pat. No. 4,868,218, which is a division of Ser. No. 086,795, filed Aug. 18, 1987, now U.S. Pat. No. 4,861,800.*

## FIELD OF THE INVENTION

My present invention relates to the therapeutic administration of the drug L-deprenyl a method of treating human subjects suffering from depression and, more particularly, to (levo phenyl isopropyl methyl propynyl amine) for this purpose. For brevity, L-deprenyl will often be denoted as LDY.

## BACKGROUND OF THE INVENTION

Two general classes of organic pharmaceuticals useful in the treatment of the mental disease depression in humans have been recognized: (1) tricyclic antidepressants, as exemplified by amitriptyline and protriptylene, and (2) monoamine oxidase inhibitors (MAOI), as exemplified by the commercially available drugs Nardil, Parnate, and L-deprenyl.

Both types of drugs are generally regarded as effective, but both have undesirable side effects. For tricyclic drugs, recognized side effects include dry mouth, orthostatic hypotension, and impotence, and these effects are frequent. The most significant side effect of the MAOI drugs is a rare but serious one: sudden and dangerous life-threatening elevation of blood pressure when the patent taking such drugs also consumes foods high in the naturally occurring substance tyramine. Cheese is the most common food containing large amounts of tyramine, so that this side effect is often known colloquially in the medical profession as the "cheese effect".

Because the cheese effect can cause very serious medical problems, including death in severe cases, MAOI drugs are little used, even though they are generally free from the other more common side effects of the tricyclic drugs and are believed to have at least equal effectiveness in the treatment of most types of depression.

Tyramine is known to be capable of causing severe hypertension when presented in the blood, but it is normally converted in the gastrointestinal tract by the action of a monoamine oxidase enzyme naturally present there, to other substances incapable of causing dangerous hypertension. When a patient is taking an MAOI orally, however, deactivation of the tyramine by gastrointestinal enzymes is at least partially repressed, and serious clinical symptoms may result.

Recent research has recognized a distinction among the MAOI drugs themselves, coupled with recognition of the existence of two isozymes of monoamine oxidase itself, denoted simply as the A and B isozymes. Nardil and Parnate are recognized as primarily inhibitors of the action of monoamine oxidase A, while depre-

**2**

nyl first inhibits the action of monoamine oxidase B and significantly inhibits the action of monoamine oxidase A only at larger doses. The tyramine deactivating monoamine oxidase enzyme is primarily type A, so that it would appear that administration of L-deprenyl should not induce the cheese effect. The cheese effect, however, is potentially so serious that, the use of L-deprenyl in an oral dosage is nevertheless counterindicated simply because it does appear to have some MAO-A inhibiting activity. On the other hand, the monoamine oxidases in the brain are primarily of the B type, so that LDY is very effective in inhibiting their action.

There are three general modes of administration which have been used for the antidepressants under consideration, which must reach the blood stream in the course of exerting their therapeutic effects: oral, intravascular, and transdermal. Because of the danger of infection and the need for trained personnel for administration, intravascular administration is disfavored when one of the other two means is effective. Drugs for treating depression have traditionally been administered orally, but transdermal administration of some of the tricyclic antidepressant drugs, and by implication, any suitable drug, has also been taught by U.S. Pat. No. 4,230,105 of Oct. 28, 1980 to Harwood. Transdermal administration of drugs in general has been taught by earlier patents, including some cited in the Harwood reference.

One highly restrictive limitation on the transdermal administration of drugs is the possibility of skin irritation or allergic reactions induced by such administration. This is particularly important when considering treatment of depression since MAO inhibitors are required to be used at higher dose levels.

In Whatever dosage form it may be administered, an antidepressant drug must be constantly present in the body for up to six months if the patient is to derive maximum benefit and not revert to a depressed state.

If transdermal administration of an antidepressant is to be used, this means very prolonged and constant or near-constant contact between the patient's skin and the pharmaceutical including the drug. It is well known that long-term exposure of skin to a chemical substance even at low dosages often will result either in a local skin inflammation at the side of contact or a more general immunologically based allergic reaction that can have a serious adverse effect on the entire body. When either of these events occur, the affected patient should immediately discontinue contact with the offending agent. Since MAO inhibitors generally were found heretofore to be skin irritants, clearly their use for antidepression treatment by transdermal techniques was not indicated.

## SUMMARY OF THE INVENTION

I have found, most surprisingly, that LDY, applied to a suitable form and amount to human skin, is readily absorbed through the skin into the bloodstream to achieve and maintain a level in the blood, including the blood in the brain, which is effective in the treatment of depression.

Furthermore, while other MAO inhibitors are highly irritating to the skin, surprisingly, it has been found that LDY causes little or no skin irritation, by contrast with Parnate, for example, which is strongly irritating to the skin. Thus, transdermal administration of LDY provides a surprisingly nonirritating and effective method for treating depression.

Re. 34,579

3

## SPECIFIC DESCRIPTION

For a normal human adult, about 30 mg of deprenyl per day is normally an effective dose for a relief of depression. This may be adjusted to blood volume of a particular patient by calculations well-known in the medical arts. The drug is preferably used either as free base or as its hydrochloride. For convenience in dispensing, the drug usually is mixed with other pharmaceutically inert materials. These inert materials, also called excipients, can be formulated by methods known in the prior art so as to promote either rapid absorption of most of the drug content applied to the skin, or a slower absorption over a longer time.

In treating most patients for depression, it is preferable to use a formulation, which will result in an approximately constant level of the antidepressant drug in the blood supply to the brain. After a possibly different initial treatment, such a constant level of drug in the blood will normally result from a constant rate of absorption from the applied drug mixture through the patient's skin into the bloodstream.

A mixture of LDY with appropriate excipients may effectively be utilized in a skin patch structure, of any of several types known to the art which will maintain the drug mixture in effective contact with the skin, protect against deteriorations in the drug which might be caused by such common causes as air oxidation, moisture absorption or loss, etc., and stay in position under normal conditions of patient mobility and bathing. The prepared patch structure, including a mixture of LDY in contact with the skin, may be applied to the skin of a patient in any of the locations on the body conventionally used for application of transdermal medications.

In order to promote consistent therapy with poorly motivated, easily distracted, or otherwise less-than-ideally-attentive patients—types particularly likely to be countered in the treatment of depression—it is advantageous for the supply of LDY in a single therapeutic structure to last for at least one full day. Structures lasting several days, or even weeks, are still more preferable as they require less patient attention.

The scope and nature of the invention may be further appreciated from the following non-limiting examples. In all the examples, all specifications of parts and percentages in formulations refer to parts and percentages by weight, and the dosage specified may be adjusted to the exact needs of an individual patient and accurately dispensed by conventional techniques known in the medical arts.

## EXAMPLE 1

A suitable mixture for treatment according to this invention, consists of 3 parts of L-deprenyl mixed with 97 parts of an ointment base. The composition of the ointment base is as follows:

| | |
|---|---|
| Polyethylene glycol 6000 distearate | 5-15% |
| Polyethylene glycol 1540 | 15-25% |
| Butylated hydroxytoluene preservative | 0.1-.1-0-5% |
| Polyethylene glycol 300 | Balance |

An amount of 0.5 to 2.0 grams of this medicated ointment is applied to the forearm of a patient suffering from depression and rubbed into the skin to provide a therapeutically effective amount of L-deprenyl for at least one day.

4

## EXAMPLE 2

This is the same as Example 1, and is used in the same way, except that the base is a cream rather than an ointment. The composition of the cream base is:

| | |
|---|---|
| Glyceryl monostearate NF VII | 10-20% |
| Cetyl alcohol | 5-10% |
| Cetyl ester wax | 5-10% |
| Polysorbate 60 | 5-10% |
| Propylene glycol | 5-10% |
| Dimethicone 350 | 0.5-3% |
| Paraben preservative | 0.2% |
| Water | Balance |

## EXAMPLE 3

This is an example of a transdermal patch incorporating LDY. Five to fifty milligrams of this drug is dissolved in a mixture of mineral oil and poly (isobutylene) to provide a liquid-center reservoir of active drug. This reservoir is enclosed in a sealed, flat disc-shaped pouch, one to six centimeters in diameter. The top of the pouch consists of a thin aluminized polyester film that is impermeable to the pouch contents. The bottom of the pouch that will be in contact with the skin in use consists of thin polypropylene membrane that is slowly porous to LDY, allowing the drug to continuously come into contact with the skin, so long as the bottom of the pouch is in contact with the skin. This bottom of the pouch also includes a thin coat of a hypoallergenic silicone adhesive disposed on the bottom in such a way as to hold the patch firmly to the skin without unduly impeding the permeation of the drug through the membrane. As manufactured, a protective strip of siliconized polyester film covers the polypropylene membrane. This siliconized film is impermeable to the liquid mixture and thus protects the pouch's therapeutic contents during storage. The protective film is removed by the patent prior to the attachment of the patch to the skin.

## EXAMPLE 4

The general construction of the therapeutic device for this example is the same as for Example 3, except that (1) the LDY is mixed with 50 mg of lactose, 50 mg of finely divided silicon dioxide, and 0.1 to 0.4 milliliters of medical-grade silicone fluid to form the reservoir of active drug and (2) the bottom of the patch consists of a thin ethylene-vinyl acetate copolymer membrane. The product is used in the same manner as in Example 3.

## EXAMPLE 5

For this example, a solution or finely divided emulsion of L-deprenyl is prepared in a dispersion in water, or alternatively in a co-dispersion with a binder such as polyvinyl chloride. Geon 576, a product of B. F. Goodrich, is a suitable dispersion of binder into which LDY can be do-dispersed. The emulsion is dried onto a thin solid film of polyvinyl chloride or polypropylene plastic, which is slowly permeable to LDY to give a flat disc 1 to 6 centimeters in diameter. The top surface of the patch, the provision of a protective cover on the bottom for storage, and the optional use of a hypoallergenic adhesive on the outside of the bottom of the patch are the same as in the previous examples. The type of skin patch used for this example is described in more detail in U.S. Pat. No. 4,284,444.

Re. 34,579

5

It is well known in the medical arts that a patch maintained in tight contact with the skin will provide an occlusive cover. This will induce changes in the cellular architecture of the skin, including an increase in its water content. These changes allow LDY to migrate 5 from the dried reservoir in the patch through the skin into the systemic blood circulation.

I claim:

1. A method of treating depression in a human patient which comprises maintaining in contact with the skin of 10 said patient a quantity of L-deprenyl or a salt thereof in a form permitting migration of said L-deprenyl or salt thereof through the skin of said patient into the bloodstream of the patient to a sufficient extent to produce a therapeutically effective amount of L-deprenyl within 15 the blood supply to the brain of said patient without causing skin irritation to the patient or inducing a cheese effect in the patient.

2. The method defined in claim 1 wherein said L-deprenyl or salt thereof is mixed with an excipient be- 20 fore being applied to the skin of said patient.

3. The method defined in claim 2 wherein said excipient causes the L-deprenyl content of the mixture to migrate into the bloodstream of the patient at a controlled rate, whereby at least said therapeutically effec- 25 tive amount of L-deprenyl is maintained in the blood supply to the brain of said patient continuously throughout a time interval.

4. The method defined in claim 3 wherein said mixture containing L-deprenyl is contained within a patch 30 structure for convenient affixation to a part of the body of said patient in such a manner as to maintain contact

6

between the skin of said patient and said mixture containing L-deprenyl during said time interval.

5. The method defined in claim 4 wherein said time interval is at least one day.

6. A method, according to claim 5, wherein said controlled rate is between 5 and 50 mg of L-deprenyl per day.

*7. A topical composition for the transdermal administration of L-deprenyl or a salt thereof, comprising a quantity of L-deprenyl or a salt thereof as a sole therapeutically active agent effective upon transdermal migration into the bloodstream to inhibit monoamine oxidase B, in combination with at least one pharmaceutical carrier operable to permit transdermal absorption of L-deprenyl or a salt thereof.*

*8. The topical composition according to claim 7 wherein the quantity of L-deprenyl or a salt thereof is sufficient to provide from about 5 to about 50 mg of L-deprenyl per day to a patient.*

*9. The topical composition according to claim 7 wherein the carrier is an ointment base.*

*10. The topical composition according to claim 7 wherein the carrier is a cream base.*

*11. The topical composition according to claim 7 wherein the composition is incorporated into a transdermal patch structure.*

*12. The topical composition according to claim 11 wherein the transdermal patch structure comprises a sealed pouch having a top layer impervious to the composition and a bottom membrane for dermal contact through which said L-deprenyl or a salt thereof is slowly porous.*

* * * * *

35

40

45

50

55

60

65

USPTO - Maintenance Fee Statement (Patent Number: 4868218)

EXHIBIT D

EX MAIL NO. EV 258 030 987 us

Page 1 of 2

**United States Patent and Trademark Office**

## Maintenance Fee Statement

04/26/2006 05:20 PM EDT

Patent Number: 4868218

Customer Number: 3171

MATHEWS, COLLINS, SHEPHERD & GOULD
100 THANET CIRCLE, SUITE 306
PRINCETON NJ 08540-3674

The data shown below is from the records of the U.S. Patent and Trademark Office. If the maintenance fee and any necessary surcharge have been timely paid for the patent listed below, the notation "PAID" will appear in the "STAT" column.

If the statement of small entity status is defective the reason will be indicated below in the "Small Entity" status column. THE STATEMENT OF SMALL ENTITY STATUS WILL BE ENTERED UPON RECEIPT OF ACCEPTABLE CORRECTION.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | STAT | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| 4,868,218 | $930.00 | $0.00 | 07/339,712 | 09/19/89 | 04/18/89 | 04 | NO | PAID | 17140 |

Direct any questions about this notice to:
Mail Stop: M. Correspondence
Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**Click here to obtain your Maintenance Fee Statement as a PDF.**
Please note that in order to view your Maintenance Fee Statement as a PDF, you must have Adobe's Acrobat Reader installed. If you do not have it, download it for FREE!



USPTO - Maintenance Fee Statement (Patent Number: 4868218)

Need Help? | USPTO Home Page | Finance Online Shopping Page

USPTO - Maintenance Fee Statement (Patent Number: RE34579)

Page 1 of 2

EXHIBIT E

EX MAIL NO. EV 258 030 987 us



**United States
Patent and
Trademark Office**

## Maintenance Fee Statement

04/26/2006 05:19 PM EDT

Patent Number: RE34579

Customer Number: 21586

VINSON & ELKINS, L.L.P.
1001 FANNIN STREET
2300 FIRST CITY TOWER
HOUSTON TX 77002-6760

The data shown below is from the records of the U.S. Patent and Trademark Office. If the maintenance fee and any necessary surcharge have been timely paid for the patent listed below, the notation "PAID" will appear in the "STAT" column.

If the statement of small entity status is defective the reason will be indicated below in the "Small Entity" status column. THE STATEMENT OF SMALL ENTITY STATUS WILL BE ENTERED UPON RECEIPT OF ACCEPTABLE CORRECTION.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | STAT | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| RE34,579 | $2,050.00 | $0.00 | 07/750,292 | 09/19/89 | 04/18/89 | 08 | NO | PAID | 1433-103.1RE |

Direct any questions about this notice to:
Mail Stop: M. Correspondence
Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**Click here to obtain your Maintenance Fee Statement as a PDF.**
Please note that in order to view your Maintenance Fee Statement as a PDF, you must have Adobe's Acrobat Reader installed. If you do not have it, download it for FREE!

https://ramps.uspto.gov/eram/getMaintFeesInfo.do?patentNum=RE34579&applicationNum=07750292&maintFeeAction=View...    4/26/2006

USPTO - Maintenance Fee Statement (Patent Number: RE34579)



Need Help? | USPTO Home Page | Finance Online Shopping Page

USPTO - Maintenance Fee Statement (Patent Number: RE34579)

Page 1 of 2





**EXHIBIT F**

EX MAIL NO. EV 258 030 987 US

# United States Patent and Trademark Office

## Maintenance Fee Statement

04/26/2006 05:18 PM EDT

Patent Number: RE34579

Customer Number: 21586

VINSON & ELKINS, L.L.P.
1001 FANNIN STREET
2300 FIRST CITY TOWER
HOUSTON TX 77002-6760

The data shown below is from the records of the U.S. Patent and Trademark Office. If the maintenance fee and any necessary surcharge have been timely paid for the patent listed below, the notation "PAID" will appear in the "STAT" column.

If the statement of small entity status is defective the reason will be indicated below in the "Small Entity" status column. THE STATEMENT OF SMALL ENTITY STATUS WILL BE ENTERED UPON RECEIPT OF ACCEPTABLE CORRECTION.

| PATENT NUMBER | FEE AMT | SUR-CHARGE | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPL. FILING DATE | PAYMENT YEAR | SMALL ENTITY? | STAT | ATTY DKT NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| RE34,579 | $2,990.00 | $0.00 | 07/750,292 | 09/19/89 | 04/18/89 | 12 | NO | PAID | 1433-103.1RE |

Direct any questions about this notice to:
Mail Stop: M. Correspondence
Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

**Click here to obtain your Maintenance Fee Statement as a PDF.**
Please note that in order to view your Maintenance Fee Statement as a PDF, you must have Adobe's Acrobat Reader installed. If you do not have it, download it for FREE!

https://ramps.uspto.gov/eram/getMaintFeesInfo.do?patentNum=RE34579&applicationNum=07750292&maintFeeAction=View...    4/26/2006



Page 2 of 2

USPTO - Maintenance Fee Statement (Patent Number: RE34579)



Need Help? | USPTO Home Page | Finance Online Shopping Page



**Somerset**
PHARMACEUTICALS, INC.

777 South Harbour Island Boulevard
Suite 880
Tampa, Florida 33602-5746
(813) 223-7677
FAX (813) 229-3054

**EXHIBIT G**

EX MAIL NO. EV 258 030 987 US

December 20, 1994

FOOD AND DRUG ADMINISTRATION
Center for Drug Evaluation and Research (HFD-120)
Attn: Document Control Room
Woodmont II
1451 Rockville Pike
Rockville, MD 20852

Dear Sir/Madam:

RE: Selegiline Transdermal System (STS)
Investigational New Drug Application

Enclosed please find an Investigational New Drug Application (IND) for Selegiline Transdermal
System (STS). Included with this application is a clinical protocol for a Phase II safety and
tolerability study in adult patients with Major Unipolar Depression (protocol S9303-E103-95B).
The proposed study is a parallel-designed, double-blind evaluation in which 60 patients will be
randomly assigned to multi-site randomized placebo therapy or one of four transdermal
treatment groups (1,2,3, or 4 patches). All patients will be treated for fourteen days.

Somerset has already extensively evaluated the transdermal selegiline preparation proposed for
study with the present IND. IND #42,302 was submitted to FDA on May 10, 1993. To date,
fourteen Phase I single and multi-dose evaluations have been completed in 190 healthy
volunteers (including healthy young adults and healthy elderly patients). Summaries of these
studies are included with the enclosed submission.

December 20, 1994
IND-Major Unipolar Depression
Page 2 - continued

_____

As discussed with Katurah Higgins on November 7, 1994, IND #42,302 will now be directed to patients with Senile Dementia of the Alzheimer Type (SDAT). At FDA's direction the enclosed IND is submitted to provide for the clinical evaluation of STS in patients presenting with Major Unipolar Depression. Somerset authorizes reference to all information provided to IND #42,302 in support of this new IND submission.

Somerset plans to initiate the enclosed study protocol during the week of January 23, 1995. Please contact me if you have any questions.

Very truly yours,

Richard E. Lowenthal, M.S.
Director,
Regulatory Affairs

CDB/REL/kg

Enclosure

cc: Katurah Higgins, CSO - Desk Copy



**Somerset**
PHARMACEUTICALS, INC.

202 N. West Shore Blvd., Suite 450
Tampa, Florida 33607
(813) 288-0040

**EXHIBIT H**

May 24, 2001

**EX MAIL NO. EV 258 030 987 US**

Russell Katz, M.D.
Director, Division of Neuropharmacological
Drug Products (HFD-120)
FOOD AND DRUG ADMINISTRATION
Woodmont II
1451 Rockville Pike
Rockville, MD 20852

RE:    New Drug Application #21-336
       User Fee ID# 4146
       Selegiline Transdermal System: Major Depression
       N:000- Original Submission

Dear Dr. Katz:

Pursuant to 21 CFR 314.50, submitted herein is Somerset's New Drug Application for Selegiline Transdermal System, 20mg/20cm$^2$, NDA number 21-336. Please note, each Section is individually paginated; sections each beginning at 000001. A master index, providing volume number, section number and starting page for the respective sections, is provided in Volume 1.

For ease of review, we have included smaller miscellaneous sections (i.e., patent information/certification, debarrment certification, etc.) in Volume 1 with the NDA summary and FDA forms. Also included in Volume 1 of the Archival and Clinical Reviewer's Copies of Section 11, are the Compac Discs containing the SAS transport files, for Phase III studies, as agreed in our March 28, 2001 meeting.

As noted on Form FDA 356h, Section 20 of this NDA provides a world wide literature review of contributory information regarding selegiline.

Pursuant to 21 CFR 314.108, Somerset hereby claims this NDA represents a new chemical entity and is entitled to market exclusivity.

If you should require any further information regarding this submission, I can be reached at (813) 288-0040, extension 276.

Very Truly Yours,

Melissa L. Goodhead, B.S, RAC
Director of Regulatory Affairs

EXHIBIT I

EX MAIL NO. EV 258 030 987 US

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 12/20/94 | 000 | IND Submission |
| 01/20/95 | 001 | Information Amendment 001 Pharmacokinetics Data |
| 02/08/95 | 002 | New Protocol S9303-020-95B |
| 02/28/95 | 003 | Change in Protocol |
| 03/03/95 | 004 | Change in Protocol |
| 03/30/95 | 005 | Information Amendment |
| 04/12/95 | 006 | Requested Information AME 006S9303 &007S9303 |
| 06/20/95 | 007 | New Protocol |
| 07/07/95 | 008 | New Protocol |
| 08/16/95 | 009 | New Protocol - CMC update |
| 09/01/95 | 010 | CMC - update |
| 09/14/95 | 011 | New Protocol |
| 10/19/95 | 012 | Protocol Amendment |
| 12/08/95 | 013 | New protocol & CMC Update |
| 5/17/96 | 014 | Submission Schedule |
| 6/27/96 | 015 | CMC Amendment |
| 08/29/96 | 016 | Annual Report |
| 10/31/96 | 017 | New Protocol S9303-E106 |
| 11/19/96 | 018 | Requested Vital Sign Data |
| 12/5/96 | 019 | Requested Info from S9303-020 |
| 12/11/96 | 020 | Requested Info from S9303-E101 |
| 2/13/97 | 021 | Protocol Amendment |
| 2/14/97 | 022 | Investigator Data |
| 6/3/97 | 023 | Investigator's Data |
| 6/11/97 | 024 | General Correspondence |

1

IND 46,944

Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 8/28/97 | 025 | Annual Report |
| 10/1/97 | 026 | General Correspondence |
| 11/3/97 | 027 | Investigator Data S9303-E112-97B |
| 11/21/97 | 028 | Right of Reference Letter |
| 12/04/97 | 029 | Withdraw authorization to reference IND |
| 12/31/97 | 030 | Protocol Amendment |
| 1/14/98 | 031 | Corrected Protocol Amendment |
| 1/23/98 | 032 | Serious Adverse Event (E109) |
| 2/5/98 | 033 | Serious AME |
| 2/18/98 | 034 | Serious AME Final Close-out Report |
| 3/16/98 | 035 | Request for End-of-Phase II Meeting |
| 4/1/98 | 036 | transfer of Obligations E112 |
| 4/9/98 | 037 | SAE-HIV |
| 4/14/98 | 038 | SAE- PD |
| 4/14/98 | 039 | Transfer of Obligations S9303-E112-97B |
| 4/22/98 | 040 | Informational Correspondence |
| 6/1/98 | 041 | Tyramine Study S9303-P9802 Protocol Amendment |
| 7/2/98 | 042 | Letter of Reference |
| 7/7/98 | 043 | New Protocol (S9303-E113-98B) |
| 7/16/98 | 044 | Authorization to Reference INDS- NIDA |
| 7/24/98 | 045 | Authorization to Reference INDS |
| 8/24/98 | 046 | Investigator Data E113 |
| 8/31/98 | 047 | Annual Report STS |
| 9/2/98 | 048 | Protocol Amendment E113 |
| 10/23/98 | 049 | Protocol Amendment P9804/Revised 10/25/98 |

2

**IND 46,944**
**Selegiline Transdermal System-Depression**

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 10/23/98 | 050 | Protocol Amendment E112 |
| 10/30/98 | 051 | Protocol Amendment P9805 |
| 10/30/98 | 052 | New Investigator's Brochure- October 1998 |
| 1/14/99 | 053 | Protocol Amendment- Submission of S9303-P9814 and P9816 |
| 1/19/99 | 054 | Investigator data- E113 |
| 1/25/99 | 055 | Investigator Data- P9804 |
| 1/25/99 | 056 | Response to Agency's Letters Re:E113/P9804 |
| 1/27/99 | 057 | Protocol Amendment- S9303-P9807 |
| 2/5/99 | 058 | Protocol Amendment- P9812/P9816 Amendment #1 |
| 2/12/99 | 059 | Protocol Amendment- P9816(A#2)/P9917/E-109 (A#1-7) |
| 2/15/99 | 060 | Investigator Data-P9807 |
| 2/16/99 | 061 | Investigator Data-P9812 |
| 2/17/99 | 062 | Protocol S9303-P9808 Submission |
| 3/2/99 | 063 | Protocol #P9805- Amendment #2 |
| 3/2/99 | 064 | Investigator Information P9816 |
| 3/5/99 | 065 | Protocol Amendment S9303-9918/S9303-P9812 Amendment #1 |
| 3/18/99 | 066 | Reference Authorization |
| 3/23/99 | 067 | Protocol Submissions (P9811/P9919) |
| 4/6/99 | 068 | Meeting SAE's: Initial 10-Day Alert (E113/P9805) |
| 4/23/99 | 069 | Briefing Document/request for Pre NDA |
| 4/23/99 | 070 | Investigator data (P9811) |
| 4/23/99 | 071 | SAE's: Initial 10-Day Alert (P9804) |
| 5/4/99 | 072 | Confirmation of Date for Pre-NDA Meeting |
| 5/17/99 | 073 | Protocol Submissions (P9920/P9921/P9922/Amendment #1-P9919) |
| 5/17/99 | 074 | Submission of Protocol S9303-P9809 |

3

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 5/18/99 | 075 | SAE's: Initial 10 day Alerts (P9804- 0221/LSS & 0607/CLG) |
| 5/19/99 | 076 | Submission of Protocols P9924 & P9926 |
| 5/20/99 | 077 | Submission of acknowledgment letter of typo from 1/25/99 letter re:E113 |
| 6/21/99 | 078 | Submission of Protocol S9303-P9933 |
| 6/23/99 | 079 | Submission of protocol P9806 |
| 6/23/99 | 080 | Submission of protocol P9925/31/22-Amendment #1 |
| 6/24/99 | 081 | Submission of June 10th Meeting Minutes |
| 7/1/99 | 082 | Clarification of Overheads Presented at 6/10/99 Meeting |
| 7/1/99 | 083 | Investigator Data S9303-P9918 |
| 7/1/99 | 084 | Investigator Data S9303-E114 |
| 7/1/99 | 085 | Investigator Data S9303-P9805 |
| 7/7/99 | 086 | SAE's (E109- 14SS9303-146S9303) |
| 7/7/99 | 087 | SAE Follow-ups (140S9303/142S9303) |
| 7/7/99 | 088 | Acceptance of Agency's 6/10/99 Minutes |
| 7/12/99 | 089 | Amendment #1- S9303-P9918 |
| 7/19/99 | 090 | Protocol #S9303-P9928 |
| 8/9/99 | 091 | P9804 Investigator Data |
| 8/10/99 | 092 | Response to Agency's request for Information- Carcinogenicity |
| 8/13/99 | 093 | CMC-Injectable Solution S9303-P9809 |
| 8/25/99 | 094 | Protocol Amendment S9303-P9806 |
| 8/31/99 | 095 | Annual Report |
| 9/2/99 | 096 | SAE Initial (147S9303) and Follow-up |
| 9/2/99 | 097 | Protocol S9303-P9810 w/ CMC 14C Selegiline |
| 9/21/99 | 098 | Protorm1 S9:10:1-1399:14 Amendment 4#1 |
| 10/27/99 | 099 | Submission: Protocol S9303-P9932 |

4

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 11/5/99 | 100 | Submission of CMC Briefing Document |
| 11/16/99 | 101 | Somerset's response to Agency's 11/8/99 letter re: carcinogenicity |
| 11/19/99 | 102 | SAE Patient AMI |
| 12/8/99 | 103 | Submission of Protocol #S9303-P9927 |
| 12/9/99 | 104 | Submission of response to Agency's 12/7/99 Letter re: Carc |
| 1/13/00 | 105 | Submission of Protocols P9941, P9936 and P9937 |
| 1/13/00 | 106 | Submission of SAEs (S9303-150/151/152/153)/Follow-ups S9303-149/148 |
| 1/26/00 | 107 | Submission of information |
| 2/8/00 | 108 | Protocol Amendment P9941 |
| 3/2/00 | 109 | Protocol Revision #1 to P9937 |
| 3/9/00 | 110 | Follow-up 10 Day Alert K-H |
| 3/9/00 | 111 | Submission of protocol #S9303-P0044 |
| 4/3/00 | 112 | Submission of Compassionate Use Protocol (S9303-P0043) |
| 3/22/00 | 113 | Submission of Protocol Amendment to P9941 |
| 3/22/00 | 114 | Submission of P0045 |
| 3/28/00 | 115 | Submission of P9942 |
| 4/13/00 | 116 | Submission of 10 Day Alerts |
| 5/12/00 | 117 | Submission of SAE Alert (MMC-Fetal demise) |
| 5/15/00 | 118 | Amendment to Protocol #S9303-P9941 |
| 5/16/00 | 119 | Amendment to Protocol #S9303-P0045 |
| 5/19/00 | 120 | Submission of EMSAM™ to Nomenclature |
| 5/19/00 | 121 | Protocol Amendment S9303-P9806 |
| 5/23/00 | 122 | Submission of three additional patients to Compassionate Use |
| 5/26/00 | 123 | Submission of protocol P0046 (PPA) |
| 6/19/00 | 124 | Submission of Protocol Amendments for P0046 |

5

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 6/20/00 | 125 | Submission of Amendment #1 to P0043 |
| 7/6/00 | 126 | Submission of Protocol #S9303-P0048- Original/Amendments #1 and 2 |
| 8/28/00 | 127 | Submission of Protocol #S9303-P0050 |
| 8/30/00 | 128 | Annual Report |
| 10/12/00 | 129 | Submission of Amendment to P0043- 00009 (DL) |
| 10/26/00 | 130 | Request for Eldepryl (Selegiline HCl) Safety Database |
| 10/31/00 | 131 | Protocol Amendment: S9303-P9935 |
| 11/3/00 | 132 | Submission of Investigator Data P0043 |
| 11/6/00 | 133 | Submission of P0051 |
| 11/21/00 | 134 | Carc Submission |
| 12/6/00 | 135 | Protocol Amendment #1 to S9303-P0051 |
| 12/14/00 | 136 | CRT Submission |
| 1/30/01 | 137 | Request for Pre-NDA MTG/Briefing Document Submission |
| 02/01/01 | 138 | Amendment #2 to S9303-P0051 |
| 03/14/01 | 139 | Submission of protocol S9303-P0156 |
| 04/20/01 | 140 | Letter of Reference for Protocol A5090 (NIH-HIV-CI) |
| 7/9/01 | 141 | Submission of S9303-P0052 Protocol updated IB/CMC Update for 40cm$^2$ |
| 8/31/01 | 142 | Annual Report |
| 8/31/01 | 143 | Transfer of Obligations- P0052 |
| 9/10/01 | 144 | Submission of Protocol S9303-P0158 |
| 10/08/01 | 145 | Amendment No. 1 to S9303-P0158 |
| 01/02/02 | 146 | Submission of 1572s and CVs for 0158/0052 |
| 2/12/02 | 147 | SAE 15689303 |
| 3/4/02 | 148 | SAE |
| 04/09/02 | 149 | SAE 15689303 Follow-up |

6

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 04/09/02 | 150 | Report of Breaking of the Blind- S9303-P0052 -Pt MAM |
| 04/17/02 | 151 | Protocol Amendment#2 S9303-P0043 |
| 5/16/02 | 152 | Protocol Amendment #0158- Extend an additional 6 months for total 12 |
| 5/20/02 | 153 | Protocol S9303-P0201- Tyramine 60-90 Day Study |
| 6/6 /02 | 154 | Protocol Submission - P0204-Elderly |
| 6/6/02 | 155 | Protocol Amendment P0052 |
| 6/12/02 | 156 | Amendment #1 S9303-P0204 |
| 8/7/02 | 157 | SAE: 161 S9303 |
| 8/13/02 | 158 | Protocol Amendment S9303-P0201 |
| 9/3/02 | 159 | Annual Report |
| 9/9/02 | 160 | Amendment #2 S9303-P0201 |
| 9/9/02 | 161 | Amendment #2 S9303-P0204 |
| 9/10/02 | 162 | Amendment #3 S9303-P0201 |
| 9/10/02 | 163 | Amendment #4 S9303-P0158 |
| 9/25/02 | 164 | Amendment #3 S9303-P0052 |
| 9/27/02 | 165 | SAE No. 162S9303 |
| 10/07/02 | 166 | Response to 10-4-02 Fax re: statistical comments |
| 10/17/02 | 167 | Amendment #4 to S9303-P0201 |
| 10/21/02 | 168 | Investigator Data- S9303-P0204 |
| 11/12/02 | 169 | Submission of Compassionate Use Protocol #S9303-P0208 (Pts from P0158) |
| 12/6/02 | 170 | Submission of Protocol S9303-P0206 (Tyramine) |
| 12/19/02 | 171 | Protocol Amendment S9303-P0204 |
| 2/17/03 | 172 | Protocol Amendment P0204 |
| 3/4/03 | 173 | Amendment No. 1 to Investigator's Brochure Dated 6/28/01 |
| 4/17/03 | 174 | Protocol Amendment P0204 |

IND 46,944
Selegiline Transdermal System-Depression

| SUBMISSION DATE | AMENDMENT NUMBER | SUBJECT OR DESCRIPTION OF SUBMISSION |
|---|---|---|
| 8/27/03 | 175 | Annual Report |
| 9/8/04 | 176 | Annual Report |
| 8/24/05 | 177 | Annual Report |

8

EXHIBIT J

EX MAIL NO. EV 258 030 987 us

NDA NO. 21-336
SELEGILINE TRANSDERMAL SYSTEM-DEPRESSION

| Submission No | Date | Description of Submission |
|---|---|---|
| 000 | 5/24/01 | Original Submission of NDA |
| Desk Copies | 6/6/01 | Requested Desk Copies- 8 Copies Vol 1.1/Disk w/ WORD version of proposed labeling |
| Desk Copies | 6/11/01 | Requested Desk Copies Vols 1.001, 1.152, 1.505, 1.506, Comprehensive Index |
| 001 | 6/20/01 | Electronic Data Sets of SAS Transport Files- Reformatted from Original Submission |
| 002 | 6/21/01 | Archival Copy of Requested Electronic Desk Copies |
| 003 | 7/11/01 | PDF Copy of Section 4 (CMC) |
| 004 | 7/13/01 | Pictures of Patch as Requested |
| 005 | 8/3/01 | Submission of Requested information re: ISS data linkage |
| Desk Copy | 8/15/01 | Requested electronic version of 8/3/01 submission |
| 006 | 8/30/01 | Submission of Requested Information Re: Request for Efficacy Data Analysis |
| 007 | 9/25/01 | Submission of Requested Information- PDF CDS Section 6 and 8C |
| 008 | 9/26/01 | 120-Day Safety Update |
| 009 | 10/5/01 | Submission of Requested Information- Response to 9/18/01 Division Fax |
| 010 | 10/17/01 | Revised submission of N:009- SAS Transport files to replace SAS output |
| 011 | 11/16/01 | Submission of Requested statistical information |
| Requested Desk Copy | 12/4/01 | Fax of E101 Final CSR Tablets 16 & 17- AEs in STS patients >5% and >1% |
| Desk Copy | 12/7/01 | Requested Desk Copy of Volume 354 |
| Desk Copy | 12/10/01 | Requested Desk Copy of Volumes 505-507 (ISE and main text ISS) |
| 012 | 12/26/01 | Submission of Requested statistical information |
| 013 | 01/09/02 | Submission of Requested Safety Data (12/28/01 Request) |
| Desk Copy | 1/10/02 | Requested electronic version of 1/9/02 submission |
| 014 | 02/19/02 | Submission of Requested data on pseudophedrine |
| 015 | 02/20/02 | Somerset's Response to FDA meeting minutes of 1/30/02 telecon/CAC minutes |
| 016 | 2/22/02 | Submission of Requested coding dictionary for AEs |
| 017 | 3/4/02 | Supplement to Submission No. 16 |

NDA NO. 21-336
SELEGILINE TRANSDERMAL SYSTEM-DEPRESSION

| Submission No | Date | Description of Submission |
|---|---|---|
| NA Ltr | 3/25/02 | Notification of Non-Approvable |
| 018 | 4/5/02 | Submission of Briefing Document for Not Approvable Mtg |
| 019 | 4/25/02 | Submission of revised Briefing Document for 5/2/02 Meeting |
| 020 | 5/20/02 | Submission of toxicology protocols (AMES/in vitro cytogenetics) |
| 020B | 5/21/02 | Submission of electronic carcinogenicity datasets |
| 021 | 6/20/02 | Acceptance of FDA Minutes from 5/2/02 Meeting |
| 022 | 01/29/03 | Request for CMC Telecon/MTG- CMC Briefing Document |
| 023 | 03/12/03 | Submission of Requested Specifications for 20/30/40 to show N-oxide spec. |
| 024 | 7/31/03 | Resubmission of NDA |
| 025 | 8/7/03 | Resubmission of Electronic Files (SAS Transport Files) |
| 026 | 8/12/03 | Submission of Requested CMC Information |
| | 8/12/03 | Request for USAN Submission for Selegiline Base |
| 027 | 8/18/03 | Submission of Requested CMC Information- Product Specifications |
| 028 | 8/18/03 | Submission of Requested CMC Information |
| 029 | 8/20/03 | Confirmation of Requested USAN Submission |
| | 8/20/03 | FDA Notification of Acceptance of Resubmission of NDA |
| | 8/22/03 | Request for Reference Standards for Laboratory Validation |
| | 9/2/03 | Request for Drug Product Specifications |
| | 9/3/03 | Request for Information on Child Resistant Packaging |
| 030 | 9/4/03 | Submission of Requested CMC Information: Composition Update |
| 031 | 9/8/03 | Submission of Requested Electronic SAS Formats |
| 032 | 9/9/03 | Submission of Requested Selegiline N-oxide Characterization |
| | 9/9/03 | Request to Confirm Dates of Manufacture |
| 033 | 9/16/03 | Letter of Agreement w/ Deferment of Pediatric Waiver |
| 034 | 9/19/03 | Timing and Outline for Response to September 2, 2003 Clinical Request |

2

NDA NO. 21-336
SELEGILINE TRANSDERMAL SYSTEM-DEPRESSION

| Submission No | Date | Description of Submission |
|---|---|---|
| 035 | 9/25/03 | Submission of requested CMC Information |
| 036 | 9/26/03 | Submission of requested Revised Environmental Assessment-Categorical Exclusion |
| 037 | 10/6/03 | Response to Request for additional PDUFA- Maintenance Indication (P9806) |
| | 10/15/03 | NDA Filed for Treatment of Long-Term MDD |
| 038 | 10/30/03 | Stability Update |
| | 10/31/03 | Request for Dissolution Data |
| 039 | 10/29/03 | Response to 9/2/03 Request for Clinical Data |
| 040 | 11/07/03 | Submission of Requested Dissolution Profile (10/31/03 CMC Request) |
| | 12/17/03 | Request for Shipment of Samples |
| | 12/29/03 | Shipment of Requested Samples |
| 041 | 1/6/04 | Submission of Mock Labeling/Patient Leaflet |
| 042 | 1/14/04 | Submission of Faxed Requested CMC Information Faxed 8/28/03 |
| 043 | 1/20/04 | Submission of Faxed Requested CMC Information Faxed 1/19/04 |
| 044 | 1/23/04 | Submission of USAN Registration |
| | 1/30/04 | Approvable Letter Issued |
| 045 | 12/21/04 | Briefing Document: Request for Telecon/Meeting- Labeling |
| 046 | | Figures 1-4 Inadvertently left out of desk copies of brief document |
| 047 | 01/18/05 | CMC Briefing Document: Request for Telecon/Meeting-Monomers |
| 048 | 05/26/05 | Formal Response |
| | 6/2/05 | Request for Updated API Stability |
| 049 | 6/8/05 | Submission of SAE/DC due to AE log |
| 050 | 6/8/05 | Submission of Stability Update |
| | 6/9/05 | Request for Finished Product Samples |
| 051 | 6/17/05 | Submission of Revised PAPs/Note of error in stability tables. |
| 052 | 6/21/05 | Submission of API Lot Assignment/COAs |

3

**NDA NO. 21-336**
**SELEGILINE TRANSDERMAL SYSTEM-DEPRESSION**

| Submission No | Date | Description of Submission |
|---|---|---|
| 053 | 7/18/05 | Requested CMC Information |
| 055 | 8/2/05 | Requested CMC Information |
| 059 | 9/21/05 | Response to CMC Reviewer Re; Monomer Specs |
| 060 | 10/4/05 | Final response to CMC Reviewer-Proposed Specs |
| 061a | 11/02/05 | Submission of Revised Proposed Label |
| 062 | 11/4/05 | Administrative Correspondence |
| 063 | 11/15/05 | Nomenclature Submission |
| 064 | 11/21/05 | Submission of Risk Minimization Plan |
| 065 | 12/1/05 | Submission of Requested CMC Methods for Validation |
| 066 | 1/9/06 | Submission of Revised Combined MedGuide/Patient Leaflet |
| | 1/25/06 | Received FDA Proposed Revised Labeling |
| | 1/27/06 | Received Request for Method Validation Materials |
| 067 | 2/6/06 | Proposed Label Revisions to FDA 012006 Proposed label |
| 068 | 2/7/06 | Proposed Revisions Medication Guide to FDA 020106 Proposal |
| | 2/27/06 | Approval Issued |
| 069 | 03/23/06 | Submission of Post-Approval FPL (20 Copies) |

4

## EXHIBIT K

<u>Table of Contents – Part 13</u>                                      <u>Page No.</u>

A.  Proper Construction of "Active Ingredient of a New Drug" is the Single

    Active Ingredient of the Drug Product...............................................    21

B.  Binding Precedent Dictates That "Active Ingredient" Does Not Mean

    "Active Moiety"...................................................................    24

C.  Court *Dicta* Suggesting "Active Ingredient" Encompasses All Salts

    and Esters of the Active Ingredient is Incorrect.................................    29

D.  Applicant's Proposed Construction of "Active Ingredient of a New Drug"

    is Consistent with the Statute as a Whole.......................................    34

E.  Applicant's Proposed Construction of "Active Ingredient of a New Drug" is

    Consistent with Legislative History............................................    36

F.  Conclusion..........................................................................    40

**EXHIBIT K**

EX MAIL NO. EV 258 030 987 US

## Type 1 (New Molecular Entity) — Average NDA Approval Times From 1999-2005

| Year | Review Type | # of Approvals | Average Approval Time (Months) |
|---|---|---|---|
| 1999 | S[1] | 16 | 16.3 |
| | P[2] | 19 | 6.9 |
| 2000 | S | 18 | 19.9 |
| | P | 9 | 6 |
| 2001 | S | 17 | 19 |
| | P | 7 | 6 |
| 2002 | S | 10 | 15.9 |
| | P | 7 | 16.3 |
| 2003 | S | 12 | 23.1 |
| | P | 9 | 6.7 |
| 2004 | S | 15 | 24.7 |
| | P | 21 | 6 |
| 2005 | S | 5 | 23 |
| | P | 15 | 6 |

1999-2005 Type I Average Approval Time (S&P) ▶ 14 months
1999-2005 Type I Average Approval Time (S) ▶ 20.3 months

## Type 2 (New Ester, New Salt, or Other Noncovalent Derivative) — NDA Approvals From 1999-2005 (excluding EMSAM®)

| Year | Drug Name | Review Type | Approval Time (Days) | Approval Time (Months) |
|---|---|---|---|---|
| 1999 | Zofran ODT | S[1] | 574 | 19.1 |
| | Chirocaine | S | 465 | 15.5 |
| | Catcit | P[2]O[3] | 757 | 25.2 |
| 2000 | Betaxon | P | 181 | 6 |
| 2001 | Nexium | S | 426 | 14.2 |
| | Valcyte | S | 181 | 6 |
| 2002 | Daypro Alta | S | 1976 | 65.9 |
| 2003 | Femring | S | 454 | 15.1 |
| | Iprivask | S | 1010 | 33.7 |
| | Prilosec OTC | S | 1240 | 41.3 |
| | Lexiva | S | 304 | 10.1 |
| | Amvaz | S | 679 | 22.6 |
| 2004 | Mylotic | S | 303 | 10.1 |
| 2005 | Proquin XR | S | 304 | 10.1 |

21.1 months ◄ 1999-2005 Type 2 Average Approval Time (S&P)
22 months ◄ 1999-2005 Type 2 Average Approval Time (S)

Exhibit L

Ex. Mail No. EV 258 030 987 US

[1] S = Standard Review
[2] P = Priority Review
[3] O = Orphan



Average Approval Time For Standard Review NDAs (1999-2005)
Type 1 vs. Type 2 NDAs

Exhibit M
Ex. Mail No. EV 258 030 987 US

# Exhibit 3

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Office of Regulatory Policy
HFD - 13
5600 Fishers Lane
Rockville, MD  20857

Attention:  Beverly Friedman

COPY MAILED

DEC 2 2 2006

OFFICE OF PETITIONS

The attached application for patent term extension of U.S. Patent No. RE 34,579 was filed on April 27, 2006, under 35 U.S.C. § 156.

The assistance of your Office is requested in confirming that the product identified in the application, EMSAM® (selegiline transdermal system), has been subject to a regulatory review period within the meaning of 35 U.S.C. § 156(g) before its first commercial marketing or use and that the application for patent term extension was filed within the sixty-day period after the product was approved.  Since a determination has not been made whether the patent in question claims a product which has been subject to the Federal Food, Drug and Cosmetic Act, or a method of manufacturing or use of such a product, this communication is NOT to be considered as notice which may be made in the future pursuant to 35 U.S.C. § 156(d)(2)(A).

Our review of the application to date indicates that the subject patent would NOT be eligible for extension of the patent term under 35 U.S.C. § 156 because the hydrochloride salt form of selegiline was previously approved as a human drug under 21 U.S.C. § 355 (section 505 of the Federal Food, Drug and Cosmetic Act).

At issue in this case is whether the approval of the New Drug Application (NDA) for EMSAM® (selegiline transdermal system), which according to Applicant was granted by the Food and Drug Administration (FDA) on February 27, 2006, authorized the first permitted commercial marketing or use of the *product* in accordance with § 156.  According to the statute:

    (f) For purposes of this section:
            (1) The term "product" means:
                (A) A drug product.

                . . .
            (2) The term "drug product" means the active ingredient of—
                (A) a new drug, antibiotic drug, or human biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Public Health Service Act)

                . . .
        including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

35 U.S.C. § 156(f).

Applicant argues that U.S. Patent No. RE 34,579 is entitled to extension under 35 U.S.C. § 156 because, *inter alia,*  the FDA's approval of EMSAM® (selegiline transdermal system) authorized the first commercial marketing of the new drug product selegiline.  Applicant's position is that the phrase "as a single entity" as used in 35 U.S.C. § 156(f)(2) should be understood as indicating that selegiline is a different "single entity" from selegiline hydrochloride.

The United States Patent and Trademark Office (Office) does not agree.  According to the plain language of 35 U.S.C. § 156(f)(2), the term "drug product" means the active ingredient of a new

U.S. Patent No. RE 34,579 – page 1

drug, "including any salt or ester of the active ingredient." That is, the active ingredient encompasses salts and esters as well as the non-salified and non-esterified drug species. The phrase "as a single entity or in combination with another active ingredient" describes how the active ingredient may be present in the drug product – alone as either (1) the non-salified and non-esterified drug species, (2) a salified drug species, or (3) an esterified drug species, or alternatively as one of these three species in combination with another active ingredient.

The error in Applicant's statutory interpretation appears to be in attempting to use the phrase "as a single entity" to explain what the active ingredient is, rather than to indicate how it may be present. The statute will not bear such an interpretation. Applicant's statement that "Congress clearly intended 'drug product' to mean the *single*, specific active ingredient actually present in the drug product" cannot be correct because if it were, the phrase "including any salt or ester of the active ingredient" would be rendered superfluous. Second, as a matter of linguistics the "including any salt or ester of the active ingredient" phrase is set off by commas, and therefore can be lifted from the sentence to reveal that the "as a single entity . . ." phrase applies to "the active ingredient" of the first line of 35 U.S.C. § 156(f)(2). Thus it is clear that "the active ingredient" can be present either "as a single entity or in combination with another active ingredient." The "as a single entity . . ." phrase cannot be interpreted to indicate whether a salt is a different "single entity" from a non-salified drug species because to do so would render the phrase meaningless as applied to "the active ingredient" of the first line of 35 U.S.C. § 156(f)(2).

This interpretation of the statute by the Office is in accord with relevant court decisions. The Federal Circuit's decision in *Fisons PLC v. Quigg*, 876 F.2d 99, 100 (Fed. Cir. 1989) as to the meaning of the term "product" in 35 U.S.C. § 156(f) is on point. *See id.* at 101-02. The *Fisons* court squarely considered the proper interpretation of § 156, stating the issue before it as follows:

> At issue is the proper interpretation of Section 201 of the Drug Price Competition and Patent Term Restoration Act of 1984, 35 U.S.C. § 156 (Supp.II 1984).

*Fisons PLC v. Quigg*, 876 F.2d 99, 100 (Fed. Cir. 1989). In response to the issue presented, the court stated:

> In sum, we hold that the district court correctly applied the definition given in 35 U.S.C. § 156(f) to the term "product" used in section 156(a)(5)(A). We are convinced that such an interpretation comports with the intent of Congress as expressed in the statute.

*Id.* at 102. The district court had found that

> Congress' intent was to restore patent life only to new chemical entities. This intention is reflected directly in Section 156(f), which restrictively defines "product" for purposes of Section 156 as the drug's active ingredient.

*Fisons v. Quigg*, 1988 WL 150851, *7, 8 U.S.P.Q.2d 1491, 1497 (D. D.C. 1988), cited with approval in *Fisons v. Quigg*, 876 F.2d 99, 102, 10 U.S.P.Q.2d 1869, 1871 (Fed. Cir. 1989).

The interpretation of § 156 adopted by the Federal Circuit in *Fisons* was followed in *Pfizer, Inc. v. Dr. Reddy's Laboratories*, 359 F.3d 1361 (Fed. Cir. 2004). In that case, the Federal Circuit provided guidance on what constitutes a "product" for purposes of FDA regulatory review. The *Pfizer* court, in determining that amlodipine maleate was covered by the patent term extension granted to Pfizer for amlodipine besylate, stated:

> The FDA ruled that "the term 'active ingredient' as used in the phrase 'active ingredient including any salt or ester of the active ingredient' means active moiety." *Abbreviated New Drug Application Regulations: Patent and Exclusivity*

*Provisions*, 59 Fed. Reg. 50338, 50358 (F.D.A. Oct. 3, 1994). The FDA has defined "active moiety" as "the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 314.108(a).

*Pfizer* at 1366. Eligibility for patent term extension must be consistent with the rights derived from a patent term extension. Accordingly, and in accordance with *Pfizer*, if the rights derived from the extension of a patent based upon the regulatory approval of an active ingredient encompass salts and esters as well as the non-salified and non-esterified drug species, then extensions based upon subsequent approval of other members of this group must be barred.

Applicant argues that *Glaxo Operations UK Ltd. v. Quigg*, 13 USPQ 1628 (Fed. Cir. 1990) compels the conclusion in this application that selegiline is a different active ingredient from selegiline hydrochloride. Applicant then asserts that the FDA's approval of selegiline is the approval resulting in the "first permitted commercial marketing or use of the product" in accordance with 5 U.S.C. § 156(a)(5)(A). The Office does not agree. *Glaxo*, like *Pfizer*, concerned different members of the same active moiety. However, in *Glaxo* the court had found that because the new member (cefuroxime axetil) was neither a salt nor an ester of the previously approved product (two sodium salts of cefuroxime), the new ester could support a patent term extension. This application is distinguishable because selegiline hydrochloride is clearly a salt of selegiline. Furthermore, insofar as *Pfizer* and *Glaxo* may be seen to conflict, *Pfizer* is the decision seen to be in accordance with the precedent of *Fisons*.

Finally, according to information available at the FDA's web site, Applicant would appear to have made an admission at an FDA Advisory Committee Meeting during the course of the FDA approval process of EMSAM® that oral selegiline (ELDEPRYL®) and transdermal selegiline (EMSAM®) have the same active ingredient. See http://google2.fda.gov/search?q=eldepryl&client=FDA&site=dockets&output=xml_no_dtd&oe= &lr=&proxystylesheet=FDA and in particular slide 21 of www.fda.gov/ohrms/dockets/ac/05/slides/2005-4186S2_03_Somerset-EMSAM.ppt , both accessed August 1, 2006. Based on this admission, ELDEPRYL® would have been the product embodying the first permitted commercial marketing or use of the active ingredient in EMSAM®.

Inquiries regarding this communication should be directed to the undersigned at (571) 272-7754 (telephone) or (571) 273-7754 (facsimile).

Kathleen Kahler Fonda
Legal Advisor
Office of Patent Legal Administration
Office of the Deputy Commissioner
  for Patent Examination Policy

cc:    Margaret J. Sampson
       Vinson & Elkins, L.L.P.
       2300 First City Tower
       1001 Fannin
       Houston, TX 77002-6760

# Exhibit
# 4

.

# EXHIBIT A

02-08-07

07 750 292

IAN

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re: | U.S. Reissue No. 34,579 |
| Issued: | April 5, 1994 |
| Inventor: | Buyske, Donald A. (deceased), late of Lake Worth, Florida<br>Buyske, Susan G., Administratrix, New York, New York |
| Assignee: | Somerset Pharmaceuticals, Inc., Tampa, Florida |
| For: | Method of Treating Depression |

---

**CERTIFICATE OF EXPRESS MAILING**
LABEL NO: EV 918 016 354US
DATE OF DEPOSIT: February 7, 2006

I hereby certify that this papers is being deposited with the United States Postal Service "express Mail Post Orffice to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:
Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA   22313-1450

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Enclosed for filing in connection with the above-referenced patent are the following:

1.  Interview Summary (with Exhibits A and B);

2.  Postcard.

Please date-stamp and return postcard to evidence receipt of the enclosed document.

It is believed no fees are due with the filing of this paper; however, should any fees under 37 C.F.R. §§ 1.16 to 1.21 be required for any reason relating to the enclosed document the Commissioner is authorized to appropriately deduct the requisite amount from Vinson & Elkins L.L.P. Deposit Account No. 22-0365/SOM700/4-01RE US/13001.

Respectfully submitted,

Margaret J. Sampson

MJS/cp
Enclosure

797579v.1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                    U.S. Reissue No. 34,579

Issued:                   April 5, 1994

Inventor:                 Buyske, Donald A. (deceased), late of Lake Worth, Florida
                          Buyske, Susan G., Administratrix, New York, New York

Assignee:                 Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                      Method of Treating Depression

---

### CERTIFICATE OF EXPRESS MAILING

LABEL NO:  EV 918 016 354 US
DATE OF DEPOSIT: February 7, 2007

I hereby certify that this papers is being deposited with the United States Postal Service "express Mail
Post Orffice to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:
Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA   22313-1450

---

## INTERVIEW SUMMARY

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Enclosed for filing with the above-referenced Reexamination patent is the following

Interview Summary.

It is believed that no fees are due with the filing of this document; however, should any

fees be required for any reason, the Commissioner is authorized to deduct said fees from Vinson

& Elkins, Deposit Account No. 22-0365/SOM700/4-4RE/13001.

### Interview Summary

On February 2, 2007, Tracey Davies and Margaret Sampson, attorneys for Somerset Pharmaceuticals, Inc. ("Applicant"), met with the following United States Patent and Trademark Office ("PTO") representatives: Kathleen Fonda and Kery Fries from the Office of Patent Legal Administration, and Janet Gongola from the Office of the Solicitor. The purpose of the interview was to discuss the Application for Extension of Patent Term Under 35 U.S.C. § 156 for U.S. Patent No. RE 34,579 ("PTE Applications"), which was filed by Applicant on April 26, 2006. A timeline leading up to the interview is attached hereto as Exhibit A. After the interview, the PTO requested that Applicant prepare and submit a more detailed summary of the interview, which is set forth below.

Applicant brought to the interview a slide presentation to guide the discussion of the issues and topics related to the PTE Application during the interview. It is Applicant's understanding that the slide presentation has been made of record. A copy of this slide presentation is attached hereto as Exhibit B.

Applicant began by explaining that Applicant spent eleven years obtaining regulatory approval for EMSAM® (selegiline transdermal system) patches, which are covered by U.S. Reissue No. 34,579 ("the '579 patent"). Upon receiving regulatory approval of the drug product by the Food and Drug Administration ("FDA"), Applicant analyzed 35 U.S.C. § 156 and the case law, and determined that the '579 patent, which claims the drug product, is eligible for patent term extension. The central issue discussed during the interview is the meaning of the terms "drug product" and "active ingredient," as those terms are used in 35 U.S.C. § 156(f)(2), and whether the active ingredient of the

2

drug product, recognized by the FDA as selegiline, is the first permitted commercial marketing or use of this single active ingredient.

The discussion first addressed the holding of *Fisons PLC v. Quigg*, 872 F.2d 99 (Fed. Cir. 1989) ("*Fisons*"). Applicant stated its position that *Fisons* holds that "product" under 35 U.S.C. §156 means the particular active ingredient in a drug product, not the finished drug product. This holding is consistent with the plain language of 35 U.S.C. § 156, as well as the legislative history. While the holding of *Fisons* is directed to an eligibility inquiry under 35 U.S.C. § 156, it is not on point regarding the issue in this matter because it determined simply that a patent covering a new formulation, dosage, or indication of the exact same chemical compound would not be eligible for term extension. Applicant pointed out that its position in this matter is consistent with *Fisons*, since EMSAM® (selegiline transdermal system) is the first permitted commercial marketing or use of the exact chemical compound (i.e., selegiline) present in that drug product.

Next, Applicant pointed out that in *Glaxo Operations UK Ltd. V. Quigg*, 894 F.2d 392 (Fed. Cir. 1990) ("*Glaxo*"), the Commissioner of the PTO argued that Congress intended "product" to mean any "new chemical entity," but the Federal Circuit squarely rejected the Commissioner's argument in *Glaxo*. Instead, in a carefully reasoned opinion of the statutory language of 35 U.S.C. § 156, the Federal Circuit held that "active ingredient" does not equal "active moiety" (i.e., new chemical entity). Applicant stated its position that the PTO followed the holding of *Glaxo* for at least fourteen years. Applicant also pointed out that when the Federal Circuit determined what "active ingredient" means under 35 U.S.C. § 156(f)(2) in *Glaxo*, it focused on the fact that

3

35 U.S.C. § 156(f)(2) was narrowly crafted to exclude a broad range of compounds, which is consistent with Applicant's position in this matter.

Applicant noted that while the holding of *Glaxo* is directed to an eligibility inquiry under 35 U.S.C. § 156, the holding of *Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.* 359 F.3d 1361 (Fed. Cir. 2004) ("*Pfizer*"), is directed to an enforcement inquiry under 35 U.S.C. § 156. Applicant pointed out that the PTO's review of Applicant's PTE Application is an eligibility determination, not an enforcement determination. Therefore, *Pfizer* is not binding precedent for determining the eligibility of a patent for term extension under 35 U.S.C. § 156. Applicant further pointed out that the holding in *Pfizer* that "active ingredient" equals "active moiety" does not appear to be consistent with the holding of *Glaxo*, which is never mentioned in the *Pfizer* opinion. In addition, *Pfizer* appears to be inconsistent with the holding of an earlier Federal Circuit opinion, *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996), as pointed out by Judge Mayer in his dissent (Judge Mayer was also on the *Fisons* panel).

After discussing the case law, Applicant made clear that to its knowledge, the eligibility of the '579 patent for patent term extension is a matter of first impression. With respect to determining eligibility, Applicant stated its position that the holding in *Glaxo*, i.e., that "active ingredient" does not mean "active moiety", is binding precedent. It was also noted that Applicant agrees with the PTO that a plain reading of the statute makes clear that the term "single entity" in 35 U.S.C. § 156(f)(2) modifies "active ingredient" (as stated by the PTO in its communication to the FDA dated December 22, 2007). Applicant noted that reading the statute in view of *Glaxo*, the "single entity" statutory language makes it clear that Congress intended the term "active ingredient of a

4

new drug" to mean the single, specific active ingredient actually present in the drug product, whether it is in a basic form *per se*, in the form of a salt *per se*, or in the form of an ester *per se*. Further, the modification of the term "active ingredient" by "single entity" means that active ingredient cannot be defined to include a class of compounds related to the active ingredient.

Thus, the plain meaning of the phrase "active ingredient of a new drug" in 35 U.S.C. § 156(f)(2) means the "single active ingredient of a drug product." This statutory interpretation is proper because it is consistent with the plain language of the statute, it attributes meaning to the term "single entity," and it is consistent with 35 U.S.C. § 156 as a whole.

Applicant discussed *Glaxo Operations UK Ltd. V. Quigg*, 706 F. Supp. 1224 (E.D. Va. 1989), in which the district court suggested as *dictum* in a footnote that the term "active ingredient" should be construed as a class of compounds that consists of the active ingredient, all salts of the active ingredient, and all esters of the active ingredient. Applicant carefully explained that according to this *dictum*, if a base was approved before a salt of the base, the salt is eligible for patent term extension, but if the situation is reversed and the salt of the base was approved first, the base is not eligible for patent term extension. Applicant discussed the unattractive asymmetry of this construction, as admitted by the district court, and that when the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") looked at the district court's suggested construction in *Abbott Laboratories v. Young*, 920 F.2d 984, 988-89 (D.C. Cir. 1990), it characterized the construction as "speculation," and rejected such construction as failing to serve any conceivable statutory purpose.

5

Applicant explained its position that this construction proposed as *dictum* is not consistent with the plain language of the statute nor the policy of the statute, fails to attribute meaning to the term "single entity," and is inconsistent with 35 U.S.C. § 156 as a whole. For example, the statutory construction proposed by Applicant that "drug product" is the single, specific active ingredient of a new drug actually present in the drug product is absolutely consistent with subsection 156(a)(4), since this drug product is the exact "product" that was "subject to a regulatory review period before its commercial marketing or use." In contrast, a construction of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient does not make sense under a plain reading of subsection 156(a)(4), since only the single active ingredient actually present in the product was subject to regulatory review, not a class of compounds related to the active ingredient. Such a nonsensical result is a strong indication that this construction is incorrect, and supports Applicant's construction.

Applicant also discussed the position set forth in the PTO's communication to the FDA dated December 22, 2006, that Applicant made an admission at an FDA Advisory Committee Meeting that EMSAM® and Eldepryl® have the same active ingredient. The PTO expressed concern that Applicant may be taking inconsistent positions in front of different federal agencies. Applicant assured the PTO that Applicant never intended to make such a representation to the FDA regarding the term "active ingredient" as it is used in 35 U.S.C. § 156. Applicant further pointed out that the FDA fully understands that the individual active ingredients of EMSAM® and Eldepryl® are different, as shown in the FDA website postings for these products (copies of which are included in the slide presentation). These postings show that the FDA lists the active ingredient for

6

EMSAM® as selegiline, and the active ingredient for Eldepryl® as selegiline hydrochloride, which clearly are different active ingredients.

Applicant and the PTO discussed a path for moving forward and the process for the PTO reaching a final determination on Applicant's PTE Application.

Applicant expressed a need to have a decision regarding the eligibility of the '579 patent for term extension as soon as possible in view of the patent's impending expiration on August 18, 2007 (lacking any term or interim extension). The possibility of the PTO granting an interim extension was discussed. Applicant pointed out that, in view of the impending patent expiration of the '579 patent, *In re Reckitt*, 230 U.S.P.Q. 369, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986) ("*Reckitt*"), is instructive. In *Reckitt*, the PTO granted an interim extension to a patent despite a determination by the PTO that the patent was not eligible for extension. Applicant explained the facts of *Reckitt*, including that:

- the eligibility determination hinged upon the FDA's regulatory approval date, which was in dispute;
- under the FDA's regulatory approval date, the patent term extension application in *Reckitt* had not been filed within 60 days of FDA approval, so the PTO determined that it was not eligible for term extension;
- a suit against the FDA regarding the approval date, at the Federal District Court level, was adverse to the FDA's position regarding the date of regulatory approval, indicating the patent was eligible for term extension;
- the PTO granted an interim extension on the patent pending appeal by the FDA to the 6th circuit, acknowledging: (1) the decision at the District Court level, (2) the harm to patentee if the patent expired, and (3) that the public interest was not harmed because the FDA-granted marketing exclusivity was in place for the drug product, thus the interim patent protection did not remove anything further from the public domain;
- the interim extension was crafted narrowly to allow for appeal and a decision on appeal;
- when the FDA prevailed on appeal, and the patentee did not timely apply for an additional interim extension pending further appeal, the PTO lifted the interim extension, and the patent expired. *See In re Reckitt*, 2

7

U.S.P.Q.2d 1450, 1987 WL 123817 (Com'r Pat. & Trademarks) (March 27, 1987)

Applicant also pointed out that 35 U.S.C. § 156 does not prohibit granting an interim extension pending court review, even if there is a PTO determination that a patent is not eligible for term extension. Applicant stated that if necessary, Applicant will file for an interim extension of the '579 patent that is narrowly tailored to allow only for Applicant to pursue a final non-appealable judicial decision on the eligibility of the '579 patent for term extension, and that the interim extension primarily would be to maintain the status quo. Applicant pointed out that there is FDA-granted marketing exclusivity for EMSAM® until February 27, 2009.

The PTO expressed that it is waiting for a response from the FDA regarding whether the FDA believes that EMSAM® is the first approved commercial marketing or use of the active ingredient it contains (i.e., selegiline). Applicant stated that the eligibility determination under 35 U.S.C. §156 is solely determined by the PTO, so Applicant does not believe that the PTO must wait to hear from the FDA before making its final determination regarding Applicant's PTE Application, in light of the short amount of time before the '579 patent is set to expire (lacking any term or interim extension).

The parties agreed that Applicant would contact Kathleen Fonda two weeks from the meeting date, to inquire as to the status of the PTO's review of the PTE Application. Applicant will contact Ms. Fonda on February 19, 2007, for a status update.

During the interview, Applicant repeatedly expressed the urgency of this matter in view of the impending 20-year expiration date of the '579 patent. Applicant is very

8

grateful for the time and attention devoted to this matter by the PTO, and in particular by those PTO representatives in attendance at the interview on February 2, 2007.

Respectfully submitted,

Somerset Pharmaceuticals, Inc.

By: *Margaret Sampson*

Margaret J. Sampson,
Registration Number 47,052

Vinson & Elkins, L.L.P.
2300 First City Tower
1001 Fannin
Houston, Texas 77002-6760
Telephone:    (512)542-8569
Facsimile:    (512)236-3264
Email: msampson@velaw.com.

Ex. Mail. #EV918016354US

## Exhibit A

Background for the interview on February 2, 2007:

| | |
|---|---|
| Feb. 27, 2006: | The FDA granted regulatory approval of EMSAM® (selegiline transdermal system) patches to Somerset Pharmaceuticals, Inc. |
| April 26, 2006: | Applicant timely filed its PTE Application with the PTO. |
| Dec. 22, 2006: | The PTO sent a first communication along with a copy of the PTE Application to the FDA, indicating a preliminary decision by the PTO that the "subject patent would NOT be eligible for extension of the patent term under 35 U.S.C. § 156." The PTO's communication requests that the FDA confirm that "EMSAM® (selegiline transdermal system), has been subject to a regulatory review period within the meaning of 35 U.S.C. § 156(g) before its first commercial marketing or use and that the application for patent term extension was filed within the sixty-day period after the product was approved." The PTO's communication was sent to the FDA under a Memorandum of Understanding Between the PTO and the FDA, 52 Fed. Reg. 17831 (May 12, 1987), based on the requirement that the Director of the PTO determine a product's eligibility for patent term restoration. *See* 35 U.S.C. § 156(e)(1). |
| Jan. 23-26, 2007: | Given that the PTO provided the FDA with a copy of the PTE Application, Applicant contacted Ms. Kathleen Fonda at the PTO after thirty (30) days to determine whether the FDA had responded to the PTO's communication. *See* 35 U.S.C. § 156(d)(2)(A). Upon learning that the FDA had not yet responded to the PTO's communication, Applicant requested a status update and meeting with Ms. Fonda, as well as a representative from the Office of the Solicitor. Ms. Fonda and the Office of the Solicitor graciously agreed to meet with Applicant's attorneys on February 2, 2007. |
| Feb. 2, 2007: | Tracey Davies and Margaret Sampson, attorneys for Applicant, met with the following PTO representatives: Kathleen Fonda and Kery Fries from the Office of Patent Legal Administration, and Janet Gongola from the Office of the Solicitor. |

# EXHIBIT B

Ex. Mail. #EV918016354US

Vinson&Elkins

# Patent Term Extension Application for U.S. Patent No. RE 34,579

## February 2, 2007

Somerset Pharmaceuticals, Inc.

BEST AVAILABLE COPY

Ex. Mail. #EV918016354US

V&E

# Topics for Discussion

○ **Case Law Related to Patent Term Extension**

    ○ *Fisons PLC v. Quigg I* (District Court) and *II* (Federal Circuit)

    ○ *Glaxo v. Quigg I* (District Court) and *II* (Federal Circuit)

    ○ *Pfizer v. Dr. Reddy's* (Federal Circuit)

    ○ *Glaxo II* holding, not *Pfizer*, controls eligibility determinations under 35 U.S.C. § 156

● **Statutory Construction**

    ○ "Active Ingredient of a New Drug" = Single Active Ingredient of the Drug Product

    ○ Policy behind 35 U.S.C. § 156 patent term extension

V&E

# Topics for Discussion

- Path Forward
  - Time Frame for Resolution
    - RE34,579 expires August 18, 2007
    - Marketing exclusivity for EMSAM® expires February 27, 2009
  - PTO must determine eligibility

V&E

## *Fisons PLC v. Quigg*
### 876 F.2d 99 (Fed. Cir. 1989)

- Held: "Product" equals the particular active ingredient in a drug product, not the finished drug product

- Eligibility inquiry under 35 U.S.C. § 156

V&E

# *Fisons PLC v. Quigg*

## 876 F.2d 99 (Fed. Cir. 1989)

Fisons took the position that 35 U.S.C. § 156 should allow patent term extension for new doses and uses

– framed the issue by arguing that developments of new uses and doses for known compounds are as important as NCE developments

– argued that under 35 U.S.C. § 156(a)(5)(A), product does not mean active ingredient, but rather "the <u>particular</u> drug product that the FDA approved." *Id.* at 100 (emphasis added)

V&E

*Fisons* ... ...

8/6...

- "[T]he PTO and district court interpreted the statute as limiting extensions to the term of the patent on the first permitted marketing or use of a **particular** *active ingredient*." *Id. at* 100 (italics in original, bold and underline added).

- The Federal Circuit held that the district court correctly applied the definition to the term "product." *Id.* at 102.

- This holding was directly supported by the plain language of the statute, and by clear portions of the legislative history

V&E

"New chemical..."

## December 22, 2006 PTO Communication: *Fisons* district court found that

"Congress' intent was to restore patent life only to new chemical entities. This intention is reflected in Section 156 (f), which restrictively defines 'product' for purposes of Section 156 as the drug's active ingredient."

In *Glaxo Operations UK Ltd. V. Quigg (II)*, 894 F.2d 392 (Fed. Cir. 1990), the Commissioner argued that Congress intended "product" to mean any "new chemical entity."

The Federal Circuit squarely rejected the Commissioner's argument in *Glaxo.*



- Held: "Active ingredient" does not equal "active moiety" (i.e., new chemical entity)

- Eligibility inquiry under 35 U.S.C. § 156

- PTO followed *Glaxo II* for at least 14 years, not *Fisons*

V&E

*Glaxo Operations*
*894 F.2d at 398*

When determining what "Active Ingredient" means within 156(f)(2), *Glaxo II* focused on the fact that §156(f)(2) was narrowly crafted to exclude a broad range of compounds:

"Congress specifically selected terms with narrow meanings, that it chose from among many alternatives [such as "new molecular entity," "active moiety," or "new chemical entity"]  Congress could have, but did not select broad terms with a range of possible meanings." 894 F.2d at 399.

Case 1:07-cv-00279-GMS Document 5-7 Filed 05/22/2007 Page 24 of 45



V&E

*Pfizer, Inc. v. ...* *359 ...*

- Held: "Active ingredient" equals "active moiety"

- Enforcement inquiry under 35 U.S.C. § 156

- *But see, Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996) ("[T]he restoration period of the patent does not extend to all products protected by the patent but only to the product on which the extension was based.")

- *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392 (Fed. Cir. 1990), is not mentioned in *Pfizer*



*Glaxo Operations UK Ltd. v. Quigg,*
894 F.2d 392 (Fed. Cir. 1990)

The holding of *Glaxo II* is binding precedent for eligibility determinations under 35 U.S.C. § 156, i.e., "active ingredient" does not equal "active moiety"

**"Active Ingredient" as a class of compounds**

V&E

- *Glaxo Operations UK Ltd. V. Quigg (I)*, 706 F. Supp. 1224 (E.D. Va. 1989), suggested as *dictum* in a footnote that "active ingredient" would be a class of compounds that consists of the active ingredient, all salts of the active ingredient, and all esters of the active ingredient."

- District court acknowledged this construction creates an "unattractive asymmetry."

- "[I]n this case the district court's formalistic reading of the statute would produce absurdly anomalous results. Availability of a patent term extension for a particular drug would depend upon which form of the drug's therapeutically active substance... was the first to receive FDA approval." Brief for Appellant [USPTO] at 11, *Glaxo Operations UK Ltd. V. Quigg*, No. 89-1407 (Fed. Cir. July 19, 1989).

"Active Ingredient" does not mean "active moiety" or V&E class of compounds

- In *Glaxo I and II*, the parties agreed that the dispositive question at issue was whether "active ingredient" is equivalent to "active moiety."

- *Glaxo I and II* must not be read beyond the legal holding that an "active ingredient" does not mean "active moiety."

V&E

"Active ﬆ﬍﬉﬊ﬆﬆ﬊
class of ﬆﬆﬆ﬊ﬆﬆ"

## December 22, 2006 PTO Communication:

"However, in *Glaxo* the court had found that because the new member (cefuroxime axetil) was neither a salt nor an ester of the previously approved product (two sodium salts of cefuroxime), the new ester could support a patent term extension."

Instead, *Glaxo II* only recognized that this was not the issue being decided:

"Moreover, the Commissioner does not appear to contest ZINACEF and KEFUROX (the two sodium salts of cefuroxime) are neither salts nor esters of cefuroxime axetil."



V&E

## Statutory

- 35 U.S.C. § 156(f)(2) Defines Drug Product:

  (2) The term "drug product" means the active ingredient of—

  (A) a new drug...

  including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

- Plain meaning of the statute:

  Active Ingredient    =    Single Active Ingredient
  of a New Drug                of a Drug Product

# Statutory Cons[...]

## "As a sing[...]

## of the first line o[...]

V&E

"…[A]s a matter of linguistics, the 'including any salt or ester of the active ingredient' phrase is set off by commas, and therefore can be lifted from the sentence to reveal that the 'as a single entity…' phrase applies to 'the active ingredient' of the first line of 35 U.S.C. § 156(f)(2)."

*Dec. 22 PTO Communication, p. 2.*

## We agree:

In the context of the statutory language, the term "single entity" clearly modifies the term "active ingredient." This position is reinforced by the phrase following "as a single entity," which makes clear that a drug product may contain an active ingredient as a single entity, or a combination of one single, specific active ingredient with another, different, active ingredient.

*PTE Appl. at p. 20-21.*



**Statutory Construction:**
**Active Ingredient**
**of a New Drug**

- The "single entity" language is unambiguous, and indicates that Congress clearly intended "drug product" to mean the single, specific active ingredient actually present in the drug product, not a class of compounds that consists of the active ingredient, all salts of the active ingredient, and all esters of the active ingredient. The latter construction, which includes a class of compounds within the meaning of "active ingredient," would render the language "single entity" superfluous and inoperative, which is not permitted under the rules of statutory construction.

V&E



**Statutory Co~~~~ ~~~~~**
**Active ing~~~~ ~~~~**
**of a New Drug**

V&E

35 U.S.C. § 156(f)(2) Defines Drug Product:

(2) The term "drug product" means the active ingredient of—

(A) a new drug...

including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient.

The highlighted phrase must also be given effect, and makes clear that the active ingredient of the drug product means the single, specific active ingredient of a new drug actual present in the drug product whether that active ingredient is a salt, ester, free base, or other form.



## Statutory Co... Active Ingred... of a New D...

V&E

- Because any statutory construction that defines the phrase "active ingredient of a new drug…, including any salt or ester of the active ingredient, as a single entity," as including a class of compounds renders the language "single entity" meaningless, and ignores the exemplary language of "including any salt or ester of the active ingredient" it must be rejected.

- Congress did not use "active moiety."

- Congress did not use "New Chemical Entity."

V&E

Applicant's Opening Brief on the
Whole of 36...t...

For example, 35 U.S.C. § 156(a)(4) requires that "the *product* has been subject to a regulatory review period before its commercial marketing or use."

Substituting Applicant's definition into the plain language of the statute, this provision reads:

the "active ingredient of a new drug…, as a single entity" must "ha[ve] been subject to a regulatory review period before its commercial marketing or use" to be eligible for a patent term extension.

V&E

Applica... ...
Whole of 3...

The statutory construction proposed by Applicant herein that "drug product" is the single, specific active ingredient of a new drug actually present in the drug product is absolutely consistent with subsection 156(a)(4), since this drug product is the exact "product" that was "subject to a regulatory review period before its commercial marketing or use."

V&E

Applicants' [illegible]
Whole of 3[illegible]

In contrast to Applicant's construction, **a construction of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient does not make sense under a plain reading of subsection 156(a)(4)**, since only the single active ingredient actually present in the product was subject to regulatory review, not a class of compounds related to the active ingredient. Such a nonsensical result is a strong indication that an interpretation is incorrect.



## Applicable ... Legislative ...

V&E

- Patent term extensions were enacted for patent owners to recoup patent term lost to regulatory approval process

- Somerset spent 11 years of patent term diligently obtaining regulatory approval for EMSAM®, which employs an active ingredient not present in any other approved product (as recognized on the FDA website)





V&E

# U.S. Food and Drug Administration

## CENTER FOR DRUG EVALUATION AND RESEARCH

FAQ | Instructions | Glossary | Contact Us | CDER Home



FDA Approved Drug Products

Start Over

## Drug Details

| | |
|---|---|
| Drug Name(s) | ELDEPRYL (Brand Name Drug) |
| FDA Application No. | (NDA) 020647 |
| Active Ingredient(s) | SELEGILINE HYDROCHLORIDE |
| Company | SOMERSET |
| Original Approval or Tentative Approval Date | May 15, 1996 |
| Chemical Type | 3  New formulation |
| Review Classification | S  Standard review drug |





Active Ingre

V&E



# FDA

# U.S. Food and Drug Administration

 Department of Health and Human Services

## CENTER FOR DRUG EVALUATION AND RESEARCH

FAQ | Instructions | Glossary | Contact Us | CDER Home

## Drugs@FDA
FDA Approved Drug Products

Start Over

## Overview

**Drug Name**  EMSAM

**Active Ingredient(s)**  • SELEGILINE

**Form(s) and Strength(s) Available**
• FILM, EXTENDED RELEASE; TRANSDERMAL: 12MG/24HR; 6MG/24HR; 9MG/24HR
• SYSTEM; TRANSDERMAL: 12MG; 6MG; 9MG



Applicant's Construction is Consistent with the Legislative Intent

- Applicant's construction is **entirely** consistent with the intent of Congress, given the long delays in approval of drug products with active ingredients that have not been previously approved by the FDA (even if the new active ingredient is related to a previously approved but different active ingredient).

V&E



## Applicant's Proposed Legislation

- NDA applications for new active ingredients that are directed to, for example, a new ester, new salt, or other noncovalent derivative of a previously approved drug will be subject to the same rigorous and time-consuming regulatory approval by the FDA as an NDA directed to a new chemical entity, and thus should be entitled to term extension.

- Type I and Type II Drugs each have long approval times, with Type II drugs actually taking slightly longer for approval.





Average Approval Time For Standard Review NDAs (1999-2005)
Type 1 vs. Type 2 NDAs

BEST AVAILABLE COPY



# EXHIBIT B

| *U.S. Reissue No. 34,579*  **Interview Summary** | Application No. 07/750,292 | Applicant(s) BUYSKE ET AL. | |
|---|---|---|---|
| | Examiner K. Fonda | Art Unit OPLA | |

All participants (applicant, applicant's representative, PTO personnel):

(1) K. Fonda. – PTO – OPLA

(2) J. Gongola. – PTO – SO

(3) K. Fries. – PTO – OPLA

(4) T. Davis & M. Sampson. Attorneys for PTE applicant

Date of Interview: 02 February 2007.

Type:  a)☐ Telephonic  b)☐ Video Conference
c)☒ Personal [copy given to: 1)☐ applicant   2)☐ applicant's representative]

Exhibit shown or demonstration conducted:   d)☐ Yes   e)☒ No.
If Yes, brief description: _____.

Claim(s) discussed: N/A

Identification of prior art discussed: N/A

Agreement with respect to the claims f)☐ was reached.  g)☐ was not reached.  h)☒ N/A.

Substance of Interview including description of the general nature of what was agreed to if an agreement was reached, or any other comments: _____.

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims allowable, if available, must be attached.  Also, where no copy of the amendments that would render the claims allowable is available, a summary thereof must be attached.)

THE FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MPEP Section 713.04).  If a reply to the last Office action has already been filed, APPLICANT IS GIVEN A NON-EXTENDABLE PERIOD OF THE LONGER OF ONE MONTH OR THIRTY DAYS FROM THIS INTERVIEW DATE, OR THE MAILING DATE OF THIS INTERVIEW SUMMARY FORM, WHICHEVER IS LATER, TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  See Summary of Record of Interview requirements on reverse side or on attached sheet.

Applicant's attorneys pointed out that Fisons + Glaxo wer eligibility cases, while Pfizer was an enforcement case. Therefore they argue that Pfizer does not apply. Also, they argue that Fisons was a new use of old product case. They support the outcome of Fisons, but argue that the case is distinguishable. Primarily, they argue that active ingredient ≠ active moiety. They inquired as to filing for an interim extension, and pointed out In re Reckitt in support of issuance of an interim extension in the face of a denial. Attorneys may call the Office for updates on status. Attorneys agreed to submit a full summary of the interview. The handout presented will be made part of the record

Examiner Note: You must sign this form unless it is an Attachment to a signed Office action.

Examiner's signature, if required

U.S. Patent and Trademark Office
PTOL-413 (Rev. 04-03)          Interview Summary          Paper No. 20070202

Kathleen Kehler
2-2-2007

## Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
#### Paragraph (b)
In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2 Business to be transacted in writing. .
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

———

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
(The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

# Exhibit

# 5

07/750,292     1 FW



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                    U.S. Reissue No. 34,579

Issued:                   April 5, 1994

Inventor:                 Buyske, Donald A. (deceased), late of Lake Worth, Florida
                          Buyske, Susan G., Administratrix, New York, New York

Assignee:                 Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                      Method of Treating Depression

---

**CERTIFICATE OF EXPRESS MAILING**
LABEL NO:  EV 918 016 345 US
DATE OF DEPOSIT:   February 21, 2007

I hereby certify that this papers is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:
Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA   22313-1450

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Enclosed for filing in connection with the above-referenced patent are the following:

1. Application for Interim Patent Term Extension Under 35 U.S.C. § 156(e)(2);

2. Postcard.

Please date-stamp and return postcard to evidence receipt of the enclosed document.

It is believed no fees are due with the filing of this paper; however, should any fees under 37 C.F.R. §§ 1.16 to 1.21 be required for any reason relating to the enclosed document the Commissioner is authorized to appropriately deduct the requisite amount from Vinson & Elkins L.L.P. Deposit Account No. 22-0365/SOM700/4-01RE US/13001.

Respectfully submitted,

Margaret J. Sampson

MJS/cp
Enclosure

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                              U.S. Reissue No. 34,579

Issued:                             April 5, 1994

Inventor:                           Buyske, Donald A. (deceased), late of Lake Worth, Florida
                                    Buyske, Susan G., Administratrix, New York, New York

Assignee:                           Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                                Method of Treating Depression

---

**CERTIFICATE OF EXPRESS MAILING**

LABEL NO:  EV 918 016 345 US
DATE OF DEPOSIT:  February 21, 2007

I hereby certify that this papers is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:

Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## APPLICATION FOR INTERIM PATENT TERM
## EXTENSION UNDER 35 U.S.C. § 156(e)(2)

Sir:

This paper serves as an application for an interim patent term extension of U.S. Reissue No. 34,579 ("the '579 patent") under 35 U.S.C. § 156(e)(2).

Somerset Pharmaceuticals, Inc. (referred to herein as "Applicant") respectfully requests an interim extension under 35 U.S.C. § 156(e)(2) of the term of the '579 patent for a period of one year from the expiration date of the '579 patent, which is August 18, 2007, such that the expiration date of the '579 patent will be extended until August 18, 2008. Applicant further requests that should the U.S. Patent and Trademark Office ("PTO") grant the requested interim extension, the interim extension will continue even if the PTO issues a Final Determination that the '579 patent is not eligible for extension under 35 U.S.C. § 156, until a final, non-appealable judicial decision on the eligibility of the '579 patent for term extension is obtained, or until August 18, 2008, whichever is earlier. Applicant will timely file additional applications for interim extension as necessary.

On April 27, 2006, Applicant filed an Application for Extension of Patent Term Under 35 U.S.C. § 156 ("PTE Application") for the '579 patent, based on the regulatory approval of EMSAM® (selegiline transdermal system) patches ("EMSAM®"). Applicant spent over 11 years getting EMSAM® approved by the FDA. Therefore, Applicant has requested extension of the term of the '579 patent until August 18, 2012, which is the maximum permitted extension provided under 35 U.S.C. § 156.

On December 22, 2006, the PTO sent a communication along with a copy of the PTE Application to the Food and Drug Administration ("FDA"), indicating the PTO's preliminary view that the "subject patent would NOT be eligible for extension of the patent term under 35 U.S.C. § 156." (emphasis in original).

In the absence of an extension, the '579 patent is set to expire in less than six months, i.e., August 18, 2007.

Notwithstanding the PTO's preliminary indication that the '579 patent would not be eligible for patent term extension under 35 U.S.C. § 156, Applicant maintains that the '579

2

patent is entitled to such a term extension. Applicant's position is set forth fully in the PTE Application, as well as in the Interview Summary filed on February 7, 2007, which summarizes the interview granted to Applicant by the PTO on February 2, 2007. To Applicant's knowledge, the facts applicable to determining eligibility of the '579 patent for patent term extension have not been considered previously by the PTO.

A grant of an interim extension of the '579 patent by the PTO from August 18, 2007 until August 18, 2008, will avoid any possible hiatus in patent protection for Applicant, and will place the public on notice regarding the extension of the term of the patent. *See In re Reckitt*, 230 U.S.P.Q. 369, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986). Applicant highlights that in *Reckitt*, the PTO granted an interim extension to a patent despite a Final Determination by the PTO that the patent was not eligible for extension. *Id.* at 372. The PTO noted that its decision to grant the interim extension avoided having to address "the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires." *Id.* at 371.

Granting an interim extension for the '579 patent will not preclude others from the protection granted under 35 U.S.C. § 271(e)(1). *See id.* at 372. In addition, EMSAM®, the product that forms the basis for the PTE Application, has been granted non-patent exclusivity by the FDA such that the FDA will not approve an Abbreviated New Drug Application ("ANDA") for a generic equivalent of EMSAM® until after February 27, 2009. Thus, a grant of the application for interim extension will strike a reasonable balance between the competing factors involved in this case.

In accordance with PTO rules and procedures, Applicant hereby respectfully requests that the PTO make a decision regarding this application for interim extension within three months, i.e., by May 21, 2007. Under 37 C.F.R. § 1.760, an application for an interim patent term extension under 35 U.S.C. § 156(e)(2) should be filed *at least* three months prior to the

3

expiration date of the patent. Recently, another applicant filed an application for interim extension of a patent after the PTO had issued a Final Determination that the patent was not eligible for extension under 35 U.S.C. § 156. *See* papers filed with the PTO for U.S. Patent No. 4,600,706. The PTO responded by granting another interim extension for the patent (which previously had been granted three interim extensions), less than one month after the request was made by the applicant. Therefore, clearly the PTO can make a decision about whether to grant Applicant's application for interim extension under 35 U.S.C. § 156(e)(2) within three months of this request.

Applicant respectfully requests an interim extension of the '579 patent under 35 U.S.C. § 156(e)(2) until either a final, non-appealable judicial decision of the eligibility of the '579 patent for term extension, or until August 18, 2008, whichever is earlier. Any additional applications for interim extension will be filed by Applicant as needed.

Respectfully submitted,

Margaret J. Sampson
Registration. No. 47,052
Attorney for Applicant

VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin, Suite 2300
Houston, Texas 77002-6760
Telephone:    (512)542-8569
Facsimile:    (512)236-3264
Email: msampson@velaw.com.

Date: February 21, 2007

4

# Exhibit
# 6

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                   U.S. Reissue No. 34,579

Issued:                  April 5, 1994

Inventor:                Buyske, Donald A. (deceased), late of Lake Worth, Florida
                         Buyske, Susan G., Administratrix, New York, New York

Assignee:                Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                     Method of Treating Depression

---

**CERTIFICATE OF EXPRESS MAILING**
LABEL NO:  EV 918 016 306 US
DATE OF DEPOSIT:   April 9, 2007

I hereby certify that this papers is being deposited with the United States Postal Service "Express Mail Post
Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:
Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA   22313-1450

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Enclosed for filing in connection with the above-referenced patent are the following:

1.  Communication Regarding Application for Interim Patent Term Extension Under 35
    U.S.C. § 156(e)(2);

2.  Postcard.

Please date-stamp and return postcard to evidence receipt of the enclosed document.

It is believed no fees are due with the filing of this paper; however, should any fees under
37 C.F.R. §§ 1.16 to 1.21 be required for any reason relating to the enclosed document the
Commissioner is authorized to appropriately deduct the requisite amount from Vinson & Elkins
L.L.P. Deposit Account No. 22-0365/SOM700/4-01RE US/13001.

Respectfully submitted,

*Margaret Sampson*

Margaret J. Sampson

MJS/cp
Enclosure

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:                          U.S. Reissue No. 34,579

Issued:                         April 5, 1994

Inventor:                       Buyske, Donald A. (deceased), late of Lake Worth, Florida
                                Buyske, Susan G., Administratrix, New York, New York

Assignee:                       Somerset Pharmaceuticals, Inc., Tampa, Florida

For:                            Method of Treating Depression

---

**CERTIFICATE OF EXPRESS MAILING**

LABEL NO:  **EV 918 106 306 US**
DATE OF DEPOSIT:   **April 9, 2007**

I hereby certify that this papers is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is address to:

Mail Stop Patent Ext.
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

---

**MAIL STOP PATENT EXT.**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

## COMMUNICATION REGARDING APPLICATION FOR INTERIM PATENT TERM EXTENSION UNDER 35 U.S.C. § 156(e)(2)

Sir:

This paper is a communication regarding the application for an interim patent term extension of U.S. Reissue No. 34,579 ("the '579 patent") under 35 U.S.C. § 156(e)(2).

On February 21, 2007, Somerset Pharmaceuticals, Inc. ("Applicant") filed an Application for Interim Patent Term Extension Under 35 U.S.C. § 156(e)(2) ("Application for Interim Extension"), requesting an interim extension of the term of the '579 patent. The '579 patent is set to expire in approximately four months, i.e., on August 18, 2007. The U.S. Patent and Trademark Office ("PTO") has not yet made a Final Determination regarding the eligibility of the '579 patent for term extension, based on Applicant's Application for Extension of Patent Term Under 35 U.S.C. § 156 for U.S. Patent No. RE 34,579 ("PTE Application"), which was filed on April 26, 2006, nearly one year ago.

Therefore, in an effort to maintain the status quo, Applicant requested that the expiration date of the '579 patent be extended until either the issuance of a final, non-appealable judicial decision of the eligibility of the '579 patent for term extension, or until August 18, 2008, whichever is earlier. As set forth in the Application for Interim Extension, there is precedence for the PTO granting such an interim extension. *See In re Reckitt*, 230 U.S.P.Q. 369, 372, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986); *see also* papers filed with the PTO for U.S. Patent No. 4,600,706. Specifically, *In re Reckitt* recognized that granting such an interim extension will avoid any possible hiatus in patent protection, as well as "the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires." *Id.* at 371. Any additional applications for interim extension would be timely filed by Applicant as needed to maintain the status quo.

Applicant further requested, in accordance with PTO rules and procedures, that the PTO make a decision regarding the Application for Interim Extension as soon as possible, but in any event within three months, i.e., by May 21, 2007, so that Applicant has sufficient time to protect its rights as appropriate before the current expiration of the '579 patent on August 18, 2007.

2

The PTO has expressed to Applicant on two occasions that it would like a response from the Food and Drug Administration ("FDA") to the communication the PTO sent to the FDA on December 22, 2006 ("PTO Communication") before making a decision in this case. In the PTO Communication, the PTO stated:

> The assistance of your Office is requested in confirming that the product identified in the application, EMSAM® (selegiline transdermal system), has been subject to a regulatory review period within the meaning of 35 U.S.C. § 156(g) before its first commercial marketing or use and that the application for patent term extension was filed within the sixty-day period after the product was approved. PTO Communication, p. 1.

The PTO's request for assistance from the FDA should not impact or delay the PTO's decision of whether to grant the Application for Interim Extension, but instead counsels in favor of granting the requested interim extension. To the extent the PTO desires input from the FDA, an interim extension would permit time for this inter-agency communication to occur without prejudicing the Applicant.

That said, Applicant restates and does not waive its position that the eligibility determination based on the PTE Application is to be made solely by the PTO, and notes its respectful disagreement with the PTO's position that it must or should wait to hear from the FDA before making its final determination regarding the eligibility of the '579 patent for term extension. Under Title 35, the Director of the PTO determines the eligibility of a patent for term extension, while the FDA determines the length of the regulatory review period upon which an application for patent term extension is based, and publishes a notice of that determination. *See* 35 U.S.C. §156(d)(1)(C) and (d)(2)(A)(ii). Thus, as set forth by the Commissioner: "The PTO and FDA have separate responsibilities under Section 156 with regard to determination of the regulatory review period. The PTO determines whether it occurred at all and the FDA determines its length." *In re Allen and Hansbury*, 227 U.S.P.Q. 955, 960, 1985 WL 71949

3

(Com'r Pat. & Trademarks) (September 19, 1985). The Associate Commissioner for Health Affairs of the FDA similarly has testified that "it is not appropriate for FDA to take a position on the merits of individual patent extension requests." Associate Commissioner for Health Affairs, U.S. Food and Drug Administration, Stuart Nightingale, M.D., Speech before United States Senate Subcommittee on Patents, Copyrights and Trademarks, Committee on the Judiciary (Aug. 22, 1991).

Applicant recognizes that the FDA possesses information for answering certain factual questions related to the regulatory approval of the New Drug Application upon which an application for patent term extension is based. But the question set forth in this case is not factual in nature. Instead, the question at issue is whether the '579 patent is eligible for term extension under 35 U.S.C. § 156, as properly construed. The '579 patent is eligible for term extension because the product EMSAM® is the first permitted commercial marketing or use of the single active ingredient present in the drug product: selegiline.

Respectfully submitted,

Margaret J. Sampson
Registration. No. 47,052
Attorney for Applicant

VINSON & ELKINS L.L.P.
First City Tower
1001 Fannin, Suite 2300
Houston, Texas 77002-6760
Telephone:     (512)542-8569
Facsimile:     (512)236-3264
Email: msampson@velaw.com.

Date:  April 9, 2007

4

# Exhibit
# 7



# UNITED STATES PATENT AND TRADEMARK OFFICE

RECEIVED NOV 6 2006

In re Arkion Life Sciences　　　　　　　:
Request for Patent Term Extension　　　: **ORDER GRANTING**
U.S. Patent No. 4,600,706　　　　　　　: **INTERIM EXTENSION**

On May 13, 2004, Arkion Life Sciences, the owner of record in the United States Patent and Trademark Office of U.S. Patent No. 4,600,706, filed an application under 35 U.S.C. § 156, requesting an extension of five years. The patent was previously extended for a period of one year pursuant to 35 U.S.C. 156(d)(5), from November 17, 2003, until November 17, 2004, and for a second year pursuant to 35 U.S.C. 156(e)(2), from November 17, 2004, until November 17, 2005, and for a third year pursuant to 35 U.S.C. 156(e)(2), from November 17, 2005, until November 17, 2006. The patent claims a method of use of natamycin, an additive contained in the animal feed product "NSURE®." The application indicates that the product has undergone a regulatory review under Section 409 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 355) before the first permitted commercial use or sale of the product.

Review of the application indicates that the subject patent is eligible for an extension of the patent term under 35 U.S.C. § 156. Because it is apparent that processing of the application for patent term extension will not be completed before the extended expiration date of the patent, interim extension of the patent term is appropriate.

An interim extension under 35 U.S.C. § 156(e)(2) of the term of U.S. Patent No. 4,600,706 is granted for a period of one year from the extended expiration date of the patent, until November 17, 2007.

10/20/06
_____
Date

_____
Jon W. Dudas
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

Interim Patent Term Extension
U.S. Pat. No. 4,600,706

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent No:    4,600,706
Applicant:    A.F. Carter
Issued:       July 15, 1986
Title:        ANTI-FUNGAL FEED COMPOSITIONS CONTAINING NATAMYCIN

### CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or
deposited with the United States Postal Service as first class mail, with sufficient postage, in
an envelope addressed to:  Commissioner for Patents, P.O. Box 1450, Alexandria, VA
22313-1450 on: **September 27, 2006**

_Renee L. Sipple_

Renee L. Sipple

### APPLICATION FOR INTERIM PATENT TERM
### EXTENSION UNDER 35 U.S.C. § 156(E)(2)

Mail Stop Patent Term Extension
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

This paper serves as an application for an interim patent term extension of US Patent No.
4,600,706 (the "Patent") under 35 U.S.C. § 156(e)(2).

The Patent was assigned from DuCoa L.P. to Arkion Life Sciences (herein referred to as
"Applicants") on July 30, 2001 (Reel/Frame No. 012463/0992).

The Patent expired on November 17, 2003.  On November 3, 2003, Applicants filed an
application under 35 U.S.C. § 156(d)(5) for an interim extension of the term of the Patent.
On June 24, 2004, the US Patent Office granted an interim extension for a period of one
year from the expiration date of the Patent, i.e. until November 17, 2004. (Exhibit A)

Applicants' product under regulatory review, NSURE®, received commercial approval on
April 13, 2004 as published in the Federal Register Vol. 69, No. 71.  On May 13, 2004
Applicants filed an application for patent term extension under 35 U.S.C. § 156. (Exhibit B)

Interim Patent Term Extension
U.S. Pat. No. 4,600,706

On November 4, 2004, the US Patent Office granted an interim extension under 35 U.S.C. § 156(e)(2) of the term of the Patent for a period of one year from the extended expiration date of the Patent, until November 17, 2005. (Exhibit C)

On October 18, 2005, the US Patent Office granted an interim extension under 35 U.S.C. § 156(e)(2) of the term of the Patent for a period of one year from the extended expiration date of the Patent, until November 17, 2006. (Exhibit D)

On September 7, 2006, the US Patent Office issued a Final Determination that the Patent is not eligible for extension under 35 U.S.C. § 156. (Exhibit E)

Applicants intend to file a request for reconsideration of the Final Determination of Ineligibility within the time period allotted. Applicants submit that they have a good faith basis for filing the request for reconsideration, and such basis was expressed orally by Applicants' undersigned attorney, Basil S. Krikelis, in a phone conversation to Mary Till at the US Patent Office, on Thursday, September 21, 2006. Ms. Till stated that Applicants' basis for requesting reconsideration was in good faith, and suggested that Applicants file the present application for interim extension. In this regard, Applicants respectfully request that the US Patent Office grant Applicants' application for an interim patent term extension of US Patent No. 4,600,706 under 35 U.S.C. § 156(e)(2).

Respectfully Submitted,

By:
Basil S. Krikelis
Reg. No. 41,129



DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville MD 20857

JUN 1 4 2006

Re: Revlimid
Docket No. 2006E-0240

The Honorable Jon Dudas
Under Secretary of Commerce for Intellectual Property and
    Director of the United States Patent and Trademark Office
Box Pat. Ext.
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Director Dudas:

This is in regard to the application for patent term extension for U.S. Patent No. 5,635,517 filed by
Celgene Corporation under 35 U.S.C. § 156. The human drug product claimed by the patent is
Revlimid (lenalidomide), which was assigned NDA No. 21-880.

A review of the Food and Drug Administration's official records indicates that this product was
subject to a regulatory review period before its commercial marketing or use, as required under 35
U.S.C. § 156(a)(4). Our records also indicate that it represents the first permitted commercial
marketing or use of the product, as defined under 35 U.S.C. § 156(f)(1), and interpreted by the courts
in *Glaxo Operations UK Ltd. v. Quigg*, 706 F. Supp. 1224 (E.D. Va. 1989), *aff'd*, 894 F. 2d 392
(Fed. Cir. 1990).

The NDA was approved on December 27, 2005, which makes the submission of the patent term
extension application on February 3, 2006, timely within the meaning of 35 U.S.C. § 156(d)(1).

Should you conclude that the subject patent is eligible for patent term extension, please advise us
accordingly. As required by 35 U.S.C. § 156(d)(2)(A) we will then determine the applicable
regulatory review period, publish the determination in the *Federal Register*, and notify you of our
determination.

Please let me know if we can be of further assistance.

Sincerely yours,

Jane A. Axelrad
Associate Director for Policy
Center for Drug Evaluation and Research

cc:     Anthony M. Insogna, Esq.
        Jones Day
        Customer # 20583
        222 East 41st Street
        New York, NY 10017



UNITED STATES PATENT AND TRADEMARK OFFICE

SEP 18 2006

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

Office of Regulatory Policy
HFD-7
5600 Fishers Lane (Rockwall II Rm 1101)
Rockville, MD 20857

Attention: Beverly Friedman

The attached application for patent term extension of U.S. Patent No. 6,248,775 was filed on
August 15, 2006, under 35 U.S.C. § 156.

The assistance of your Office is requested in confirming that the product identified in the
application, Prezista™ (darunavir ethanolate), has been subject to a regulatory review period
within the meaning of 35 U.S.C. § 156(g) before its first commercial marketing or use and that
the application for patent term extension was filed within the sixty-day period after the product
was approved. Since a determination has not been made whether the patent in question claims a
product which has been subject to the Federal Food, Drug and Cosmetic Act, or a method of
manufacturing or use of such a product, this communication is NOT to be considered as notice
which may be made in the future pursuant to 35 U.S.C. § 156(d)(2)(A).

Our review of the application to date indicates that the subject patent would be eligible for
extension of the patent term under 35 U.S.C. § 156.

Inquiries regarding this communication should be directed to the undersigned at (571) 272-7755
(telephone) or (571) 273-7755 (facsimile).

Mary C. Till
Legal Advisor
Office of Patent Legal Administration
Office of the Deputy Commissioner
  for Patent Examination Policy

cc:     Philip Johnson, Esq.
        Johnson & Johnson
        One Johnson Drive
        New Brunswick, NJ 08816

# Exhibit

# 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOMERSET PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| JON W. DUDAS, in his official capacity | ) | |
| as Under Secretary of Commerce for | ) | |
| Intellectual Property and Director of the | ) | |
| United States Patent and Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF MARGARET J. SAMPSON IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Margaret J. Sampson, declare and state as follows:

1.      I am an attorney in the firm of Vinson & Elkins L.L.P. ("V&E"), and along with Tracey Davies, am counsel of record for Somerset Pharmaceuticals, Inc. ("Somerset") in the administrative proceedings underlying the above captioned case. I have personal knowledge of the facts and matters stated in this declaration and, if called as a witness, would testify to the facts set forth herein.

2.      Somerset markets a product, EMSAM® (selegiline transdermal system), which is a patch that is applied to the skin. The sole active ingredient in EMSAM® is selegiline.

3.      On April 27, 2006, Somerset timely filed with the United States Patent and Trademark Office ("PTO") an Application for Extension of Patent Term under 35 U.S.C. § 156 ("PTE Application") for U.S. Reissue Patent No. 34,579 ("the '579 Patent"), based on approval of EMSAM® by the Food and Drug Administration ("FDA") on February 27, 2006. Based on

the 11 years Plaintiff spent obtaining regulatory approval of EMSAM®, Plaintiff requested extension of the term of the '579 Patent for 5 years, until August 18, 2012, which is the maximum extension of patent term allowable under 35 U.S.C. § 156. Exhibit 2 of Somerset's Preliminary Injunction Brief is a true and correct copy of the PTE Application.

4.      Under 21 U.S.C. § 355(j)(5)(F)(iii), the FDA granted EMSAM® three years of non-patent marketing exclusivity, until February 27, 2009. This non-patent marketing exclusivity means that no generic drug for EMSAM® will be approved by the FDA to enter the U.S. market until at least February 27, 2009.

5.      On December 22, 2006, the PTO wrote to the FDA indicating the PTO's preliminary view that the '579 Patent "would NOT be eligible for extension of the patent term under 35 U.S.C. § 156." (emphasis in original). Exhibit 3 of Somerset's Preliminary Injunction Brief is a true and correct copy of the PTO's letter to the FDA.

6.      Currently, the term of the '579 Patent is set to expire on August 18, 2007.

7.      On February 2, 2007, I, along with Tracey Davies, on behalf of Somerset met with representatives of the PTO to discuss the PTE Application. This interview was memorialized by both Somerset and the PTO. During the interview, the PTO expressed that it is interested in the views of the FDA on Somerset's PTE Application. In response, Somerset expressed to the PTO its position that, as a matter of law, the PTO alone is to make the required statutory determination in deciding Somerset's PTE Application. Exhibit 4a of Somerset's Preliminary Injunction Brief is a true and correct copy of the Interview Summary prepared by Somerset, which was filed on February 7, 2007. Exhibit 4b of Somerset's Preliminary Injunction Brief is a true and correct copy of the Interview Summary prepared by the PTO. As reflected in

both of the Interview Summaries, Somerset first raised the issue of an interim extension for the '579 Patent with the PTO on February 2, 2007.

8.      Somerset filed an Application for Interim Patent Term Extension Under 35 U.S.C. § 156(e)(2) ("Application for Interim Extension") with the PTO on February 21, 2007, approximately six months before the '579 Patent is set to expire.  Exhibit 5 of Somerset's Preliminary Injunction Brief is a true and correct copy of the Application for Interim Extension.

9.      Exhibit 6 of Somerset's Preliminary Injunction Brief is a true and correct copy of the communication sent to the PTO by Somerset on April 9, 2007, clarifying Somerset's position with respect to its Application for Interim Extension.

10.     Throughout the pendency of Somerset's Application for Interim Extension, Somerset has been in regular contact with representatives of the PTO about the status of its PTE Application and, in particular, about the status of its Application for Interim Extension.  Both myself and Tracey Davies, separately or together, have spoken with the PTO in multiple telephone conferences, as set forth below, underscoring on several occasions the grounds and necessity for the PTO to grant the request interim relief:

> a.  Feb. 20, 2007:    Telephone conference with Kathleen Fonda at the PTO's Office of Patent Legal Administration.
>
> b.  Feb. 21, 2007:    Message with Janet Gongola at the PTO's Office of the Solicitor.
>
> c.  Feb. 23, 2007:    Message with Janet Gongola.
>
> d.  March 2, 2007:    Message with John Whealan, Deputy General Counsel for Intellectual Property Law and Solicitor at the PTO.
>
> e.  March 7, 2007:    Brief telephone conference with John Whealan- told to call back the next day.
>
> f.  March 8, 2007:    Telephone conference with John Whealan.
>
> g.  March 13, 2007:  Telephone conference with Kathleen Fonda.

h.  March 27, 2007:   Telephone conference with Kathleen Fonda.

i.  April 27, 2007:   Telephone conference with Kathleen Fonda.

j.  May 11, 2007:   Telephone conference with John Whealan.

k.  May 17, 2007:   Telephone conference with Kathleen Fonda.

l.  May 17, 2007:   Telephone conference with Janet Gongola.

m. May 21, 2007:   Telephone conference with Kathleen Fonda.

11.   Somerset has advised the PTO several times (including in the last business days before this lawsuit was filed) that it would be forced to litigate the matter if no interim extension was forthcoming by May 21, 2007, approximately three months before the expiration of the '579 patent. In response, PTO personnel were noncommittal on whether the interim extension would be granted or denied, never raising any potential infirmity with the Interim Application, but otherwise giving no indication either as to their concerns (if any) or the timing or likely substance of a decision.

12.   Exhibit 7 of Somerset's Preliminary Injunction Brief is a true and correct copy of publicly available papers from the image file wrapper of U.S. Patent No. 4,900,706, as found on the PTO's Patent Application Information Retrieval ("PAIR") website. We are aware of this case because PTO personnel brought it up in discussions during the interview on February 2, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Margaret J. Sampson

May 22, 2007
Date

# Exhibit
# 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOMERSET PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| JON W. DUDAS, in his official capacity | ) | |
| as Under Secretary of Commerce for | ) | |
| Intellectual Property and Director of the | ) | |
| United States Patent and Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARATION OF MELISSA L. GOODHEAD, B.S., RAC

I, Melissa L. Goodhead have personal knowledge of the facts set forth in this statement and hereby testify and declare the following:

1.     My name is Melissa L. Goodhead.  I am over the age of 18, of sound mind, and capable of making this declaration.  I have personal knowledge of the facts stated in this declaration, and they are true and correct to the best of my knowledge, information, and belief.

#### Personal Information and Background

2.     I am the Vice President, Operations and Regulatory Affairs for Somerset Pharmaceuticals, Inc. ("Somerset").

3.     I have a Bachelors of Science from the University of South Florida, in Tampa, Florida.  I have over 13 years of experience in the pharmaceutical field, particularly in the area of regulatory approval of new drugs by the Food and Drug Administration ("FDA").  I began working for Somerset in 1994.  In that time, I have served as Group Director- Regulatory Affairs/Quality Assurance, before being promoted to my current position in February 2007.  In

these positions, I have gained familiarity with Somerset's products, as well as the company's actual and projected revenues from the marketing of those products.

### Somerset's Products

4.      Somerset currently markets two pharmaceutical products.

5.      The first product, ELDEPRYL®, has been marketed by Somerset for 17 years.

6.      The second product, EMSAM® (selegiline transdermal system), received FDA approval on February 27, 2006. EMSAM® is a patch that is applied to the skin, which is designed to continuously administer the active ingredient of the product. The sole active ingredient in EMSAM® is selegiline. EMSAM® is applied by a patient once a day, and is prescribed as a treatment for major depressive disorder. The continuous administration of selegiline with the patch offers several significant therapeutic advantages to patients, including reducing the risk of potentially fatal hypertensive crises.

7.      EMSAM® is Somerset's primary product, and generates most of Somerset's revenue. In 2006, EMSAM® generated a net sales revenue of $24 million.

8.      Somerset currently projects that EMSAM® will generate a net revenue of $20 million per year for 2007, 2008, and 2009.

I declare under penalty of perjury that the foregoing is true and correct.

Melissa L. Goodhead

May 21, 2007.
Date

## CERTIFICATE OF SERVICE

On this 22nd day of May, 2007, I caused to be served a copy of the foregoing Plaintiff's Brief in Support of Motion for Preliminary Injunction, as follows:

## BY HAND DELIVERY

Jon W. Dudas
Under Secretary of the United States Department of Commerce
  and Director of the United States Patent and Trademark
Madison Building East, Room 10B20
600 Dulany St.
Alexandria, Virginia 22314

John Whealan
Office of the Solicitor
Director of the United States Patent and Trademark Office
Madison Building East, Room 10B20
600 Dulany Street
Alexandria, VA  22314
Tel:  (571) 272-9035
Fax: (517) 273-0373

Colm F. Connolly
United States Attorney
District of Delaware
700 Nemours Building
1007 Orange Street
Wilmington, DE  19801
Tel:  (302) 573-6277
Fax: (302) 573-6220

The Honorable Alberto R. Gonzales
United States Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Tel:  (202) 514-2001
Fax: (202) 517-4507

_____
Attorney for Plaintiff
(Col I.D. 2793)