## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOMERSET PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 07-279 (GMS) |
| | ) | |
| v. | ) | |
| | ) | |
| JON W. DUDAS, in his official capacity | ) | |
| as Under Secretary of Commerce for | ) | |
| Intellectual Property and Director of the | ) | |
| United States Patent and Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

David E. Wilks
Del. Bar I.D. 2793
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel. 302.778.7560
Fax 302.778.7575

John M. Faust
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
Tel. 202.639.6500
Fax 202.639.6604

Attorneys for Plaintiff
Somerset Pharmaceuticals, Inc.

Dated: July 19, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.     NATURE AND STAGE OF THE PROCEEDINGS ..............................................2

II.    FACTUAL BACKGROUND AND SUMMARY OF THE ARGUMENT ............4

III.   ARGUMENT .......................................................................................................7

       A.     Legal Standard and Nature of Relief Sought ..............................................7

       B.     Somerset Has Strong Arguments On The Merits That It Is Entitled
              To Patent Term Extension Under 35 U.S.C. § 156 And That The
              PTO Erred By Concluding Otherwise. ......................................................11

       C.     Somerset Will Be Irreparably Harmed If Its Patent Is Permitted To
              Expire Without Judicial Review Of The PTO's July 12 Decision. ...........16

       D.     The PTO Will Suffer No Harm From Provisionally Extending The
              '579 Patent. ..............................................................................................17

       E.     Somerset's Motion Is In The Public Interest. ...........................................18

IV.    CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.,*
106 F. Supp. 2d 627 (D. N.J. 2000) ............................................................... 20

*Acierno v. New Castle County,*
40 F.3d 645 (3d Cir. 1994) ...................................................................... 10

*Allegheny Energy, Inc. v. DQE, Inc.,*
171 F.3d 153 (3d Cir. 1999) ...................................................................... 8

*Constructors Ass'n of W. Pa. v. Kreps,*
573 F.2d 811 (3d Cir. 1978) ...................................................................... 8

*Fisons PLC v. Quigg,*
876 F.2d 99 (Fed. Cir. 1989) ............................................................. 14, 15

*Glaxo Operations UK Ltd. V. Quigg,*
894 F.2d 392 (Fed. Cir. 1990) .......................................................... passim

*Golden State Bottling Co. v. National Labor Rel'ns Bd.,*
414 U.S. 168 (1973)..................................................................................... 10

*In re Microsoft Corp. Antitrust Litig.,*
333 F.3d 517 (4th Cir. 2003) ................................................................... 11

*In re Reckitt & Colman Prods., Ltd.,*
230 U.S.P.Q. (BNA) 369, 1986 WL 83591 (Comm'r Pat. & Trademarks)
(Mar. 17, 1986) ....................................................................................... 17

*Merck & Co., Inc. v. Kessler,*
80 F.3d 1543 (Fed. Cir. 1996) ................................................................. 14

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
290 F.3d 578 (3d Cir. 2002) ...................................................................... 17

*Pfizer Inc. v. Dr. Reddy's Labs, Ltd.*
359 F.3d 1361 (Fed. Cir. 2004) ............................................................... 14

*Salt Pond Assocs. v. United States Army Corps of Eng'rs,*
815 F. Supp 766 (D. Del. 1993).................................................................. 9

*Smith Int'l, Inc. v. Hughes Tool Co.,*
718 F.2d 1573 (Fed. Cir. 1983). .............................................................. 20

*Sovereign Order of Saint John of Jerusalem-Knights of Malta v. Messineo,*
572 F. Supp. 983 (E.D. Pa. 1983)............................................................. 10

*State of Delaware v. Bender,*
370 F. Supp 1193 (D. Del. 1974)................................................................ 9

*Tootsie Roll Indus., Inc. v. Sathers, Inc.,*
666 F. Supp. 655 (D. Del. 1987)................................................................. 7

*Tustin v. Heckler*,
   591 F. Supp. 1049 (D.N.J. 1984),
   *vacated in part on other grounds*, 749 F.2d 1055 (3d. Cir. 1984) ................................. 10

*United States v. Alton*,
   60 F.3d 1065 (3rd Cir. 1995) ...................................................................................... 12

## Rules and Statutes

21 U.S.C. § 355(j)(5)(F)(iii). .......................................................................................... 19

21 U.S.C. § 841(b)(1)(B) ................................................................................................ 12

35 U.S.C. § 156 ....................................................................................................... passim

35 U.S.C. § 156(a)(4) ..................................................................................................... 15

35 U.S.C. § 156(a)(5)(A) ................................................................................................ 11

35 U.S.C. § 156(d)(1) ....................................................................................................... 4

35 U.S.C. § 156(d)(2)(A) .................................................................................................. 5

35 U.S.C. § 156(e)(2) .................................................................................................... 1, 5

35 U.S.C. § 156(f)(2) ..................................................................................... 7, 11, 13, 14

35 U.S.C. § 156(g)(6)(A) .................................................................................................. 4

37 C.F.R. § 1.760 ............................................................................................................. 6

5 U.S.C. § 705 ......................................................................................................... 1, 8, 20

5 U.S.C. § 706(2)(A) ........................................................................................................ 3

Fed. R. Civ. P. 65 ............................................................................................................. 1

## Other Authorities

H.R. Rep. No. 98-857 (1984), Part I, at 15, *reprinted in* 1984 U.S.C.C.A.N. at 2648 ..... 18

## INTRODUCTION

Plaintiff Somerset Pharmaceuticals, Inc. ("Somerset") submits this brief in support of its accompanying Motion for Temporary Restraining Order and Preliminary Injunction, pursuant to FED. R. CIV. P. 65. Somerset is the owner of a patent, "the '579 Patent," *which will expire in four weeks* – to Somerset's lasting and potentially irrevocable detriment – unless this Court acts now to provisionally extend the patent pending judicial review of the PTO decision at issue in this case.

This matter first came before the Court when the '579 Patent had almost three months of patent life left, as a motion for preliminary injunction. The Court issued an Order denying Somerset's motion for preliminary injunction compelling the Director of the United States Patent and Trademark Office (the "***Director***" and the "***PTO***") to grant Somerset's application for a one-year interim extension of the '579 Patent. While Somerset has appealed that issue on an expedited basis, the relief Somerset is seeking in the present motion is distinct and separate from the relief Somerset is seeking on appeal.

Here, Somerset respectfully requests that the Court exercise its equitable power and legal authority under 5 U.S.C. § 705 to "*to preserve status or rights pending conclusion of the review proceedings*" (emphasis added) by ordering the PTO to take such actions as are necessary to extend the term of the '579 Patent pending judicial review in this Court and, if necessary, on further appeal, of the PTO's decision denying Somerset's request for a five-year extension of the '579 Patent under the Hatch-Waxman Act. In contrast, Somerset is requesting the appellate court to compel the PTO to grant Somerset's application for a one-year interim extension under 35 U.S.C. § 156(e)(2) in accordance with the PTO's precedents and statutory obligations.

I.    **NATURE AND STAGE OF THE PROCEEDINGS**

This matter was before the Court previously on a motion for preliminary injunction filed on May 22, 2007, in which Somerset sought an order compelling the PTO to decide a pending matter and more, to decide that matter in a particular way, namely, to grant Somerset's then-pending application for interim extension of the '579 Patent. In its response filed June 11, 2007, the PTO argued that no such relief was necessary because its decision was imminent and that the PTO has a right to make its own decisions in the first instance. The Court denied Somerset's motion by Order entered June 29, 2007.

In a decision issued on July 12, 2007, the PTO finally did decide, denying Somerset's request for a five-year patent term extension of the '579 Patent (the "*PTE Application*"). In addition, the PTO denied Somerset's request for a one-year interim extension (the "*Interim Application*"), which Somerset had filed based on its concern that the '579 Patent might expire before the PTO issued a final decision on the PTE Application and before Somerset could seek judicial review of an adverse decision on the requested extension. This "*July 12 Decision*" (copy attached as Exhibit 1) obviously disposes of Somerset's effort to compel the PTO to issue a decision on the Interim Application. It remains our position, however, that the PTO should have been compelled to *grant* the Interim Application and Somerset is currently appealing that issue on an expedited basis, with briefing scheduled to conclude in the United States Court of Appeals for the Federal Circuit ("*Federal Circuit*") on July 27, 2007.[1]

---

[1]    On July 11, 2007, Somerset filed a Motion to Expedite Briefing For a Decision on Appeal, Before Patent Expiration Date of August 18, 2007. This Motion was granted by the Federal Circuit the next day, on July 12, 2007.

Meanwhile, in this Court, Somerset has now moved for leave to amend its original complaint to seek judicial review of that portion of the PTO's July 12 Decision which denies Somerset's PTE Application and in particular to set that decision aside as arbitrary, capricious and contrary to law. *See* 5 U.S.C. § 706(2)(A). Somerset was required to file that motion under FRCP 15(a), since the Defendant refused to consent to an amendment without first seeking the Court's involvement. The PTO does agree, however, that Somerset has a right to judicial review. [Doc. 14, at 12] The problem is that the PTO's substantial delay in making a final decision has left an insufficient amount of patent life remaining to permit such review. The '579 Patent expires in just over one month, leaving the parties very little time to brief and argue a complex issue and this Court very little time to decide it, even on an expedited schedule.

The only way to assure that Somerset can actually exercise its acknowledged right to judicial review is to preserve its rights in the '579 Patent until this Court can adjudicate the merits of this matter (and, if necessary, for the matter to be reviewed further at the appellate level). Somerset is likely to succeed on the merits, and the relief sought would avert the irreparable harm (which has not been disputed) of Somerset losing its patent without judicial review of its statutory entitlement to term extension. Provisional extension of the patent would harm no one because Somerset has non-patent related marketing exclusivity for its primary drug product, EMSAM®, until early 2009. If Somerset is able to secure this limited and provisional relief pending judicial review, it will withdraw its appeal to the Federal Circuit.

## II.    FACTUAL BACKGROUND AND SUMMARY OF THE ARGUMENT[2]

1.    Somerset spent over 11 years of the patent life of its '579 Patent pursuing Food and Drug Administration ("*FDA*") approval of the drug product covered by that patent, a skin patch called EMSAM® that continuously administers an antidepressant drug called Selegiline. [Doc. 5; Doc. 5, at Exh. 2, Exh. 9:¶ 6]  EMSAM® is Somerset's principal product, generating most of the company's revenue.  [Doc. 5, at Exh. 9:¶ 7]  In 2006, EMSAM® generated net revenues of $24 million, and Somerset currently projects that it will generate annual net revenues of approximately $20 million for 2007–2009. [*Id.* at ¶ 7-8]

2.    In April 2006, after the FDA approved EMSAM® in February 2006, Somerset filed a timely application with the PTO under the Hatch-Waxman Act, 35 U.S.C. § 156, seeking to extend the '579 Patent for the statutory maximum period of five years, to recover some of the patent life lost during the lengthy FDA review period.[3] (We refer to that application as the "*PTE Application*").  [Doc. 5, at Exh. 2]  Without extension, the '579 will expire in just four weeks, on August 18, 2007.

3.    The PTO was required by statute to advise the FDA of the filing of Somerset's PTE Application within 60 days so the FDA could provide the PTO with

---

[2]    Because the facts and statutory context of this dispute were treated at length in the parties' briefing on Somerset's earlier motion [Doc. 5, 14, 15], it is rehearsed here only briefly, with emphasis on developments since the Court ruled on June 29, 2007.  No material facts are in dispute.

[3]    Under 35 U.S.C. § 156(d)(1), an application for patent term extension may only be submitted after a drug product has received regulatory approval by the FDA. Such an application must be filed within sixty days after FDA approval.  EMSAM® was not approved by the FDA until February 27, 2006, and Somerset timely filed the PTE Application within sixty days of FDA approval.  Section § 156(g)(6)(A) sets forth that the extension of patent term may not exceed five years.

information necessary for the PTO to determine how long to extend the patent. *See* 35 U.S.C. § 156(d)(2)(A). Instead, the PTO waited *eight months* to contact the FDA, from April to December, 2006. [Doc. 5, at Exh. 3] Then the PTO waited almost *seven months more* to issue its July 12 Decision denying Somerset's PTE Application.

4.    In addition to failing to meet that statutory deadline set forth by 35 U.S.C. § 156(d)(2)(A), the PTO also failed to diligently pursue the input it asserted it needed from the FDA before it could make its final decision on Somerset's PTE Application. [Doc. 14, at 3, 6] Subsequent to the PTO's initial communication requesting input from the FDA on December 22, 2006, the only inquiry regarding this request was by a PTO representative not handling Somerset's PTE Application in March 2007, in the context of contacting the FDA "about several pending requests" for FDA input. [*See* Doc 14, at Exh. 4, ¶ 3,4] The PTO representative handling Somerset's PTE Application did not solicit further FDA input until *after* the filing of the present lawsuit, despite expressing in numerous communications to Somerset's counsel regarding the status of the PTE Application *before* the filing of the lawsuit that the PTO was awaiting input from the FDA before it could make its final decision . [*See* Doc 14, at Exh. 2, ¶¶ 3, 6-8; ¶9 (email and telephone communications to the FDA on May 23, 2007, May 24, 2007, and June 4, 2007)] Within two months of the PTO starting these post-litigation communications with the FDA, the FDA sent the requested input to the PTO, on July 12, 2007.

5.    The July 12 Decision also denied Somerset's application for an interim extension (the "***Interim Application***"). Interim extensions are available in one-year increments under 35 U.S.C. § 156(e)(2) in situations where it is possible that the PTO

will not decide an underlying patent term extension application before the patent at issue expires or, as PTO precedent holds, where there is insufficient time before expiration to review the PTO decision administratively and/or judicially. By regulation, the deadline for filing an interim extension request is three months before the patent expires, 37 C.F.R. § 1.760, and in practice, the PTO has decided such requests in much less time. Somerset submitted its Interim Application in February 2007, nearly *six* months before the '579 Patent was due to expire. The PTO took nearly *five* months to decide, two months longer than its own three-month deadline would suggest it should have taken, and one month after it assured this Court that a decision was imminent.

      6.    The PTO has acknowledged that Somerset is entitled to judicial review of its administrative decisions. [Doc. 14, at 12][4] *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). The PTO also advised the Court that the prospect of judicial review before the '579 Patent expires on August 18, 2007 was "doubtful" even as of June 11, when the PTO was opposing Somerset's earlier motion for preliminary injunction. [*Id.* at 14-15] That prospect was "doubtful" because of the PTO's substantial delay in deciding matters put properly before it and the situation has only grown worse given the agency's election to wait until July 12 to issue its decision, leaving now only four weeks for Somerset to attempt to vindicate its statutory rights in this Court.

---

[4]    The PTO stated: "Under 28 U.S.C. § 1361, such decision is to be made by the government agency in the first instance. After that decision issues, Plaintiff may properly appeal the merits of the decision to a court under the Administrative Procedures Act."

7.    The PTO's delay threatens to make a practical nullity Somerset's acknowledged right to judicial review, as a reversal of the agency's July 12 Decision after August 18 will arrive too late to save this patent.  This patent must be extended long enough for this Court to pass on the propriety of the PTO's decision not to extend the patent.  Somerset has a powerful case for preliminary relief of this nature under Rule 65. It has a strong position that when 35 U.S.C. § 156(f)(2) is properly construed and applied in view of the facts of this case, as well as controlling precedent, Selegiline base is in fact an "active ingredient" for which there has not been prior commercial marketing or use, and thus the '579 patent is not only eligible for, but entitled to term extension.  Somerset faces a concededly irreparable harm in the expiration of its patent, and the relatively brief reprieve from patent term expiration that Somerset requests will not harm the PTO or have any negative impact on the rights of third parties or the public.

## III.    ARGUMENT

### A.    Legal Standard and Nature of Relief Sought

Given the exigencies of the situation, which make it inadvisable to await full briefing and argument on even a motion for preliminary injunction, Somerset casts this motion as seeking a temporary retraining order as well as a preliminary injunction.  *See Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987) ("The function of the temporary restraining order is to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction.").[5]

---

[5]    Unlike a preliminary injunction, moreover, a temporary restraining order can be issued without notice to the adverse party.  FED. R. CIV. P. 65(b).  However, Somerset has given notice to the PTO and the United States Attorney of its intent to file this motion, and a copy is being served on those parties by email as well as regular mail.

The standards for the two very similar forms of relief are much the same. *Id.* In weighing Somerset's request for provisional relief, the Court must balance four factors, *i.e.,* whether: (1) Somerset has shown a reasonable probability of success on the merits; (2) Somerset would be irreparably injured by the denial of the relief; (3) the potential harm Somerset would sustain if the injunction is not granted outweighs the harm to the nonmoving party should the injunction be granted; and (4) granting the preliminary relief would be in the public interest. *See Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999). The factors are to be balanced, such that a particularly strong showing on one element can overcome a lesser showing on others. *See Constructors Ass'n of W. Pa. v. Kreps,* 573 F.2d 811, 815 (3d Cir. 1978) (Rule 65 requires a "delicate balancing of all elements," such that, "in a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party," an injunction may be granted even on a lesser showing of likelihood of success on the merits).

Somerset's request for provisional relief is typical of such requests in that it seeks simply to preserve its rights, in this case, to preserve the '579 Patent in its current unexpired state pending judicial review of the PTO's decision to deny Somerset's PTE Application for a five-year extension under the Hatch-Waxman Act.[4] The path to that relief is clear. Section 705 of the APA empowers courts reviewing agency action to "issue all necessary and appropriate process to postpone the effective date of an agency action **or** *to preserve status or rights pending conclusion of the review proceedings.*" 5 U.S.C. § 705 (emphasis added). Additionally, the equitable power of the Court provides further support for Somerset's requested relief. *State of Delaware v. Bender,*

-8-

370 F. Supp 1193, 1196 (D. Del. 1974) (finding that general principles of equity and 5 U.S.C. § 705 authorized preliminary injunctive relief). Entitlement to relief turns on the outcome of the traditional four-factor test described above. *See id.* at 1196.

Additionally, under Rule 705, Courts are empowered to order an agency to take affirmative steps to preserve status or rights pending full judicial review. For example, in *State of Delaware v. Bender*, 370 F. Supp. 1193, 1205 (D. Del. 1974), this Court issued a preliminary injunction preventing the relevant agency from recognizing the validity of a permit and *directing the agency to take any and all steps to prevent the performance of the work authorized by the permit*. Admittedly, there are limits to this authority, as acknowledged in *Salt Pond Assocs. v. United States Army Corps of Eng'rs*, 815 F. Supp 766 (D. Del. 1993), where this Court expressed doubt about its ability under that provision to dictate actual terms or conditions to the agency and grant a "preliminary" injunction compelling the Army Corps of Engineers to issue the very environmental permit that the plaintiff sought as ultimate relief in the case. *See Salt Pond*, 815 F. Supp. at 775-776 (declining to "disrupt the status quo and dictate specific agency action" where such relief would "essentially" grant ultimate relief in the case before adjudication of the merits).

But Somerset is not seeking a preliminary injunction requiring the PTO to grant its PTE Application. In that event, like the plaintiff in *Salt Pond*, Somerset would be seeking ultimate relief in a preliminary guise. That is not the situation presented here: Somerset seeks only to preserve its patent rights through provisional extension of its patent, pending full judicial review. And unlike the permit requested in *Salt Pond*, those provisional patent rights can be taken away immediately if Somerset does not prevail on

the merits here or on appeal. Furthermore, unlike in *Salt Pond*, if the provisional relief herein requested is *not* granted, it is unclear whether the rights can *ever* be recovered by Somerset, as explained in the prior briefing, and *infra*.

In any event, from the standpoint of Rule 65, there is no particular impediment to so-called "mandatory" or "affirmative" injunctive relief if the Court were to conclude that such relief is necessary here. *See Golden State Bottling Co. v. National Labor Rel'ns Bd.*, 414 U.S. 168, 178 n.4 (1973) (noting that the Court had "previously found Rule 65(d) applicable to mandatory injunctions and [had] noted that the courts of appeals have applied it not only to prohibitory injunctions but to enforcement orders and affirmative decrees as well") (citation and internal quotes omitted). As courts in this Circuit have recognized, the distinction between "mandatory" and "prohibitive" relief is a slippery and largely semantic one, as sometimes "the condition of rest is exactly what will inflict the irreparable injury" to the status quo that preliminary relief is meant to forestall. *Tustin v. Heckler*, 591 F. Supp. 1049, 1055 (D.N.J. 1984), *vacated in part on other grounds*, 749 F.2d 1055 (3d. Cir. 1984).

The same four-part balancing test is used regardless of how the relief is characterized. *Id.* The difference is that courts considering a mandatory injunction sometimes require a stronger overall showing from the movant on the necessity for relief. *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994). Movants are required to show that the "exigencies of the situation demand such relief and the facts and the law are clearly in [their] favor." *Sovereign Order of Saint John of Jerusalem-Knights of Malta v. Messineo*, 572 F. Supp. 983, 988-89 (E.D. Pa. 1983) (citing *Wetzel v. Edwards*, 635 F.2d 283 (4th Cir. 1980)). Put another way, "a mandatory preliminary

injunction must be necessary both to protect against irreparable harm *in a deteriorating circumstance created by the defendant* and *to preserve the court's ability to enter ultimate relief on the merits of the same kind.*" *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 526 (4th Cir. 2003) (citing *Wetzel*, 635 F.2d at 286)) (emphasis added).

Both of those conditions are satisfied here. The PTO's delay has brought Somerset to the brink of patent expiration and along with it a practical nullification of this Court's opportunity and responsibility to provide judicial review and enter appropriate ultimate relief. It remains only to balance the four factors under Rule 65, which both singly and collectively establish Somerset's right to the preliminary relief it seeks.

**B.    Somerset Has Strong Arguments On The Merits That It Is Entitled To Patent Term Extension Under 35 U.S.C. § 156 And That The PTO Erred By Concluding Otherwise.**

35 U.S.C. § 156 provides that the term of a patent which claims a product or a method of using a product that is subject to pre-marketing regulatory approval by the FDA shall be extended from the original expiration date of the patent to compensate the patent holder for patent life lost while going through the time-consuming regulatory approval process. The issue in this lawsuit centers on the meaning of the terms "product" and "active ingredient," as those terms are used in 35 U.S.C. § 156(f)(2), and whether the single active ingredient of the drug product EMSAM®, recognized by the FDA as Selegiline base, is the first permitted commercial marketing or use of this single active ingredient, as required for term extension under 35 U.S.C. § 156(a)(5)(A).

The PTO cannot dispute that a pharmaceutical containing Selegiline base has not been previously approved for commercial marketing and use by the FDA, although the FDA has previously approved pharmaceuticals containing Selegiline Hydrochloride ("Selegiline HCl"). Thus, the nub of the present dispute is whether prior FDA approval

-11-

of a pharmaceutical containing Selegiline HCl is, in effect, approval of a pharmaceutical with the same "active ingredient" as one containing Selegiline base.

The distinction between Selegiline base and Selegiline HCl is analogous to the difference between crack cocaine (cocaine base) and cocaine hydrochloride (cocaine salt). The base form of cocaine (*i.e.*, "crack" cocaine) is amenable to inhalation (smoking) because of its physical characteristics, and has significantly different chemical and pharmacokinetic properties than cocaine hydrochloride, which is generally abused by snorting in powder form because of its physical properties. These physical and pharmacokinetic differences have resulted in the two compounds having vastly different impacts on society and therefore they are managed markedly differently under criminal statutes.[6] Selegiline base and Selegiline HCl are equally distinct, each having unique pharmacokinetic characteristics. They are not substitutable from a regulatory standpoint and are properly treated as different active ingredients under 35 U.S.C. § 156.

Somerset has compelling arguments for why, when section 156(f)(2) is properly construed and applied, Selegiline base is in fact a unique "active ingredient" distinct from Selegiline HCl, and thus, a "product" containing Selegiline base has not been subject to prior commercial marketing or use, even though pharmaceuticals containing Selegiline HCl were previously approved. Accordingly, the '579 Patent is not only eligible for, but

---

[6]     Mandatory sentencing guidelines provide equivalent prison terms for possession of amounts of crack cocaine that are one hundred times **less** than cocaine HCl (powder). *See United States v. Alton*, 60 F.3d 1065, 1067 (3rd Cir. 1995) ("21 U.S.C. § 841(b)(1)(A) establishes a mandatory ten-year term of imprisonment for offenses involving 5 kilograms of cocaine [cocaine hydrochloride powder] or 50 grams of cocaine base ["crack" cocaine]. And 21 U.S.C. § 841(b)(1)(B) provides for a mandatory five-year term of imprisonment for offenses involving 500 grams of cocaine or 5 grams of cocaine base.").

is entitled to, term extension under 35 U.S.C. § 156.  For its part, the PTO takes the opposite position: that Selegiline base and Selegiline HCl are the same "active ingredient," and thus the same "product" under 35 U.S.C. § 156(f)(2).  The PTO argues "'product' means the molecule or ion excluding those appended portions of the molecule that cause the drug to be an ester or salt responsible for the physiological or pharmacological action of the drug substance."  July 12 Decision, at 4.  In other words, the PTO contends that "active ingredient" under 35 U.S.C. § 156(f)(2) means the chemical entity, also known as the "active moiety," of the drug product, independent of whether or not it is in the form of a base, salt, ester, or other form.  As indicated by the July 12 Decision, this is a potentially vast group of compounds.[7]  *See Id.* at 3.  The PTO's position is clearly wrong for numerous reasons.

To begin, the PTO's construction runs directly afoul of controlling precedent specifically construing the meaning of "product" and "active ingredient" under 35 U.S.C. § 156(f)(2), and specifically rejecting the construction of "active ingredient" that the PTO now advances.  In *Glaxo Operations UK Ltd. V. Quigg*, 894 F.2d 392 (Fed. Cir. 1990) ("***Glaxo***"), the Federal Circuit squarely rejected the PTO's argument (then and now).  In a carefully reasoned opinion on the statutory language of 35 U.S.C. § 156, the Federal Circuit held that "active ingredient" does not equal "active moiety" (i.e., new chemical entity).  *Id.* at 397 ("The Commissioner argues that . . . 'product' was to mean 'new chemical entities' as defined by FDA.  We are unpersuaded . . ." (footnote

---

[7]        Specifically, the July 12 Decision states: "The term 'active ingredient' thus includes: (i) non-salified forms of a molecule; (ii) non-esterified forms of a molecule; (iii) salts of a molecule; and (iv) esters of a molecule."  Each one of these subgroups could have numerous members.

omitted)).    In so holding, the Federal Circuit focused on the fact that 35 U.S.C. § 156(f)(2) was narrowly crafted to exclude a broad range of compounds, consistent with Somerset's position. *Id.* at 396 ("Moreover, Congress clearly had articulated policy reasons for making more types of patents eligible for extension"). This holding in *Glaxo* remains good law, is clearly the most relevant precedent, and dictates that the PTO's decision denying term extension for the '579 patent is wrong.

Second, the PTO's denial of Somerset's PTE Application relies upon less than helpful precedent: *Pfizer Inc. v. Dr. Reddy's Labs, Ltd.* 359 F.3d 1361, 1366 (Fed. Cir. 2004) ("*Pfizer*"), and *Fisons PLC v. Quigg,* 876 F.2d 99 (Fed. Cir. 1989) ("*Fisons*"). The PTO cites *Pfizer* in support of its position that "active ingredient" means "active moiety." *Pfizer* is not the most appropriate precedent upon which to rely in this case, however, because it addresses enforcement actions (as opposed to entitlement determinations at issue in this matter) under 35 U.S.C. § 156.  In addition, it is only a panel decision, and thus cannot overrule *Glaxo*.  Therefore, *Pfizer* is not the binding precedent for determining the eligibility of a patent for term extension under 35 U.S.C. § 156, *Glaxo* is.  Further, *Pfizer* is rendered more questionable in that it is inconsistent not only with the holding of the more relevant *Glaxo* case (which *Pfizer* fails to even mention), but also with the holding of another earlier Federal Circuit opinion, *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996), as pointed out by Judge Mayer in his dissent.

The PTO also points to the equally unhelpful *Fisons* for support.  *Fisons* addressed the issue of whether patents covering products for the *exact same compound* (*i.e., exact same active ingredient* even under Somerset's construction), but for different

therapeutic indications or in different dosage forms, could be extended under 35 U.S.C. § 156. *Id.* Specifically, *Fisons*, held that multiple patents covering products that all contained the active ingredient cromolyn sodium could not be extended under section 156, because products containing that exact same cromolyn sodium had been previously approved, and such an outcome would clearly be in conflict with the plain reading of section 156. *Id.* at 102. Those facts are not present here, where a pharmaceutical containing Selegiline in its base form has not previously been approved. Indeed, Somerset's position is consistent with *Fisons*, and Somerset does not take issue with its holding.

Third, the PTO's construction (that "active ingredient" means all forms of a molecule, *i.e.*, active moiety) does not make sense if applied consistently throughout section 156 while, in contrast, the statutory construction proposed by Somerset (that "product" is the single, specific "active ingredient" of a new drug actually present in the drug product) is absolutely consistent. For example, subsection 156(a)(4) requires that the same "product" be "subject to a regulatory review period before its commercial marketing or use." A construction of "active ingredient" as including a potentially enormous class of compounds related to the active ingredient — as advanced by the PTO — does not make sense under a plain reading of subsection 156(a)(4), since only the single molecule actually present in the product was subject to regulatory review, not a class of compounds related to the active ingredient. Such a nonsensical result is a strong indication that the PTO's construction is incorrect.

Finally, the PTO's construction is at odds with the legislative history and legislative intent behind the statute. As the Federal Circuit noted in *Glaxo*, "we simply

cannot find any clear statement that extensions are required based on first approval of 'new chemical entities.' In fact, if that were Congress' intent, one would expect it to use the same term – 'new chemical entity' – in the bill as is used in the House Report." 894 F.2d at 398. The Federal Circuit went on to say that "Congress specifically selected terms with narrow meanings that it chose from among many alternatives. [FN10: For example: 'new molecular entity,' 'active moiety.' Or 'new chemical entity.'] Congress could have, but did not, select broad terms with a range of possible meanings." *Id.* at 399. Again, the PTO's position rejected in *Glaxo* was the very position the PTO takes now in the July 12 Decision. And once again, it should be rejected.

### C. Somerset Will Be Irreparably Harmed If Its Patent Is Permitted To Expire Without Judicial Review Of The PTO's July 12 Decision.

The irreparable harm in this case stems from the undisputed fact that it is an open legal question whether a patent can ever be revived once it has expired, even if a court were later to determine that the PTO was *flat wrong* in refusing to extend it.[8] Indeed, the PTO itself has acknowledged the legal uncertainty over this question in the *In re Reckitt* case, and even cited it there as a basis for granting an interim extension of the patent at issue:

> There is some possibility that the PTO could hold Reckitt's request for reconsideration in abeyance pending a final decision on any appeal which might be taken. If the PTO were to do so, it might have to resolve the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires. *This is an issue which need not be addressed, however, if an interim extension is granted under 35 U.S.C. §156(e)(2).*

---

[8] Although Somerset will argue strenuously to revive its patent if the PTO's long period of inaction causes it to expire prematurely, the PTO itself has acknowledged the risk that it might not be possible to do so.

*In re Reckitt & Colman Prods., Ltd.*, 230 U.S.P.Q. (BNA) 369, 371, 1986 WL 83591 (Comm'r Pat. & Trademarks) (Mar. 17, 1986) (emphasis added).

Even assuming that the '579 Patent could be revived, Somerset would be forced to defend the patent against potential infringers and could be harmed if an infringer gains intervening rights while the patent is expired. Given EMSAM®'s status as Somerset's highest revenue-generating product, the result of even such a temporary loss could threaten Somerset's viability.[9] Thus, the harm to Somerset if the patent were allowed to expire would be severe and irreparable.[10]

### D. The PTO Will Suffer No Harm From Provisionally Extending The '579 Patent.

There would be no conceivable harm to the PTO if it were required to prevent the expiration of the '579 Patent. Even if there were any such harm, the balance of hardships would overwhelmingly favor the grant of injunctive relief to Somerset because of the substantial harm that it will suffer it the patent expires without judicial review.

---

[9]    *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595–96 (3d Cir. 2002) (defining irreparable harm as "potential harm which cannot be redressed by a legal or an equitable remedy following trial," including loss of sales and market share to a competitor).

[10]    As the Court may recall from the prior briefing, the PTO has brought up two other Somerset patents that cover EMSAM®, positing that Somerset is sufficiently protected by these patents so that the irreparable harm associated with premature expiration of the '579 Patent (the only patent at issue in this case) can be excused. But, the '579 Patent is considerably more valuable to Somerset than the other two patents because it broadly covers topical compositions for the transdermal administration of Selegiline as the "sole therapeutically active agent." In contrast, the other listed patents are narrower in scope than the '579 Patent because they are directed to specific transdermal formulations. In the world of innovator and generic competition, the broad patent is significantly more valuable to Somerset because, while a competitor may be able to design a generic transdermal Selegiline product that does not infringe the narrower formulation patents, it will not be able to design a generic transdermal Selegiline product that does not infringe the '579 Patent.

### E.    Somerset's Motion Is In The Public Interest.

In the abstract, the PTO or a court might reasonably worry that an injunction provisionally extending the term of a patent – even temporarily, as here – could disadvantage the public by delaying the passage of knowledge into the public domain for public use. In cases involving drug products, however, Congress has determined that the public will benefit through the extension of patent term for certain patents, rather than be harmed by such extensions. Thus, in the Hatch-Waxman Act, Congress made the public policy judgment that the public interest in fostering innovation and drug development supports extending patent protection for this class of patents in light of the unique challenges of creating and commercializing drug products.

Specifically, the Act provides for extending patents that cover drug products (and only drug products) because they must undergo an FDA regulatory review process that consumes much of the patent life they would otherwise have, meaning that, for much of the drug's patent life, the patentee lacks the regulatory approval to sell the product and make good on its patent-law right to exclude others. Other patented commercial products do not face this tremendous hurdle to come to market, which is why there is no mechanism for extending such patents.

The Hatch-Waxman Act acknowledges this distinction, reciting the explicit purpose to "create a new incentive for increased expenditures for research and development of [ ] products which are subject to premarket government approval." H.R. Rep. No. 98-857, Part I, at 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 2648. Thus, Congress intended to "encourage new drug research by restoring some of the patent term lost while drug products undergo testing and await FDA pre-market approval" when it passed the Act. *Glaxo* at 396. Moreover, even where this patent term extension

-18-

mechanism is available, its impact is limited: The five-year maximum term for an extension under the Act limits the potential return of patent life lost during FDA review, which in this case was 11 years.

Another reason why the public will not be disserved by an injunction compelling a provisional extension is that Somerset is entitled to non-patent related marketing exclusivity under *another* statute until February 27, 2009. *See* 21 U.S.C. § 355(j)(5)(F)(iii). This ensures that there will be no practical harm to the public from the temporary continuation of the '579 Patent's term pending judicial review because statutory market exclusivity, like the patent, effectively prevents any generic competition from entering the market. Thus, the public and generic competitors are in the same condition irrespective of a provisional extension of the '579 Patent until at least early 2009. The only impact that a provisional extension will have is preserving the '579 Patent long enough for Somerset to obtain a full and final determination of its entitlement to patent term extension and, if that effort is successful, to enjoy patent protection until August 2012, three and a half years beyond the marketing exclusivity period.[11]

Even if there were no remaining marketing exclusivity period for EMSAM®, the public interest would be served because the public interest strongly favors protecting the rights secured by a valid patent. *See, e.g., Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d

---

[11]  Somerset's remaining market exclusivity does not affect the irreparability of the harm it faces from undue expiration of the '579 Patent in August 2007. Because of the marketing exclusivity, the impact of patent expiration in August would be focused on the three and one half year period from the expiration of the exclusivity period in February 2009 to the requested extension of the '579 Patent in August 2012. The trigger for this harm, however, is imminent (expiration is only four weeks away) and the harm itself, beginning in 2009, is both inevitable and irreparable if either: (1) the patent cannot be reinstated; or (2) even if it can be revived, third parties successfully claim rights to use the patent during the time period in which it was lapsed.

1573, 1581 (Fed. Cir. 1983). Here, the PTO's prolonged delay in denying Somerset's PTE Application threatens to cancel Somerset's '579 Patent before a full and fair adjudication of its right to patent term extension. "Whatever interest exists in having more suppliers . . . put their products on the market is strongly outweighed by the public policy in favor of enforcing patent rights and encouraging inventors to develop new products." *A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.,* 106 F. Supp. 2d 627, 656 (D. N.J. 2000).

Finally, the public interest is served here through the appropriate use of limited judicial resources. With provisional relief in place, Somerset will be able to seek this Court's review of the PTO's July 12 Decision to deny the PTE Application in a considered and orderly manner, and if necessary to take an appeal. As admitted by the PTO, Somerset has a right to properly appeal the merits of decisions by the PTO to a court under the APA. The unavoidable alternative, as this case illustrates, is a rush to the courthouse and needless uncertainty over the fate of Somerset's patent.

## IV.    CONCLUSION

The four Rule 65 factors, both singly and in combination, favor the grant of injunctive relief pending judicial review. Accordingly, Somerset respectfully requests that the Court, pursuant to its equitable power and legal authority under 5 U.S.C. § 705, grant its motion for temporary restraining order and preliminary injunction and enter an order requiring the PTO to undertake such measures as are necessary to preserve the '579 Patent pending judicial review in this Court and, if necessary, on further appeal.

Respectfully submitted,

David E. Wilks
Del. Bar I.D. 2793
**Reed Smith LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel.  302.778.7560
Fax 302.778.7575

John M. Faust
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
Tel. 202.639.6500
Fax 202.639.6604

Counsel for Plaintiff
Somerset Pharmaceuticals, Inc.

July 19, 2007

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SOMERSET PHARMACEUTICALS, INC.,          )
                                          )
      Plaintiff,                          )          C.A. No.:  07-279 (GMS)
                                          )
      v.                                  )
                                          )
JON W. DUDAS, in his official capacity    )
      as Under Secretary of Commerce for   )
      Intellectual Property and Director of the )
      United States Patent and Trademark Office, )
                                          )
      Defendant.                          )
                                          )

## AMENDED COMPLAINT

### Introduction

Plaintiff brings this action under the Administrative Procedure Act to set aside, as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the July 12, 2007 decision of the United States Patent and Trademark Office ("PTO") denying extension of Plaintiff's drug product patent, U.S. Reissue Patent No. 34,579 ("the '579 Patent"), under the Hatch-Waxman Act, 35 U.S.C. § 156.  *See* 5 U.S.C. § 706(2)(A).[1]  Because Plaintiff's patent will expire on August 18, 2007 unless the Court intervenes, this Amended Complaint is accompanied by a Motion for Temporary Restraining Order and Preliminary Injunction requiring the PTO to undertake any and all measures necessary, as soon as possible and in all events prior to August 17, 2007, to extend the term of the '579 Patent until a final, non-appealable judgment

---

[1]    A true and correct copy of the '579 Patent was attached as Exhibit A to the original Complaint and is incorporated by reference here.

on Plaintiff's claim for judicial review of the PTO's July 12 Denial of Application for Extension
of Patent Term and Denial of Application for Interim Extension.

For its Amended Complaint in this matter, Plaintiff alleges as follows:

## Parties

1.    Plaintiff Somerset Pharmaceuticals, Inc. ("Somerset") is a pharmaceutical company
organized as a corporation under Delaware law.   Somerset's principal place of business is
located in Tampa, Florida 33607.

2.    Defendant Jon W. Dudas (the "Director") is Under Secretary of the United States
Department of Commerce and Director of the PTO.   The PTO is located at Madison Building
East, Room 10B20, 600 Dulany St., Alexandria, Virginia 22314.   The Director is sued in his
official capacity.

## Jurisdiction and Venue

3.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1361.

4.    Venue is proper in this district under 28 U.S.C. § 1391(e)(3) as the Plaintiff resides in
the District of Delaware for purposes of venue under this statute.

## Factual Allegations

### *The Product*

5.    Plaintiff's product, EMSAM® (Selegiline transdermal system), is a patch that is
applied to the skin, which is designed to continuously administer the active ingredient of the
product.   The sole active ingredient in EMSAM® is Selegiline.   EMSAM® is applied by a patient
once a day, and is prescribed as a treatment for major depressive disorder.   The continuous
administration of Selegiline with the patch offers several significant therapeutic advantages to
patients, including reducing the risk of potentially fatal hypertensive crises.

6.    Plaintiff is the owner and assignee of the entire interest in the '579 Patent.  The product EMSAM®, as well as a method of using EMSAM®, fall within the scope of certain claims of the '579 Patent.

7.    Currently, the term of the '579 Patent is set to expire on August 18, 2007.

### *Somerset's Application for Patent Term Extension*

8.    35 U.S.C. § 156 provides that the term of a patent which claims a product or a method of using a product that is the subject of a New Drug Application ("NDA") shall be extended from the original expiration date of the patent to reimburse the NDA Applicant for patent life lost while going through the time-consuming regulatory approval process administered by the Food and Drug Administration ("FDA").

9.    Plaintiff spent over 11 years of the patent life of the '579 Patent pursuing regulatory approval of EMSAM® by the FDA, leaving the '579 Patent with less than a year and a half of patent life upon approval of the NDA by the FDA on February 27, 2006.

10.    In addition to covering a product subject to pre-marketing regulatory review, the patent and the product must meet the other statutory requirements set forth in 35 U.S.C. § 156 in order to be eligible for extension of patent term.  In particular, the statute requires that the product be the first permitted commercial marketing or use of the single active ingredient present in the drug product, in this case Selegiline base.  To Plaintiff's knowledge, and as confirmed by a communication dated July 12, 2007 from the FDA to the PTO regarding the EMSAM® product, no product containing Selegiline base as an active ingredient has ever received FDA pre-marketing approval.

3

11.     On April 27, 2006, Plaintiff timely filed an Application for Extension of Patent Term under 35 U.S.C. § 156 ("PTE Application") for the '579 Patent, based on FDA approval of EMSAM® on February 27, 2006.

12.     Based on the 11 years Plaintiff spent obtaining regulatory approval of EMSAM®, Plaintiff requested extension of the term of the '579 Patent for 5 years, until August 18, 2012, which is the maximum extension of patent term allowable under 35 U.S.C. § 156.

13.     35 U.S.C. § 156(d)(2)(A) is a statutory mandate, requiring the PTO to provide notice and a copy of the PTE Application to the FDA, within 60 days of submission of the application to the PTO.  The PTO failed to comply with this deadline.

14.     Instead, on December 22, 2006, nearly eight months after Plaintiff filed its PTE Application, and nearly six months after the statutory mandate of 35 U.S.C. § 156(d)(2)(A) had passed, the PTO sent the PTE Application along with a communication to the FDA indicating the PTO's preliminary view that the "subject patent would NOT be eligible for extension of the patent term under 35 U.S.C. § 156." (emphasis in original).  Confirming the preliminary nature of its assessment, the PTO also emphasized that "this communication is NOT to be considered as notice which may be made in the future pursuant to 35 U.S.C. § 156(d)(2)(A)." (emphasis in original).

15.     The PTO's preliminary assessment stated that the PTO did not agree with Plaintiff that the '579 Patent met the requirements of 35 U.S.C. § 156.  Specifically, the PTO stated its preliminary view that "active ingredient" under §156(f)(2) of the statute encompasses all forms of the active ingredient, including its salt and ester forms.  Thus, the PTO reasoned, because the salt form of Selegiline, Selegiline hydrochloride, had been previously approved in therapeutic products subject to pre-marketing regulatory review, EMSAM® did not represent the "first

4

commercial marketing or use" for Selegiline base. In support of this position, the PTO relied upon its reading of the specific provision of the statute at issue, 35 U.S.C. § 156 (f)(2), and upon *Fisons PLC v. Quigg*, 876 F.2d 99 (Fed. Cir. 1989) and *Pfizer Inc., v. Dr. Reddy's Laboratories, Ltd.*, 359 F.3d 1361 (Fed. Cir. 2004) ("*Pfizer*").

16.     After the PTO's preliminary assessment was sent to the FDA, Plaintiff made repeated inquiries to the PTO, and Plaintiff's counsel met with PTO officials on February 2, 2007, in an attempt to obtain a final and favorable decision on the PTE application. At this interview with PTO representatives, and subsequently in a written interview summary to the PTO, Plaintiff explained that the PTO's preliminary position was inconsistent with the statute itself (including in view of other provisions of 35 U.S.C. § 156 and the legislative history), as well as with the most relevant precedent, *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392 (Fed. Cir. 1990) ("*Glaxo*"). Specifically, in *Glaxo*, the Federal Circuit held that the term "active ingredient" under 35 U.S.C. § 156(f)(2) does *not* mean all forms of the particular active ingredient subject to regulatory review. This decision is the most relevant Federal Circuit case law precedent specifically construing 35 U.S.C. § 156(f)(2), is binding precedent, and was completely ignored by the panel in *Pfizer*, which construed the term "active ingredient" in a different context.

17.     Despite the interview, additional explanation, and repeated inquiries, the PTO continued to refuse to provide Plaintiff specific information on the status of its PTE Application, other than to advise that the PTE Application was still pending and under consideration and that the PTO was awaiting input from the FDA. The PTO would not issue a final decision on the PTE Application until July 12, 2007, more than fourteen months after Somerset submitted its PTE Application, and with only five weeks to go before the '579 Patent is set to expire.

5

### *Somerset's Application for Interim Extension*

18.    35 U.S.C. § 156(e)(2) provides that the Director of the PTO shall extend the term of a patent for periods of up to one year, if the term of a patent for which an application has been submitted under 35 U.S.C. § 156 will expire before a certificate of extension is issued or denied. *See also* 37 C.F.R. § 1.760 (2006).

19.    On February 21, 2007, Plaintiff filed an Application for Interim Patent Term Extension Under 35 U.S.C. § 156(e)(2) ("Interim Application") with the PTO.    Plaintiff's Interim Application requested that the term of the '579 Patent be extended for a period of one year from the expiration date of the patent (from August 18, 2007, to August 18, 2008).    Plaintiff further requested that the interim extension continue even if the PTO issues a Final Determination that the '579 Patent is not eligible for extension under 35 U.S.C. § 156, until a final, non-appealable judicial decision on the eligibility of the '579 Patent for term extension is obtained, or until August 18, 2008, whichever is earlier.

20.    Consistent with the PTO's rules and prior practice, a grant of the requested interim extension would avoid any possible hiatus in patent protection for Plaintiff, and would place the public on notice regarding the extension of the term of the patent. *See In re Reckitt & Coleman Prods., Ltd.*, 230 U.S.P.Q. (BNA) 369, 372, 1986 WL 83591 (Com'r Pat. & Trademarks) (March 17, 1986).

21.    In *Reckitt*, the PTO granted an interim extension to a patent despite a Final Determination by the PTO that the patent was not eligible for extension. *Id.* at 372.    In that case, the applicant submitted an application for term extension of the patent at issue to the PTO under 35 U.S.C. § 156.    The PTO simultaneously denied the application and granted an interim extension of the patent for one year, or until 14 days after a judicial determination of the patent's eligibility for term extension was rendered by the appropriate appellate court (i.e., the U.S. Court

of Appeal for the Sixth Circuit), whichever was earlier. *Id.* The PTO noted that its decision to grant the interim extension avoided having to address "the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires." *Id.* at 371.

22.     The PTO further noted in *Reckitt* that the FDA-approved product covered by the patent had been granted three years of non-patent marketing exclusivity by the FDA, meaning that no generic competitors could enter the U.S. market regardless of whether or not the patent was in force for that period of time. *Id.* at 372. Thus, while the interim extension protected the patentee from patent term expiration pending judicial review of the PTO's decision on the underlying application for patent term extension, the product's remaining period of non-patent marketing exclusivity meant that the interim extension would have no practical impact on the public interest.

23.     Like the product at issue in *Reckitt*, EMSAM® has been granted three years of non-patent marketing exclusivity by the FDA, until February 27, 2009. Therefore, no generic competitors can enter the U.S. market until at least February 27, 2009, regardless of whether there is any patent protection available for EMSAM®. The sole purpose of Plaintiff's request to grant the interim extension was to keep the '579 Patent alive until the eligibility of the '579 Patent for term extension could be finally resolved, thus avoiding the question of whether the term of a patent can be extended *nunc pro tunc* after the patent expires.

24.     Plaintiff requested that the PTO decide whether to grant the interim extension within three months from the filing date of the Interim Application, or by May 21, 2007. 37 C.F.R. § 1.760 provides that an applicant should file an application for interim extension at least three months prior to the expiration of the patent, thus setting the regulatory time limit for the PTO to determine whether to grant the interim extension.

25.    The PTO continues to follow the precedent established in *Reckitt*, and recently has shown that it can act quickly in granting an applicant's request for interim extension. For example, on September 27, 2006, another applicant – Arkion Life Sciences, the holder of Patent No. 4,600,706 – filed an application for interim extension of a patent after the PTO had issued a Final Determination that the patent was not eligible for term extension under 35 U.S.C. § 156. Less than one month later, on October 20, 2006, the PTO responded by granting another one-year interim extension for the patent (which previously had been granted three one-year interim extensions). Somerset is aware of this prompt disposition because the PTO brought it up in discussions with Somerset as an example of the availability of interim relief.

26.    Nonetheless, for a period of more than three months after filing, the PTO refused to give Plaintiff any information on the status of Plaintiff's Interim Application, despite repeated inquiries by the Plaintiff, other than to advise that the Interim Application was still pending and under consideration. The PTO would not issue a final decision on the Interim Application until July 12, 2007, nearly five months after Somerset submitted the application, and with only five weeks to go before the '579 Patent is set to expire.

### *Somerset's Original Complaint and Motion for Preliminary Injunction*

27.    On May 22, 2007, more than three months after the request for interim extension was filed, and still lacking a decision from the PTO on either the Interim Application or the underlying PTE Application, Plaintiff filed its original Complaint and accompanying Motion for Preliminary Injunction, seeking relief in the nature of mandamus under 5 U.S.C. § 706(1) requiring the PTO to both rule upon and affirmatively grant the interim extension pending a final

determination by the PTO on the underlying PTE Application, and extending through any potential judicial review of that decision.

28.     On June 29, 2007, this Court denied the motion for preliminary injunction.  Plaintiff filed its Notice of Appeal to the Court of Appeals for the Federal Circuit ("CAFC") on July 2, 2007, and by order of the CAFC is now briefing the appeal on an expedited schedule to conclude with Somerset's reply brief on July 27, 2007.

### *The PTO's July 12 Decision*

29.     On July 12, 2007, shortly after receiving the Order from the CAFC granting Plaintiff's Motion to Expedite, Plaintiff received a Final Determination from the PTO, denying both the Interim Application ("Interim Extension Denial") and the underlying PTE Application ("PTE Denial").  In its decision, the PTO clearly states:  "THIS DECISION MAY BE VIEWED AS A FINAL AGENCY ACTION."   In its PTE Denial, the PTO maintained its position expressed in the preliminary communication that it sent to the FDA in December of 2006.  As to the Interim Extension Denial, despite statutory language and clear precedent to the contrary, the PTO took the position that it could not and would not grant interim extensions after a final decision denying the underlying application for patent term extension.

### COUNT I:  ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706

30.     Plaintiff incorporates the allegations in Paragraphs 1 through 29 as if fully set forth herein.

31.     The Director's July 12 Interim Extension Denial is "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law," and therefore may be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

32.     The Director's July 12 PTE Denial is "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law," and therefore may be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

33.     As a result of the Director's substantial delay in issuing the PTO's July 12, 2007 decision, the '579 Patent is in danger of expiring on August 18, 2007, without adequate time to secure judicial review of the PTO's July 12 decision to deny any extension of patent life under the Hatch-Waxman Act.  In particular, the one month of patent life remaining is not sufficient time for Somerset to obtain complete judicial review of the Director's PTE Denial.  If the patent were to expire, there is also a substantial risk that it could not be revived, even if the PTO or a court were later to conclude that Somerset was legally entitled to patent term extension. Accordingly, this Amended Complaint is accompanied by a Motion for Temporary Restraining Order and Preliminary Injunction requiring the PTO to extend the patent on a provisional basis pending judicial review of the PTO's July 12 decision.

## **Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

a.     Enter an order declaring that the Director's Interim Extension Denial for the '579 Patent is unlawful and reversing that decision accordingly;

b.     Enter an order declaring that the Director's Denial of the PTE Application for the '579 Patent is unlawful and reversing that decision accordingly;

c.     Order such provisional relief as is necessary to prevent expiration of the '579 Patent and to extend the term of that patent pending judicial review of the PTO's July 12, 2007 decision;

e.     Award costs, interest, and attorneys fees to Plaintiff; and

f.    Order such other and further provisional and permanent relief as the Court

deems just and appropriate.

_/s/ David E. Wilks_
David E. Wilks
Del. Bar I.D. 2793
**REED SMITH LLP**
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
Tel.  302.778.7560
Fax 302.778.7575

John M. Faust
**VINSON & ELKINS L.L.P.**
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
Tel. 202.639.6500
Fax  202.639.6604

Counsel for Plaintiff
Somerset Pharmaceuticals, Inc.

July 19, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOMERSET PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO.: 07-279 (GMS) |
| | ) | |
| v. | ) | |
| | ) | |
| JON W. DUDAS, in his official capacity | ) | |
| as Under Secretary of Commerce for | ) | |
| Intellectual Property and Director of the | ) | |
| United States Patent and Trademark Office, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 19, 2007, a copy of the foregoing **Opening Brief in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction** was served on the following counsel of record via CM/ECF and Hand Delivery:

COLM CONNELLY
UNITED STATES ATTORNEY
Patricia C. Hannigan
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

REED SMITH LLP

  /s/ David E. Wilks
David E. Wilks (DE Bar ID #2793)